# FREEDOM COURT REPORTING

## Page 1

1  IN THE U.S. DISTRICT COURT
2  MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CASE NUMBER:  1:05-CV-479-A
6
7  FRANK LETT,
8  Plaintiff(s),
9  vs.
10  RELIABLE RUSKIN d/b/a RELIABLE
11  PRODUCTS,
12  Defendant(s).
13
14  DEPOSITION OF KEN TAYLOR
15
16  S T I P U L A T I O N
17  IT IS STIPULATED AND AGREED,
18  by and between the parties through
19  their respective counsel that the
20  deposition of KEN TAYLOR may be taken
21  before Allison Miller, Commissioner, at
22  the offices of Wiggins, Childs, Quinn &
23  Pantazis, 301 19th Street North,

## Page 2

1  Birmingham, Alabama, on the 11th day of
2  April, 2006, commencing at or about
3  1:30 p.m.
4  IT IS FURTHER STIPULATED AND
5  AGREED that the reading of and
6  signature to the deposition by the
7  witness is waived, said deposition to
8  have the same force and effect as if
9  full compliance had been had with all
10  laws and rules of court relating to
11  taking of depositions.
12  IT IS FURTHER STIPULATED AND
13  AGREED that it shall not be necessary
14  that any objections be made by counsel
15  to any questions, except as to form or
16  leading questions, and that counsel for
17  the parties may make objections and
18  assign grounds at the time of the
19  trial, or at the time said deposition
20  is offered in evidence, or prior
21  thereto.
22  IT IS FURTHER STIPULATED AND
23  AGREED that notice of filing of the

## Page 3

1  deposition by the Commissioner is
2  waived.
3  In accordance with Rule 5(d)
4  of The Alabama Rules of Civil
5  Procedure, as Amended, effective May
6  15, 1988, I, Allison Miller am hereby
7  delivering to Mr. Jon Goldfarb, Esq.,
8  the original transcript of the oral
9  testimony taken on the 11th day of
10  April, 2006, along with exhibits.
11  Please be advised that this
12  is the same and not retained by the
13  Court Reporter, nor filed with the
14  Court.
15
16
17
18
19
20
21
22
23

## Page 4

1  I N D E X
2  EXAMINATION BY:           PAGE NO:
3  Mr. Goldfarb        6
4  Mr. Harbuck        125
5  Mr. Goldfarb        133
6
7  EXHIBITS:
8  Plaintiff's 4 -        93
9  Answers
10  Plaintiff's 5 -        94
11  Answers
12  Defendant's 1 -        131
13  Answers
14
15
16
17
18
19
20
21
22
23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

```
 1        APPEARANCES
 2
 3   APPEARING ON BEHALF OF THE PLAINTIFF:
 4     Mr. Jon Goldfarb, Esq.
 5     Ms. Allison Lowell, Esq.
 6     Wiggins, Childs, Quinn & Pantazis
 7     301 19th Street North
 8     Birmingham, Alabama 35205
 9
10   APPEARING ON BEHALF OF THE DEFENDANTS:
11     Mr. Jonathan S. Harbuck, Esq.
12     The Kullman Firm
13     600 University Park Place
14     Birmingham, Alabama 35209
15
16   ALSO PRESENT:
17     Mr. George Helms
18
19
20
21
22
23
```

Page 6

```
 1        I, Allison Miller, acting
 2   as Commissioner, certify that on this
 3   date as provided by Rule 30 of the
 4   Federal Rules of Civil Procedure and
 5   the foregoing stipulation of counsel,
 6   there came before me at the offices of
 7   Wiggins, Childs, Quinn & Pantazis, 301
 8   19th Street North, Birmingham, Alabama,
 9   KEN TAYLOR, witness in the above cause,
10   for oral examination, whereupon the
11   following proceedings were had:
12
13        KEN TAYLOR,
14   being first duly sworn, was examined
15   and testified as follows:
16
17        COURT REPORTER:  Usual
18   stipulations?
19        MR. GOLDFARB:  Yes.
20        MR. HARBUCK:  Read & sign
21   also.
22   EXAMINATION BY MR. GOLDFARB:
23     Q.   Can you state your name,
```

Page 7

```
 1   please?
 2     A.   Kenneth B. Taylor.
 3     Q.   What is your home address,
 4   please?
 5     A.   ████████████████████,
 6   ████████
 7     Q.   How do you spell Bonifay?
 8     A.   B-O-N-I-F-A-Y.
 9     Q.   What is your zip code?
10     A.   █████
11     Q.   What is your Social
12   Security number?
13     A.   ██████████
14     Q.   And your date of birth?
15     A.   ████████
16     Q.   Where do you work today?
17     A.   Reliable Products.
18     Q.   How long have you been
19   there?
20     A.   August will be seventeen
21   years.
22     Q.   How old were you when you
23   went to work for them?
```

Page 8

```
 1     A.   I'm thirty-nine so --
 2     Q.   Twenty-two?
 3     A.   Yeah, it was in '89.
 4     Q.   You started the same year
 5   that Mr. Henderson started; is that
 6   right?
 7     A.   Just about, yeah.  '89 is
 8   when I started, August.
 9     Q.   Did you know him before you
10   went to work there?
11     A.   No.
12     Q.   Where did you work before
13   Reliable?
14     A.   West Point Pepperell.
15   It's now West Point Apparel.
16     Q.   What did you do there?
17     A.   I was in utility service
18   when I first started, the first six
19   months, and then the last year I worked
20   there, I was what they call a boiler
21   cutter.
22     Q.   Is that the job you had
23   after high school?
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1   A.   No, sir. I worked at Home
2   Shirt Company when I got out of high
3   school.
4   Q.   How long did you do that?
5   A.   About two, two and a half
6   years.
7   Q.   Did you go to college?
8   A.   No.
9   Q.   You graduated from high
10  school?
11  A.   Yes, sir.
12  Q.   Have you been to any
13  college at all?
14  A.   Other than the -- we had
15  some courses we went through at the
16  University of Alabama, which has been a
17  few years back.
18  Q.   What kind of courses?
19  A.   It was in management.
20  Q.   Management courses?
21  A.   Yes, sir.
22  Q.   That was through this
23  company here?

Page 10

1   A.   Yes.
2   Q.   When you started seventeen
3   years ago at Reliable -- was it
4   Reliable Products then --
5   A.   Yes.
6   Q.   -- what was your job?
7   A.   Saw operator.
8   Q.   How long did you do that?
9   A.   I would say around eight
10  years maybe; seven to eight.
11  Q.   Where did you work as a saw
12  operator; what departments?
13  A.   Department 4 at that time.
14  Q.   The whole time?
15  A.   Yes, sir, the whole time.
16  Q.   Was that in -- was Frank
17  also in Department 4?
18  A.   No, sir.
19  Q.   Where was he at that time?
20  A.   Department 2.
21  Q.   Departments 4 and 2, do you
22  remember when they were together?
23  A.   Department 2, when the

Page 11

1   Miami line come in, they were
2   assembling those in Department 4. Now,
3   when it separated off, I don't know,
4   because I wasn't involved in that. I
5   mean, my duties was on the other lines,
6   so I don't know.
7   Q.   Was --
8   MR. HARBUCK: Were you
9   finished with your answer?
10  THE WITNESS: Yes, sir.
11  Q.   Was Frank ever a lead
12  person over you?
13  A.   Not that I know of, no.
14  Now, he was -- I'm not familiar -- let
15  me go back to the dates, but I have
16  worked -- no, that was during the time
17  that Harmon Sellers was the lead person
18  when I worked in the area with Frank,
19  but I don't believe Frank was -- until
20  Harmon retired on disability is when
21  Frank stepped up, and I don't believe I
22  had any -- I did not work back there in
23  his department.

Page 12

1   Q.   Harmon Sellers is there
2   now?
3   A.   No, sir, his brother,
4   Herman, was there.
5   Q.   You have Herman and Harmon?
6   MR. HARBUCK: Herman and
7   Harmon are two different people?
8   THE WITNESS: Yes.
9   MR. HARBUCK: It must have
10  been confusing growing up.
11  Q.   So Herman Sellers -- when
12  Herman left, did Frank take over his
13  job?
14  A.   Yes.
15  Q.   My understanding is Frank
16  became a lead person in 1994; does that
17  sound about right?
18  A.   I would be guessing. I
19  don't know.
20  Q.   You became -- you were a
21  saw operator from '89 until -- well,
22  '96 or '97?
23  A.   Best of my knowledge.

3  (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1    Q.   Where were you -- when you
2  were a saw operator, you were in
3  Department 4; right?
4    A.   Yes, sir.
5    Q.   Do you remember Frank being
6  a lead person in Department 4?
7    A.   No, sir.
8    Q.   Do you remember him being a
9  lead person in Department 2 when you
10  were a saw operator?
11    A.   That's the time that I
12  don't know if he was already a lead
13  person before I became a lead person in
14  Department 4.  I just -- I don't know
15  the time there.
16    Q.   Were you a lead person at
17  the same time, at least for some of it,
18  that Frank was a lead person?
19    A.   I believe, the best I can
20  remember.
21    Q.   When did you become a lead
22  person?  You said you were hired in --
23    A.   I would be guessing at the

Page 14

1  date.
2    Q.   You were hired in '89, and
3  you said you were a saw operator for
4  eight years?
5    A.   I believe about eight
6  years.
7    Q.   So after you were a saw
8  operator, did you become a lead person?
9    A.   Yes, sir.
10    Q.   And then somewhere around
11  '97ish you became a lead person --
12    A.   Huh-huh.
13    Q.   -- the best you can
14  remember?
15    A.   Best I can remember.
16    Q.   What area were you a lead
17  person over?
18    A.   It was in Department 4.
19    Q.   How did you become a lead
20  person?
21    A.   The lead person had health
22  problems and had to go on disability,
23  and I took over his duties.  And I was

Page 15

1  going -- when he went on permanent
2  disability, I was made lead.
3    Q.   Okay.  That was Herman?
4    A.   That was Wilmer Fountain.
5    Q.   So Wilmer left, and you
6  took over Wilmer's job?
7    A.   Huh-huh.
8    Q.   Yes?  When you say huh-huh,
9  you need to say yes.  That's a yes;
10  right?
11    A.   Yes.
12    Q.   So Wilmer leaves and you
13  become lead person.  How long were you
14  a lead person in Department 4?
15    A.   To the best of my
16  knowledge, about two years.
17    Q.   And --
18    A.   A year and a half, two
19  years.
20    Q.   So around 1999, did you
21  move to a new job?
22    A.   Yes.
23    Q.   What job?

Page 16

1    A.   Assistant supervisor.
2    Q.   Over what area?
3    A.   Department 5 -- 4, 5, and
4  2.
5    Q.   Had you ever worked as an
6  assembler in any department other than
7  4, or did you ever work as an assembler
8  at all?
9    A.   Yes, sir.
10    Q.   You were a saw operator.
11  When did you work as an assembler?
12    A.   When my sawing was caught
13  up, I went on the floor and assembled.
14    Q.   Is that what saw operators
15  do; when they get done sawing, they
16  assemble?
17    A.   Yes.
18    Q.   Where did you work as an
19  assembler?
20    A.   Mostly in Department 4.
21    Q.   Had you ever worked in
22  Department 5 as an assembler?
23    A.   No.

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1    Q.   Department 2?
2    A.   Yes.
3    Q.   In '99, somebody -- who
4   made you the assistant supervisor?
5    A.   David Burch.
6    Q.   Who is that?
7    A.   My plant manager; HVAC
8   production manager.
9    Q.   How did he go about making
10  you assistant supervisor?  Did you
11  apply for the job?
12   A.   No.
13   Q.   He just came up to you and
14  told you you were going to be the
15  assistant supervisor?
16   A.   He come and asked me would
17  I be interested in moving up and taking
18  on the assistant position, and I told
19  him I would like to give it a try.
20   Q.   Then what happened?
21   A.   And I was a made assistant.
22   Q.   Did you have to fill out
23  any forms or any paperwork to move to

Page 18

1   that job?
2    A.   Best of my knowledge, no.
3    Q.   Did you have to answer any
4   questions to move into that job; any
5   written questions?
6    A.   To the best of my
7   knowledge, no.
8    Q.   You've told me how you
9   moved into that job?
10   A.   Yes.
11   Q.   David Birchfield is -- what
12  is his job now?  Is it Burch?
13   A.   Burch.
14   Q.   What is his job?
15   A.   His job is HVAC production
16  supervisor now.
17   Q.   Still the same job he had
18  then?
19   A.   At the time, he was a
20  supervisor.
21   Q.   He's moved up to HVAC
22  manager?
23   A.   Huh-huh.

Page 19

1    Q.   Yes?
2    A.   Yes.
3    Q.   He's a white guy; right?
4    A.   Yes, sir.
5    Q.   How long did you hold the
6   assistant supervisor job?
7    A.   Probably a year.
8    Q.   So from '99 to 2000?
9    A.   A year and a half,
10  somewhere right in there.  I've been a
11  supervisor for about four and a half to
12  five years.
13   Q.   Around 2000 or 2001 you
14  became a supervisor?
15   A.   Supervisor.
16   Q.   How did you move to
17  supervisor?
18   A.   Our director of operations
19  or plant manager retired.
20   Q.   Who is that?
21   A.   That's Bobby Ray Cross.  He
22  retired, and our plant manager, Clyde
23  Cook, stepped into production manager

Page 20

1   -- production operations.
2    Q.   So Clyde advances and gets
3   promoted; right?
4    A.   Right.  And David promotes
5   -- or gets promoted to HVAC manager.
6    Q.   He moved -- David moved
7   into Clyde's job?
8    A.   I wouldn't say it was his
9   job.  I just -- I would just say that
10  David was made HVAC production manager.
11   Q.   Who held that job before
12  David did?  What was Clyde's job before
13  Clyde moved into director?
14   A.   Clyde pretty much -- well,
15  I really don't know how to answer
16  that.  Clyde pretty well run the whole
17  company there, and it got to the point
18  where he had -- he had some help on the
19  architectural side, which is Roger
20  Pete, and when Clyde had to -- moved up
21  and he needed help on the HVAC side,
22  took David over to watch and manage
23  HVAC.

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1    Q.   So David moved from the
2  supervisor job into that HVAC job?
3    A.   Yes.
4    Q.   When was that; 2001ish?
5    A.   That was during the same
6  time.
7    Q.   Around 2001?
8    A.   Yes.
9    Q.   And then in 2000, did your
10  job become open, the job you had
11  occupied as assistant supervisor?
12    A.   I'm trying to think back.
13  Give me a minute.  When I become
14  assistant, Stan come over into the --
15  my lead person area that I had.
16    Q.   Okay.
17    A.   Did I word that right?
18    Q.   Yes.
19      MR. HARBUCK:  I'm not sure
20  you answered the question he asked,
21  though.
22    Q.   Let's --
23      MR. HARBUCK:  Did your

Page 22

1  assistant supervisor position become
2  open when you moved into the --
3      THE WITNESS:  No, not at
4  that time.
5    Q.   Let's do this:  When you
6  moved into the assistant supervisor
7  job, you had been a lead person?
8    A.   Right.
9    Q.   So that opened up the lead
10  person job; yes?
11    A.   Yes.
12    Q.   And Stan moved into your
13  lead person job --
14    A.   Yes.
15    Q.   -- when you moved into the
16  assistant supervisor job?
17    A.   Yes.
18    Q.   That was around 2001?
19    A.   Yes.
20    Q.   And then what happened is
21  -- what -- that was the lead person in
22  Department 4 --
23    A.   Yes.

Page 23

1    Q.   -- on the day shift?
2    A.   Yes.
3    Q.   Prior to that, Stan had
4  been doing the night shift lead person
5  job when the night shift was running;
6  is that right?
7    A.   To the best of my
8  knowledge, yes.
9    Q.   So then you moved to
10  assistant supervisor, Stan moves to
11  your lead person job, and then you
12  worked as a lead person -- I'm sorry,
13  as an assistant supervisor for a couple
14  of years; right?
15    A.   Yes, best of my knowledge.
16    Q.   I mean, '99 until 2001,
17  somewhere in there?
18    A.   Yes.
19    Q.   And then in 2001, you move
20  into the supervisor job?
21    A.   Yes.
22    Q.   And that leaves -- and you
23  moved out of the assistant supervisor

Page 24

1  job?
2    A.   Yes.
3    Q.   Was there an assistant
4  supervisor vacancy when you moved into
5  the supervisor job?
6    A.   There was a vacancy, but
7  there was nothing posted or anything;
8  in other words, the job wasn't going to
9  be filled at that time.
10    Q.   So for a while there, you
11  had no assistant supervisor --
12    A.   Yes.
13    Q.   -- and you did the work of
14  the assistant supervisor as well as a
15  supervisor; right?
16    A.   Right.
17    Q.   At some point in time, did
18  you decide you needed some help from an
19  assistant supervisor?
20    A.   Yes.
21    Q.   And you decided that you
22  needed to bring back the assistant
23  supervisor job?

6  (Pages 21 to 24)

## FREEDOM COURT REPORTING

Page 25

```
1      A.   Yes.
2           MR. HARBUCK:  Object to the
3   form.
4      Q.   When you brought back --
5   when you -- did you reopen the
6   assistant supervisor job at that time?
7      A.   We went through -- there
8   was -- I'm trying to think of the
9   events we went through.  Would you ask
10  the question again for me?
11     Q.   My understanding is that
12  for a while, you had no person in the
13  assistant supervisor job and you were
14  doing the work of the -- that you had
15  been doing as assistant supervisor and
16  you were also doing supervisor work?
17     A.   Right.
18     Q.   That went on for a few
19  years; right?
20     A.   Yes.
21     Q.   At some point in time,
22  there was a need for the position of
23  assistant supervisor?
```

Page 26

```
1      A.   Yes.
2      Q.   Did you decide that, that
3   you needed some help?
4      A.   Yes.
5      Q.   So you decided to open up
6   the assistant supervisor job?
7      A.   Me and my manager talked
8   about it, and we felt that it would be
9   best.
10     Q.   Your manager, David?
11     A.   Yes.
12     Q.   When did you -- did you go
13  to David and say I need some help,
14  basically?
15     A.   Best of my knowledge, yes.
16     Q.   Did you say let's -- did
17  you ask him if you could reopen the
18  assistant supervisor job?
19     A.   Yes.
20     Q.   Did you have somebody in
21  mind at the time that you were going to
22  put in that job?
23     A.   To the best of my
```

Page 27

```
1   knowledge, no.  When me and David had
2   spoke, he wanted to fill out -- we made
3   up a sheet with some questions on it,
4   and we wanted to make sure that
5   everyone in the department under my
6   area was given the sheet, and any of
7   those outside of the area that was
8   interested in it, to come to me and
9   ask, and I would give them a sheet.
10     Q.   Who would be in your area?
11     A.   There would be lead
12  people.  It would be Stan Henderson,
13  Harmon Sellers, Wendell Ard, and Frank
14  Lett.
15     Q.   Only lead people?  You said
16  everyone.
17     A.   At the time, okay, that was
18  all lead people.
19     Q.   Could anybody --
20     A.   Yes.
21     Q.   Did you give it to anybody?
22     A.   Anybody that come to me and
23  was interested.
```

Page 28

```
1      Q.   Who else came to you and
2   expressed an interest?
3      A.   Ted Hampton and Corky --
4   Walter Newman.
5      Q.   Anybody else?
6      A.   None that I know of.
7      Q.   Did they all fill out those
8   -- the questions and answers?  Did they
9   all answer the questions?
10     A.   Not all of them.
11     Q.   Who didn't?
12     A.   Harmon Sellers, he told me
13  up front that he was not interested.
14  Wendell Ard did not return his, and the
15  last day that I requested to have those
16  back was when I got Frank's.
17     Q.   Did you make up -- did you
18  type out the questions?
19     A.   No.
20     Q.   Who did that?
21     A.   David Burch.
22     Q.   Exhibit 2, are those the
23  questions?
```

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  A.  Yes, sir.
2  Q.  Why is the top part limited
3  -- why does it only say Department 5?
4  You see what I'm talking about there?
5  A.  Yes, sir.  I have no idea.
6  Q.  You didn't do that?
7  A.  No, sir, I didn't.
8  Q.  What you did is you handed
9  that sheet to the people and told them
10  to fill it out; right --
11  A.  Yes, sir.
12  Q.  -- the people we talked
13  about?
14  A.  Yes.
15  Q.  Did you tell them anything
16  when you told them to fill it out?
17  A.  Yes.
18  Q.  What did you tell them?
19  A.  I told them that I needed
20  these answered, and I give them a date,
21  a time frame to return them.  If I did
22  not have these back by then, I would
23  accept that as they were not interested

Page 30

1  in the job.
2  Q.  That's all you told them?
3  A.  Yes.
4  Q.  When did you give it to
5  them?
6  A.  I cannot -- to the best of
7  my knowledge, I can't -- it was -- I
8  cannot remember that date.
9  Q.  How long before the
10  decision was made to fill that job with
11  Stan Henderson did you give out that
12  sheet?
13  A.  I cannot remember that
14  time.
15  Q.  If the position was filled
16  in October, 2004, does that help you
17  remember when you gave out the sheet?
18  Do you know if it was in 2003 or 2004?
19  A.  I cannot remember.
20  Q.  All right.
21  A.  I mean, that's the time
22  frame that I -- I just -- I just can't
23  remember and be able to accurately give

Page 31

1  you any dates.
2  Q.  Do you remember what the
3  weather was like?  Was it cold?
4  A.  No, sir.
5  Q.  You don't even remember
6  that?
7  A.  No.
8  Q.  No?
9  A.  No, sir.
10  Q.  When you gave out the
11  sheets, you told them they had a
12  certain deadline.  How long did they
13  have?
14  A.  Best of my knowledge, it
15  was two full weeks or three full
16  weeks.  It was either/or.
17  Q.  You didn't say anything to
18  them about the job that they were going
19  to be filling if they got the job, you
20  just handed them the sheet; right?
21  A.  I give them the sheet and
22  told them they needed to be answered,
23  and I give them a deadline.

Page 32

1  Q.  Right.
2  A.  And then I told them that I
3  had to have these back before I would
4  accept that they wasn't interested in
5  the job.
6  Q.  Did you tell them it would
7  be the same job you had held
8  previously?
9  A.  No, sir.
10  Q.  You told me everything you
11  told them?
12  A.  Best of my knowledge.
13  Q.  The only one -- the only
14  lead person over Department 2 at that
15  time was Frank Lett; right?
16  A.  Right.
17  Q.  The other -- where did
18  Wendell work; Department 4?
19  A.  Department 4.
20  Q.  And Stan was over 5 as a
21  lead person?
22  A.  There was two lead people
23  in Department 4.

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  Q. And was there a Department
2  5?
3  A. Yes.
4  Q. Who was the lead person
5  there?
6  A. Harmon Sellers and Mavis
7  Baxley.
8  Q. Was Mavis still there?
9  A. Yes.
10  Q. You didn't give her a
11  sheet?
12  A. I can't remember on that.
13  Q. Any reason why you wouldn't
14  give it to her?
15  A. She's been gone so long, I
16  have completely --
17  MR. HARBUCK: Are you
18  saying you think she might have no
19  longer been a lead person at that
20  time?
21  MR. GOLDFARB: He can
22  answer. You don't need to do that.
23  A. That's --

Page 34

1  Q. Do you remember who you
2  gave this to other than the people you
3  told me?
4  A. Yeah, I believe she was
5  planning on stepping down.
6  Q. Had she done it at that
7  time?
8  A. She had been talking with
9  us, but --
10  Q. Harmon had been talking
11  about retiring, hadn't he?
12  A. I'm a supervisor, and I've
13  asked him a couple of times, and he
14  tells me that when he gets ready to
15  retire, he will let me know. So I
16  don't know, you know, if he's making
17  that kind of comment to others. I
18  don't know.
19  Q. You have asked him a couple
20  of times when he's going to retire?
21  A. Yes.
22  Q. He told you he would let
23  you know?

Page 35

1  A. Yes.
2  Q. Yes?
3  A. Yes.
4  Q. Why are you asking him when
5  he's going to retire?
6  A. Just in general
7  conversation. We just had an employee
8  to retire, and that was one day just
9  this last week that I talked with him,
10  because his health is starting to
11  deteriorate a little bit, and I know
12  some other things we had talked about
13  and --
14  Q. Harmon; right?
15  A. Yes. There was another
16  time before I made the decision on --
17  to an assistant that another employee
18  was making a comment about hitting him
19  up about retiring, and I talked with
20  him again and told him that if this
21  employee was bothering you about asking
22  you this type of questions, tell him
23  it's none of his business. That's the

Page 36

1  only time he and I have had any talk
2  about retirement.
3  Q. You talked to him last week
4  about him retiring?
5  A. I believe it was last week.
6  Q. You said his health is
7  deteriorating?
8  A. It's getting to the point
9  where he -- the duties that he's doing,
10  we're trying to look at things to let
11  the younger try to take the load and
12  use him to where he's -- his abilities
13  are more in figuring up orders and
14  counting materials. That's how we want
15  to try to start working with him.
16  Q. Would he move out of the
17  lead person job?
18  A. No.
19  Q. Would you get somebody else
20  to help him out?
21  A. Someone would be helping
22  him in the -- in what area he's at
23  right there.

9 (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1    Q.   As a lead person?
2    A.   To some extent, yes.
3    Q.   Who do you have in mind?
4    A.   We've got Christy Hudson.
5    She's been training. She has learned
6    several of the jobs in that area. She
7    has learned more, and we feel that
8    she's capable. In Harmon's absence,
9    she fills in.
10    Q.   How old is she?
11    A.   I'm guessing, I would say,
12    twenty-five.
13    Q.   Have you asked anybody else
14    when they're going to retire?
15    A.   No, sir.
16    Q.   When you got the sheets
17    back, the answer sheets, did you read
18    them over from the people?
19    A.   Yes, sir.
20    Q.   Did you make your decision
21    as who to hire based on the answers to
22    the questions?
23    A.   No, sir.

Page 38

1    Q.   What did you make your
2    decision on? What did you base your
3    decision on?
4    A.   I wanted to see just what
5    was -- what they had to offer on paper
6    and their mental aspect there, as well
7    as I wanted to know -- looking at their
8    experience, knowledge. That's what I
9    based my decision off of.
10    Q.   And did you decide to give
11    the job to anybody other than Stan
12    Henderson?
13         MR. HARBUCK: Object to the
14    form.
15    A.   No.
16    Q.   Stan was your first choice?
17    A.   Yes.
18    Q.   Stan is who you picked --
19    A.   Yes.
20    Q.   -- based on what we just --
21    what you just told me?
22    A.   Yes.
23    Q.   You said that -- you

Page 39

1    mentioned Christy Hudson has been
2    training in various areas. What areas
3    has she trained in?
4    A.   The LFD, GXHD area.
5    Q.   What is that?
6    A.   Department 5.
7    Q.   How do you decide -- how
8    does Christy go about getting training;
9    Christy or anybody? I'm trying to
10    understand how a person can get
11    training in order to advance such as
12    Christy.
13    A.   A lot of times, the
14    employee will step up and take the
15    initiative to do more. She has shown
16    that type of initiative. By showing
17    so, I added more to her, more -- in
18    this part of the training.
19    Q.   Mr. Lett -- did Mr. Lett
20    have experience in Department 4?
21    A.   To my knowledge, I don't
22    know. When I come there --
23    Q.   In '89?

Page 40

1    A.   -- in '89, I cannot
2    remember exactly what he was working
3    on, but very little, if any, in 4 that
4    I can remember.
5    Q.   Do you know if sometimes he
6    came in on Saturdays to help out in
7    Department 4 do assembly work since
8    you've been there?
9    A.   That, I cannot remember. I
10    can't remember that.
11    Q.   Do you know if he came in
12    sometimes to help out in Department 5
13    to do assembly work?
14    A.   Best I can remember, it's
15    always been mainly Department 2, and
16    when Department 5 or 2 is not working,
17    he would go to architectural and work.
18    Q.   So it's your testimony that
19    he did not work in Departments 4 or 5?
20    A.   I'm saying to the best of
21    my knowledge. Now, I don't recall.
22    Q.   Is there -- do you keep
23    records of where people work? Like if

10 (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1  you come in -- let me finish.  Say
2  somebody has to come in on a Saturday
3  and they want to work in Department 5
4  because they need -- you need some
5  extra help over there, would it be
6  recorded anywhere on your payroll
7  records or your -- some type of
8  documents showing where that person
9  worked on the Saturday when they came
10  in?
11      A.   Within a year, it should
12  be, yes.
13      Q.   What do you mean within a
14  year?
15      A.   Within a year -- as long as
16  I keep my records is within a year.
17  Now, I don't know what -- the
18  accounting department, if they have
19  those records, I do not know.
20      Q.   But there would be
21  something that showed the departments
22  that Frank worked in when he came in
23  and worked outside of 2?

Page 42

1      A.   Like I say again, I don't
2  know.
3      Q.   You don't know if you still
4  have it, but you do keep up --
5      A.   I don't know how long they
6  keep time cards or such as that, that
7  type records.  I don't know.
8      Q.   If Frank came in and worked
9  in Department 4, would he sign in on a
10  sheet, or is it just recorded
11  somewhere?
12      A.   Right now there's no longer
13  a Department 4.  If he was to come in
14  and work in a department, he would
15  clock in, and at the end of the day, he
16  would have his hours.  If he worked
17  eight hours in Department 2 and then
18  come over and worked two hours in
19  Department 5, he would mark it as that.
20      Q.   On a sheet or something?
21      A.   On a time card.
22      Q.   Actually mark it on the
23  time card itself?

Page 43

1      A.   Yes.
2      Q.   That's what you're supposed
3  to do --
4      A.   Yes.
5      Q.   -- to keep up with what the
6  labor costs are?
7      A.   Yes.
8      Q.   Is there anything else
9  other than a handwritten time card that
10  sometimes employees might write on and
11  sometimes they might not that indicates
12  where they would work?
13          MR. HARBUCK:  Object to the
14  form.
15          John, ask the question with
16  a little bit different tone, would
17  you?
18          MR. GOLDFARB:  I don't know
19  what that's supposed to mean.  What
20  tone are you talking about?
21          MR. HARBUCK:  I don't like
22  the sarcastic tone of that last
23  question.

Page 44

1          MR. GOLDFARB:  If we want
2  to turn this type of deposition into
3  that, that's fine with me, but don't
4  answer anymore questions for your
5  client.
6          MR. HARBUCK:  It hasn't
7  been --
8          MR. GOLDFARB:  I'm not
9  being sarcastic.
10      Q.   Do you think I'm being
11  sarcastic?  All I'm --
12          MR. HARBUCK:  He doesn't
13  have to answer that.
14      Q.   Sometimes you have an
15  employee that comes in, and maybe Frank
16  forgets to write it down.  All I'm
17  saying is, on his time card, is there
18  any other record in the particular
19  department, you know, that would show
20  Employee X built this particular vent,
21  you know, showing who is working over
22  there?
23      A.   No, sir.

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    Q.   Nothing like that?
2    A.   No.
3    Q.   How do you know where the
4    employee works?  If you wanted to go
5    today and figure out who is working in
6    Department 4, how would you figure that
7    out?
8    A.   I would go look.
9    Q.   You have to go look, you
10   can't look at any documents?
11   A.   I assign pretty much in
12   Department 5 as to where -- what I want
13   done through the lead people.  Frank,
14   he has his people pretty well -- he
15   assigns those as to where he wants
16   them.  Now, for me to go and be able to
17   tell where he's doing what, I pretty
18   much know who is doing what.
19   Q.   If there's somebody out
20   there that works in Department 5, is it
21   every day that they come in and work in
22   Department 5, do they have to fill out
23   on their time card that they're working

Page 46

1    in Department 5, or do they just do
2    that when they go outside their
3    department?
4    A.   They're supposed to do it
5    in the department, the same department,
6    if all the hours are in the same
7    department.  Some don't, but especially
8    when they're working outside of the
9    department, yes, they're supposed to do
10   that.
11   Q.   After they indicate that on
12   the time card, what do you do?
13   A.   I transfer it to my records
14   so when the time cards are turned in,
15   everything is matching; my records and
16   their time cards.
17   Q.   You have records that
18   summarize what the time cards are?
19   A.   Yes.
20   Q.   And those are the records
21   you keep for a year?
22   A.   Yes.
23   Q.   And after a year, you throw

Page 47

1    them out; is that right?
2    A.   Yes.
3    Q.   Do you have -- do you know
4    what a record retention policy is?
5    Have you ever heard of that?
6    A.   No.
7    Q.   Those courses you went to
8    at Alabama never mentioned anything
9    like that?
10   A.   No.
11   Q.   Does your company have any
12   kind of policy where it says you have
13   to maintain your records for a
14   particular period of time?
15   A.   Not that I know of.
16   Q.   Have you ever heard when a
17   lawsuit is filed against you that you
18   have to keep records?
19   A.   No.
20   Q.   Did you know that Frank had
21   filed an EEOC charge sometime before
22   his lawsuit was filed?
23   A.   I had heard something.

Page 48

1    Q.   Do you know what I mean --
2    an EEOC charge is a thing you file with
3    the EEOC and then the actual lawsuit is
4    filed in court, do you know -- like a
5    complaint, do you know what I'm talking
6    about?
7    A.   I had heard that Frank had
8    -- was seeing a lawyer to make charges
9    against Reliable.  As far as the exact
10   way it was worded, I cannot remember.
11   And that's about all I --
12   Q.   Have you ever seen his EEOC
13   charge?
14   A.   No.
15   Q.   Have you ever seen the
16   complaint he filed in court?
17   A.   No.
18   Q.   Has anybody else ever --
19   that's worked at Reliable since you
20   have been there filed an EEOC charge
21   against the company that you know of?
22   A.   To the best of my
23   knowledge, I do not know.

12 (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1    Q.    There's -- how many people
2    work at that Reliable company down
3    there?
4    A.    Total employees?
5    Q.    Yes.
6    A.    Six fifty to seven hundred.
7    Q.    How many of those are
8    African-American?
9    A.    I don't know that
10   information.
11   Q.    Do you know how many
12   African-American supervisors you have?
13   A.    I do not know that.
14   Q.    Have you ever known one?
15   A.    No, sir.
16   Q.    There's no African-American
17   managers either; is that correct?
18   A.    No, sir.
19   Q.    That's wrong?
20   A.    As far as the title of
21   manager, no, sir.
22   Q.    Other than Frank, is there
23   any other person who is black who has

Page 50

1    any supervisory duties?
2    A.    Okay.  I do not know for
3    sure if he's a lead person, but I
4    believe Cortez Moore, I want to think,
5    is something to do with management, but
6    I'm not for sure.
7    Q.    Where does he work?
8    A.    Architectural.
9    Q.    How long has he -- how long
10   do you think he's had some supervisory
11   job duties?
12   A.    I do not know.
13   Q.    If anything, you think it's
14   a lead or you think it's a supervisor?
15   A.    I would think it would be a
16   lead.
17   Q.    But you don't work -- you
18   do not work over in architecture?
19   A.    No.
20   Q.    Right?
21   A.    Right.
22   Q.    Have you ever worked over
23   there?

Page 51

1    A.    No, sir, I have not.
2    Q.    Do you know what Frank did
3    when he worked over there?
4    A.    No, sir.
5    Q.    Did Frank ever teach you
6    how to work the saw?
7    A.    No, sir.
8    Q.    Do you know how to weld?
9    A.    No, sir.
10   Q.    Have you -- do you go to
11   Frank when you need welding jobs done?
12   A.    Yes.
13   Q.    Does he supervise the
14   welders?
15   A.    Yes, sir.
16   Q.    Are you the person who --
17   well, I understand -- I took Stan's
18   deposition not long ago, and he worked
19   in Department 4 as a lead person and
20   Department 5 as a lead person; is that
21   right, and 4 became 5?
22   A.    Yes.
23   Q.    And then he worked at night

Page 52

1    as a lead person; is that right?
2    A.    Yes.
3    Q.    You know that, also?
4    A.    Yes.
5    Q.    When he worked at night as
6    a lead person, how did he become a lead
7    person at night, do you know?
8    A.    I do not know.
9    Q.    You had nothing to do with
10   that --
11   A.    No.
12   Q.    -- correct?
13   A.    Correct.
14   Q.    When he moved to Department
15   4 as a lead person, what did you have
16   to do with that?
17   A.    I really don't know.  When
18   he come over, he took my place as the
19   lead person.  He had had some
20   experience in the area, so he wasn't
21   completely lost as to the type of
22   grills that's being done.  Best of my
23   knowledge, David had no problem with

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  him coming to that job.
2      Q.  Did you make the decision
3  to make him lead person, though?
4      A.  Best of my knowledge, no.
5      Q.  Did you recommend him to
6  replace you?
7      A.  I would have to say yes
8  because of his experience there.
9      Q.  So did you discuss that
10  with David when you recommended him?
11      A.  Yes.
12      Q.  Anybody else?
13      A.  No.
14      Q.  And that's when he became
15  the lead person, which we think was, I
16  guess, around '99 when you became
17  assistant supervisor, somewhere in
18  there; right?
19      A.  Yes.
20      Q.  And then you became
21  supervisor in 2001 and he remained lead
22  person; he meaning Stan; right?
23      A.  Yes.

Page 54

1      Q.  And then he was -- at some
2  point, Stan moved over to Department 5,
3  because 4 and 5 combined; right?
4      A.  Yes.
5      Q.  At that time, you were the
6  supervisor.  Did you have some
7  involvement in moving Stan over to 5?
8      A.  That was -- yes, due to the
9  paperwork.  See, when Mavis Baxley
10  stepped down, that's when Stan came
11  over.
12      Q.  Okay.
13      A.  Then what we called a
14  remapping of our production flow and
15  presses come through, and that's when I
16  made the decision as to who I wanted to
17  be -- or I made the decision I needed a
18  -- as an assistant, and that's when we
19  gave out the questionnaires.  And,
20  still, once I received the
21  questionnaires, that's when I realized
22  -- I didn't want to make -- I was
23  wanting to wait until the plant was --

Page 55

1  or my area was realigned to make sure
2  that they -- an assistant would be
3  needed.
4      And then once we seen, yes,
5  one is needed, then that's when we sent
6  out the questionnaires and got those
7  back, and then we made the decision.
8      Q.  How did -- explain to me
9  how your area got realigned.  You said
10  something about Mavis stepping down.
11      A.  Yes, she wanted to step
12  down.
13      Q.  All right.
14      A.  I don't know exactly what
15  all -- if it was a step down.  I know
16  she was there long enough to train Stan
17  in that area, and she eventually went
18  to what they call -- what we call a
19  specialist, took that duty, and Stan
20  took over the lead person duties.
21      Q.  Did her pay go down when
22  she became a specialist?
23      A.  I can't say.

Page 56

1      Q.  Mavis -- is it Mavis?
2      A.  M-A-V-I-S.
3      Q.  What is her last name?
4      A.  Baxley.
5      Q.  So Mavis voluntarily steps
6  down; right?
7      A.  Yes.
8      Q.  How old is Mavis about?
9      A.  Right now, I would say at
10  least fifty.
11      Q.  She's a white lady?
12      A.  Yes.
13      Q.  So Mavis steps down into
14  the specialist job?
15      A.  Yes.
16      Q.  What is a specialist?
17      A.  It's any kind of special
18  projects, that sort of duty.
19      Q.  You don't know anything
20  that happened to her salary?
21      A.  No.
22      Q.  So that is what happened --
23  so -- because she steps down, tell me

14 (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

```
1    what chain of events led to this
2    assistant supervisor job.  She's over
3    5; is that right?
4         A.    She was over the 4000 area
5    or 5.
6         Q.    What --
7         A.    4000-T line, the strip line
8    area.  There's different lines --
9         Q.    In 5?
10        A.    -- in 5.
11        Q.    So she's over the 4000
12   line?
13        A.    Huh-huh.
14        Q.    So her stepping down leaves
15   that line open --
16        A.    Yes.
17        Q.    -- for a lead person to
18   take it over?
19        A.    Yes.
20        Q.    Who takes that over?
21        A.    Stan.
22        Q.    And Stan was over what at
23   the time?
```

Page 58

```
1         A.    He was in the LFD -- I'm
2    sorry, IDSG, AIG, MCD.
3         Q.    Can you say that slower?
4         A.    IDSG, AIG, MCD.
5         Q.    So at the time, Stan was
6    over that area?
7         A.    Yes.
8         Q.    Is that all Stan was
9    over --
10        A.    Yes.
11        Q.    -- is that one line?
12        A.    Three lines.
13        Q.    That's three lines?
14        A.    Yes.
15        Q.    Was Mavis only over one
16   line?
17        A.    No.
18        Q.    The 4000 area --
19        A.    Is about four lines.
20        Q.    That's four lines.  Okay.
21   So Stan is going to take on Mavis' four
22   lines plus his three lines.  And if
23   he's going to -- I guess if he had
```

Page 59

```
1    stayed lead person, he would have all
2    those eight lines; right?
3         A.    That's the event where we
4    come in and realigned.
5         Q.    Right.
6         A.    That's where we took some
7    of the lines, the lighter grills, and
8    pulled them down to the large area and
9    made them, the lighter, smaller type
10   grills in his area, and kept the larger
11   linear grills in the -- in Stan's area
12   and Harmon's area.  So instead of
13   having four lead people, we broke it
14   down to three lead people by the
15   remapping and realignment of the
16   machine.
17        Q.    So it would be Stan,
18   Harmon, and Wendell --
19        A.    Yes.
20        Q.    -- right?
21        A.    Yes.
22        Q.    And that's taking Mavis out
23   of the picture?
```

Page 60

```
1         A.    Yes.
2         Q.    And I don't know if -- so
3    what you did is you took some of the
4    lighter ones, you said, and you moved
5    those to --
6         A.    Yeah, the -- actually, it
7    was the door grill, RPD531, and the MCD
8    line.  It was transferred down into the
9    -- into Wendell's area.
10        Q.    To Wendell's area.  What is
11   his last name?
12        A.    Ard, A-R-D.
13        Q.    MCD, which had previously
14   been with Stan, then moves over to
15   Wendell?
16        A.    Yes.
17        Q.    And then Stan -- is Stan
18   still over IDSG and AIG?
19        A.    I'm sorry, it's another
20   line that got moved to Wendell because
21   of the way we had to line it up.  We
22   had to slip that line, heavy duty line,
23   in there.
```

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  Q.  I want to make sure I
2 understand.  MCD went to Wendell?
3  A.  Yes.
4  Q.  Did IDSG to go Wendell?
5  A.  Yes, and AIG.  All three of
6 them went to --
7  Q.  Those --
8  A.  It was the three that Stan
9 had.
10  Q.  All three of Stan's lines
11 go to Wendell?
12  A.  Right.
13  Q.  And then all -- then you --
14 what you've got is all four of Mavis'
15 line is still out there.  Where do
16 those go?
17  A.  That's Stan's.
18  Q.  Mavis' lines go to Stan,
19 Stan's lines go to Wendell?
20  A.  Yes.
21  Q.  Where do Wendell's lines go
22 to, or do they stay with the lines
23 Wendell is over already?

Page 62

1  A.  They're all together.
2  Q.  Wendell got Stan's lines
3 added to him --
4  A.  Yes.
5  Q.  -- and Stan picks up Mavis'
6 lines?
7  A.  Yes.
8  Q.  So Wendell really took on a
9 lot more; right?
10  A.  As far as the lines, yes,
11 but workload, workload is not as --
12 just steady on each line.  You have --
13 you have days that this line -- you
14 focus and you work all your employees
15 on this line.  You get it, and you go
16 to the next line.  That's basically how
17 it works.
18  Q.  Let me make sure I
19 understand.  Wendell takes over Stan's
20 lines and keeps his own lines?
21  A.  Yes.
22  Q.  Stan's lines that he had
23 are gone, and he picks up Mavis' lines?

Page 63

1  A.  Yes.
2  Q.  So why do you need the
3 assistant supervisor job?
4  A.  Because the duties that I
5 had, the ISO, the lean manufacturing,
6 there were -- all this extra was added
7 to my duties.  I saw where we had --
8 the area -- in my absence, I needed
9 somebody that I could focus on.
10  Q.  Was Mavis over those
11 things, ISO and lean?
12  A.  No.
13  Q.  Was Stan over those things?
14  A.  Stan had to get his area
15 prepared for ISO, yes.  All the lead
16 people were.
17  Q.  They all did?
18  A.  Yes.
19  Q.  What I'm asking is, if you
20 can help me with this:  I understand
21 that Stan lost his area and it went to
22 Wendell?
23  A.  Yes.

Page 64

1  Q.  Mavis' area is gone, and it
2 goes to Stan, so he basically takes
3 over for Mavis?
4  A.  Yes.
5  Q.  So was there some new stuff
6 that came in, more work that was coming
7 in at that time that required you to
8 add this assistant?
9  A.  The work comes and goes.
10 It's a busy season and a slow season.
11 One line may be up and one may be
12 down.  I just seen once -- after we
13 done the remapping, I still -- I needed
14 -- I realized I needed an assistant; I
15 needed some help.
16  Q.  You were thinking about
17 having an assistant before the
18 remapping?
19  A.  Yes.
20  Q.  And then you go ahead and
21 do -- you knew you had to have some
22 changes, so you do the changes, and you
23 still say I still need help?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 65

1    A.   Yes.
2    Q.   When did you do it?  Do you
3  remember when the changes took place?
4    A.   No, sir.
5    Q.   In 2003 or 2004, do you
6  remember what year?
7    A.   That would be a close
8  guess, yeah.
9    Q.   Okay.  One of those years?
10   A.   Yes.
11   Q.   So, basically, Mavis
12  leaving is, and you were going to wait
13  and see what it looked like after Mavis
14  left --
15   A.   Yes.
16   Q.   -- to make sure you still
17  needed the assistant job?
18   A.   Yes, and remapping of the
19  area.
20   Q.   Right.  Mavis caused the
21  remapping; right?
22   A.   No, this was a company-wide
23  effort.  The whole company has been --

Page 66

1  each department has went through and
2  been remapped and the work flow made
3  more efficient.
4    Q.   Okay.  You were going to
5  remap whether Mavis stayed or left?
6    A.   Yes.  That was a company
7  goal, the whole company.
8    Q.   So Mavis leaving and the
9  company remapping caused this -- these
10  changes; is that right?
11       MR. HARBUCK:  Object to the
12  form.
13   Q.   Or Mavis stepping down?
14       MR. HARBUCK:  Same
15  objection.
16   A.   I would say --
17   Q.   Huh?
18   A.   I would say -- I don't see
19  where that would have anything to do
20  with that.  I mean --
21   Q.   Mavis stepping down had
22  nothing to do with the changes?
23   A.   I just don't see -- I don't

Page 67

1  believe that she had anything to do
2  with the changes.
3    Q.   If Mavis was still there,
4  was it your intention to still take her
5  duties and move it to Stan?
6    A.   No, sir.
7    Q.   So what happens next is you
8  have had these changes and you decide
9  that you need help --
10   A.   Yes.
11   Q.   -- and Stan becomes the
12  assistant supervisor; right?
13   A.   Yes.
14   Q.   Who takes over Stan's lead
15  person duties?
16   A.   Stan does both duties.
17   Q.   Stan still has the lead
18  person duties of being over Mavis' four
19  lines?
20   A.   Yes.
21   Q.   And he's assistant
22  supervisor?
23   A.   Yes.

Page 68

1    Q.   Does he help Wendell do the
2  door grill and RPD531, also?
3    A.   No, Wendell takes care of
4  his own.  If he has a problem, he comes
5  to see me or Stan.
6    Q.   You haven't added a lead
7  person to help Wendell; right?
8    A.   No.
9    Q.   Wendell has just taken on
10  Stan's old duties plus his own?
11       MR. HARBUCK:  Object to the
12  form.
13   A.   Yes.
14   Q.   Did you ask Wendell if he
15  was interested -- personally go to him
16  and ask him if he was interested in the
17  supervisor job?
18   A.   I went to him to give him
19  this questionnaire.
20   Q.   And he filled it out?
21   A.   No, sir.
22   Q.   He didn't fill it out,
23  either?

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1    A.    No, sir.
2    Q.    So Walter didn't return it
3    and neither did Wendell; is that right?
4    A.    Harmon, he told me up
5    front.
6    Q.    Harmon just said he was not
7    interested?
8    A.    Wendell, I did not get
9    anything from Wendell.
10    Q.    You didn't get anything
11    from Walter, either?
12    A.    Yes, I got something from
13    him.
14    Q.    I misunderstood you.  You
15    said --
16         MR. HARBUCK:  You said
17    Corky, but he's the same guy.
18    Q.    Walter Newman or Corky did
19    return --
20    A.    Yes.
21    Q.    -- the form?
22    A.    Yes.
23    Q.    Did you think that Wendell

Page 70

1    was -- Wendell Ard was qualified for
2    the job of assistant supervisor?
3    A.    No, I did not believe he
4    was qualified.
5    Q.    Why not?
6    A.    Actions.
7    Q.    What kind of actions?
8    A.    His action towards the
9    seriousness of his work.  As far as --
10    he's got -- his strength is paperwork.
11    He's good at paperwork.  His weakness
12    would be motivation.  He tends to stand
13    and excessively talks.
14    Q.    Have you disciplined him
15    for that?
16    A.    If I catch it and know it's
17    not business, I will.
18    Q.    You have?
19    A.    But it's been verbal, it
20    has not been anything on paper, so,
21    therefore, I have to say, no, I
22    haven't.
23    Q.    You've talked to him, you

Page 71

1    just haven't written it down?
2    A.    Right.
3    Q.    Anything else that in your
4    mind makes Mr. Ard not qualified?
5    A.    You know, the knowledge
6    that he has is mainly just in his area,
7    as far as the LFD, the 531, or the 4000
8    strip mine, he has no knowledge of it.
9    He has never approached me to learn
10    other areas.
11    Q.    He took on Stan's areas;
12    right?
13    A.    Yes.
14    Q.    Did he do okay when he did
15    that?
16    A.    It was a learning process.
17    The people that was building those
18    grills knew those grills.  He didn't --
19    the only thing, they were just pulling
20    his area.
21    Q.    Not much to supervise?
22    A.    The people know the grills
23    and the people done the work.

Page 72

1    Q.    They did it themselves?
2    A.    Yes.
3    Q.    He just had to monitor
4    them?
5    A.    Yes.
6    Q.    And was Ted -- did you
7    consider Ted Hampton qualified?
8    A.    No, sir.
9    Q.    Why not?
10    A.    His actions out on the
11    floor, he was -- he was into having
12    fun, not being what I call serious,
13    taking his work serious.
14    Q.    Did you consider Walter
15    Newman qualified for that job as
16    assistant supervisor?
17    A.    As far as him, he didn't
18    have the knowledge.
19    Q.    Knowledge of what?
20    A.    Of my area, Departments 5
21    and 2.
22    Q.    Where was he working?
23    A.    He was in the architectural

18 (Pages 69 to 72)

## FREEDOM COURT REPORTING

Page 73

1  line.
2      Q.    So he was not qualified?
3      A.    I'm not going to say he
4  wasn't qualified as far as, you know,
5  by the answering of the questionnaire,
6  but what I'm saying is, the reason why
7  I didn't choose him is because Stan had
8  more knowledge in that area.  That's
9  why I put Stan over him.
10     Q.    Would you say that Walter
11 was qualified, but Stan was more
12 qualified?
13     A.    Yes.
14     Q.    Would you say Ted Hampton
15 was not qualified?
16     A.    Yes.
17     Q.    When you say -- would you
18 say Wendell Ard was not qualified?
19     A.    Yes.
20     Q.    Would you say Frank Lett
21 was qualified but not as qualified as
22 Stan?
23     A.    Yes.

Page 74

1      Q.    How about Mavis, did you
2  even consider her?
3      A.    No.
4      Q.    And Harmon, was he
5  qualified?
6      A.    No, sir.
7      Q.    Why not?
8      A.    Harmon is -- he is
9  qualified to figure orders, figure
10 materials, and he's good at it.  He can
11 count, keep accurate inventory.  But
12 when it comes to dealing with people
13 and organizing, he's not.
14     Q.    He's -- does he do okay as
15 a lead person?
16     A.    He's okay, yes.
17     Q.    You just don't think he
18 could serve as assistant supervisor?
19     A.    No.
20     Q.    Because of his people
21 skills and organizational skills, he's
22 not qualified?
23     A.    Yes.

Page 75

1      Q.    Harmon -- Harmon is in his
2  sixties?
3      A.    Late sixties --
4      Q.    Late sixties?
5      A.    -- I believe, if I'm not
6  wrong.
7      Q.    Somewhere in his sixties.
8  I won't hold you to it.
9      A.    Right.
10     Q.    Wendell Ard, how old is he?
11     A.    I would say around forty-
12 seven maybe, forty-six.
13     Q.    And Mavis is around fifty;
14 right?
15     A.    Yes.
16     Q.    Ted Hampton, how old is he?
17     A.    He should be forty right
18 now.
19     Q.    Walter Newman?
20     A.    I would say thirty-eight,
21 maybe.
22     Q.    Is Walter a supervisor?
23     A.    Yes, he's an architectural

Page 76

1  supervisor.
2      Q.    Did you have anything to do
3  with him being picked for that job?
4      A.    No, sir.
5      Q.    Did you see that job
6  posted?
7      A.    No, sir.
8      Q.    The job, the assistant
9  supervisor job we're talking about here
10 that Stan received, that was not
11 posted; right, on the board?
12     A.    To my knowledge, no, I
13 didn't see it.
14     Q.    Do you have anything -- are
15 you the person that posts these jobs,
16 or is that HR?
17     A.    HR.
18     Q.    Have you seen any
19 supervisor jobs posted?
20     A.    No, sir.
21     Q.    How about lead person jobs,
22 have you seen those posted?
23     A.    I've just now gotten email

19 (Pages 73 to 76)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1  to my computer, so I have seen jobs,
2  but as far as lead person jobs, I can't
3  recall.  I mean, I don't see
4  everything.  I don't look at the
5  bulletin board.
6      Q.    When you said email, who
7  has email at your company?  Is it
8  supervisors that have email?
9      A.    Supervisors, managers,
10  anybody with a PC in the front office.
11      Q.    Do employees have PC's?
12      A.    No, sir.
13      Q.    Just workers?
14      A.    No, sir.
15      Q.    How about lead people?
16      A.    No, sir.
17      Q.    Did you train Stan
18  Henderson when he originally moved over
19  into Department 4 doing specialty
20  products; special order products?
21      A.    When he had a problem, yes,
22  he would talk to me to help him sort
23  out the problem.  Any questions, that's

Page 78

1  what I was there for, to assist him.
2      Q.    That's when you were
3  assistant supervisor?
4      A.    Yes.
5      Q.    Did you work with him --
6      A.    Yes.
7      Q.    -- and teach him how to do
8  the job?
9      A.    If he had questions, yes.
10      Q.    Did he have questions?
11      A.    Oh, yeah.
12      Q.    At the beginning, did you
13  have to teach him a lot and then he
14  gradually learned it?
15      A.    I can't remember that.
16      Q.    All right.  If he says that
17  you trained him, is there any reason to
18  dispute that?
19      A.    He may have known more
20  about it than what I can remember.
21      Q.    Then when he became --
22  moved over to Department 5, is 5
23  different machines than 4, different

Page 79

1  lines?
2      A.    Yes.
3      Q.    Did you train him on those
4  lines in 5?
5      A.    No, Mavis trained him.  And
6  the employees that he worked with --
7  worked for him there helped him train.
8      Q.    Had you worked over there
9  in 5?
10      A.    Some.
11      Q.    Your area was 4?
12      A.    I was still actually
13  learning myself --
14      Q.    When you were over there?
15      A.    Yes.
16      Q.    Go ahead.
17      A.    I learned a lot, but as far
18  as learning detail about how to build
19  what presses, what materials, I mean,
20  it's a lot to learn.  You just don't
21  get over there and jump right in and
22  start building, you know how to build
23  them.  It takes time.  There's still

Page 80

1  things about the 4000 FDI line after
2  five years that I still don't know.
3      Q.    Who is helping you through
4  it?
5      A.    The lead people, Stan and
6  the employees that knew the job.
7      Q.    When you originally went
8  from saw operator to over there as a
9  lead -- started as a lead person --
10      A.    Yes.
11      Q.    -- who taught you how to do
12  the lead person job?
13      A.    I learned through the
14  previous lead person, as well as the
15  employees that was there, and some of
16  the stuff I learned on my own.
17      Q.    Who was the previous lead
18  person?
19      A.    Wilmer Fountain.
20      Q.    He didn't leave the second
21  you went over there?
22      A.    No.
23      Q.    He trained you for a little

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1  bit and then he left?
2      A.   Well, he had to go on
3  disability.
4      Q.   Right.  That's what I
5  thought you said.
6      A.   And during the times he was
7  out sick for weeks, somebody -- I would
8  come up and help keep the line going.
9  I learned a lot, and then when he
10  retired, they give me -- I was assigned
11  lead person of that area.
12      Q.   How old were you when you
13  became assistant supervisor?
14      A.   I'm thirty-nine, so I would
15  say thirty-four, thirty-five.
16      Q.   You have -- anybody else
17  that's reporting to you that's near
18  retirement other than we talked about
19  Harmon?
20      A.   No, sir.
21      Q.   Is Mavis still there?
22      A.   No, sir.
23      Q.   When did she leave?

Page 82

1      A.   I do not recall.
2      Q.   Why did she leave?
3      A.   She left because -- I
4  believe she was having foot problems
5  and her mother --
6      Q.   What problems?
7      A.   She was having foot
8  problems, and her mother was in bad
9  shape.  She wanted to quit, and she
10  quit.
11      Q.   You supervised Frank Lett;
12  right?
13      A.   Yes.
14      Q.   Does Frank do a good job?
15      A.   Yes.
16      Q.   He's a good worker?
17      A.   Yes, sir.
18      Q.   He's a good lead person?
19      A.   Yes.
20      Q.   I mean, you give him -- you
21  give him good evaluations?
22      A.   Yes.
23      Q.   Does Frank need any

Page 83

1  supervision as far as daily going over
2  there teaching him how to do things?
3      A.   We do have orders and ship
4  dates, and I have to refer him as to
5  what I need to go to the paint shop.
6  That's usually about what I will talk
7  to him about.  It's just a few orders.
8  There may be three orders, two, one,
9  or it may be a stack of them that needs
10  to go in the paint shop.
11      Q.   And he sends it to the
12  paint shop?
13      A.   He builds them and sends
14  them to the paint shop.
15      Q.   Basically, you can say, I
16  need this many built, send it to the
17  paint shop?
18      A.   On the orders.  Now, as far
19  as everything we build is on an order,
20  but we have a stock order, and it's run
21  off of a different form.  David, the
22  HVAC manager, he helps me with that.
23  He keeps a watch on that as to what

Page 84

1  needs to be built and how many.
2      Q.   What do you use your
3  assistant supervisor, Stan, for?
4      A.   When I -- when I get things
5  that I have to take care of and other
6  things that I don't, such as chasing
7  down orders, making sure -- checking up
8  on orders, making sure they're being
9  worked on, shipping, the paint shop,
10  orders that have not been shipped that
11  day, he has to help me track those down
12  to find out why they have not been
13  shipped.  During my absence, he takes
14  care of the reports, the hours, the
15  hours worked for that day, as well as
16  following orders and making sure that
17  people are positioned in the right job
18  and working on the right orders.
19      Q.   That's what he does?
20      A.   Yes.
21      Q.   When you're not -- when you
22  aren't there as an assistant
23  supervisor, who filled in for you?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1    A.    When I --
2    Q.    There are occasions when
3  you're an assistant supervisor that you
4  are not there; right?
5    A.    Yes.
6    Q.    Who would take over your
7  job and fill in?
8    A.    Nobody that I know of.
9    Q.    Did Stan ever, as far as
10  you know, fill in for you when you were
11  assistant supervisor?
12    A.    As far as I know, I can't
13  -- I don't know. I don't know how to
14  answer that.
15    Q.    You think he has some
16  knowledge of what he did or who took
17  over your job when you weren't there;
18  Stan does?
19    A.    Well, see, when David was
20  the supervisor, at the time --
21    Q.    Right.
22    A.    -- if I wasn't there, I
23  don't know if he got him to help him,

Page 86

1  you know, on errands or whatever, or if
2  David took care of them himself.
3    Q.    When Stan is not there, who
4  steps into his job?
5    A.    Nobody.
6    Q.    Did you train Stan on
7  anything concerning how to be an
8  assistant supervisor or give him any
9  training?
10    A.    When?
11    Q.    Ever. I'm just trying to
12  understand what you did to train him
13  before he became assistant supervisor,
14  after he became assistant supervisor,
15  at any point.
16    A.    As far as training, I don't
17  remember any -- any just detailed
18  training other than Stan took it on his
19  initiative to help do different things.
20    Q.    Like what? Are you talking
21  about before he became assistant
22  supervisor or afterwards?
23    A.    During my absence, that's

Page 87

1  when he would -- that's when he would
2  take care of the reports and help
3  follow up on orders in my absence, and
4  that kind of let us believe that he's
5  showing that he's willing to do extras,
6  that's what we more or less expected
7  from him, and he was -- he had no
8  problem doing these things.
9    Q.    So when you were absent, he
10  would -- you're saying he would pick up
11  where you -- on things you left?
12    A.    Yes.
13    Q.    And this is when he was
14  over the IDSG, AIG, and --
15    A.    No, 4000.
16    Q.    This is when he was over
17  Mavis' area --
18    A.    Yes.
19    Q.    -- the 4000 area?
20    A.    Yes.
21    Q.    I thought he was -- was
22  there -- was there a time period that
23  Stan -- that the IDSG and AIG moved out

Page 88

1  of Stan's area and he was a lead person
2  over 4000?
3    A.    Yes.
4    Q.    That was before he was
5  promoted?
6    A.    Yes.
7    Q.    How long was he in that
8  job?
9    A.    I can't give you that date.
10    Q.    Do you know what I'm
11  saying, how long did he act as a lead
12  person taking over the 4000 line which
13  Mavis had previously been over; the
14  4000 plus, which is 4 lines?
15    A.    I can't -- I can't give you
16  an honest answer on that. I would be
17  guessing.
18    Q.    Okay. And when he was in
19  4000, you had two lead persons other
20  than you had Wendell --
21    A.    In Department 5?
22    Q.    Right. In Department 5 you
23  had Wendell and Stan; right?

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1    A.    Yes, and Harmon.
2    Q.    Harmon was there, too?
3    A.    Yes.
4    Q.    What was Harmon over?
5    A.    LFD, GXHD.
6    Q.    GXHD?
7    A.    Yes.
8    Q.    He was over how many lines?
9    A.    Actually, the compu-grill
10   and TAFD.  There's more lines than
11   Stan's, but those are the main two that
12   has any volume is the LFD and GXHD.
13       Q.    He was also over the compu-
14   grill and TAFD --
15   A.    Yes.
16   Q.    -- which is 4 lines?
17   A.    Yes.
18   Q.    Stan was over 4 lines?
19   A.    Well, if you want to add
20   some more, there was DQM -- Stan --
21   VFVF.
22   Q.    So he was over those two?
23   A.    Yes, but there's not that

Page 90

1    much volume.
2    Q.    Those are low volume?
3    A.    Yes.  Mainly, they give you
4    those first as that's the ones with
5    volume.
6    Q.    Wendell was over all Stan's
7    former lines plus his lines?
8    A.    Yes.
9    Q.    Did Wendell have any
10   volume?
11   A.    It's just one day that this
12   one is up, and the next one -- there's
13   nothing that's really -- in other
14   words, not all lines had the same work
15   coming through.
16       Q.    How many people did Stan
17   have working for him when he took over
18   Mavis' area?
19   A.    I would guess or estimate
20   four.
21   Q.    Four people?
22   A.    Yes.
23   Q.    How many people did Wendell

Page 91

1    have?
2    A.    I'd estimate about seven.
3    Q.    Seven people?
4    A.    Yes.
5    Q.    How many people did Harmon
6    have?
7    A.    About seven.
8    Q.    How many people did Frank
9    have?
10   A.    Frank, I would estimate
11   about twenty-eight.  That changes, too,
12   from busy season to slow season.
13       Q.    In the --
14   A.    That would be a close
15   average.
16   Q.    From March to October, is
17   that your busier season?
18   A.    Yes.
19   Q.    Sometimes it's shorter,
20   sometimes it's longer?
21   A.    Yes.
22   Q.    Sometimes it ends in June,
23   sometimes it ends in -- correct me if

Page 92

1    I'm wrong.
2    A.    You know, there was times
3    that we shut the whole department down,
4    you know, around Christmas, and then by
5    February, we would -- or January, we
6    kicked up going again.  But the past
7    two years, it has pretty well run all
8    year with no breaks in orders or
9    nothing nonstop.
10       Q.    Frank was also over your --
11   in addition to being over the
12   assemblers, he was over the welders;
13   right?
14   A.    Yes.
15   Q.    Anybody that needed a
16   welding job, he would go to Frank, and
17   Frank would assign that, too; right?
18   A.    Yes.
19       MR. HARBUCK:  I need a
20   break, John.
21       MR. GOLDFARB:  Okay.
22       (Brief recess.)
23   Q.    (BY MR. GOLDFARB)  We're

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  back on the record after a break.
2       What did you do to get
3  prepared for your deposition today?
4       A.   We talked with the lawyer.
5       Q.   Anything else?  Did you
6  look at any documents?
7       A.   Pretty much what is right
8  here (indicating).
9           MR. HARBUCK:  I've got two
10 other documents we looked at.
11          MR. GOLDFARB:  Is this in
12 y'all's Rule 26 disclosure?
13          MR. HARBUCK:  No, we don't
14 rely on them.  We're giving them to you
15 in response to your request for
16 production.  This is what the other
17 fellow turned in, plus Frank's, but
18 you've got that.
19
20      (Whereupon, Plaintiff's Exhibit 4
21      was marked for identification and
22      same is attached hereto.)
23

Page 94

1       Q.   Exhibit 4 is something I
2  just received from your attorney, and
3  that is Walter Newman's answers to the
4  questions; correct?
5       A.   Yes.
6           MR. HARBUCK:  Make sure you
7  know what you're looking at.
8
9       (Whereupon, Plaintiff's Exhibit 5
10      was marked for identification and
11      same is attached hereto.)
12
13      Q.   Tell me what Exhibit 5
14 is.  Let's do it this way --
15      A.   This is Ted Hampton's
16 answers to his questions.
17      Q.   Thank you.  It's two pages,
18 a page and a half; right?
19      A.   Yes.
20      Q.   Those individuals typed out
21 their answers; right?
22      A.   Yes.
23      Q.   And do you find any fault

Page 95

1  with the way these guys answered their
2  questions on Exhibit 4 and Exhibit 5?
3       A.   No.
4       Q.   Do you think they did a
5  good job?
6       A.   Yes.
7       Q.   But you didn't base the
8  selection decision on the way they
9  answered the questions, did you?
10      A.   No.
11          MR. HARBUCK:  Object to the
12 form.
13      Q.   You looked at -- what --
14 why did you select Stan Henderson over
15 Frank Lett for the assistant supervisor
16 position?
17      A.   Because of the job
18 knowledge and experience that Stan had
19 on all the other lines.
20      Q.   That's your reason?
21      A.   That's the main reason,
22 yes.
23      Q.   Is that the only reason?

Page 96

1       A.   And he also had good
2  written communication skills.
3       Q.   You had seen that over the
4  years?
5       A.   Yes.
6       Q.   Any other reasons?
7       A.   That's pretty much it --
8  that's it.
9       Q.   Okay.  The written
10 communication you're talking about, is
11 that -- where did you get a chance to
12 see over the years the written
13 communication of Stan versus the
14 written communication of Frank?
15      A.   A record of conversations,
16 appraisals.
17      Q.   How they filled out their
18 own self-appraisals or appraisals on
19 employees?
20      A.   On employees.
21      Q.   You've got the way Frank
22 appraised his employees versus the way
23 Stan appraised his employees?

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1    A.    The wording, when I go
2  through Stan's wording, I mean, I don't
3  have to make changes, whereas I have to
4  make changes and proofread what Frank
5  has written.
6    Q.    Are these the evaluations
7  they fill out; the appraisal forms?
8    A.    On his employees.
9    Q.    He's got -- Frank has
10  twenty-eight employees?
11    A.    Yes.
12    Q.    And --
13    A.    Estimated.
14    Q.    Estimated.  Stan had four?
15    A.    Yes.
16    Q.    Stan had -- do you agree
17  with me that Stan could spend more time
18  with his four than Frank could with his
19  twenty-eight appraisals?
20    A.    I cannot answer that.
21    Q.    Any other thing than the
22  written communication?
23    A.    No, sir.

Page 98

1    Q.    The main thing that I want
2  to get --
3    A.    The main thing is the job
4  knowledge and experience.
5    Q.    Tell me about Stan's job
6  knowledge and experience that made him
7  -- that caused you to select him over
8  Frank.
9    A.    He had experience in -- he
10  was a lead person in Department 2.
11    Q.    This is Stan?
12    A.    Stan.
13    Q.    A Department 2 lead.  Go
14  ahead.
15    A.    Lead person in Department
16  4, lead person in Department 5.
17    Q.    Is that it?  Those are your
18  reasons for selecting Stan because of
19  his -- the job knowledge over Frank --
20    A.    Yes.
21    Q.    -- because Frank was only a
22  lead person over 2; right?
23    A.    Right.

Page 99

1    Q.    Did you ever offer Frank
2  the opportunity to be a lead person
3  over 4?
4    A.    No, sir.
5    Q.    Did you ever offer Frank
6  the opportunity to be a lead person
7  over 5?
8    A.    No.
9    Q.    Do you know if anybody
10  offered Frank those opportunities to be
11  a lead person over 4 or 5?
12    A.    Not that I know of.
13    Q.    Now, when Stan was over 2,
14  he was a lead person on the night
15  shift?
16    A.    Yes.
17    Q.    And how many people were
18  there at night?  Did he say ten?
19    A.    I would say ten or twelve.
20    Q.    I think that's what he
21  said.
22    A.    That's usually a second
23  shift.

Page 100

1    Q.    That would run when you're
2  really at peak season?
3    A.    Yes.
4    Q.    That's what he was saying.
5  He said that would run sometimes from
6  March to June; right?
7    A.    Yes.
8    Q.    Were you involved in
9  moving -- or you recommended Stan for
10  the Department 4 lead job?
11    A.    Yes.
12    Q.    And you selected Stan for
13  the Department 5 lead job?
14    A.    I asked him that since
15  Mavis was stepping down, did he want to
16  take over her area, and he agreed.
17    Q.    And that's the whole
18  Departments 4 and 5 stuff that I can't
19  go through again, but we've already
20  talked about that; right?
21    A.    Yes.
22    Q.    He ran 5 with his -- he ran
23  Department 5, which was 4 combined; 4

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1 went into 5?
2    A.    Yes.
3    Q.    Okay.
4    A.    Yeah.
5    Q.    He did that until he became
6 assistant supervisor?
7    A.    Yes.
8    Q.    Now, the lead person -- the
9 assistant supervisor job was assistant
10 supervisor over Department 2 as well as
11 Department 5?
12    A.    Yes.
13    Q.    And Frank had plenty of --
14 Frank had more experience than Stan
15 over Department 2; right, as a lead
16 person over there?
17    A.    I can't say that. As far
18 as years of service there, I would say
19 yes. Experience, if you -- yes.
20    Q.    I'm not saying one is --
21 all I'm saying, he had been there
22 longer, he had more experience working
23 it, too; but Frank, what you're saying

Page 102

1 is Frank lacked was experience as a
2 lead person in Departments 4 and 5 in
3 that area; right?
4    A.    Experience as far as the
5 knowledge and knowing how to build the
6 grills.
7    Q.    Tell me what you understood
8 that Frank did not know how to do with
9 regards to 4 and 5.
10    A.    I don't know of anything he
11 can do in Department 5 that he knows
12 how to do. He has never shown me or
13 told me anything he can do.
14    Q.    Has he ever --
15    A.    He can run a saw, shown
16 what dies, what material --
17    Q.    He can assemble, can't he?
18    A.    -- and assemble as to --
19 and being shown -- which he may have
20 some knowledge of the -- of some of the
21 lines. I do not know.
22    Q.    Well, if Stan says that
23 Frank has worked over in 4 and 5

Page 103

1 sometimes --
2    A.    Yes.
3    Q.    -- doing assembly work, do
4 you have any reason to dispute that?
5    A.    No, but as far as me
6 knowing when --
7    Q.    You just don't know exactly
8 when --
9    A.    What he's worked on, I
10 don't know exactly what he's worked on.
11    Q.    In 4 and 5?
12    A.    Right.
13    Q.    He, meaning Frank?
14    A.    Frank.
15    Q.    Did you ever ask Frank,
16 what have you done in Departments 4 and
17 5?
18    A.    No.
19    Q.    When you first became a
20 lead person in Department 4, was
21 Department 4 at that time the specialty
22 product Department 4 or was it the
23 standard sizes?

Page 104

1    A.    At that time, it was the
2 IDSG and AIG.
3    Q.    What does that mean?
4    A.    Industrial duty supply
5 grill, and AIG is a lighter version of
6 that.
7    Q.    Is that standard sizes?
8    A.    Well, standard sizes, yes,
9 and then there is special construction
10 on some of them, the larger sizes.
11    Q.    When you first became a
12 lead person over there, was it
13 specialty orders also over there that
14 you were over?
15    A.    Some of it -- some orders
16 come in with specialty construction,
17 yes.
18    Q.    But most of it was
19 standard?
20    A.    Standard.
21    Q.    And where are those built
22 now? Are any of those in 2?
23    A.    No.

26 (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1    Q.    No?
2    A.    That's the ones that went
3 to Department -- went to the large
4 area.
5    Q.    Why did you recommend Stan
6 moving to 4 as opposed to -- as a lead
7 person back then as opposed to Frank?
8    A.    Stan had more experience in
9 that line. He has worked in the IDSG
10 and AIG lines.
11    Q.    At the time you recommended
12 him?
13    A.    Before -- night shift
14 didn't last forever, so when he come
15 back there was times when he had work
16 in that area, and he was familiar with
17 it. And him being a -- him being a
18 lead person and having to come off
19 night shift, he didn't know if it would
20 affect his pay. So to keep him as a
21 lead person, we pulled him in that
22 area.
23    Q.    Frank was already a

Page 106

1 full-time lead?
2    A.    Yes.
3    Q.    All right. I mean, it's my
4 understanding, and correct me if I'm
5 wrong, that Stan, at the time he was a
6 lead person on nights, when he came off
7 nights, he worked for Frank in
8 Department 2, and then sometimes on
9 Saturdays and Sundays he would go to 4;
10 is that right?
11    A.    Yes.
12    Q.    And then what happened is
13 -- and tell me if I'm wrong, Department
14 4, when you left Department 4, it
15 created a lead person vacancy, and
16 Frank was on the nights -- Frank was --
17 I'm sorry, not Frank -- Stan was on
18 nights and he was -- he had already
19 been a lead person, so he could come
20 into the lead position over on 4 --
21         MR. HARBUCK: Object to the
22 form.
23    A.    Yes.

Page 107

1    Q.    -- whereas Frank was
2 already a full-time lead person on the
3 day shift?
4    A.    Yes.
5    Q.    Who moved into the lead
6 person job at night when Stan left?
7    A.    We have not had a --
8 rephrase that. There was several that
9 had stepped up and took over that as it
10 was needed. You need the names?
11    Q.    Please. Who --
12    A.    Bob --
13    Q.    -- if you can remember
14 them. Bob -- do you have somebody now?
15    A.    There's no night shift
16 right now.
17    Q.    When did the night shift
18 end?
19    A.    I can't remember his last
20 name.
21    Q.    Bob is fine.
22    A.    Allen Bain.
23    Q.    Is he still there?

Page 108

1    A.    Yes. And I cannot remember
2 another one. I want to think maybe
3 Candis Redd was with him on second.
4 That's all I can think of at this time.
5    Q.    When did the night shift
6 end?
7    A.    I couldn't tell you that.
8 Whenever the busy season was over,
9 that's when it ended.
10    Q.    Are you going to have a
11 night shift this year?
12    A.    No, we're working different
13 -- we're working different hours to try
14 to keep the night shift from starting.
15    Q.    What do you mean, more
16 hours or something?
17    A.    Yes. We're trying -- we
18 alternate -- we've got some folks
19 coming in at five o'clock and getting
20 off at two thirty, we've got folks
21 coming in at six o'clock and getting
22 off at three thirty, we've got some
23 folks coming in at seven o'clock and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1 getting off at four thirty.  It gives
2 you more people and longer hours.
3     Q.   All right.
4     A.   So far it's working, and we
5 don't need a second shift.
6     Q.   So you've told me all the
7 reasons you selected Stan over Frank
8 for the lead person job -- I mean,
9 you've told me all the reasons you have
10 selected Stan over Frank for the
11 assistant supervisor job; correct?
12     A.   Yes.
13     Q.   Yes?
14     A.   Yes.
15     Q.   Have you ever had to
16 counsel Frank for anything, discipline
17 him for anything?
18     A.   Not that I know of.
19     Q.   Do you know -- have you had
20 any discussions with George Helms about
21 this case; Frank's case?
22         MR. HARBUCK:  Other than
23 with counsel present.

Page 110

1     Q.   Out of your lawyer's
2 presence?
3     A.   Yes.
4     Q.   What did y'all talk about?
5     A.   Just -- I really don't know
6 how to answer that.
7     Q.   Any way you want.
8     A.   We looked over some
9 documents and he asked us some
10 questions.
11     Q.   When was this?
12     A.   This was last Thursday.
13     Q.   What documents?
14         MR. HARBUCK:  Wait, wait.
15 I was in that meeting.
16         THE WITNESS:  Yes.
17     Q.   When he's not there.
18         MR. HARBUCK:  He's only
19 asking about any meetings you had with
20 George Helms when -- about this case
21 when I was not there.
22     A.   I've had none.
23     Q.   Okay.  Have you had any

Page 111

1 discussions -- have you and George
2 talked about this case at all outside
3 of this lawyer's presence or any
4 lawyer's presence?
5     A.   No, sir.
6     Q.   How about have you had any
7 discussions with Clyde Cook, Roger
8 Peak, or Stan about this case outside
9 of the lawyer?
10     A.   No, sir.
11     Q.   Did you have some
12 discussions with Stan concerning Stan
13 saying Frank is more qualified for this
14 job?
15     A.   No, sir.
16     Q.   Did Stan ever come to you
17 and say if Frank -- if you pick Frank
18 for this job, I want Frank's job, and,
19 you know, Frank's job was lead person
20 over Section 2?
21     A.   I don't recall that.
22     Q.   Did you have any
23 discussions with Stan about him taking

Page 112

1 over Frank's job if Frank gets the
2 assistant supervisor job?
3     A.   It seems like I want to
4 think he may have said something to
5 that effect, but I'm not positive.  I
6 can't remember exactly what was said.
7     Q.   So it is your -- when we
8 were talking about communication
9 skills, you said you had to go back and
10 change or edit Frank's writing.
11     A.   Yes.
12     Q.   How would you -- did he
13 write it out in pen and you would write
14 it out or something?
15     A.   Pencil.
16     Q.   He wrote it in pencil.
17 What would you do, erase it?
18     A.   Yes.
19     Q.   And do what, rewrite it?
20     A.   Rewrite -- not rewrite the
21 whole thing or the whole statement,
22 just re -- I would just have to rewrite
23 it to where I understood what was said.

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1   Q.   Did you talk to him about
2  it and then rewrite it?
3      A.   No, sir.
4      Q.   How do you know what he was
5  saying in the first place?  You said
6  you rewrote it so you would understand
7  what was said.  What do you mean by
8  that?
9      A.   I wrote what I thought was
10 proper English.
11     Q.   So you thought his grammar
12 was bad, and you would fix it --
13     A.   Yes.
14     Q.   -- is that what you're
15 saying?
16     A.   Yes.
17     Q.   Did you redo the content of
18 what he did?
19     A.   No, sir.
20     Q.   So you would correct his --
21 you would --
22     A.   Spelling and grammar.
23     Q.   Stuff like that?

Page 114

1      A.   Yes.
2      Q.   Did you go over it with
3  Frank, the problems that you had with
4  his grammar, or would you just do it
5  yourself and not let him know?
6      A.   I took care of it myself.
7      Q.   And you didn't go over it
8  with him?
9      A.   No.
10     Q.   As far as you know, he
11 doesn't know you have rewritten his --
12 the evaluations he did; right?
13     A.   When he gives them to me
14 and I turn them in, they go through HR.
15 They come back to me, they go back to
16 Frank, he goes over them with the
17 employee, so he's got it there in front
18 of him to reread.
19     Q.   Did you ever explain to him
20 what his problems were with his
21 grammar?
22     A.   No, sir.
23     Q.   Have you ever offered for

Page 115

1  him to go to any type of tuition
2  reimbursement classes so he can bone up
3  on his English?
4      A.   No.
5      Q.   No?
6      A.   No.
7      Q.   Do you have a tuition
8  reimbursement program?
9      A.   I don't know what that is.
10     Q.   You can go to class, take
11 an English class or something at a
12 local community college, and the
13 company will reimburse you.  Do y'all
14 have anything like that?
15     A.   They've got some type of
16 program about school.  I have never had
17 any experiences with it, so I don't
18 know exactly what they offer.
19     Q.   You have never recommended
20 anybody to go to anything like that?
21     A.   No.
22     Q.   So you think Frank would
23 benefit from some type of school, some

Page 116

1  type of education concerning grammar, I
2  guess?
3      A.   I don't know how to answer
4  that.
5      Q.   You think he has something
6  to learn about grammar?
7      A.   I would just say there's
8  room for improvement.
9      Q.   Why didn't you tell him,
10 look, Frank, your grammar needs some
11 work, here's what you're doing wrong,
12 so you could help him?
13     A.   I just didn't tell him.
14     Q.   Why?
15     A.   I really don't know how to
16 explain it.  I figured it best to take
17 care of it myself.
18     Q.   Did you want him to
19 improve?  I mean, is that one of the
20 reasons you didn't pick him to be a
21 supervisor?
22     A.   I really don't know how to
23 answer that.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1    Q.   Isn't that one of the
2    reasons you didn't pick him --
3    A.   Yes.
4    Q.   -- is his grammar skills or
5    written communication skills?
6    A.   Yes.
7    Q.   You didn't have any problem
8    with his oral communication; right?
9    A.   No, sir.
10   Q.   This has been -- I guess
11   his written communication skills you
12   have known have been a problem since
13   you have been an assistant manager?
14   A.   Yes.
15   Q.   And you knew -- before you
16   were assistant manager, did you have an
17   -- you didn't have a chance to review
18   his written communication skills;
19   right?
20   A.   No, sir.
21   Q.   He never evaluated you or
22   anything, did he?
23   A.   No.

Page 118

1    Q.   Are you sure he didn't -- I
2    can't remember.  I read his
3    deposition.  Did he ever supervise you
4    right at the beginning or sometime in
5    your employment?
6    A.   It could have been during
7    the time Herman retired on disability.
8    Frank had stepped up, and it's possible
9    I did saw or work for him at that
10   time.  I cannot remember for sure.
11   Q.   Because you were -- you
12   think you were operating the saw until
13   about '97, somewhere in there?
14   A.   Yes.  Frank could have been
15   the lead person way before then.  I
16   don't know.
17   Q.   When you would do the saw,
18   would you do it for Department 2 as
19   well as the other departments?
20   A.   Yes.
21   Q.   Do you still run the saw
22   ever?
23   A.   When needed, yes.

Page 119

1    Q.   You do?
2    A.   Yes.
3    Q.   You get in there and do it?
4    A.   Yes.
5    Q.   Does -- Frank still welds
6    when he needs to; right?
7    A.   Yes.
8    Q.   When you became a
9    supervisor, from assistant supervisor
10   to supervisor, your pay became salary?
11   A.   Yes.
12   Q.   Before that, you had been
13   hourly?
14   A.   Yes.
15   Q.   What is the -- you don't
16   remember what year you became a
17   supervisor, do you?
18   A.   No.
19   Q.   I think you told me you had
20   nothing to do with the selection of
21   Walter Newman for the assistant
22   supervisor job; is that right?
23   A.   Yes.

Page 120

1    Q.   Who picked you to be a
2    supervisor?  Was it your --
3    A.   David Burch.
4    Q.   Did your salary increase
5    when you became a supervisor?
6    A.   Yes.
7    Q.   What was the highest rate
8    you got when you were hourly as an
9    assistant supervisor?
10   A.   I cannot recall.
11   Q.   In 2003, were you a
12   supervisor or assistant supervisor?
13   A.   Supervisor.
14   Q.   And then in 2002, do you
15   remember whether you were supervisor or
16   assistant supervisor?
17   A.   I cannot remember exactly
18   when.
19   Q.   When you were an assistant
20   supervisor, were you over Department 2
21   as well?
22   A.   Yes.
23   Q.   And you and Mr. Burch

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 121

1  worked on the -- did you work with him
2  on the questions?
3      A.   He told me.
4      Q.   You and he discussed it
5  before?
6      A.   Yes.
7      Q.   Have you ever had any
8  discussions with anyone there about why
9  there's no African-Americans in
10 managerial or supervisory jobs at the
11 company?
12     A.   No.
13     Q.   Has anybody ever complained
14 to you about that; any black workers
15 ever complained about no blacks in
16 management?
17     A.   To my knowledge, no.
18     Q.   Is this the only EEOC
19 charge you have ever received as far as
20 you know of Mr. Lett's?
21     A.   This is my first
22 experience.
23     Q.   Do you know how long Frank

Page 122

1  Lett has been at the company?
2      A.   I would guess thirty.
3      Q.   I guess he was hired in
4  '73.  Does that sound about right?
5      A.   I don't know.
6      Q.   Is this the only time you
7  have ever been in a deposition?
8      A.   Yes, sir.
9      Q.   Have you ever testified in
10 a trial?
11     A.   No, sir.
12     Q.   Have you ever testified
13 under oath before?
14     A.   No, sir.
15     Q.   Do you know what Frank's
16 pay rate is?
17     A.   No, sir.
18         MR. GOLDFARB:  I want to
19 know what his rate of pay was when he
20 became supervisor.  We can seal this
21 section of the deposition, if you want.
22         MR. HARBUCK:  If he doesn't
23 mind, I don't mind him answering.

Page 123

1      Q.   What is your rate of pay
2  now?
3      A.   My rate of pay now per hour
4  is twenty-one dollars and ten cents.
5      Q.   But you're salaried; right?
6      A.   Yes.
7      Q.   You don't --
8      A.   That's per eighty-six point
9  six six hours a week.
10     Q.   Twenty-one --
11     A.   I believe it's twenty-one
12 ten.
13     Q.   And it is at eighty-six
14 hours every two weeks?
15     A.   That's what you're prorated
16 at is eighty-six hours.  I believe
17 that's right --
18     Q.   How long has it been that?
19     A.   -- per pay period.
20     Q.   How long has it been that
21 rate?
22     A.   Since January.
23     Q.   Before that, what was it --

Page 124

1  the year January, 2006; right?
2      A.   Yes.
3      Q.   Before that, what was it?
4      A.   Twenty thirty-nine.
5      Q.   How long was it at that
6  rate?
7      A.   One year.
8      Q.   Before that, what was it?
9      A.   I'm sorry, I can't
10 remember.
11     Q.   You get around a fifty cent
12 raise each year since you have been --
13     A.   Fifty to sixty, yes.
14     Q.   Your job that you moved
15 into -- every job you have moved into
16 has not been posted; your lead person
17 job, your assistant supervisor job, and
18 the supervisor job; is that right?
19     A.   Right.
20     Q.   And you made the decision
21 to select Mr. Stan Henderson over the
22 other applicants?
23     A.   Yes.

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1    MR. GOLDFARB: That's all.
2  Thanks.
3
4  EXAMINATION BY MR. HARBUCK:
5    Q.   I have a few questions.
6    Mr. Taylor, you testified
7  that Stan Henderson supervised four
8  people as a lead person?
9    A.   Yes.
10   Q.   In which department?
11   A.   At the time, Department 4.
12   Q.   Now, he has been a lead
13 person in Department 5 as well?
14   A.   Yes.
15   Q.   Has he ever supervised more
16 than four people?
17   A.   Yes, he was a lead person
18 in Department 2 before he came to
19 Department 4.
20   Q.   How many did he supervise
21 in Department 2?
22   MR. GOLDFARB: Object.
23 Asked and answered.

Page 126

1    A.   Second shift would be
2  eight, ten, twelve people.
3    Q.   How many did he supervise
4  in Department 5?
5    A.   Six, seven, in that area.
6  I would say about seven.
7    Q.   If he testified that in
8  Department 4 he supervised up to eight
9  to ten, and in Department 5, ten to
10 twenty, would you have any reason to
11 dispute that?
12   MR. GOLDFARB: Object to
13 the form.
14   A.   That would be the whole
15 area.
16   Q.   But that would be the area
17 of his responsibility, would it not?
18   A.   Yes.
19   MR. GOLDFARB: Object to
20 leading.
21   Q.   That would be a larger
22 group than just the four that you
23 testified to before?

Page 127

1    MR. GOLDFARB: Object to
2  the form. Leading.
3    A.   Yes.
4    Q.   What is the difference
5  between the kind of products built on
6  -- in Department 2 and the products
7  that were built in what was at the time
8  Departments 4 and 5?
9    A.   The grills in Department 2
10 are a repetitious type, one type of
11 grill all day long, whereas the grills
12 in Department 5 are completely
13 different, different sizes, a different
14 special construction totally.
15   Q.   Now, when you say
16 Department 5, do you mean Department 5
17 as is presently constituted today?
18   A.   Yes.
19   Q.   When it was Departments 4
20 and 5, was it the same as you have just
21 described?
22   A.   Yes.
23   MR. GOLDFARB: Object to

Page 128

1  the form.
2    Q.   Custom?
3    MR. GOLDFARB: Object to
4  the form. Asked and answered.
5    A.   In some cases custom,
6  special construction. Mostly it was
7  standard.
8    Q.   Has the standard -- has
9  Number 2 always been standard?
10   A.   Yes.
11   Q.   When you talked about the
12 wider experience that you believe Mr.
13 Henderson had over Mr. Lett, is that
14 what you were referring to --
15   MR. GOLDFARB: Object to
16 the form. Leading.
17   Q.   -- the different
18 departments?
19   A.   Can you ask the question
20 again?
21   Q.   Yes. You described Mr.
22 Henderson, in your opinion, as having
23 more experience in all product lines.

32  (Pages 125 to 128)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1    A.   Yes.
2    Q.   Is that what you were
3  referring to, the different types of
4  products?
5         MR. GOLDFARB:  Object to
6  the form.  Leading.
7    A.   Yes.
8    Q.   Did Mr. Lett, when he
9  worked in other departments other than
10  Department 2, was he supervising
11  anybody?
12    A.   Not that I know of.
13    Q.   So when he would go into
14  another department, what would he be
15  doing?
16    A.   Assembly -- I was thinking
17  assembly.
18    Q.   But he was not supervising
19  anybody in those departments?
20    A.   No, sir.
21    Q.   At the time that you made
22  the decision to select Mr. Henderson,
23  had he supervised people in those other

Page 130

1  departments?
2    A.   No, sir.
3    Q.   Had Mr. Henderson
4  supervised people in those departments?
5    A.   Yes.
6    Q.   How long -- when you handed
7  out these questionnaires to the people
8  you've identified, did you give them
9  all to them on the same day?
10    A.   Yes, sir.
11    Q.   How long before Mr.
12  Henderson returned the answers to you?
13    A.   Within the week, the first
14  week.
15    Q.   How long before Mr. Hampton
16  returned his answers?
17    A.   It was after the first
18  week -- around the second week.
19    Q.   How about Mr. Newman, how
20  long before he returned his answers?
21    A.   About the same time.
22    Q.   How did you get Mr. Lett's
23  answers?

Page 131

1    A.   The day that they were told
2  that they was due, I had to go to him
3  and ask him that morning did he have
4  them.
5    Q.   He hadn't turned them in
6  yet?
7    A.   No, sir.  He did not have
8  them, and he brought them to me later.
9    Q.   How much later?
10    A.   I would say on -- it would
11  seem to be around two to three hours.
12    Q.   The same day?
13    A.   The same day.
14    Q.   And you had to ask?
15    A.   Yes, sir.
16
17         (Whereupon, Defendant's Exhibit 1
18         was marked for identification and
19         same is attached hereto.)
20
21    Q.   Defendant's Exhibit 1, is
22  that Mr. Lett's answers?
23    A.   Yes.

Page 132

1    Q.   Is that the form that he
2  gave them to you?
3    A.   Form as --
4    Q.   Well, this is on a big
5  sheet of paper.  Was the piece of paper
6  he gave you this big, or was it smaller
7  than that?
8    A.   Smaller than this.
9    Q.   Clarify something about Ms.
10  Christy Hudson, who has been filling in
11  for Harmon from time to time when he is
12  out.  This is in Department 5?
13    A.   Yes.
14    Q.   Is Department 5 where Ms.
15  Hudson normally works?
16    A.   Yes.
17    Q.   She is somebody that works
18  for Mr. Harmon --
19    A.   Yes.
20    Q.   -- for Harmon Sellers?
21    A.   Yes.
22    Q.   And you testified that she
23  filled in for him when he was sick and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 133

1  that y'all were looking into
2  reconfiguring some of his job duties --
3      A.  Yes.
4      Q.  -- so that she can help him
5  with stuff that he can no longer do?
6          MR. GOLDFARB:  Object to
7  the form.
8      Q.  Is that a correct summary
9  of what you said?
10     A.  He can do these things, but
11 we want to use his abilities where he
12 is the best, which is working up
13 orders, figuring materials, and let
14 Christy take care of those other
15 duties.
16         MR. HARBUCK:  That's all.
17
18 RE-EXAMINATION BY MR. GOLDFARB:
19     Q.  When you had Frank fill out
20 the answers to the questions, you
21 already knew he couldn't communicate
22 verbally -- I mean, in writing very
23 well; right?  You had been looking at

Page 134

1  his -- the things he filled out, his
2  applicant reviews, and correcting them
3  for five years; right?
4      A.  Yes, I have to agree.
5          MR. GOLDFARB:  No more
6  questions.
7
8          FURTHER DEPONENT SAITH NOT.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**