**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

## Page 1

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE MIDDLE DISTRICT OF ALABAMA
3 SOUTHERN DIVISION
4
5 CIVIL ACTION NO: 1:05CV479-A
6
7 FRANK LETT,
8 Plaintiff,
9 Vs.
10 RELIABLE RUSKIN, D/B/A
11 RELIABLE PRODUCTS,
12 Defendants.
13
14
15 DEPOSITION
16 OF
17 FRANK LETT
18 MARCH 28, 2006
19
20
21 TAKEN BEFORE: Jane B. Elliott
22 Certified Shorthand Reporter
23 And Notary Public

## Page 2

1 STIPULATION
2 IT IS STIPULATED AND AGREED, by
3 and between the parties, through their
4 respective counsel, that the deposition
5 of FRANK LETT may be taken before Jane B.
6 Elliott, CSR, Commissioner and Notary
7 Public, State of Alabama at Large;
8 That the signature to and
9 reading of the deposition by the witness
10 is waived, the deposition to have the
11 same force and effect as if full
12 compliance had been had with all laws and
13 rules of Court relating to the taking of
14 depositions;
15 That it shall not be necessary
16 for any objections to be made by counsel
17 to any questions, except as to form or
18 leading questions, and that counsel for
19 the parties may make objections and
20 assign grounds at the time of trial, or
21 at the time said deposition is offered in
22 evidence, or prior thereto.
23

## Page 3

1 A P P E A R A N C E S
2
3 FOR THE PLAINTIFF:
4 WIGGINS, CHILDS, QUINN & PATAZIS
5 MS. ALLISON W. LOWELL
6 THE KRESS BUILDING
7 301 NINETEENTH STREET NORTH
8 BIRMINGHAM, ALABAMA 35203
9
10 FOR THE DEFENDANT, RELIABLE RUSKIN D/B/A
11 RELIABLE PRODUCTS:
12 MS. ELIZABETH P. ODOM
13 MR. JONATHAN S. HARBUCK
14 THE KULLMAN FIRM
15 SUITE 340
16 600 UNIVERSITY PARK PLACE
17 BIRMINGHAM, ALABAMA 35209
18
19 ALSO PRESENT:
20 MR. GEORGE HELMS
21
22
23

## Page 4

1
2 EXAMINATION BY:        PAGE NUMBER:
3 MS. ODOM..........................7
4 MS. LOWELL........................209
5
6 RE-EXAMINATION BY:
7 MS. ODOM..........................239
8 MS. LOWELL........................250
9
10
11
12 E X H I B I T S
13 DEFENDANT'S EXHIBITS:      PAGE NUMBER:
14 EXHIBIT 1..........................12
15 (AMENDED NOTICE OF DEPOSITION)
16 EXHIBIT 2..........................46
17 (APPLICATION)
18 EXHIBIT 3..........................57
19 (2000 APPLICATION)
20 EXHIBIT 4..........................60
21 (HANDBOOK)
22 EXHIBIT 5..........................60
23 (ACKNOWLEDGEMENT)

1 (Pages 1 to 4)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 5

1  EXHIBIT 6..........................100
2  (QUESTIONS)
3  EXHIBIT 7..........................101
4  (RESPONSES)
5  EXHIBIT 8..........................183
6  (CHARGE OF DISCRIMINATION)
7  EXHIBIT 9..........................189
8  (OCTOBER 6 LETTER)
9  EXHIBIT 10........................190
10 (DISMISSAL AND NOTICE OF RIGHTS)
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1          I, Jane B. Elliott, a Certified
2  Shorthand Reporter of Birmingham,
3  Alabama, and Notary Public for the State
4  of Alabama at Large, acting as
5  Commissioner, certify that on this date,
6  pursuant to the Federal Rules of Civil
7  Procedure and the foregoing stipulation
8  of counsel, there came before me at the
9  offices of The Kullman Firm, Suite 340,
10 600 University Park Place, Birmingham,
11 Alabama, on the 28th day of March, 2006,
12 commencing at 9:00 a.m., FRANK LETT,
13 witness in the above cause, for oral
14 examination, whereupon the following
15 proceedings were had:
16
17          FRANK LETT,
18 being first duly sworn, was examined and
19 testified as follows:
20
21          THE REPORTER:  Usual
22 stipulations?
23          MS. ODOM:  Yes.

Page 7

1          MS. LOWELL:  Yes.
2
3  EXAMINATION BY MS. ODOM:
4      Q.    Mr. Lett, I'm Libby Odom and we
5  just met, and I am an attorney for
6  Reliable, the Defendant in this lawsuit.
7  It's my understanding you've brought a
8  claim against Reliable and we're here to
9  take your deposition.  You understand?
10     A.    I understand.
11     Q.    Okay.  The gentleman to the far
12 left of me is John Harbuck.  He is also
13 an attorney for Reliable, and the
14 gentleman next to me you know is George
15 Helms, who is a corporate representative.
16          I'm sure you went over this
17 with your attorney, but what I'm going to
18 do is ask you several questions, and it's
19 your responsibility to answer what I ask
20 you.  Okay?
21     A.    (NODS HEAD.)
22     Q.    Have you ever taken a
23 deposition before?

Page 8

1      A.    Sort of.  Not really, but a
2  definition (SIC) -- something like this.
3      Q.    Explain to me what you mean by
4  sort of.
5      A.    I was in an accident case and
6  they asked me some questions before some
7  more attorneys, something sort of similar
8  to this, but not a definition.
9      Q.    Okay.  Was there a court
10 reporter taking down --
11     A.    No.
12     Q.    Okay.  Now, if you don't
13 understand a question I ask, I'm going to
14 ask you to -- just ask me to rephrase it,
15 because if you answer we're all going to
16 assume that you understood what I was
17 asking.  Okay?
18     A.    Okay.
19     Q.    Also, we want to make sure that
20 we speak clearly for the court reporter,
21 because she's going to take down
22 everything you and I say, so it's very
23 important that we speak clearly and that

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 9

1  you answer my questions with yes or no.
2  You understand?
3      A.    I understand.
4      Q.    Okay.  Because sometimes we nod
5  our heads, uh-huh and huh-uh, and that's
6  just not going to be acceptable, because
7  it's very hard for her to take down those
8  things.
9              Also, you're entitled to a
10 break whenever you'd like to take one.
11 You know, if you want to stretch your
12 legs, go down the hall to the restroom,
13 have something to drink, that's fine.
14 The only thing I ask is that you answer
15 the question that's on the table.  Once
16 you've answered that question, we can go
17 ahead and take a break.  Okay?
18     A.    Okay.
19     Q.    Let's begin.  You understand
20 that you took an oath to tell the truth;
21 correct?
22     A.    Yes.
23     Q.    Would you please state your

Page 10

1  full name and address for the record?
2      A.    Full name is Frank Daniel Lett,
3  address█████████████████████████████,
4  █████████
5      Q.    Okay.  And I'm going to show
6  you what is called a Notice of
7  Deposition, and I just want you to take a
8  look at it.  Perhaps your lawyer can
9  stipulate that you all received this
10 Amended Notice of Deposition?
11            MS. LOWELL:  Yes, we did.
12     Q.    (BY MS. ODOM)  And before the
13 deposition, your attorney had said that
14 you all were going to bring some
15 documents over to this deposition.  Is
16 that correct?
17     A.    That's correct.
18     Q.    Okay.  Now, I want to go over
19 this Notice of Deposition.  I had
20 requested some documents.  If you look on
21 at number one, it says copies of each
22 invoice, bill, cancelled check, or any
23 other writing evidencing treatment or

Page 11

1  counseling for any emotional distress or
2  trauma.  Do you have any documents that
3  you're going to bring today that would be
4  responsive to that request?
5      A.    No more than what I gave her.
6            MS. LOWELL:  That wouldn't be
7  something that was included.
8      Q.    (BY MS. ODOM)  Okay.  What
9  about number two?
10     A.    Not knowledge -- of my
11 knowledge.
12            MS. LOWELL:  I mean, there is
13 records evidencing a communication.  I
14 mean, it depends on how broadly we would
15 read that, but there are approximately --
16 we have, I think, eight documents that
17 are going to be produced today.  And it's
18 more along the lines, I believe, that
19 there is a pay record page, there is a
20 record of phone numbers for people at
21 Reliable.
22            MS. ODOM:  Okay.
23            MS. LOWELL:  There -- I mean,

Page 12

1  it depends on how broadly you would read
2  number two and number three, but I would
3  say that there are documents that are
4  related to that, but I don't know that --
5  they should be here relatively very soon.
6            MS. ODOM:  Okay.  Well, we'll
7  just wait and see what they are, and, you
8  know, see if they're responsive to this.
9            Okay.  I'm going to mark into
10 the record Exhibit 1, which will be the
11 Amended Notice.
12            (WHEREUPON, DEFENDANT'S
13            EXHIBIT #1 WAS MARKED FOR
14            IDENTIFICATION AND IS ATTACHED
15            HERETO.)
16     Q.    (BY MS. ODOM)  Mr. Lett, I
17 understand that you probably spoke with
18 your attorney prior to this deposition.
19 Is there anything else you did to prepare
20 for the deposition?
21     A.    No more than just went over
22 some things me and her talked about.
23 That's it.

3 (Pages 9 to 12)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 13

1   Q.      Just talking to your attorney?
2   A.      That's it.
3   Q.      Okay.  Did you review any
4   documents in preparation for this
5   deposition?
6           MS. LOWELL:  Object.
7   Q.      (BY MS. ODOM)  You can go ahead
8   and answer.
9   A.      Go ahead and answer it?
10  Q.      Did you look at any documents?
11  A.      No more than what -- what she
12  showed me on records.
13  Q.      Have you met with anyone else,
14  did you talk to anyone else?
15  A.      No, not concerning this.
16  Q.      No employees of Reliable?  You
17  didn't meet with any employees of
18  Reliable about this deposition?
19  A.      No.
20  Q.      Okay.  And you're not taking
21  any medications today that would prevent
22  you from testifying truthfully?
23  A.      No medications today.

Page 14

1   Q.      What's your date of birth?
2   A.      ███████████████████████
3   Q.      How old would that make you
4   today?
5   A.      I'm fifty-one, fixing to turn
6   fifty-two.
7   Q.      And where were you born?
8   A.      Geneva, Alabama.
9   Q.      Okay.  How long have you
10  resided at the current address that you
11  gave?
12  A.      I've been there probably about
13  twelve years.
14  Q.      Do you rent or own?
15  A.      Own.
16  Q.      Does anyone live there with
17  you?
18  A.      Yes.
19  Q.      Who lives there with you?
20  A.      My brother, daughter in and
21  out.
22  Q.      Your daughter lives with you?
23  A.      In and out.

Page 15

1   Q.      So periodically?
2   A.      Periodically.
3   Q.      And what's your daughter's name
4   that lives with you?
5   A.      Beg pardon?
6   Q.      What's your daughter's name
7   that lives with you?
8   A.      Frankie.  She's in and out,
9   like I said.
10  Q.      Frankie Lett?
11  A.      Uh-huh.
12  Q.      How old is Frankie Lett?
13  A.      Twenty-one.
14  Q.      What's your brother's name?
15  A.      Roy.
16  Q.      Roy Lett, I assume?
17  A.      (NODS HEAD.)
18  Q.      Does anyone co-own the house
19  with you?  Is it your house?
20  A.      No.  It would just be my wife.
21  Q.      So you and your wife are
22  co-owners of this house?
23  A.      Yes.

Page 16

1   Q.      And your wife lives with you?
2   A.      Off and on.  She got her own
3   apartment.  We just separated right now.
4   Q.      What's your wife's name?
5   A.      Cora Lett.
6   Q.      And you're legally separated?
7   A.      No.
8   Q.      You just periodically live
9   apart?
10  A.      Yes.
11  Q.      How long have you been married?
12  A.      Approximately fifteen years,
13  sixteen.
14  Q.      Have you ever been divorced?
15  A.      No.
16  Q.      And where does Mrs. Lett live
17  when she doesn't live with you?
18  A.      An apartment.
19  Q.      Excuse me?
20  A.      An apartment.
21  Q.      And what is the address, do you
22  know?
23  A.      Not right off  .

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 17

```
 1    Q.    Is it in Geneva?
 2    A.    Yes.
 3    Q.    And you've never been married
 4  before?
 5    A.    No.
 6    Q.    Do you have any children
 7  besides Frank -- Frankie Lett?
 8    A.    Nine other children.
 9    Q.    Nine children. Okay. Can we
10  go through who those children are?
11    A.    Okay. I have -- I'm confused
12  right now. Just give me time. I got
13  Frankie, James --
14    Q.    Okay. You can start with the
15  oldest, I guess, or --
16    A.    Okay. Corey.
17    Q.    Corey, is that a boy or girl?
18    A.    Boy.
19    Q.    Okay. How old is Corey?
20    A.    He's thirty-two, I'm just
21  guessing.
22    Q.    Is it Corey Lett?
23    A.    No.
```

Page 18

```
 1    Q.    So what's Corey's last name?
 2    A.    McNeil.
 3    Q.    Does he live in Geneva?
 4    A.    Yes.
 5    Q.    Okay. Who is the next one?
 6    A.    Daniel.
 7    Q.    Daniel or Danielle?
 8    A.    Daniel.
 9    Q.    Okay. And how old is Daniel?
10    A.    He's twenty-eight.
11    Q.    And he lives in Geneva?
12    A.    Uh-huh.
13    Q.    Okay.
14    A.    Erica Scott.
15    Q.    Okay. And how old is Erica?
16    A.    She's thirty, somewhere like
17  that.
18    Q.    Thirty, you said?
19    A.    Uh-huh.
20    Q.    And you may have said this,
21  Daniel's last name is?
22    A.    Lett.
23    Q.    Lett. Okay. And Erica lives
```

Page 19

```
 1  in Geneva?
 2    A.    Uh-huh.
 3    Q.    Who else?
 4    A.    Travis Lett.
 5    Q.    And how old is Travis?
 6    A.    He's twenty-seven.
 7    Q.    Lives in Geneva?
 8    A.    (NODS HEAD.)
 9    Q.    Is that a yes?
10    A.    Yes.
11    Q.    Okay. Who else?
12    A.    James Smith.
13    Q.    James?
14    A.    Smith.
15    Q.    James Smith?    James?
16    A.    Uh-huh.
17    Q.    Okay. And how old is James?
18    A.    Twenty-one.
19    Q.    Lives in Geneva?
20    A.    No, he's in Massachusetts.
21    Q.    Okay. And I think you've got
22  three more. Who?
23    A.    Let's see, that's -- I said
```

Page 20

```
 1  nine or eight? Okay. I got confused.
 2  All right. I got Shantay.
 3    Q.    Can you spell that?
 4    A.    Shantay Treece -- Treece.
 5  Shantay -- I don't know how he really
 6  spells it. I think it's Shantay --
 7  really, he's not my son, but I just --
 8  you might as well put it on record, it's
 9  not on record or anything. Do I need to
10  put that on record?
11    Q.    What do you -- explain to me
12  how -- he's not your biological son?
13    A.    Well, yes, but then yes and no.
14  I mean --
15    Q.    Is he your biological son?
16    A.    Well, no. I'm not going to put
17  them on there, because they're not
18  biological. I just always claimed them.
19    Q.    What do you mean, you've always
20  claimed them?
21    A.    Well, his mother said he was
22  mine, but then yet -- it's not on there.
23    Q.    So his mother said he was
```

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 21

1  yours, you're not sure?
2      A.    Right.
3      Q.    Okay.  Do you pay child support
4  for Shantay?
5      A.    No.
6      Q.    Did you ever pay child support
7  for Shantay?
8      A.    No.
9      Q.    How old is Shantay?
10     A.    He's about twenty-seven,
11 twenty-eight.
12     Q.    When you say you claim them
13 sort of --
14     A.    Well, you know, I'm always
15 close to certain ones, you know, and they
16 always just call me dad.
17     Q.    So you act like a father figure
18 to them?
19     A.    Uh-huh.
20     Q.    Okay.  But no child support?
21     A.    No.
22     Q.    Okay.  Any other ones?
23     A.    Jason.

Page 22

1      Q.    Jason, what's Jason's last
2  name?
3      A.    Simon.
4      Q.    Okay.  And how old is Jason?
5      A.    Twenty-six.
6      Q.    Who is Shantay's mother?  Do
7  you know her name?
8      A.    Dorothy.
9      Q.    Dorothy?  What's her last name?
10     A.    Treece.
11     Q     Excuse me?
12     A.    Treece.
13     Q.    And what's Shantay's last name?
14     A.    Treece.
15     Q.    Okay.
16     A.    That's it.  That's probably
17 just eight of them.
18     Q.    That's seven.  You have Corey,
19 Daniel, Erica, Travis, James, Shantay,
20 Jason.
21     A.    Frankie.
22     Q.    Got Frankie -- no, we don't
23 have Frankie.

Page 23

1      A.    That's eight.
2      Q.    Okay.  You said nine.
3      A.    I know I said nine, but it's
4  eight.
5      Q.    It's just eight?  Okay.
6            Do you have any step-children,
7  or is the step-children --
8      A.    They all on there.
9      Q.    Okay.  Who would be your
10 step-child and not your biological child?
11     A.    Erica.
12     Q.    Who is Erica's real mother --
13 or biological mother?
14     A.    Cora.
15     Q.    Cora.  And that would make
16 sense.
17     A.    And -- well, that's right.
18     Q.    Okay.  Do you have any child
19 support orders?
20     A.    Yes.
21     Q.    Okay.  For which of these
22 children?
23     A.    I still pay Cora.

Page 24

1      Q.    For Frankie?
2      A.    Yes, back pay.
3      Q.    And you have no other child
4  support orders?
5      A.    I have child support order but
6  I pay for another child, but that's --
7  that's on my doing, trying to survive.
8      Q.    Okay.  Well, so you pay a child
9  support order for a child that is not
10 yours?
11     A.    Well, long story.
12     Q.    Okay.  Who is the child?
13     A.    Okay.  The child is ▆▆▆▆▆▆▆▆
14     Q.    ▆▆▆▆▆▆▆▆.  Okay.  How old is
15 ▆▆▆▆▆▆?
16     A.    Seven.
17     Q.    Okay.  And this is not your
18 child?
19     A.    Well, I'm -- I claim --
20     Q.    You claim her?
21     A.    Yeah, because of the
22 circumstances.
23     Q.    What circumstances?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 25

1    A.    Just keep confusion down.
2    Q.    Can you elaborate on what you
3  mean by keep confusion down?
4    A.    It's a long, drawn out story.
5  It's another case.
6    Q.    Who is ████████████mother?
7    A.    Cynthia.
8    Q.    Cynthia who?
9    A.    Lane.
10    Q.    How long have you been paying
11  child support for Cynthia Lane's child?
12    A.    Probably the last three years
13  or something like that, three years,
14  something like that, four.
15    Q.    And how -- I'd like you to
16  elaborate on how you came about paying
17  child support for Cynthia Lane's child if
18  you are saying that the child is not
19  yours?
20    A.    Well, if I go through that,
21  we're going through that we're going to
22  be on another case.  That's -- that's
23  another document.

Page 26

1    Q.    What do you mean by that?
2    A.    It's -- it's like another case,
3  it's contradentiary (SIC).
4    Q.    Was there a paternity test case
5  in this?  Did she claim that you were the
6  father and --
7    A.    Well, that's what I'm saying,
8  it's another -- it's another case.  It's
9  contradentiary (SIC).
10    Q.    Confidential?
11        MS. LOWELL:  Can we take a
12  quick break?
13        MS. ODOM:  Sure.
14        (WHEREUPON, A SHORT RECESS WAS
15        HAD.)
16    Q.    (BY MS. ODOM)  Before we took a
17  break we were talking about Cynthia Lane
18  and the child█████████e that you pay
19  child support for.
20    A.    Okay.
21    Q.    And you were talking something
22  about there being another case; is that
23  correct?

Page 27

1    A.    Well, I was talking about it
2  with -- I didn't think it had anything to
3  do with this right here, but I'm ready to
4  go ahead, answer your questions or
5  whatever.
6    Q.    Okay.  Well, back with what you
7  were saying, were the court records
8  sealed in that case, or is there a case?
9    A.    It's not sealed.
10    Q.    Okay.  What are the facts of
11  that case?  I mean, is Cynthia Lane suing
12  you for child support?
13    A.    No.  I select to pay the child
14  support.
15    Q.    Okay.  And why did you select
16  to pay child support?
17    A.    I just select to pay child
18  support because she said the child was
19  mine.
20    Q.    Okay.  Have you ever had a
21  personal relationship with Cynthia Lane?
22    A.    Yes.
23    Q.    For how long?

Page 28

1    A.    Wasn't very long, just a few
2  months or something like that.
3    Q.    Is this still going on?
4    A.    No.
5    Q.    Can you maybe -- was it a year
6  ago, six months ago?
7    A.    No, it's been years ago.
8    Q.    How many years ago?
9    A.    Probably -- now, we talk, but
10  as far as a relationship, no.  It's been
11  -- I think it's been over five or six
12  years ago, maybe longer.
13    Q.    Now, does Cynthia Lane work
14  with you?
15    A.    Yes.
16    Q.    What position does she hold?
17    A.    She's just assembly.
18    Q.    Is she a subordinate of yours?
19    A.    Beg pardon?
20    Q.    Does she work under you?
21    A.    Yes.
22    Q.    Have you ever been involved in
23  any other lawsuits other than this suit

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 29

1  and any -- not including any child
2  support orders, any other lawsuits?
3       A.    No.
4       Q.    What is Lett v. Bradford?  Does
5  that case ring a bell?
6       A.    Who?
7       Q.    Lett versus Bradford.
8       A.    Bradford?
9       Q.    Bradford.  Are you familiar
10  with that lawsuit?
11      A.    I think that was a car accident
12  that happened years ago.
13      Q.    Are you the Plaintiff Lett in
14  that case, or is that your wife?
15      A.    We both was involved -- my son
16  was involved in it and that's when it
17  came up.  He had stole the car that that
18  was about.
19      Q.    Your son stole a car?
20      A.    Yes.
21      Q.    And that's Lett versus
22  Bradford?
23      A.    Yes.  And did you testify in

Page 30

1  that lawsuit?
2       A.    No.  I think that was --
3  that's the one I was telling you about
4  earlier about I thought it was like a
5  definition.  We dropped all of that.
6       Q.    Okay.  But you've never been
7  plaintiff or defendant in any other
8  lawsuits?
9       A.    No.
10      Q.    Have you ever filed any claim
11  or complaints with the EEOC or the NLRB
12  or any other federal agency other than
13  with respect to this claim?
14      A.    No.
15      Q.    Have you ever applied for
16  unemployment compensation against
17  benefits?
18      A.    No, not -- many years ago.
19      Q.    It's my understanding that you
20  have been periodically laid off from
21  Reliable and that perhaps maybe you had
22  gotten unemployment compensation with
23  respect to layoffs; is that correct?

Page 31

1       A.    Yes.
2       Q.    And in those instances, when
3  you would have applied, you would have
4  received benefits; correct?
5       A.    Yes.
6       Q.    Have you ever provided a
7  written statement or affidavit under
8  oath?  What I mean by that is signed a
9  writing that would have been under oath?
10      A.    No.  Not as I recall, no.  No.
11      Q.    Have you ever filed for
12  bankruptcy?
13      A.    Yes.
14      Q.    When?
15      A.    A couple of years ago, I think,
16  about a year ago, year, something like
17  that.
18      Q.    Do you remember what court you
19  filed bankruptcy in?
20      A.    In Dothan, Alabama.  I know it
21  was Dothan, Alabama.
22      Q.    Did you and your wife, Cora
23  Lett, do it together?

Page 32

1       A.    No.  Just me.
2       Q.    So that would have been in 2005
3  you did that, or --
4       A.    2005.  I think it was 2 --
5  yeah, 2005.
6       Q.    Have you ever been convicted of
7  a crime?
8       A.    No.
9       Q.    Have you ever been arrested?
10      A.    No.
11      Q.    I'm going to give you this
12  sheet, and this is a list of the counties
13  in the Middle District of Alabama.
14  You've filed a lawsuit in the Middle
15  District of Alabama, and what I want you
16  to do is just look at this list of
17  counties and tell me what relatives you
18  have in these counties.  I know we've
19  gone over your children and your wife, so
20  other than your children and your wife
21  and your brother, can you give me any
22  other relatives in these counties?
23      A.    No, I really -- most of them in

8 (Pages 29 to 32)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

---

Page 33

1    Geneva County.
2        Q.    What about grandparents, do you
3    have any grandparents that are still
4    living?
5        A.    No.  No.
6        Q.    Aunts, uncles?
7        A.    No -- yeah, I have an uncle
8    living.  They all live in Geneva.
9        Q.    Your uncle lives in Geneva?
10       A    Uh-huh.
11       Q.    Okay.  And what's your uncle's
12   name?
13       A.    Andrew Clay.
14       Q.    Andrew Clay?
15       A.    Uh-huh.
16       Q.    Any other uncles or aunts
17   living in Geneva?
18       A.    No -- yes, I have one named
19   Kate.
20       Q.    Kate?  What's Kate's last name?
21       A.    I don't know what she go by.
22   She done got remarried.  She used to be
23   Kate Lett.

Page 34

1        Q.    How old is Kate Lett?
2        A.    She's probably about
3    sixty-eight, sixty-nine.
4        Q.    What about brothers and sisters
5    living in Geneva close to you?
6        A.    Yes.
7        Q.    Who are those brothers and
8    sisters?
9        A.    Willie Lett.
10       Q.    Willa?
11       A.    Willie.
12       Q.    Willie, okay.  Is that a male
13   or female?
14       A.    Male.
15       Q.    Anyone else?
16       A.    Ella Lett.
17       Q.    Ella?
18       A.    Uh-huh.  Mort.
19       Q.    Excuse me?
20       A.    Mort.
21       Q.    Molt?  Can you spell that?
22       A.    M-O-R -- Mort.
23       Q.    Okay.  Lett?

Page 35

1        A.    Lett.
2        Q.    Anyone else?
3        A.    Rosie.
4        Q.    Rosie Lett?
5        A.    Uh-huh.  Roy Lett.
6        Q.    Roy lives with you; correct?
7        A.    (NODS HEAD.)
8        Q.    Is that right?
9        A.    Uh-huh.
10       Q.    Okay.  Anyone else?
11       A.    That's it.
12       Q.    Parents?
13       A.    They live here in Birmingham,
14   both my parents.
15       Q.    Okay.  What about cousins, any
16   cousins?
17       A.    Whew!  Plenty of cousins.
18       Q.    Can you just maybe rattle off a
19   few for me or those that you can
20   remember, I mean, that would live -- I'm
21   really interested in relatives of yours
22   that live in these counties.
23       A.    Andrew Clay, Jawana Clay.

Page 36

1        Q.    Jawana?
2        A.    (NODS HEAD.)
3        Q.    Okay.
4        A.    Lily.
5        Q.    What's Lily's last name?
6        A.    She's Clay, too.  I got some
7    Hayeses.
8        Q.    Hayes?
9        A.    They live in the county.
10       Q.    Last name H-A-Y-E-S?
11       A.    Uh-huh, Hayes, yes.  Most of
12   them are close relatives.  Got some more
13   Letts in the county.
14       Q.    Any other names you can give
15   me?
16       A.    Most of them mostly the closest
17   to me.  I mean, plenty of cousins, but
18   most of them the main ones.
19       Q.    Okay.  Where do you attend
20   church, or should I say do you attend
21   church?
22       A.    Yes.
23       Q.    Where?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 37

1    A.    EPC is the name of it, in
2  Geneva.
3    Q.    EPC?
4    A.    Uh-huh. That's the Evangelical
5  Pentecostal Church.
6    Q.    Okay. And how long have you
7  been with that church?
8    A.    Eighteen years.
9    Q.    You haven't been with any other
10  churches?
11    A.    I used to be in the Baptist
12  Church.
13    Q.    When were you in the Baptist
14  Church?
15    A.    I had been there all my life
16  before I joined the other church.
17    Q.    Eighteen years ago?
18    A.    Uh-huh.
19    Q.    Are you pastor?
20    A.    I was a minister.
21    Q.    You were a minister? Are you a
22  minister now?
23    A.    I'm still a minister.

Page 38

1    Q.    Okay. And where are you a
2  minister?
3    A.    At the EPC -- Evangelizing.
4    Q.    How long have you been a
5  minister?
6    A.    Probably nine, ten years.
7    Q.    Where did you attend high
8  school?
9    A.    Geneva.
10    Q.    Geneva High?
11    A.    Geneva High.
12    Q.    And when did you graduate?
13    A.    '72.
14    Q.    And I assume you received a
15  diploma?
16    A.    Yes.
17    Q.    Any other education after high
18  school?
19    A.    No, no more than just seminars
20  and stuff like that.
21    Q.    Seminars that you would have
22  done through work?
23    A.    Yes.

Page 39

1    Q.    And you're currently employed
2  at Reliable; correct?
3    A.    That's correct.
4    Q.    And you were hired in 1973; is
5  that correct?
6    A.    That's correct.
7    Q.    Are you currently employed
8  anywhere else besides Reliable right now?
9    A.    No, just Reliable.
10    Q.    I understand that you've worked
11  at Reliable since 1973. Have you ever
12  had any other jobs other than Reliable?
13    A.    Retired military, National
14  Guard.
15    Q.    When were you in the National
16  Guard?
17    A.    '78, I started in '78 to '94.
18    Q.    And that was the Alabama
19  National Guard?
20    A.    Uh-huh.
21    Q.    What was your rank?
22    A.    Sergeant.
23    Q.    Were you discharged?

Page 40

1    A.    No, retired.
2    Q.    You didn't have any other jobs
3  other than what you did in the National
4  Guard besides Reliable?
5    A.    No. I just worked at a
6  restaurant on the side.
7    Q.    What restaurant?
8    A.    Uh, what was it? A seafood in
9  Geneva.
10    Q.    A seafood restaurant?
11    A.    Uh-huh.
12    Q.    Do you know the name of it?
13    A.    They changed it so many times,
14  I don't know what the name exactly was.
15  I just call it the seafood restaurant
16  because it's had so many odd names.
17    Q.    When was this?
18    A.    A couple of years, two or three
19  years ago.
20    Q.    How long did you work for them?
21    A.    Probably two years.
22    Q.    Did you work part-time?
23    A.    Part-time.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 41

1   Q.   What was your position?
2   A.   Cook.
3   Q.   What was your rate of pay?  Do
4   you remember?
5   A.   Five dollars an hour, minimum
6   wage.
7   Q.   Did you ever make any
8   allegation of discrimination against the
9   restaurant?
10  A.   No.
11  Q.   Any other employment you've
12  had?
13  A.   No, no more than just
14  self-employed.
15  Q.   What do you mean,
16  self-employed?
17  A.   Just done things, like yard
18  work.
19  Q.   But not for a company, you've
20  just -- on your own?
21  A.   No.  Uh-huh.
22  Q.   How old were you when you went
23  to work for Reliable?

Page 42

1   A.   Pretty young.  Probably twenty,
2   twenty -- somewhere around about twenty.
3   Q.   Did you work anywhere before
4   Reliable or did you graduate from high
5   school and go right to Reliable?
6   A.   No.  I worked at JW Well
7   Digging Company for probably three or
8   four months, and I worked at the Geneva
9   Cotton Mill for probably a year.
10  Q.   What type of work did you do at
11  those places?
12  A.   Well Digging Company, I -- we
13  dug wells.  And Geneva Cotton Mill, I was
14  a doffer.
15  Q.   So why did you leave those
16  companies?
17  A.   Because I was offered another
18  job.  I was on the night shift, so I got
19  a chance to go to days, I went to days.
20  Q.   How did you come to work for
21  Reliable?
22  A.   I had a brother working there
23  during the time, and he told me there was

Page 43

1   a good job at Reliable.  So I applied for
2   it.
3   Q.   Explain to me what Reliable
4   does?
5   A.   We build commercial grill --
6   manufacture grills, I mean, things like
7   that.
8   Q.   Okay.  And I understand that
9   the company --
10  A.   Sheet metal.
11  Q.   Go ahead.
12  A.   Sheet metal, just mostly sheet
13  metal dealing with that.
14  Q.   Okay.  I understand that the
15  company is set up in two sections; one is
16  the architectural side, and the other is
17  the HVAC side; is that correct?
18  A.   That's correct.
19  Q.   What side do you work on?
20  A.   I work on the HVAC side, but I
21  also have worked on the other side, too.
22  Q.   When did you work on the other
23  side?

Page 44

1   A.   Just part-time, sometimes
2   part-time.
3   Q.   When did you work on the other
4   side part-time?
5   A.   Just whenever they needed work,
6   you can get some work done, I mean, like
7   overtime.
8   Q.   Was this recently?
9   A.   Sure.
10  Q.   What type of work did you do on
11  the other side?
12  A.   Whatever needed.
13  Q.   Can you give me an example?
14  A.   Well, run the machines or clean
15  grills or assembly.
16  Q.   What department did you work in
17  over there?
18  A.   Six, 7.
19  Q.   And this was just when they
20  need help on an overtime basis?
21  A.   Yes, mostly.
22  Q.   So you never worked full-time
23  on the other side?

11 (Pages 41 to 44)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 45

1     A.     Not full-time.
2     Q.     And you had just worked when
3  they needed help?
4     A.     Need help.
5     Q.     It's my understanding that the
6  HVAC side does more standard items; is
7  that correct?
8     A.     Well, that's correct, but it's
9  all in one company, though, you know.
10  They just got it separated, this do this
11  type of grill, and this one do this type
12  of grill. It's all really one company,
13  but they just got it separated.
14     Q.     So the HVAC side does one type
15  and then the architectural side does
16  another type, and those types are
17  different?
18     A.     Yes.
19     Q.     Okay. I want to show you that
20  document, and I believe it is the
21  employment application that you filled
22  out in 1973; is that correct?
23     A.     It's been so long.

Page 46

1     Q.     Probably haven't seen this in a
2  while. I think on the second page it has
3  your signature. I just want you to tell
4  me whether it's a true and correct copy
5  of your employment application?
6     A.     Yes. It's been that long, I
7  don't even know what it looked like till
8  now.
9     Q.     But you don't dispute that this
10  is what you turned in?
11     A.     Yes.
12     Q.     You do dispute it?
13     A.     No. This is it. What I said,
14  it's been so long.
15     Q.     Understandable. Okay. I'm
16  going to mark this as Exhibit 2.
17          (WHEREUPON, DEFENDANT'S
18          EXHIBIT #2 WAS MARKED FOR
19          IDENTIFICATION AND IS ATTACHED
20          HERETO.)
21     Q.     Now, when you were first hired
22  at Reliable, what was your position, do
23  you remember?

Page 47

1     A.     Just assembly.
2     Q.     Assembler? And what were your
3  job duties as an assembler?
4     A.     Just form big grills, just
5  sticking grills together, just, you know,
6  working on the assembly line.
7     Q.     And how long were you in that
8  position? Several years?
9     A.     Several years, yes.
10     Q.     Who was your supervisor?
11     A.     I think his name was Jack
12  Anniston.
13     Q.     Any other supervisors? I know
14  you were there several years.
15     A.     Well, Gene Wesley.
16     Q.     Gene, G-E-N-E, Wesley?
17     A.     Uh-huh.
18     Q.     Any other supervisors?
19     A.     That was mostly about it, yeah.
20  Mac -- I think Mac Sellers later on. I
21  think he was -- he became my supervisor.
22     Q.     Okay. It's my understanding
23  that in 1989 you were promoted to saw

Page 48

1  operator; is that correct?
2     A.     That's correct.
3     Q.     Okay. From 1973 to 1989 were
4  you always an assembler?
5     A.     Yes.
6     Q.     What did you do as a saw
7  operator?
8     A.     Just saw whatever necessary
9  they needed to saw.
10     Q.     Did you have the same
11  supervisor or did you have different
12  supervisors?
13     A.     I had a different supervisor
14  during that time.
15     Q.     Okay. And who was that?
16     A.     Wesley -- I think it started
17  with him, Gene Wesley.
18     Q.     Gene Wesley. Okay. Any
19  others?
20     A.     Then came Mac Sellers. And --
21     Q.     And you were an assembler --
22  excuse me. Go ahead.
23     A.     I think David Burch came, I was

12 (Pages 45 to 48)

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 49

1  up under him after Mac Sellers passed.
2      Q.    **David Burch?**
3      A.    Uh-huh.
4      Q.    **He's still with the company;**
5  **correct?**
6      A.    Uh-huh.
7      Q.    **And when you were an assembler**
8  **and saw operator, you were on the HVAC**
9  **side of the company doing that type of**
10 **work?**
11     A.    Well during that time it wasn't
12 separated.
13     Q.    **Explain how it was during that**
14 **time.**
15     A.    Just one big company.
16     Q.    **Okay.**
17     A.    They hadn't sold out then, I °
18 don't think, during that time.
19     Q.    **When did the company separate**
20 **into those two sides?**
21     A.    If I'm not mistaken, I can't --
22 I can't really call so-called how they
23 went about doing that or when it happened

Page 50

1  or how they come up with the separation
2  and whatever, you know.  I know it
3  separated and now they call it HVAC and
4  architect side, I'd say since the last
5  company bought them out, Ruskin -- Ruskin
6  bought them out.
7      Q.    **I believe that was in 2000, so**
8  **would you agree that it's been two sides**
9  **since at least 2000?**
10     A.    Somewhere up in there.
11     Q.    **Okay.  Now, it's my**
12 **understanding that you were promoted from**
13 **saw operator to lead man in 1994; is that**
14 **correct?**
15     A.    Yes.  I left the saw man -- no,
16 that's not correct.  I left saw man to a
17 welding job.  I was the tack welder.
18     Q.    **Tank welder?**
19     A.    Tack welder, welding.
20     Q.    **When did you become the tack**
21 **welder?**
22     A.    Somewhere between -- before I
23 got the promotion.  From the saw job, I

Page 51

1  left the saw job to the tack welder.
2      Q.    **Was that a promotion?**
3      A.    Beg pardon?
4      Q.    **Was it a promotion to go from**
5  **saw operator --**
6      A.    It wasn't a promotion, but it
7  was a change of a job.
8      Q.    **Did you request that change?**
9      A.    Well, the job was open.
10     Q.    **So you wanted the job?**
11     A.    Uh-huh.
12     Q.    **And how long were you the tack**
13 **welder?**
14     A.    I was tack weld about -- oh,
15 about three or four years, somewhere up
16 in there.  Two or three years, somewhere
17 up in there.
18     Q.    **And who were your supervisors?**
19 **Were they the same individuals?**
20     A.    Yes, they was -- Mac Sellers
21 during that time.
22     Q.    **David Burch?**
23     A.    Mac Sellers.

Page 52

1      Q.    **Just Mac Sellers or --**
2      A.    It was them two between that
3  time.
4      Q.    **Mac and David?**
5      A.    (NODS HEAD.)
6      Q.    **And what type of work did you**
7  **do as a tack welder?**
8      A.    I weld mostly the new type of
9  grill we bought, just welded some grills
10 together.  That was it.
11     Q.    **And so from tack welder, you**
12 **went to lead man in 1994?**
13     A.    Right.
14     Q.    **And that was a promotion;**
15 **correct?**
16     A.    That was a promotion.
17     Q.    **And it's my understanding that**
18 **you're a lead man now; is that correct?**
19     A.    That's correct.
20     Q.    **What department are you the**
21 **lead man for?**
22     A.    Department 2.
23     Q.    **How long have you been the lead**

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 53

1  man for Department 2?  Since 1994?
2      A.    Since '94.
3      Q.      So you haven't worked in any
4  other departments -- I mean, since 1994?
5      A.    No more than just overtime
6  volunteer work.
7      Q.      Describe what you do as a lead
8  man?
9      A.    I make sure that all the
10  workers have their work, make sure
11  everything is available for them to do
12  what they have to do.  And I grade each
13  one according to how they work, you know.
14  And I --
15      Q.      You mean -- excuse me.  You
16  mean performance evaluations?
17      A.    Evaluation, whatever is needed.
18  You know, I work with the supervisor to
19  make sure we get orders out on time and
20  the work is -- we have the work --
21  everything available to do the work.
22      Q.      Who is your supervisor?
23      A.    Kenny Taylor.

Page 54

1      Q.      As a lead man, do you do
2  production work alongside the other
3  employees?
4      A.    Do I do the work?
5      Q.      Yeah, do you do the same work?
6      A.    Yes.  I get in and I help them
7  out a lot.
8      Q.      Do you complete any written
9  reports as part of your job?
10      A.    It's -- no more than just, you
11  know, orders, complete orders, on-time
12  shipments.
13      Q.      So you complete the orders for
14  the shipments that need -- for the
15  products that you all need, you make sure
16  that is all taken care of?
17      A.    Yes.
18      Q.      How many employees work under
19  you, or I guess to rephrase, how many
20  employees are you the lead man for?
21      A.    Right now, about thirty-one.
22      Q.      And what product are you all
23  making?

Page 55

1      A.    We make -- it's call an A500
2  line, that's a commercial grill for a
3  duct -- for a, like, ventilator.
4      Q.      Is that the only thing you all
5  do?
6      A.    Yes, in that area.
7      Q.      And just to be clear, that's on
8  the HVAC side?
9      A.    Yes.
10      Q.      Do you like your job?
11      A.    Yes.
12      Q.      What's your current rate of pay
13  right now?
14      A.    Fifteen -- exactly, let me make
15  sure, fifteen eleven.
16      Q.      Fifteen eleven?
17      A.    Uh-huh.
18      Q.    That's per hour?
19      A.    Uh-huh, if I'm not mistaken.
20      Q.      Do you know any other
21  employees' rate of pay?
22      A.    I'm not sure that it's correct,
23  but some of them I probably do.

Page 56

1      Q.      So you would -- you don't know
2  for sure what their rate of pay is?
3      A.    Right.
4      Q.      And over the last several
5  years, you've received pay increases;
6  correct?
7      A.    No.
8      Q.      What do you mean by that?
9      A.    I have received one pay
10  increase in the last year.  It was last
11  year I got a pay increase.
12      Q.      So each year you receive a pay
13  increase?
14      A.    Year before we didn't get a pay
15  increase.  We was frozen.  We just got a
16  bonus check.
17      Q.      But you have received pay
18  increases over the last ten years?
19      A.    Yes.
20      Q.      It's my understanding that in
21  2000 Tompkins took over the company; is
22  that correct?
23      A.    Somewhere up in there, if I'm

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 57

1  not mistaken, correct.
2      Q.    And I believe you all filled
3  out new employment applications when
4  Tompkins took over; is that correct?
5      A.    That's correct.
6      Q.    I put in front of you an
7  application for employment. Does this
8  appear to be the application that you
9  completed in 2000?
10     A.    Yes.
11     Q.    Okay. And just to be clear,
12 you were an employee, you all -- all the
13 employees were required to fill out this
14 application just because another company
15 took over; correct?
16     A.    Correct. I assume we all did.
17         MS. ODOM:    I'd like to mark
18 this 2000 employment application as
19 Exhibit 3.
20         (WHEREUPON, DEFENDANT'S
21         EXHIBIT #3 WAS MARKED FOR
22         IDENTIFICATION AND IS ATTACHED
23         HERETO.)

Page 58

1      Q.    Now, as an employee of Reliable
2  you received an employee handbook;
3  correct?
4      A.    Yes.
5      Q.    I've put in front of you a copy
6  of the employee handbook. Is that a true
7  and correct copy of the employee
8  handbook?
9      A.    Yes.
10     Q.    Okay. I'd also like to show
11 you acknowledgement of receipt of the
12 employee handbook. Is that your
13 signature at the bottom?
14     A.    That's correct.
15     Q.    And this acknowledgement states
16 that you have received a copy of the
17 employee handbook; correct?
18     A.    That's correct.
19     Q.    Now, if we could go through the
20 handbook, you can turn to Page 2.1.
21 You'll see it starts with ones, the ones,
22 and then it goes to 2.1.
23         Okay. You see at the top of

Page 59

1  the page it says "Equal Employment
2  Opportunity"?
3      A.    Yes.
4      Q.    Okay. Now I'm going to read
5  what it says. It says, "Reliable
6  Products affords equal opportunity for
7  employment to all individuals in
8  accordance with applicable local, state,
9  and federal laws. All management
10 personnel and other employees are
11 required to observe our policy of
12 non-discrimination." Is that what it
13 says?
14     A.    Yes.
15     Q.    Okay. So you would agree that
16 there is a written policy for equal
17 employment opportunity?
18     A.    Would I agree with it? Yes.
19     Q.    That there is a written policy?
20     A.    Yes. That right there, it is.
21     Q.    And under it, you see that
22 there is a harassment policy as well. Do
23 you agree that there is a sex harassment

Page 60

1  policy written for the company?
2      A.    Yes.
3         MS. ODOM: Okay. I would like
4  to mark the employment handbook as the
5  next exhibit, Exhibit 4, and then the
6  employee acknowledgement as Exhibit 5.
7         Mr. Lett, do you mind if I take
8  your copy of the employee handbook and
9  give it to the court reporter?
10        We can go off the record.
11        (WHEREUPON, DEFENDANT'S
12        EXHIBITS #4, #5 WERE MARKED FOR
13        IDENTIFICATION AND ARE ATTACHED
14        HERETO.)
15        (WHEREUPON, AN OFF-THE-RECORD
16        DISCUSSION WAS HAD.)
17     Q.    (BY MS. ODOM) I also want to
18 show you another document, Mr. Lett, and
19 this is an equal employment opportunity
20 policy. Have you seen this document
21 before?
22     A.    I don't know if I've seen
23 exactly this one or not, but they have

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 61

1  had some things that we went over.
2      Q.    What do you mean, things we
3  went over?
4      A.    Well, we talked -- we had a
5  class on equal opportunity, harassment,
6  and others things like that.
7      Q.    When did you have that class?
8      A.    I can't call --
9      Q.    Within the last few years?
10     A.    Yes.
11     Q.    And it was with all employees?
12     A.    I think it's management.  I
13  don't know if all employees had it or
14  not.
15     Q.    So just management and lead
16  persons were present?
17     A.    Yes.  I know we was on one of
18  them.
19     Q.    Okay.  So you haven't -- this
20  isn't a document that you've seen posted
21  in the break room?
22     A.    I hadn't paid any attention.
23     Q.    So it could be posted in the

Page 62

1  break room?
2      A.    It could be.
3      Q.    Okay.  You said your supervisor
4  was Kenny Taylor.  Do you have any other
5  supervisors above you?
6      A.    No more than assistant
7  supervisor.
8      Q.    And who is the assistant
9  supervisor?
10     A.    Stan Henderson.
11     Q.    What about David Burch, is he
12  your supervisor?
13     A.    Management.
14     Q.    He's the what?
15     A.    Plant manager over the
16  supervisors in that area.
17     Q.    Can you explain for me the
18  managerial hierarchy at Reliable?  Is it
19  David Burch, the plant manager, and then
20  under him the supervisor?
21     A.    Yes, Kenny Taylor.  Then Stan
22  Henderson.
23     Q.    Okay.  And then the lead

Page 63

1  persons?
2      A.    Right.
3      Q.    What about above David?  Is
4  there anyone above the plant manager, or
5  is it upper management?
6      A.    I assume Clyde and George are
7  the next men in line.
8      Q.    What's Clyde's last name?
9      A.    Cook.
10     Q.    Do you know his position?
11     A.    He's one of the management, top
12  management.
13     Q.    Of the company?
14     A.    Uh-huh.
15     Q.    And what -- who was the other
16  individual you named?
17     A.    I would think George, George
18  Helms.
19     Q.    George?
20     A.    George.
21     Q.    Helms?
22     A.    Yes.
23     Q.    And do you know George's

Page 64

1  position?
2      A.    He's the personnel.
3      Q.    Do you deal with Clyde Cook on
4  a daily basis, or is that someone you
5  deal with?
6      A.    On a daily base?  No more than
7  just talk to him here and there.
8      Q.    So if you have a problem, you
9  go to Kenny; correct?
10     A.    I go to all of them, if you
11  really want to know.
12     Q.    That's fair.
13          What type of relationship do
14  you have with Kenny Taylor?  Do you like
15  him?
16     A.    True?  Yes, I like him as a
17  person, and really as a bossman, too.
18     Q.    You all get along?
19     A.    Sure.  I have to, he's my boss.
20     Q.    Do you have any problems with
21  him?
22     A.    We have difficult problems
23  sometimes; not major problems.  We always

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 65

1  works it out.
2      Q.    Can you elaborate on what type
3  of problems you all have had in the past?
4      A.    Well, the job that I does, he's
5  not that familiar with it because he just
6  came supervisor, and the job that I was
7  doing I'd been on it for, like I said,
8  since '94.  Since he came supervisor, he
9  wasn't familiar with the job and there's
10  a lot of changes that he wanted to make,
11  and, you know, kind of had some difficult
12  problems trying to work it out, trying to
13  get him to understand why this was that
14  and that and that.  But he was the
15  bossman, he wanted things to go the way
16  he wants it to go.
17      Q.    So you're saying he didn't
18  understand your job as a lead man?
19      A.    My job was the -- not as the
20  lead man, but as that position, the kind
21  of grill we performed and what we was
22  doing.  He had to learn that.
23      Q.    Where did he come from before

Page 66

1  he was the supervisor?
2      A.    Assistant supervisor.
3      Q.    For what department?
4      A.    Four.
5      Q.    Was he the assistant supervisor
6  above you?
7      A.    Yes.  And before he was the
8  lead man, and before he was the saw
9  operator.
10      Q.    Within the same department, is
11  he moving, so he moves from saw operator
12  to lead man?
13      A.    Right.
14      Q.    To assistant supervisor?
15      A.    To supervisor.
16      Q.    So he didn't come from, I
17  guess, another department altogether, he
18  was within your department?
19      A.    He was like -- like you said,
20  we got Russell, commercial grill, HVAC on
21  one side, and this one on this side.
22  It's the same thing in the department, we
23  got one big group department together,

Page 67

1  but we was all -- just one supervisor,
2  but it was several different departments.
3      Q.    So you're saying that he didn't
4  understand what your particular
5  department made and how they made it?
6      A.    Yeah.
7      Q.    Because he was in the other
8  department?
9      A.    Right, correct.
10      Q.    What about David Burch, do you
11  get along with him?
12      A.    Yes.
13      Q.    Any problems?
14      A.    No, not really.
15      Q.    And Clyde Cook, you said you
16  deal with him sometimes?
17      A.    Yeah.  I had -- was in the
18  Reserves with him.
19      Q.    So you all are friends?
20      A.    Yes.
21      Q.    No problems with him?
22      A.    No problem.
23      Q.    When I say no problems, I mean

Page 68

1  do you all get along?
2      A.    Oh, we get along.  Have to,
3  that's my job.
4      Q.    What about Roger Peak?  Is that
5  name familiar?
6      A.    Yes.
7      Q.    What is his position?
8      A.    He's the manager.
9      Q.    What type of manager?
10      A.    He's the plant manager on the
11  Ruskin side.  That's the other side, the
12  architect side.
13      Q.    I refer to it as architect.  Is
14  that okay?
15      A.    Yes.
16      Q.    So he's the plant manager on
17  the architect side.  Clyde Cook is the
18  plant manager on the --
19      A.    Overall.
20      Q.    Over the whole thing?
21      A.    (NODS HEAD.)
22      Q.    Who is the plant manager over
23  the HVAC side?

17 (Pages 65 to 68)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 69

1    A.    David Burch.
2    Q.    David Burch.    And you get
3  along with Roger?
4    A.    Yes, we get along.
5    Q.    Do you have much dealing with
6  him?
7    A.    Not since he became -- they
8  split it up.
9    Q.    I understand.  And you said
10  Stan Henderson was assistant supervisor?
11    A.    Yes.
12    Q.    Do you get along with Stan?
13    A.    Yes.
14    Q.    No problems?
15    A.    No problem.
16    Q.    Have you ever been counseled
17  while you were an employee at Reliable?
18    A.    Yes.
19    Q.    When were you counseled?
20    A.    I think last year I was
21  counseled, probably -- I went to a
22  counsel probably about thirty minutes.
23    Q.    What was it about?

Page 70

1    A.    A drug test.
2    Q.    Can you elaborate?  Were you in
3  trouble for drugs or --
4    A.    No.  He said I didn't pass the
5  drug test.  That was it.  And I told him
6  I did.
7    Q.    And what happened?  Did you
8  take another drug test?
9    A.    Took two.
10    Q.    And you passed both of those?
11    A.    Back to back.
12    Q.    So there were no repercussions,
13  consequences?
14    A.    No.
15    Q    No write-ups?
16    A.    No.
17    Q.    So you --
18    A.    I mean, I don't know what
19  they've got on paper, but nothing
20  happened.
21    Q.    Any other counseling
22  conversations that you've had?
23    A.    No.

Page 71

1    Q.    Do you recall having a
2  conversation with Roger Peak about you
3  not having authority to promise employees
4  jobs?
5    A.    Yes.
6    Q.    Can you elaborate on that
7  conversation, if you remember it?
8    A.    Yes.  I can remember, as far as
9  my knowledge, years ago when Kenny
10  Taylor, before he became assistant
11  supervisor, we was all called in and it
12  were announced that he was our new
13  assistant supervisor.  And once they
14  announced that, you know, which we was
15  all shocked, and I asked a question, you
16  know, to Roger when we was walking out, I
17  said what do a man have to do to improve
18  his self.  That's the question I asked.
19    Q.    To who?
20    A.    Roger Peak.    And he said, well,
21  Frank, we had considered you to have the
22  job, but at the time being Kenny didn't
23  have but about four or five people to

Page 72

1  work up under him at that time, and I had
2  probably just started a new line, I
3  probably had approximately had about
4  fourteen to fifteen peoples working under
5  me.
6    Q.    When did this conversation take
7  place?
8    A.    In the learning center, as we
9  dismissed the meeting.
10    Q.    No, time frame.  Was this
11  recently?
12    A.    No, that was back when Kenny
13  Taylor became the assistant supervisor.
14  That -- I don't know exactly when he came
15  as assistant supervisor right off record.
16    Q.    We'll get to Kenny becoming the
17  assistant supervisor, but I think we're
18  talking about different things.  You
19  don't recall, or do you recall ever
20  having the conversation with Roger Peak
21  several years back about you not having
22  the authority to promise people jobs?
23    A.    That was the time that I talked

18 (Pages 69 to 72)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 73

1  to Roger about that, when he gave Kenny
2  that job and we -- you know, we brought
3  that up.
4      Q.    You don't remember any other
5  time you've talked to Roger about you
6  promising people jobs?
7      A.    Me promise people jobs?
8      Q.    Yes.
9      A.    No.  Only time we've talked
10 about that job that I asked him why they
11 -- what take a man to do to get up.
12 That's the one time we talked about it,
13 about me.  I ain't had the authority.
14     Q.    Do you ever recall talking to
15 David Burch about personal matters with
16 employees, David counseling you about
17 talking to other employees about their
18 personal life?  Do you recall that?
19     A.    No.  No.  we talks all
20 the time, I mean, in management and
21 sometimes a lot of things be said, but as
22 far as personal, we try not to get into
23 that.

Page 74

1      Q.    Do you know an employee named
2  Connie Gunter?
3      A.    Yes.
4      Q.    Have you ever talked to Connie
5  about her personal life?
6      A.    No, I hadn't talked to her.
7  She came to me and talked to me about
8  some things.
9      Q.    What did she talk to you about?
10     A.    Really wasn't nothing, just
11 about what was going on at Reliable
12 during the time, you know, with her.
13     Q.    So you don't recall ever being
14 told by management not to talk to Connie
15 about her personal life?
16     A.    No.
17     Q.    Could it have happened or you
18 don't recall or --
19     A.    I don't recall talking to her
20 about her personal life.  Like I said,
21 she came to me, talked to me about some
22 things, you know, about what was going on
23 with her personal things, and I -- you

Page 75

1  know.
2      Q.    I guess I'm not being clear.
3  My question is, do you recall Reliable --
4  managers in Reliable talking to you and
5  telling you not to talk to Connie about
6  her personal life.  Do you remember that?
7      A.    No.
8      Q.    Could it have happened?
9      A.    No, I don't so call no one
10 telling me that.
11     Q.    Have you ever been counseled
12 regarding concerns about your
13 relationship with Cynthia Lane?
14     A.    Counseling?
15     Q.    Counseling, meaning talked to
16 managers about their concerns about your
17 relationship with Cynthia Lane.
18     A.    Well, I think I had a -- one
19 conversation.  It wasn't documented or
20 anything.  Wasn't anything going on.  And
21 I told him at that time it wasn't,
22 because what had happened had happened,
23 and at the time, wasn't nothing going on.

Page 76

1      Q.    Who did you have a conversation
2  with?
3      A.    I think during the time, it was
4  George and Clyde.
5      Q.    What was that conversation?
6      A.    I can't recall, but they was
7  asking me was I involved with her, and
8  have I been involved with her, and she
9  was in another department during that
10 time, which nothing -- at that time it
11 was all over.
12     Q.    So were they asking you if you
13 were in a personal relationship with
14 Cynthia?
15     A.    Yes.
16     Q.    And you said no?
17     A.    I said no, which I wasn't at
18 that time.  I had been, but I wasn't
19 anything.
20     Q.    Did you tell them that you had
21 been in a personal relationship?
22     A.    No, I told them was nothing
23 going on.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 77

```
1      Q.    But did you tell them that you
2  had previously been in a personal
3  relationship with Cynthia?
4      A.    No.
5      Q.    Why not?
6      A.    Because there wasn't nothing
7  going on at that time.
8      Q.    And she was in a different
9  department at that time?
10     A.    Yes.
11     Q.    Did you tell them that you had
12 a child with Cynthia Lane?
13     A.    No.
14     Q.    Did they ask?
15     A.    No.
16     Q.    Is that the only conversation
17 you've had about Cynthia Lane?
18     A.    That was it.
19           MR. HARBUCK: Let's go off the
20 record.
21           (WHEREUPON, AN OFF-THE-RECORD
22           DISCUSSION WAS HAD.)
23           (WHEREUPON, A SHORT RECESS WAS
```

Page 78

```
1           HAD.)
2      Q.    (BY MS. ODOM) Mr. Lett, I want
3  to step back for a second on something we
4  were talking about earlier this morning.
5  You talked about when you were lead man
6  you were involved in the evaluation of
7  the employees under you; is that correct?
8      A.    That's correct.
9      Q.    So you have a say-so in what
10 their performance evaluation is?
11     A.    I grade, but I don't have -- I
12 just have a say-so, but far as me having
13 a say what's what, I do not.
14     Q.    So your recommendation or your
15 opinion affects the outcome of their
16 performance evaluation?
17     A.    Sometimes, but not, you know --
18 it's always be changes.
19     Q.    Are pay increases set off of a
20 performance evaluation? In other words,
21 if you get a really good performance
22 evaluation, would you get a pay increase
23 or higher pay increase?
```

Page 79

```
1      A.    Not necessary. It -- 'cause it
2  all depends how long you been there. You
3  can get a good evaluation and still not
4  get a good -- a pay increase. It's all
5  -- if you were there earlier, the years,
6  you might get a good increase, but the
7  longer you're there you get a less
8  increase. So the evaluation don't make
9  that much difference. They have a little
10 effect, but not that much effect as far
11 as the pay increase.
12     Q.    But it does come into play
13 somewhat?
14     A.    It probably -- it play a part,
15 'cause they go by some figures. I don't
16 know how personnel does that, but they
17 the one that control that.
18     Q.    I understand. Before the break
19 we were talking about some counseling
20 conversations. I had asked you if you
21 had recalled a conversation with Roger
22 Peak about you promising employees jobs,
23 and Roger telling you you didn't have the
```

Page 80

```
1  authority. You told me you don't
2  remember that conversation; is that
3  correct?
4      A.    That's -- I don't remember, no,
5  I don't remember that conversation. No,
6  I does not. I don't remember Roger Peak
7  saying I promised anybody about a job,
8  no.
9      Q.    Could that conversation have
10 taken place and you just don't remember?
11     A.    I don't think that conversation
12 ever took place as far as my knowledge.
13     Q.    If Roger Peak testified he did
14 have a conversation with you, could you
15 dispute that?
16     A.    Yes, because I don't remember.
17 The only conversation I had with Roger
18 Peak about a job, I asked him about the
19 job that had came open. That's the only
20 conversation we ever talked about a job
21 as far as I knows.
22     Q.    What about a counseling with
23 David Burch, whereas he told you not to
```

20 (Pages 77 to 80)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 81

1  discuss personal matters with Connie
2  Gunter? You told me that you don't
3  recall that; correct?
4      A.    That's correct.
5      Q.    Do you not remember or did it
6  not happen?
7      A.    I don't remember it and I don't
8  think it happened, because we've talked
9  about a lot of things. You know, he
10  probably just say something out of the
11  blue sky and I wasn't paying any
12  attention to what he was saying.
13      Q.    So it could have happened?
14      A.    Possibly, but I don't so call
15  remember or -- so call talking to him
16  about that.
17      Q.    You had also mentioned that
18  Cynthia Lane worked under you as an
19  assembler; is that correct?
20      A.    That's correct.
21      Q.    How long has she been working
22  as an assembler under you?
23      A.    Let's clear the record for

Page 82

1  right here. We talked about earlier
2  having -- probably about six years or
3  seven years, I'm trying to say, somewhere
4  up in there.
5      Q.    Was there ever a time when she
6  didn't work under you?
7      A.    Yes.
8      Q.    When was that?
9      A.    Before she was -- before she
10  came up under me, I don't know her.
11  Probably she worked in Department 6.
12      Q.    And how long was she in
13  Department 6? Do you know?
14      A.    I couldn't tell you, probably
15  about six, seven months, or probably
16  about a year. I don't know exactly.
17      Q.    Was she under you before going
18  to Department 6?
19      A.    No. She was in Department 6
20  before she came under me. That's when
21  that relationship we was talking about
22  earlier for the record, but we was
3  talking about the counseling that I had

Page 83

1  with George and Clyde. And they asked me
2  about that during that time, and already
3  -- everything already happened when she
4  was in the other department.
5      Q.    Okay. So let me get this
6  straight, correct me if I'm wrong. She
7  didn't -- she's never worked under you,
8  she was working in Department 6. You all
9  had a relationship, she had a child and
10  then she came to work under you?
11      A.    Right, but I didn't know all of
12  this before she came under me.
13      Q.    You didn't know that the child
14  was yours?
15      A.    Right.
16      Q.    Now, just for the record, I
17  mean, you were having a sexual
18  relationship with this woman; correct?
19      A.    Not having one. I had one with
20  her.
21      Q.    And the sexual relationship was
22  a few months, few years?
23      A.    No. It was just like a couple

Page 84

1  of months, a month or something like
2  that, we had a relationship.
3      Q.    Did you ever have any sexual
4  relations with Cynthia Lane when she was
5  working under you?
6      A.    No.
7      Q.    So --
8      A.    We put all that behind before
9  she came over. That's when I was saying
10  nothing was happening during the time
11  they talked to me.
12      Q.    Are you aware of any complaints
13  from your employees about favoring
14  Cynthia Lane?
15      A.    I have complaints about my
16  employees, me favoring everybody.
17      Q.    Specifically I'm asking about
18  Cynthia Lane.
19      A.    Not -- not really. I mean,
20  they might do in their mind, but they
21  never approached me, told me I got
22  favoritism, 'cause I always say in a
23  meeting I don't have no respect for a

21 (Pages 81 to 84)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 85

1  person.
2  **Q.    So you can't dispute that some**
3  **of your employees went to management**
4  **about you favoring Cynthia Lane, one of**
5  **your subordinates?**
6  A.    If they did, they never told me
7  about it, or management never told me
8  about it.  They never talked to me about
9  it.
10  **Q.    But, again, you can't dispute**
11  **that they did?  You don't know?**
12  A.    I don't know.
13  **Q.    Are you aware of employees at**
14  **work speculating that Cynthia Lane's**
15  **child is yours?**
16  A.    I assume they speculate
17  everybody's child is mine.
18  **Q.    What do you mean by that?**
19  A.    I got several womens in my
20  department going to have babies, and
21  every time one have a baby they say it's
22  my baby.  That's all of them, black,
23  white, it don't matter, they just

Page 86

1  speculate that on all of them.
2  **Q.    So sounds to me like the joke**
3  **around work is if somebody -- one of your**
4  **employees gets pregnant, it's your baby?**
5  A.    Yeah.  They always saying some
6  things -- they always try to make me look
7  bad to a point.
8  **Q.    Who?**
9  A.    Employees.  They just -- they
10  just does that.
11  **Q.    I want to show you a document,**
12  **and I'm not sure that you've ever seen**
13  **that document, but I want to talk to you**
14  **about the contents of the document.  That**
15  **is -- appears to be a police report**
16  **regarding a complaint made by your wife,**
17  **Cora Lett?**
18  A.    Uh-huh.
19  **Q.    And it looks like in this**
20  **police report she made a complaint that**
21  **you and Cynthia Cox -- is that Cynthia**
22  **Lane?**
23  A.    Uh-huh.

Page 87

1  **Q.    Okay.  Beat her up?**
2  A.    Uh-huh.
3  **Q.    Is that true?**
4  A.    No.
5  **Q.    Can you explain to me the facts**
6  **regarding this?  Do you know what this is**
7  **about?**
8  A.    They had a run-in, but far as
9  me having anything to do with it, no.  At
10  the time, I was just present on that
11  scene and I ran over and asked them what
12  was going on.  They had a little
13  confrontation, and I stopped them.
14  **Q.    Where was this confrontation?**
15  A.    In Geneva.
16  **Q.    Was it at your house, was it at**
17  **work?**
18  A.    No.  It was at the -- around on
19  the street about my house.
20  **Q.    So it was near your house?**
21  A.    Uh-huh, out front.
22  **Q.    Do you know what happened?  Do**
23  **you know --**

Page 88

1  A.    During the time, Cynthia wanted
2  to ask me a question at that time.
3  **Q.    So did she come over to your**
4  **house?**
5  A.    Yes.  She came by, she just
6  stopped out there by the road.
7  **Q.    And was Cora Lett, your wife,**
8  **at your house at that time?**
9  A.    No, she wasn't at the house
10  that time.  She pulled up.
11  **Q.    She pulled up?**
12  A.    That's true.
13  **Q.    And Cynthia was there?**
14  A.    She was out there talking.
15  **Q.    And they got in a fight?**
16  A.    No, it wasn't a fight.  It was
17  just -- a lick or passed -- or two, I
18  would assume.  It happened so fast and --
19  I don't know.  It just happened so fast.
20  **Q.    Okay.  And it looks like, based**
21  **on what I'm reading, that Cora was beaten**
22  **up and filed a complaint against you and**
23  **Cynthia?**

22 (Pages 85 to 88)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 89

1    A.    She -- Cora -- Cora didn't
2  file -- she filed a complaint or somebody
3  got her to go down there and file a
4  complaint, but once -- this complaint
5  didn't have anything to do with me, and
6  the judge found out what the truth was
7  about. It didn't have anything to do
8  with me. She'll testify to I didn't have
9  anything to do with it. It just -- she
10  just went off the bat. So --
11    Q.    Was there --
12    A.    I wasn't charged with anything
13  or anything ruled against me or anything.
14    Q.    Was it just a complaint or was
15  there a lawsuit? Did she file any sort
16  of suit against you and Cynthia, or just
17  Cynthia?
18    A.    Just Cynthia. That was between
19  her and Cynthia.
20    Q.    They filed a lawsuit -- she
21  filed a lawsuit?
22    A.    At the time she did.
23    Q.    Based on this complaint?

Page 90

1    A.    Yeah.
2    Q.    And you weren't involved in
3  that?
4    A.    No.
5    Q.    In your complaint, you allege
6  that you were denied the promotion to
7  assistant supervisor based on race and
8  age; correct?
9    A.    That's correct.
10    Q.    Describe the position of
11  assistant supervisor.
12    A.    Assistant supervisor fill in
13  for the supervisor if he's not there.
14  The assistant supervisor fill in other
15  jobs that the supervisor cannot maintain
16  at the time, help him do his work, make
17  sure that -- more just like a secretary,
18  you know, you would say, make sure that
19  they -- everyone has their work and
20  whatever he need to fill in at.
21    Q.    And when the supervisor is
22  absent, does the assistant supervisor
23  fill in as the supervisor?

Page 91

1    A.    That's correct.
2    Q.    And the supervisor in this case
3  is Kenny Taylor?
4    A.    That's correct.
5    Q.    Is the assistant supervisor
6  over two departments, or just one
7  department, or how does that work?
8    A.    He's over -- well, you might as
9  well say we've got five and two. It's
10  different now, used to be five, two and
11  four. They combined five and four
12  together.
13    Q.    You talking about five and four
14  -- the number, Department 5 and
15  Department 4?
16    A.    Uh-huh.
17    Q.    Okay.
18    A.    And they combined four and five
19  together. And they only just got two
20  departments, that's two and five.
21    Q.    So the assistant supervisor is
22  over Department 2 and over Department 5?
23    A.    That's correct.

Page 92

1    Q.    And then the supervisor is over
2  those two departments, as well?
3    A.    That's correct.
4    Q.    Now, how did you come to find
5  out about the opening of assistant
6  supervisor?
7    A.    Well, the assistant supervisor
8  had passed and I knew down the line they
9  were going to probably place somebody
10  else there eventually, and it was just
11  there sitting there, you know. And then
12  eventually Kenny Taylor came to me one
13  day, said you interested in the assistant
14  supervisor job, that he wanted to talk to
15  me about it, and I told him yes.
16    Q.    So Kenny made sure you knew
17  about the opening?
18    A.    Yes.
19    Q.    Can you elaborate on your
20  conversation with Kenny?
21    A.    Yes, some of it. He asked me
22  about he wanted somebody to help him out,
23  to fill in when he was not there, to

23 (Pages 89 to 92)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 93

1  separate orders and do these things right
2  here for him when he's not present. And
3  that's what he's going to be looking for
4  the assistant supervisor to do.
5       And I told him, I said, well,
6  sure, you know, I said most of what you
7  talking about I'm already doing. I said,
8  you know, the job you talking about
9  opening up, I'm already doing that job,
10  I'm just doing it in Department 2, you
11  know, the whole job, really. But I said
12  I'm available to do whatever I got to do,
13  you know, I'd like to have that
14  opportunity, you know. I said I'd like
15  to try it anyhow. And I said, you know,
16  if things don't work, you know, I'll have
17  to step down, you know, but I said I'd
18  like to try since the opportunity is
19  there.
20       Q.    Do you know if he talked to
21  anyone else about the position?
22       A.    Yes. He told me he had talked
23  to -- he was going to talk to someone

Page 94

1  else. I don't know was it Stan or what.
2  He said but he knew for one person that
3  didn't want the job, and that was a guy
4  named Harmon Sellers, he say, 'cause he's
5  fixing to retire, and he said he's
6  probably the next man -- probably would
7  have been the next man in line, but he
8  knew he -- he was fixing to retire and he
9  didn't want it. And -- and so that left
10  the door open for me. But he said he was
11  going to talk to someone else.
12       Q.    Okay. And this assistant
13  supervisor, you said, was over Department
14  5 and Department 2; correct?
15       A.    Right.
16       Q.    And you were the lead man in
17  which department?
18       A.    Two.
19       Q.    Two. Okay. Who was the lead
20  man in five?
21       A.    Stan.
22       Q.    Who were the decision-makers
23  with respect to this promotion?

Page 95

1       A.    Who's the decision-makers,
2  make --
3       Q.    Do you know who made the
4  decision as to who was going to be picked
5  for assistant supervisor?
6       A.    I assume --
7            MS. LOWELL: Object. Go ahead.
8            THE WITNESS: I assume -- I
9  reckon it's from Kenny Taylor to David
10  Burch to George Helms, all the way up to
11  the top make the decision.
12       Q.    (BY MS. ODOM)  Are you assuming
13  that these individuals made the decision,
14  or do you know who had the final say?
15       A.    I reckon George had the last
16  final say, soon as he get back with his
17  personnel.
18       Q.    Do you know for sure it was
19  George?
20       A.    Well, between him and Clyde and
21  all of them. I don't know just exactly
22  which one calls the shots, I really
23  don't.

Page 96

1       Q.    Do you know what factors were
2  considered in choosing the candidate?
3       A.    No. I mean, they give us a
4  little piece of paper, you know, or some
5  questions. He didn't explain nothing to
6  me about them little four questions that
7  he asked, he just said what do you think
8  about these right here? He said, just
9  jot down on a piece of paper or something
10  right quick or just give it back to me if
11  you could. If you didn't, don't worry
12  about it. That's exactly the words he
13  told me. And I said, well, if I get time
14  I'll put something on a piece of paper
15  right quick and just jot it back to you.
16  That was it. That's the last I heard of
17  it.
18       Q.    Is this a conversation you had
19  with Kenny?
20       A.    That's right.
21       Q.    Was this conversation about
22  these four questions during the same time
23  he had talked to you about --

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 97

1    A.    No, he didn't ask me about the
2  four questions during that time.
3    Q.    So this is another
4  conversation?
5    A.    Uh-huh.
6    Q.    Okay.  And in the second
7  conversation, he gave you four questions?
8    A.    No.  That's way before this job
9  ever came I got the questions about --
10   Q.    So when were you given these
11 four questions?
12   A.    Probably a couple of months
13 before the job, before he talked to me
14 about the supervisor job -- assistant
15 supervisor.
16   Q.    Okay.  Let's talk about when he
17 gave you the four questions.  Tell me
18 what happened.
19   A.    He just brought a piece -- set
20 it down, said I got these four questions,
21 I'm going to lay them on my desk, and he
22 said -- on your desk.  He said, if you
23 get time, answer these questions if you

Page 98

1  want to.  He said, it's not that -- it
2  don't mean that -- exact words, he said
3  it don't mean that much, but if you want
4  to answer these questions, you know,
5  that'll give him something just to look
6  at, you know, or think about.  He said
7  turn them back in on a piece of paper,
8  just turn something in, you know, just
9  glance through it, like he just -- it
10 didn't matter.  And I said okay.
11   Q.    Did he say it didn't
12 matter?
13   A.    Sort of.  He said it's just
14 something, just a guideline, but he
15 didn't explain his self really at all.
16   Q.    A guideline for choosing or a
17 guideline with respect to this assistant
18 supervising position?
19   A.    Well, really, he just -- I'm
20 just assuming he said guideline, but he
21 didn't explain anything.
22   Q.    He just gave you these
23 questions?

Page 99

1    A.    Yes.
2    Q.    Let me show you this piece of
3  paper.  I've put in front of you a piece
4  of paper with four questions.  Are these
5  the four questions we're talking about?
6    A.    Yes.
7    Q.    So this is the piece of paper
8  that Kenny Taylor gave you?
9    A.    Yes.
10   Q.    Now, at the top, I'm going to
11 read what it says and tell me if you
12 agree.  It says, "We may have an
13 opportunity to have an assistant
14 supervisor in Department 5 in the near
15 future.  If you are interested in this
16 position, we would like for you to answer
17 the questions below."  Is that what it
18 says?
19   A.    Uh-huh.
20   Q.    So he gave you this with
21 respect to the assistant supervisor
22 position; correct?
23   A.    Yes.

Page 100

1    Q.    And did you answer these
2  questions?
3    A.    Well, I answered to the best of
4  my ability at the time.  He didn't say
5  that he really just had to have had it,
6  though.  I said okay.
7    Q.    Is this a true and correct copy
8  of the four questions that you were
9  given?
10   A.    Yes.
11        MS. ODOM:  I'd like to mark
12 this as the next exhibit.
13        (WHEREUPON, DEFENDANT'S
14        EXHIBIT #6 WAS MARKED FOR
15        IDENTIFICATION AND IS ATTACHED
16        HERETO.)
17   Q.    (BY MS. ODOM)  And the next
18 document I've put in front of you are
19 your four answers to those questions;
20 correct?
21   A.    That's correct.
22   Q.    And that's your signature at
23 the bottom?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 101

1   A.    That's correct.
2   Q.    And is this what you turned in
3 in response to those four questions?
4   A.    Yes. I turned in a little
5 piece of paper, and I said, is this going
6 to be all right, what you need right
7 here. He said, yeah, that's good and
8 that right there, that's all I need.
9   Q.    And you turned this in to Kenny
10 Taylor?
11   A.    Yeah.
12       MS. ODOM:    I'd like to mark
13 this as the next Exhibit 7.
14       (WHEREUPON, DEFENDANT'S
15       EXHIBIT #7 WAS MARKED FOR
16       IDENTIFICATION AND IS ATTACHED
17       HERETO.)
18   Q.    (BY MS. ODOM) Do you know any
19 other employees who had applied for this
20 job as assistant, or should I say filled
21 out these responses?
22   A.    No, I can't call, but I imagine
23 he might have gave them to somebody else.

Page 102

1 I can't really call.
2   Q.    So I guess you don't know who
3 else applied for this position?
4   A.    That's correct.
5   Q.    And this job wasn't posted;
6 correct?
7   A.    That's correct.
8   Q.    Do you know if the absence of a
9 job posting violated the company policy?
10   A.    What?
11   Q.    Do you know if the absence of a
12 job posting violated the company policy?
13       MS. LOWELL: Object.
14       THE WITNESS: I don't know all
15 of that.
16   Q.    (BY MS. ODOM) Do you recall
17 Kenny Taylor specifically asking you for
18 your responses to those questions?
19   A.    No.
20   Q.    Could he have asked you or you
21 just don't recall?
22   A.    No, he didn't.
23   Q.    There was no interview;

Page 103

1 correct?
2   A.    No interview.
3   Q.    And you don't know if any other
4 employees had interviews; correct?
5   A.    That's correct.
6   Q.    So the responses to those four
7 questions, your responses, are the only
8 thing you've submitted with respect to
9 this --
10   A.    Yeah.
11   Q.    -- job, or is this anything
12 else?
13   A.    That was it, because I'm
14 waiting on him to come get back with me.
15 He said he was going to get back with me.
16 He never did.
17   Q.    What do you mean Kenny told you
18 he was going to get back with you?
19   A.    After me and him talked in his
20 office that day, had that brief
21 conversation, he said I'll get back with
22 you.
23   Q.    What conversation was this?

Page 104

1 Was this the one where he'd given you
2 these four questions or --
3   A.    After he had gave me the four
4 questions, it was after.
5   Q.    It was the second conversation
6 where he had talked to you about the job?
7   A.    Yes.
8   Q.    So if I understand it, there's
9 two instances where you talked to Kenny
10 about this job; one where he gave you
11 those four questions, and then several
12 months later he had talked to you about
13 the job?
14   A.    Right. When he give me the
15 four questions, he just put them on my
16 desk and said I'd like for you to go over
17 that. You know, that was it. He said
18 you can get back to me when you can, it
19 doesn't matter, you know, jot something
20 down right quick. I said okay. Then
21 later on we talked about the job.
22   Q.    Okay. Was there any -- in that
23 first conversation, was there anything

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 105

1  else y'all discussed besides what you've
2  told me?
3      A.    No.  No.
4      Q.    Okay.  And in the second
5  conversation, what did y'all discuss?
6      A.    About assistant supervising
7  job, that he would like to get somebody
8  to fill in for him when he's not there,
9  and separate the orders and do what he
10 got to do to fill that position.  And I
11 told him, good, I think -- I thought --
12 think I'd like to give it a try.  I said,
13 I'm already doing the job.
14     Q.    Was anything else said in that
15 conversation?
16     A.    He was talking about the other
17 guy that was going to retire, that he
18 didn't want the job.
19     Q.    Harmon Sellers?
20     A.    Uh-huh.
21     Q.    That's correct?  Is that a yes?
22     A.    That's correct.
23     Q.    Anything else y'all discussed?

Page 106

1      A.    No more than just about the
2  job.
3      Q.    Now, who received the position?
4      A.    Stan Henderson.
5      Q.    Do you believe Mr. Henderson
6  was qualified for the job?
7      A.    Sure, just as well as I was.
8      Q.    He was a lead man in the other
9  department; correct?
10     A.    That's correct.
11     Q.    Now, is he still the lead man
12 in the other department, even though he's
13 the assistant supervisor, or is there
14 someone else who is acting as the lead
15 man in that other department?
16     A.    Since they got that department
17 together, they got another lead man in
18 that Department 4.  There's another lead
19 man in that department, but I don't know
20 how they go about doing --
21     Q.    What's the name of the other
22 lead man?
23     A.    Wendall, Wendall Art.

Page 107

1      Q.    Can you spell that?
2      A.    Wendall, I don't know exactly
3  how you spell Art.
4      Q.    Art, as in A-R-T?
5      A.    Uh-huh.
6      Q.    And Wendall Art is acting as
7  the lead man in that other department?
8      A.    Yes.  He is the lead man in
9  that department.
10     Q.    Had Henderson ever worked in
11 your department?
12     A.    Yes.
13     Q.    For how long?
14     A.    He worked on the night shift up
15 under me probably less than a year.  And
16 then he came back to the first shift, he
17 worked up under me probably about --
18 about a month or two months, and I think
19 they moved him up on the other end.
20     Q.    They moved him to the other
21 department, is that what you're saying?
22     A.    Right.
23     Q.    What was he doing in your

Page 108

1  department?
2      A.    Once he came back from the
3  night shift, he was just assembly.  I
4  don't know if he was the lead man during
5  that time or not, but I can't so call
6  that he was the lead man at that time,
7  but he was assembly up under me.
8      Q.    You've never worked in Stan's
9  department, have you?
10     A.    Where he's at now?
11     Q.    (NODS HEAD.)
12     A.    Sure.
13     Q.    When did you work in that
14 department?
15     A.    I worked in that department
16 years ago.
17     Q.    How many years ago?
18     A.    When I first started, probably
19 first four or five years.
20     Q.    Back in the seventies?
21     A.    Uh-huh.
22     Q.    But in the last ten years, have
23 you worked in that department?

27 (Pages 105 to 108)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 109

1    A.    No, no more than just helping
2    out.
3    Q.    Do you know what Stan
4    Henderson's responses to those questions
5    were?  Had you seen his?
6    A.    I kind of glanced over them.
7    Q.    Did anyone ever tell you why
8    Henderson was chosen?
9    A.    Kenny talked to me about it.
10   Q.    What was that conversation?
11   A.    After he had got the job.
12   Q.    After Henderson had gotten the
13   job?
14   A.    (NODS HEAD.)
15   Q.    That's a yes?
16   A.    Yes, ma'am.
17   Q.    And what did you and Kenny talk
18   about?
19   A.    He walked up to me and said I
20   wanted you to know about the assistant
21   supervisor job, that Stan had been
22   chosen.  And he said he wanted me to hear
23   it from him before I heard it from

Page 110

1    anybody else.  And I told him I already
2    knew about it, but I hadn't heard it from
3    him.  And he said, well, that's what I
4    wanted you to know, because I want to be
5    the first one to tell you.  And I said,
6    well, Stan has been acting at this job
7    since the moment you talked to me about
8    this job, which we had that conversation
9    in August.  I said --
10   Q.    Let me interrupt.  Is this the
11   conversation where he gave you the four
12   questions or the conversation after where
13   he talked to you about the job?
14   A.    Mostly all of it, you know,
15   because he was just in and out of that
16   position.
17   Q.    Stan was?
18   A.    Yeah.
19   Q.    The assistant supervisor?
20   A.    He was the lead man, but he was
21   just like, you know, filling in sometimes
22   when he wasn't want there.
23   Q.    So before Stan became the

Page 111

1    assistant supervisor, he was the lead man
2    in the other department?
3    A.    Right.
4    Q.    But when Kenny was gone, he
5    would fill in for Kenny?
6    A.    Yeah.  That's who they chose,
7    that's who Kenny chose.
8    Q.    Was there anything else said?
9    Did Kenny say anything else?
10   A.    He just told me that he had --
11   Stan had got the job, and I told them
12   that I already knew he had got it,
13   because one of the employees had told me
14   that Stan got the job and you already
15   knew Stan was going to get the job.  And
16   I told him that I already knew what was
17   going on, because somebody had already
18   mentioned -- but I wasn't for sure, that
19   was just hearsay, like, you know, like a
20   lot of things you hear hearsay and you're
21   not sure.  So I just kind of left it
22   alone till he told me about it.
23   Q.    So when you say you knew what

Page 112

1    was going on, that -- you're referring to
2    that Stan got the job?
3    A.    Yes.
4    Q.    Do you remember who told you --
5    who was the first person to tell you Stan
6    got the job?
7    A.    Not really.  One of his
8    employees had mentioned something to me
9    about it.
10   Q.    Do you know Stan Henderson's
11   age?
12   A.    Probably about thirty-five, or
13   somewhere up in there.
14   Q.    Do you know if Stan Henderson
15   has ever received any sort of
16   disciplinary writeups?
17   A.    No, I don't.
18   Q.    Did you ever ask why you were
19   not chosen?
20   A.    Yes.  I asked Kenny that day.
21   I said, well, what was the problem.  He
22   said, well, we just thought Stan's the
23   man for the job.  I said, well, who made

28 (Pages 109 to 112)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 113

1  that decision.  He said, well, we made
2  that decision, we just thought Stan was
3  the man for the job.
4      Q.      Did he say anything else?
5      A.      I told him, I said, I
6  understand what you're saying.  And I
7  said, I know -- he was just lost for
8  words, really, because he just say he
9  knew how I felt about it.  I said, I
10  imagine you do.
11      Q.      When you say he knew how you
12  felt, that you were upset?
13      A.      Well he kind of felt like i was
14  kind of disappointed, the way my reaction
15  was.
16      Q.      Anything else said in that
17  conversation?
18      A.      Well, I told him, I said I
19  understand y'all want to do what you
20  wanted to do, and -- but you know that
21  it's not right, the way y'all went about
22  doing this, you know, not giving me an
23  opportunity.  And I told you that I would

Page 114

1  work with you any way I could, you know.
2  I said, I'm disappointed.
3      Q.      What do you mean, it wasn't
4  right, the way they went about doing it?
5      A.      Well, I was just saying he
6  hadn't got back with me after he talked
7  with me, or sit down to have a brief with
8  me, and hadn't put it on the board, jobs
9  on the board, or hadn't discussed
10  anything about it besides that little old
11  quick conversation that we had, he hadn't
12  said anything else to me about the job.
13  You know, I'm looking that we was going
14  to get together and we going to discuss
15  what's the outcome of the job, who was
16  going to get the job, but it never
17  happened.
18      Q.      Anything else you all
19  discussed?
20      A.      No more than I told him I was
21  disappointed, and I said, ain't nothing
22  else I can say to you about it or get
23  with you about it 'cause going nothing

Page 115

1  never be said, and, you know, it probably
2  going to stop right here, you know.  I
3  said, I just do whatever I got to do.
4      Q.      Is that it?
5      A.      That was it.
6      Q.      You said that Kenny told you
7  that they thought Stan was the man for
8  the job; is that correct?
9      A.      That's correct.
10      Q.      Do you have any reason to
11  believe that they didn't think Stan was
12  more qualified than you?
13      A.      I don't know why they believed
14  that.  I mean, you know, it was just like
15  everything else, more handpicked, you
16  know, what you want you get it.
17      Q.      Well, do you think they
18  believed that he was more qualified?
19      A.      They might have believed it.  I
20  can't say what they believe.
21      Q.      Do you believe you were more
22  qualified?
23      A.      I'm just as qualified as he

Page 116

1  are.
2      Q.      Do you believe that your race
3  had something to do with you not being
4  hired?
5      A.      Yes, I think it played a big
6  part.
7      Q.      Why?
8      A.      Well, there is black Americans
9  out there, you know, works out at
10  Reliable besides me, and every time a job
11  opening come up, they feel just like I
12  feel, but I speak for me because I'm in
13  front, the blacks don't have that
14  opportunity, don't get that -- that door
15  opened, a chance to prove them self, even
16  though they have the qualifications, the
17  education, that they never get a
18  opportunity.  That's the way they feel,
19  and that's the way it always been, and
20  that's the way the employees feel about
21  that.  And I think -- that's why I said I
22  think black -- being a racist is a part
23  of it, you know.  That's why I filed the

29 (Pages 113 to 116)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 117

1  equal opportunity.
2     Q.    What facts do you have to
3  support your belief that you weren't
4  promoted because you were black?
5     A.    Well, it -- just the facts, I
6  don't really -- just can't say I got
7  facts, just the fact that I been there
8  for thirty-two years and I never seen a
9  black man being promoted in a higher
10  position or gave the opportunity to have
11  that position. And I know some of them
12  got the qualifications, just like anybody
13  else got the qualifications, and that
14  make me believe that you black, you just
15  don't get anywhere.
16     Q.    When you say higher positions,
17  what are you talking about?
18     A.    Management, in the management,
19  out of all the employees there.
20     Q.    Can you give me a specific
21  example of when a black employee has
22  applied for a position and didn't receive
23  it?

Page 118

1     A.    No, I can't give you a
2  definite answer about when a black
3  applied for a job and didn't get it, but
4  mostly they don't -- they don't, like I
5  said, don't do the posting of a job.
6  It's always if you in that position or
7  you know someone or you're in the right
8  place at the right time. The way
9  basically we see it is who you are. I
10  mean, you got six hundred employees there
11  in the whole company, and back in the
12  workshop you've got several management
13  and supervision, but you don't have a
14  black man there or black lady employee
15  doing none of them positions or hadn't
16  had the opportunity to be handpicked,
17  they always looked over.
18     Q.    So you're telling me that the
19  only facts that you have that Stan was
20  promoted, or should I say that you
21  weren't promoted, because you were black
22  was because there's no blacks in
23  management?

Page 119

1     A.    No, just not only blacks in
2  management, because that's probably part
3  of it, but not just because of that.
4  Stan was promoted because that's who they
5  choose to have that job, you know. He's
6  a white Caucasian, I reckon they just
7  wanted to have him more than they did me.
8     Q.    Do you have any other facts to
9  support that belief?
10     A.    That -- we all have been in
11  that spot that we can't -- we can't raise
12  -- get no higher than where we're at.
13     Q.    Is this just your opinion?
14     A.    No. It's a lot of them's
15  opinion.
16     Q.    A lot of them, you're talking
17  about black employees?
18     A.    That's right.
19     Q.    What about his age, Stan's age?
20  Why do you believe that he was promoted
21  because he was younger than you?
22     A.    Well, I'm fifty-two years old,
23  right at it, Stan's thirty-something

Page 120

1  years old, and he's much younger than I
2  am. I reckon they just want more of a
3  younger person to have that position than
4  an older person 'cause they looking --
5     Q.    Do you have any facts --
6     A.    No, I don't have no facts,
7  because they looking out for the future,
8  you know, someone get in there and learn
9  and -- when I'm gone.
10     Q.    So it's just your belief that
11  his age had something to do with it? You
12  don't have any facts?
13        MS. LOWELL: Object.
14        THE WITNESS: I can't say that.
15  That's my belief.
16     Q.    (BY MS. ODOM) Do you know Stan
17  Henderson's rate of pay?
18     A.    No, I don't.
19     Q.    Do you know if you make more
20  than him?
21     A.    No, I don't.
22     Q.    So you could make more than
23  him?

30 (Pages 117 to 120)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 121

1    A.    I doubt it, though.
2    Q.    But don't know?
3    A.    I don't know.
4    Q.    Are there any other promotions
5 that you've applied for that you believe
6 should have been awarded to you?
7    A.    I hadn't applied for any other
8 promotions on the job, but there's been
9 some promotions that have been made at
10 Reliable that me as a black man in my
11 position should have had some
12 opportunity, even though it might have
13 been in the architect, it might have been
14 in the HVAC. There was -- you could have
15 had -- I could have had an opportunity to
16 get one of them jobs, because people from
17 architect have shift to -- I mean VAC, I
18 mean, you know, they shift them around.
19 So it don't matter, just because I work
20 in HVAC, if there's a job came open in
21 architect.
22    Q.    Can you give a specific
23 instance of a promotion that you believe

Page 122

1 you should have had an opportunity for?
2    A.    Well, an opportunity, yes.
3 There's jobs came open in the paint shop,
4 assistant supervisor job, that could have
5 been on-the-job training that I could
6 have went to. There's jobs in the
7 architect that came open.
8    Q.    Let's talk about specific jobs.
9 You're talking about a job in the paint
10 shop, what particular promotion are you
11 talking about?
12    A.    Assistant supervisor.
13    Q.    There was an assistant
14 supervisor position in the paint shop,
15 when was this?
16    A.    I can't recall, but there have
17 been some promotions in there.
18    Q.    Do you know who received the
19 job?
20    A.    Scottie Parnell.
21    Q.    Scottie Parnell?
22    A.    Uh-huh.
23    Q.    And what is Scottie's race?

Page 123

1    A.    He's white.
2    Q.    And you didn't apply for this
3 job?
4    A.    No.
5    Q.    Do you know who applied for
6 this job other than Scottie?
7    A.    I don't know how they go
8 about -- that's what we're back to. We
9 don't know how you go about applying for
10 jobs. You don't apply for a job, you
11 just get a job, mostly. That's the way
12 we see it. I mean, they don't go -- the
13 jobs don't go on the board when it comes
14 to management.
15    Q.    What facts do you have to
16 support your belief that Scottie Parnell
17 was hired because he was white?
18    A.    I can't say that he was hired
19 because he was white, but I just say he
20 was -- he got put in the position.
21    Q.    And you don't know who else
22 applied for that position or who else was
23 interested in that position?

Page 124

1    A.    Probably a lot of people if you
2 give them an opportunity, even us blacks.
3 Same thing about in the architect, job
4 came open in management.
5    Q.    I'm asking you who -- do you
6 know who else was interested in this
7 position?
8    A.    Probably several. I just can't
9 tell you exactly what --
10    Q.    So you don't know?
11    A.    No.
12    Q.    Any other promotions that you
13 believe were discriminatory?
14    A.    I can believe that. They had
15 some promotions in Department 6, and
16 probably -- I assume.
17    Q.    Let me go back to the Scottie
18 Parnell promotion, do you know what his
19 qualifications were?
20    A.    What his qualification was?
21    Q.    For the job that he got.
22    A.    No, I don't know what his
23 qualification was. I know he had worked

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 125

1  in the paint shop part time, and I know
2  he was working in another department
3  running night shift.
4      Q.    Okay.  Do you know who made the
5  decision to hire him?
6      A.    No.
7      Q.    Okay.  Do you know what factors
8  were considered in hiring him?
9      A.    No.
10     Q.    But you still think
11  discrimination played a role in it, even
12  though you don't have any knowledge of
13  the hiring?
14     A.    I think discrimination played
15  in a lot of roles in the hiring any kind
16  of management.
17     Q.    Okay.  Give me some facts on
18  the Scottie Parnell hire.
19     A.    I just can't give you the
20  straight facts 'cause I don't know the
21  facts.
22     Q.    So it's just your belief?
23     A.    That's what we believe.

Page 126

1      Q.    Okay.  Department 6, you said
2  there was a promotion in Department 6.
3  What promotion are you talking about?
4      A.    Well, they had several probably
5  promotions in Department 6.
6      Q.    Which ones that you're alleging
7  are discriminatory?
8      A.    Well, you had a supervisor job
9  came open.
10     Q.    Who received the supervisor?
11     A.    I can't think of his name right
12  now -- Corky -- of course, George can
13  probably tell you.  It's on that list,
14  Corky Newman or something like that.
15     Q.    Courtney?
16     A.    Corky Newman, something like
17  that.
18     Q.    Corky Newman?
19     A.    Yeah.
20     Q.    Okay.  And that was on the
21  architectural side?
22     A.    Yeah.
23     Q.    Do you know who had applied for

Page 127

1  that job, or who else was interested in
2  that job?
3      A.    Yes.
4      Q.    Who?
5      A.    There are several of them in
6  that department back there said they
7  would like to have it since it was -- it
8  came open.
9      Q.    Do you know if the
10  decision-makers were aware of their
11  interest?
12     A.    I don't know if they was aware
13  of their interest or not, but they never
14  was asked.
15     Q.    How do you know they were never
16  asked?
17     A.    Because they told me so.
18     Q.    Do you know if they went to the
19  supervisor or -- excuse me, do you know
20  if they went to the decision-makers and
21  told them about their interest?
22     A.    No, I don't think they did, but
23  they just like me, afraid to talk.

Page 128

1      Q.    Why are they afraid to talk?
2      A.    When you in a position that we
3  are in, want a job, got a family, trying
4  to do what you're trying to do, you don't
5  want to cause no animosity, you just want
6  to keep everything down.  I mean, you're
7  afraid you'll get fired, you're afraid
8  something will happen.
9      Q.    Is there anything else to base
10  that fear on?
11     A.    No more than it just -- they
12  just was afraid to go forward with it.
13  They wants to.
14     Q.    Do you know who the
15  decision-maker was for the Corky Newman
16  hire?
17     A.    I couldn't tell you that
18  either.  All --
19     Q.    Do you know -- go ahead.
20     A.    I couldn't tell you that.
21     Q.    Do you know what Corky Newman's
22  qualifications were?
23     A.    I couldn't tell you all his

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 129

1  qualifications.
2      Q.    And you don't know who else
3  applied for that position, do you?
4      A.    No, I do not.
5      Q.    What other promotions do you
6  believe were discriminatory?
7      A.    Well, we can go through the
8  whole plant. I couldn't just plain out
9  call the names. You can go through the
10 whole plant. There are jobs in
11 management that the opportunity, black
12 peoples, they're -- they hadn't been
13 asked or they hadn't been talked about
14 trying to get these jobs or find out how
15 do we -- they post the jobs right now on
16 the board, but before they didn't have
17 that opportunity.
18     Q.    Let's talk about specific
19 promotions. Do you know of any specific
20 promotions that you believe were
21 discriminatory?
22     A.    Most all of them when it comes
23 to management. Just -- they just feel

Page 130

1  like they just don't have that
2  opportunity.
3      Q.    So these people, these
4  African-Americans that you're talking
5  about didn't apply for these jobs?
6      A.    Ninety percent of the time they
7  don't know nothing about the jobs until
8  people get the jobs.
9      Q.    Are these people that are
10 interested in the jobs?
11     A.    Yes, they would -- they --
12     Q.    I'm sorry?
13     A.    Yeah, some of them probably are
14 interested in the job.
15     Q.    Give me an example of a job
16 promotion that an African-American was
17 interested in and did not receive.
18     A.    Well, back in -- go back in
19 architect. We -- one of the
20 qualification jobs in there, there's a
21 guy back there there for years and
22 years that's a black American, and
23 several jobs, management, came open, he

Page 131

1  hadn't had that opportunity.
2      Q.    What jobs in management came
3  open?
4      A.    Well, you got lead man jobs
5  came open, and you got supervisor job
6  came open.
7      Q.    And who received the lead man
8  job?
9      A.    I couldn't tell you right off,
10 because they got so many lead mans in
11 that area.
12     Q.    And do you know whether the
13 African-American guy applied?
14     A.    That's what I just said, they
15 don't be aware of what's going on, not
16 when it comes to certain jobs.
17     Q.    And you know that they're
18 interested in these jobs?
19     A.    Yes, some of them are.
20     Q.    How do you know?
21     A.    Because they talk to me about
22 it.
23     Q.    Do they tell other individuals

Page 132

1  that they're interested?
2      A.    I don't know who all they talk
3  to about it, but I know they talk to me
4  about a lot of things, you know, about
5  when it come to jobs.
6      Q.    So you don't know if they told
7  the decision-makers if they were
8  interested in these jobs?
9      A.    No, they hadn't told the
10 decision-makers they was interested in
11 the jobs, because they don't know about
12 the job so they can talk to the
13 decision-maker about the job.
14     Q.    Do they tell their supervisors
15 that they're interested in these jobs?
16     A.    They don't tell the supervisor
17 because they're not aware of it.
18     Q.    Do they tell their supervisors
19 that they're interested in promotions?
20     A.    Sure, I imagine they do say
21 that they'd like to move up.
22     Q.    Give me a specific example.
23     A.    There's one back there, I know,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 133

1  he was -- he always hollering he'd like
2  to do something better. I don't know if
3  he talked to his supervisor about it.
4      Q.    Who?
5      A.    Ricky Jordan.
6      Q.    He's told you he wants to do
7  something better or wants to do a
8  different job?
9      A.    Yeah.
10     Q.    But you don't know if he's told
11 the supervisor?
12     A.    No, I do not.
13     Q.    Do you know if he's told anyone
14 else?
15     A.    Well, they don't talk that much
16 because they're afraid to say too much of
17 anything.
18     Q.    Do you know if he's told anyone
19 else?
20     A.    Yes, he probably told several
21 ones.
22     Q.    Do you know for sure?
23     A.    Yes.

Page 134

1      Q.    Who?
2      A.    Told Jeffrey Holland.
3      Q.    Who's Jeffrey Holland?
4      A.    He's a black guy back there.
5      Q.    Is he -- I'm asking if
6  Ricky ever told his supervisor or --
7      A.    No. Not -- not as my
8  knowledge, I don't know.
9      Q.    Do you know of any
10 African-American employee who has
11 informed their supervisor they're
12 interested in promotion?
13     A.    I don't know how they go about
14 a way of telling them that, but they --
15 they talk to them in a certain way, you
16 -- you got to talk to them in a certain
17 way. It's kind of difficult for me to
18 sit here and tell you, but, yeah, but
19 they don't -- a lot of times you don't
20 understand a black guy when he talking,
21 or, you know, they talk in a certain way
22 trying not to -- trying to protect them
23 self at the same time.

Page 135

1      Q.    So --
2      A.    I don't know how they approach
3  their bossman or what do they tell them
4  or anything.
5      Q.    So you don't have any facts to
6  support the belief that the supervisors
7  or management knew that these
8  African-American employees were
9  interested in promotion?
10     A.    No, I don't have no facts, no
11 more than just the employee's word.
12     Q.    Any other promotions that you
13 believe were discriminatory?
14     A.    Yes. I feel like they're being
15 discriminated against throughout the
16 plant. It's -- it's not just like -- I'm
17 in here with y'all, but it go beyond me.
18 I mean, it's way beyond me.
19     Q.    Can you give me an --
20        (WHEREUPON, AN OFF-THE-RECORD
21        DISCUSSION WAS HAD.)
22        (WHEREUPON, A SHORT RECESS WAS
23        HAD.)

Page 136

1      Q.    (BY MS. ODOM)    Before the break
2  Mr. Lett, we were talking about
3  African-American employees who you
4  believe should have gotten promotions,
5  but didn't, and you had specifically
6  named two, Ricky, and I don't know what
7  Ricky's last name was. What --
8      A.    Jordan.
9      Q.    Ricky Jordan. And you had also
10 named Jeff. What was Jeff's last name?
11     A.    Holland.
12     Q.    Holland?
13     A.    Uh-huh. Andrew Clay.
14     Q.    Andrew Clay is another?
15     A.    Uh-huh.
16     Q.    Okay.
17     A.    Probably several more. I'll
18 just leave them, I know them three,
19 anyway.
20     Q.    Okay.
21     A.    I'd be going on down that list,
22 on and on and on.
23     Q.    Can you remember anyone else?

34 (Pages 133 to 136)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 137

1    A.    Yeah, several females thought
2  maybe they should have been asked on
3  jobs. You've got Betty Harley.
4    Q.    **Betty Harley?**
5    A.    Uh-huh.
6    Q.    **Who else?**
7    A.    You got Becky Williams.
8    Q.    **Becky Williams.**
9    A.    Uh-huh.
10   Q.    **Who else?**
11   A.    She's not employed. We got --
12   Q.    **She's not an employee?**
13   A.    Yeah. I was -- there's another
14 one, she's not employed there no more,
15 but when she was there, she felt the same
16 way.
17   Q.    **What's her name?**
18   A.    Minnie Holmes.
19   Q.    **Minnie Holmes?**
20   A.    Uh-huh.
21   Q.    **Anyone else?**
22   A.    They're the ones that I just
23 got right off my head.

Page 138

1    Q.    **Are there any others?**
2    A.    Not at this moment. I believe
3  there are more, but.
4    Q.    **Is there anything that could**
5  **make you remember any more?**
6    A.    I just said throughout the
7  whole -- majority of them, anyway, the
8  majority of the people that feel like
9  they should have been asked or talked to
10 them about just positions.
11   Q.    **We're talking about specific**
12 **individuals.**
13   A.    Okay.
14   Q.    **Do you know any other specific**
15 **individuals other than the ones you've**
16 **named?**
17   A.    Not right offhand.
18   Q.    **Let's talk about Ricky Jordan,**
19 **what department is he in?**
20   A.    Six.
21   Q.    **And what position do you**
22 **believe he should have been promoted to?**
23   A.    I don't know what position I

Page 139

1  believe he should have been promoted to,
2  but I know they have been open, that he
3  should have had an opportunity, he feel
4  that way.
5    Q.    **Okay. What openings do you**
6  **believe he should have had an**
7  **opportunity?**
8    A.    There have been lead man jobs
9  open.
10   Q.    **What specific lead man job?**
11   A.    I couldn't tell you exactly on
12 that area, they have so many jobs open.
13   Q.    **Do you know if he applied for**
14 **this job or told anyone he was interested**
15 **in any promotions?**
16   A.    He hadn't applied for it,
17 because, like I said, go back to what I
18 was saying, you don't know this.
19   Q.    **Do you know if he told anyone,**
20 **any of his superiors or anyone in**
21 **management, that he was interested in any**
22 **job -- or interested in a promotion?**
23   A.    I don't know if he talked to

Page 140

1  them about it or not, but they --
2  everybody has their way of doing things.
3    Q.    **So you have no facts to support**
4  **that the management --**
5    A.    No more than you can talk to
6  them and they'll give you a direct
7  answer.
8    Q.    **So you don't know that**
9  **management knew that he would be**
10 **interested in promotions?**
11   A.    Management probably know a lot
12 of people's interested in promotion, just
13 like I was, but you don't get that
14 opportunity because you don't know.
15   Q.    **But, again, you don't have any**
16 **facts to support that --**
17   A.    No facts, no more than words.
18   Q.    **-- that management knew he'd be**
19 **interested in moving up?**
20   A.    No, I don't know what
21 management know, no facts that management
22 knew.
23   Q.    **What about Jeff Holland, do you**

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 141

1  know of any specific job he applied for
2  or was interested in?
3      A.    Probably all of them lead man
4  jobs, assistant supervisor, supervisor.
5      Q.    Do you know of any facts to
6  support the notion that management or any
7  supervisor knew that he was interested in
8  any promotion?
9      A.    I don't know that.
10     Q.    Andrew Clay, do you know of any
11 job that he applied for or was interested
12 in?
13     A.    He hadn't applied, but he's
14 been interested in other jobs in his
15 department.
16     Q.    Can you name those jobs?
17     A.    Lead man, assistant supervisor,
18 supervisor, all those jobs came open with
19 him still standing there, just like me.
20     Q.    The lead man, supervisor and
21 assistant supervisor?
22     A.    All those jobs have been
23 filled.

Page 142

1      Q.    Do you know whether management
2  knew that he was interested in any of
3  those jobs?
4      A.    I really don't know.
5      Q.    Okay.  What about Betty Harley,
6  do you know if she applied or was
7  interested in any jobs?
8      A.    Probably, if they asked her.
9      Q.    Do you know if she applied for
10 any jobs?
11     A.    No, she hadn't.
12     Q.    Do you know if she informed her
13 supervisor or anyone in management that
14 she was interested in any job?
15     A.    No more than me.
16     Q.    What do you mean, no more than
17 you?
18     A.    Well, a job came open sort of
19 in my department, and she asked me why --
20 why didn't she get the job.  I told her I
21 don't know, but I didn't select her to
22 get that job, I said someone else did.
23     Q.    What job was this?

Page 143

1      A.    I got a person working under
2  me, a person, she do special work.  And
3  the job --
4      Q.    What's the position?
5      A.    She's assembly, but they got
6  her on -- she do special work.
7      Q.    And Betty Harley applied for
8  this job?
9      A.    No, she did not apply for the
10 job, nobody applied for it.
11     Q.    Did Betty Harley let anyone
12 know she was interested in that job?
13     A.    She let me know.
14     Q.    Did you let anyone know?
15     A.    I told Kenny and them about it.
16 I said, well, she feel like she ain't
17 never been asked anything.
18     Q.    Explain your conversation with
19 Kenny Taylor.  What was -- when did you
20 have it?
21     A.    I couldn't recall.  It's been
22 years ago, couple of years back, when
23 that kind of came open.

Page 144

1      Q.    So this is an assembly job
2  under you, Betty Harley told you she was
3  interested; correct?
4      A.    She said I should have asked --
5  they should have asked her.
6      Q.    So the job was already given to
7  someone else?
8      A.    Right.
9      Q.    So you didn't know she was
10 interested in it until after it was
11 already filled?
12     A.    Well, sort of.  I didn't really
13 -- I don't know if she was interested in
14 it.  She just was upset because she
15 didn't -- wasn't asked.
16     Q.    But you didn't go to Kenny
17 Taylor and talk to him about it until
18 after it was already filled?
19     A.    Right.
20     Q.    Is there any other job that you
21 believe Betty Harley should have gotten
22 and that she didn't?
23     A.    No.  I'll let her answer that.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 145

1    Q.    Okay. What about Becky
2  Williams, was there any job she applied
3  for or was interested in that she did not
4  get?
5    A.    In her department, she feel
6  like that a job came open at lead person,
7  they had assistant supervisor job came
8  open, you know. They just feel like they
9  hadn't never been asked.
10   Q.    Okay. Do you have any facts to
11 support that Becky Williams told anyone
12 in management, or that management knew
13 that Becky was interested in the position
14 of lead man or assistant supervisor?
15   A.    No, no facts I have or
16 anything.
17   Q.    So you don't know if she told
18 them she was interested?
19   A.    No, I do not.
20   Q.    Okay. What about Minnie
21 Holmes?
22   A.    I have no facts on her.
23   Q.    So you don't know if management

Page 146

1  knew she was interested in a promotion?
2    A.    No, I do not.
3    Q.    Anyone else that we have not
4  discussed? Any other African-American
5  employee that you believe should have
6  gotten a promotion that didn't?
7    A.    To my knowledge, that's it.
8    Q.    Is there anything that I could
9  help you to remember, refresh your memory
10 of anyone else?
11   A.    No.
12   Q.    You had discussed earlier, you
13 had mentioned fear, you said that
14 employees were scared to apply to jobs.
15 Was that your testimony?
16   A.    I said they are -- fear what
17 might happen. Not only -- not just apply
18 for a job; what might happen. I don't
19 think they fear of applying for them,
20 but, you know, I'm just saying a fear of
21 speaking out. They don't like the way
22 the system is set up. That's what I was
23 applying to, the way it's set up, that

Page 147

1  black Americans do not get handpicked or
2  opportunity to get a job -- opportunity
3  to get a higher class on jobs in
4  management.
5    Q.    Let me see if I can be clear.
6  You're saying that African-American
7  employees are scared to let management
8  know that they believe they should be
9  given opportunities that they're not
10 given?
11   A.    Yes, to a point. Yes.
12   Q.    And they're scared to come
13 forward and voice their concern; is that
14 correct?
15   A.    Yes, sort of. What I'm --
16 yes, there's a fear of what might happen
17 if they stand out and say they want this
18 job and don't get it, you know, they feel
19 like they get bucked around.
20   Q.    Why would they be scared?
21   A.    Well, we've never had a black
22 in management, go back to what I was
23 saying. We've never had a black in

Page 148

1  management and I know being in management
2  and being black is not easy, you know.
3  It's -- it's a challenge in there and
4  it's -- and you go to a lot of ups and
5  downs, you going to get accused of a lot
6  of things and a lot of things going to
7  happen just because of who you are in
8  that part of the country. And -- and a
9  lot of things happen.
10   Q.    Why are they scared? What do
11 they think is going to happen to them?
12   A.    I won't say they're afraid of
13 anything happening. I'm just saying to
14 speak out like I'm speaking out, they're
15 afraid of this -- something like this, to
16 stand out the right -- take the
17 opportunity to say they feel like they've
18 been discriminated against and they
19 didn't get the opportunity to get this
20 job, or the job was open, they didn't
21 have a chance to see it on the board or
22 nobody talked to them about this job, the
23 next thing you know somebody working this

37 (Pages 145 to 148)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 149

1  job. They just afraid to go to the Equal
2  Opportunity, same way I am, afraid of
3  standing out to speak out because of the
4  consequence, you know, that you have to
5  face, you know.
6      Q.    What do you mean by the
7  consequences?
8      A.    Consequence, you don't know --
9  we don't know the outcome, what will
10  happen, you know.
11      Q.    Meaning you're scared you'd be
12  terminated?
13      A.    Yes, things like that.
14      Q.    Are you saying that you were
15  scared?
16      A.    Yes, I was afraid.
17      Q.    Well, I guess I'm not
18  understanding your fear. You failed a
19  drug test; correct?
20      A.    Did I fail the drug -- no, I
21  did not fail the drug test.
22      Q.    I thought you said earlier you
23  failed a drug test.

Page 150

1      A.    I did not fail the drug test.
2  When I was -- got called up about my drug
3  test, they had a possibility that I could
4  have failed my drug test and they saying
5  that it didn't turn out right, but they
6  had made some mistakes before. They give
7  me an opportunity within seventy-two
8  hours, to take that test over. The same
9  thing I told George, and within eight
10  hours he had me in the office and telling
11  me that I had failed the drug test. So I
12  didn't have the seventy-two hours, it was
13  within eight hours, and he said if I was
14  going take that test again, I'd take a
15  chance of getting fired, so I did.
16      Q.    So I guess my question is, I
17  mean, a positive test came back for
18  drugs. Now, I understand that that may
19  have been mistaken, but they didn't
20  terminate you when that happened. They
21  let you --
22      A.    They didn't have no reason to
23  terminate me. If I would have failed

Page 151

1  that test, I would have had to go to the
2  school and report for four or five weeks,
3  just like anybody else, no different.
4      Q.    Okay. And you had sex with
5  another employee; correct?
6      A.    Yes, I did.
7      Q.    And they didn't fire you for
8  that; correct?
9      A.    That was -- she was working up
10  under personnel resource before she got
11  hired.
12      Q.    So, I'm not understanding --
13      A.    And she wasn't in my
14  department. That -- I mean, we --
15      Q.    My question really centers
16  around your basis for fear. I mean, the
17  company, I believe, has treated you
18  right, so I'm trying to figure out why
19  you believe that or why you're scared or
20  why you have fear that something may
21  happen to you when so far nothing has
22  happened to you?
23      A.    Well, that didn't have anything

Page 152

1  to do with my outside doing. That was in
2  another area, because you've got
3  supervision all over that company,
4  employees, supervisors have had --
5  mingled with other employees, other than
6  me, and they hold higher positions, and
7  the same thing, they still there today,
8  nothing never happened, and have
9  co-mingled with employees.
10      Q.    So what's your basis for being
11  scared?
12      A.    What I was saying, standing out
13  to Equal Opportunity, being a black man,
14  saying that I filed charges against the
15  company because I feel like I've been
16  discriminated against because of my race
17  and my age, that was something to be
18  fearful of because that's something a
19  black man just don't do and it's just,
20  like, never happened before. I mean, you
21  know, it's just me and a whole
22  corporation.
23      Q.    But you went ahead and filed a

38 (Pages 149 to 152)

Page 153

1  claim with the Equal Employment
2  Opportunity; correct?
3      A.    Yes, I did.
4      Q.    And you filed this lawsuit;
5  correct?
6      A.    Yes, I did.
7      Q.    And you haven't been demoted
8  because of that; correct?
9      A.    Been demoted? No, I hadn't,
10 not because I filed.
11     Q.    Okay. Have you received a
12 decrease in pay because of it?
13     A.    No, I hadn't.
14     Q.    Have you been treated any
15 differently because of it?
16     A.    No, I hadn't been treated
17 differently, but there's, I know, things
18 that it's not the same that it was. I
19 mean, that's my opinion.
20     Q.    No one's said anything to you?
21     A.    No. I hadn't said anything to
22 anybody else, either.
23     Q.    Moving back to your application

Page 154

1  -- or when you wanted the job of
2  assistant supervisor, the one that Stan
3  Henderson received, you had told me that
4  Kenny Taylor came to you about the
5  promotion; is that correct?
6      A.    Yes.
7      Q.    But you knew about the
8  promotion, or you knew about the opening
9  before Kenny came to you; correct?
10     A.    That's correct.
11     Q.    Even though it wasn't posted?
12     A.    That's correct.
13     Q.    And you didn't step forward to
14 tell Kenny that you were interested in
15 the job, Kenny came to you; correct?
16     A.    Well, just the point, go back
17 to what I was saying, no, I didn't go to
18 Kenny because when that job came, was
19 available, which Kenny had made a
20 statement, or one of them, I can't really
21 call -- so-call, but they're saying they
22 probably wasn't going to fill that
23 position any time soon, no where in the

Page 155

1  future, like they have other jobs any
2  time in the future, they wasn't going to
3  fill that job regardless of what, but any
4  time in the future they'll end up filling
5  that -- the job unaware, just like other
6  jobs came open out there.
7      Q.    I don't think I'm following
8  you. The job came open, you knew about
9  the opening; correct?
10     A.    Well, I knew they were going to
11 place somebody, like everybody else
12 assumed they were going to place somebody
13 when the assistant supervisor passed.
14     Q.    And when you knew the job was
15 open, you didn't go to Kenny and say,
16 hey, this job is open, I think I'm
17 interested in it? You didn't do that,
18 did you?
19     A.    No, I did not.
20     Q.    Kenny came to you and said,
21 hey, here are these four questions, if
22 you're interested in it --
23     A.    At that time he did.

Page 156

1      Q.    Okay.
2      A.    Now, to go back to what I was
3  saying, they said that job wasn't going
4  to be refilled any time in the future.
5      Q.    Kenny told you that?
6      A.    If I'm not mistaken, Kenny told
7  me that when Wilmer Lee had died.
8      Q.    When he gave you those four
9  questions?
10     A.    No, that was way beyond before
11 then. That was probably when he -- after
12 Wilmer Lee passed, back in two or three
13 -- two years ago.
14     Q.    So when the assistant
15 supervisor passed, you were told by Kenny
16 that the job wasn't going to be filled
17 for a while?
18     A.    Well, just a rumor mostly.
19     Q.    So Kenny never told you that?
20     A.    Well, Kenny talked to me about
21 it. He said he didn't think they were
22 going to refill it no time soon, but then
23 rumors said -- like anybody else hear

Page 157

1 rumors, they ain't going to fill that
2 job, which they didn't until that time he
3 approached with the little slip and
4 talked to me about it.
5    Q.    So you didn't know that there
6 was a possible opening until Kenny came
7 to you?
8    A.    That's right.
9    Q.    I want to go back to the
10 company hiring Stan and their reasoning
11 for hiring Stan instead of you.  Do you
12 know of anyone else who applied for that
13 position other than you and Stan?
14    A.    No, I do not know, but I
15 suspect.  What I was saying, you don't
16 know things like that.  Most things is
17 under cover.  I mean, when people get
18 promotions, we got people come off the
19 street, work at Reliable for about two or
20 three months or a year, and they just --
21 who they are, they end up with promotion
22 jobs, and some of them in management
23 jobs, just in less than two years.  So

Page 158

1 jobs like that, when they come open like
2 Stan's job or assistant supervisor job, I
3 wasn't aware of it, I mean, who all
4 applied for it.
5    Q.    So you don't know who else
6 applied for the job?
7    A.    No, I do not.
8    Q.    Okay.  And you're an
9 African-American and you knew that -- you
10 knew about the job; correct?
11    A.    Well, all of them knew about
12 it.
13    Q.    Okay.  And you were given an
14 opportunity to fill our four questions;
15 correct?
16    A.    Yes.
17    Q.    Okay.  And you had said that
18 Stan had worked in both departments, he
19 had worked in your department and the
20 other department; correct?
21    A.    Yes.  He worked in mine for a
22 while, then they moved him over to the
23 other department for a while.

Page 159

1    Q.    Okay.  Do you think it was
2 reasonable for the company to hire him as
3 the assistant supervisor because he had
4 worked in both departments?
5    A    Well, I had worked in both
6 departments for years.  I mean, I had
7 just as much background as far as working
8 and ability to do the job, even though I
9 had tack welding experience.  So we all
10 had experience in different areas.
11    Q.    I remember your testimony was
12 that you hadn't worked in that other
13 department in the last ten years; is that
14 correct?
15    A.    That's correct.
16    Q.    Okay.  And he has worked in the
17 last -- in those two departments
18 recently; is that correct?
19    A.    That's correct.
20    Q.    Was it reasonable for the
21 company to believe that he was the better
22 assistant supervisor because he had more
23 recent experience in both departments?

Page 160

1    MS. LOWELL:  Object.  Go ahead.
2    THE WITNESS:  I don't think it
3 was their reason to hire him on that job,
4 because that job, when he took over, he
5 didn't know -- he didn't know a thing
6 about it.  They mostly do on-the-job
7 training.  He didn't know a thing about
8 that job.
9    Q.    (BY MS. ODOM)  What are you
10 talking about?
11    A.    I mean, as far as what to be
12 done up there or building the grills or
13 what they had to do, he did not know
14 anything about it.
15    Q.    What job are you talking about
16 that he didn't know anything about?
17    A.    The one that when they moved
18 him out of my department, moved him over.
19    Q.    So he --
20    A.    He had another -- you had
21 another lead man in that job who had more
22 experience than Stan did.
23    Q.    But he had learned --

40 (Pages 157 to 160)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 161

1      A.      He hadn't learned that -- no,
2  he hadn't learned, still hadn't learned,
3  and he'd tell you right today he still
4  hadn't learned it.  He had another lead
5  man in that job under that -- in that
6  department already knew the job, another
7  lead man was -- he's a white American,
8  but he was in that same position.  If
9  they wanted to give the job to somebody
10  they should have gave it to him, but they
11  wanted to handpick Stan.
12      Q.      Stan was the lead man in the
13  other department; correct?
14      A.      I don't know if he was the lead
15  man before or when they made him lead
16  man, but when he was working under me, he
17  was just working under me at night.  Then
18  he came to days for a while, then they
19  put him over there.
20      Q.      I understand that he worked
21  under you in your department.  I also
22  understand, correct me if I'm wrong, that
23  at some point he moved to the other

Page 162

1  department and worked in the other
2  department; is that correct?
3      A.      Yes.
4      Q.      Okay.  And he was the lead man
5  for some time in the other department,
6  just like you're the lead man in the
7  other department.
8      A.      Correct, but they also had
9  already a lead man in that department,
10  too.
11      Q.      So they had two lead men?
12      A.      Correct.
13      Q.      Same time?
14      A.      So when he moved, he was just
15  another lead man over there.
16      Q.      Who was the other lead man?
17      A.      Wendall Art.
18      Q.      Wendall Art?
19      A.      That's what I told you earlier,
20  Wendall Art.
21      Q.      Do you think it was reasonable
22  for the company to consider Stan's
23  answers as being better than yours to

Page 163

1  those four questions?
2      A.      I don't think -- they got their
3  opinion, but I can just answers one
4  subject -- one answer.  I said I'll
5  cooperate with them, you know, whatever
6  is needed to be done.  I mean, if they
7  had told me I needed to write a
8  paragraph, if I knew I had to do all of
9  this answering, I would have sit down and
10  I would have went over it, but they
11  didn't tell me all of that.  I mean, you
12  know, my work showed for itself.
13          (WHEREUPON, AN OFF-THE-RECORD
14          DISCUSSION WAS HAD.)
15      Q.      (BY MS. ODOM)  Do you think it
16  was reasonable for the company to
17  consider the fact that Stan had no
18  counseling in his personnel file?
19      A.      I don't know what they consider
20  -- I mean, as far as counseling, we had
21  other people that had counseling
22  background worse than mine that had a
23  promotion.

Page 164

1      Q.      Do you think it was reasonable
2  for the company to consider the fact that
3  you had had sex with another employee and
4  Stan hadn't?
5      A.      I don't know what Stan had sex
6  with or what he had done personally.  You
7  might pull his record, pull some records,
8  they might be worse than mine.And that
9  is true.
10      Q.      Do you know of any similarly
11  situated white employees that make more
12  than you?
13      A.      Well, that's one thing they
14  keep secret, you know.  They don't tell
15  each one -- there's one I know, I've
16  mentioned his name, Steve Paulk, he make
17  more than I do.
18      Q.      Steve who?
19      A.      Paulk.
20      Q.      Poke?
21      A.      Paulk.
22      Q.      And what's his position?
23      A.      I assume that he's a lead

41 (Pages 161 to 164)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 165

1 person.
2    Q.    In what department?
3    A.    Department 11.
4    Q.    And you know that he makes more
5 than you?
6    A.    Yes.
7    Q.    Okay.  What's his salary?
8    A.    His last salary, it was
9 fourteen seventy-three when we all got
10 our freeze on our rate.
11    Q.    So he makes fourteen
12 seventy-three an hour?
13    A.    Yes.  And I was making fourteen
14 sixty-one.
15    Q.    When was this?
16    A.    Last year.
17    Q.    And what -- Department 11, is
18 that a different department?  I mean, is
19 that on the architectural side?
20    A.    No.
21    Q.    What does Department 11 do?
22    A.    OBD, build dampers.
23    Q.    Any other employee that makes

Page 166

1 more than you?
2    A.    Not to my knowledge, but I
3 assume a lot of them make more than I do.
4 I just never tried to compare my rate --
5    Q.    So other than Steve Paulk, you
6 don't know of any other employee?
7    A.    No.
8    Q.    What other employees besides
9 Cynthia Lane do you claim have been
10 sleeping with leads or supervisors?
11    A.    Well, I can claim or I do have
12 facts or what?  I mean --
13    Q.    You saying you don't have
14 facts?
15    A.    I mean, if I can just put my
16 fingers on it, no, I can't.
17    Q.    Do you --
18    A.    Do I have a write-up or
19 something like that, I really can't go
20 into -- tell you what all employment in
21 the management have things to do with
22 employees, because it's been throughout
23 the shop for years.  And, I mean, you've

Page 167

1 got management does things that --
2 undercover, you know.  Like I said, I
3 don't know if it's on paper or --
4    Q.    My question is do you know of
5 any other lead person who has slept with
6 another employee?
7    A.    Not as my knowledge.  I rather
8 not say that, not as my knowledge.
9    Q.    What about a supervisor, do you
10 know of any other supervisor who has
11 slept with another employee?
12    A.    Probably, yes.
13    Q.    Okay.  Who?
14    A.    I mean, I can't say they have,
15 now.
16    Q.    So you don't know?
17    A.    No, I don't know.
18    Q.    Okay.
19    A.    But I can say, yes, it have
20 happened, but I don't know the facts.
21 It's their word against my word.
22    Q.    So there's no other employee
23 who has had sex with an employee -- with

Page 168

1 another employee, and has not been
2 punished for it?
3    A.    No, they hadn't been punished.
4    Q.    Other than Steve Paulk, do you
5 have any other facts to support your
6 belief that whites make more than
7 African-Americans?
8    A.    I do a lot of grading,
9 evaluation and grading.
10    Q.    Uh-huh.
11    A.    And I see a lot of grading or
12 evaluation sheets, and I see who makes
13 what's what.  And I can say I don't
14 understand why this one make that much,
15 this one jump up, this, that -- I don't
16 know if they got anything with relation
17 -- relate -- or race or not.  I mean,
18 it's -- I can say they might be you
19 underpaid, you know, probably fifteen or
20 twenty cents different, but then yet --
21    Q.    Do you know of any specific
22 similarly situated employees, a white and
23 a black individual, where the white makes

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 169

1  more than the black and they're similarly
2  situated?
3      A.    Close to it, yes.
4      Q.    Name them.
5      A.    I mean, you got -- go back to
6  what I was saying, Betty Harley. She's
7  been there years.
8      Q.    Okay. Betty Harley.
9      A.    Uh-huh.
10     Q.    Okay. What's her position?
11     A.    She's -- she just assembly.
12     Q.    Assembler. What white employee
13 do you believe makes more than her that
14 is similarly situated to her?
15     A.    Well, I won't say make much as
16 she do, but, you know, just get up there
17 equal, I -- it's based on what you
18 talking about, because the way they got
19 that pay raise, and I can say you been
20 fifteen years and you got people been
21 there five years, what they try to get
22 you up to the grade where you should be
23 at in equal pay with everybody -- with

Page 170

1  all employment, but some of them just
2  climb the ladder pretty fast. I won't
3  say she make a whole lot different but
4  it's --
5      Q.    Can you name a white employee
6  that is similarly situated to Betty
7  Harley that you believe makes less -- or
8  excuse me, makes more or shouldn't make
9  the same?
10     A.    I can't say shouldn't make the
11 same. It's not for me to say.
12     Q.    Any other employees besides
13 Betty Harley?
14     A.    No. I'd rather not say.
15     Q.    Let me show you a copy of the
16 complaint that you filed in this case. I
17 want you to turn to Page 2. You see
18 Paragraph 6?
19     A.    Uh-huh.
20     Q.    It says RP -- and I assume
21 that's Reliable, the Defendant in this
22 matter. It says RP has discriminated
23 against Lett in his employment on the

Page 171

1  basis of his color, black, race
2  African-American, and his age, over
3  forty, in that RP, which is the
4  Defendant, has repeatedly passed over and
5  denied promotions to Lett to assistant
6  supervisor and to supervisor positions.
7  Is that what it says?
8      A.    That's what it says.
9      Q.    Is there anything that we
10 haven't gone over today that forms the
11 basis of this allegation? Have we talked
12 about everything?
13     A.    Well, I don't know if we talked
14 about everything. We was talking about
15 has been looked over in the past, you
16 know, as far as promotions. It's like my
17 supervisor, Kenny, when I say supervisor
18 and assistant supervisor, Kenny moved up
19 from assembly to saw to lead man to lead
20 man to assistant supervisor to
21 supervisor, and I'm still right there
22 stagnated, even though for all these
23 incidents, these allegations that you all

Page 172

1  say that y'all have, all of this occurred
2  before all of this, most of it.
3      Then you've got Stan come up,
4  you know, he leave Reliable, come back,
5  you know, and within so many years or a
6  year or two and get right back where he
7  was at. And then all of a sudden he fall
8  back in this same position that, you
9  know, he moves up the ladder, assistant
10 supervisor. And I sit -- I sit there and
11 watch myself down through the years, you
12 know, down through the years just --
13 people just move, bounce all over, not
14 just me as a black employee, other black
15 employees, too, you know, and the same
16 opportunity was there for me, been there
17 for them, but you just get bounced
18 around. You don't know it until --
19 nobody ever told me Kenny was fixing to
20 move up to assistant supervisor when he
21 first got the assistant supervisor job.
22     Q.    Did you apply for that
23 assistant supervisor job?

43 (Pages 169 to 172)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 173

1    A.    No way to apply for it.  We did
2  not know anything about it till he was
3  announced that he was assistant
4  supervisor, because he was a lead man
5  during the time and nobody knew nothing
6  about it.  And that's when I asked Roger
7  Peak what do a man go to do to improve
8  his self, it's been years ago, to get any
9  better.  He said we considered you, we
10  thought about you, you're doing a good
11  job and we appreciate you, but Stan -- I
12  mean, this guy don't have but about four
13  or five peoples in his department.
14    Q.    When Kenny Taylor was promoted
15  to assistant supervisor, did you inform
16  any of your supervisors or management
17  that you were interested in that
18  position?
19    A.    Yes.  I talked to Roger that
20  day.  That's when we had words, a quick
21  conversation.
22    Q.    Was that after Kenny was
23  already chosen?

Page 174

1    A.    Yes.
2    Q.    Before Kenny was chosen, had
3  you told anyone that you were interested
4  in the job?
5    A.    Yes.  They knew I been
6  interested in the job.
7    Q.    Who knew?
8    A.    I even talked to George one
9  time about -- been years ago before I
10  even got probably the lead man job, there
11  was things, that I wanted to improve
12  myself or move up the ladder.
13    Q.    So you told George that you
14  were interested in that job?
15    A.    No, not that job.  We just
16  talked about, you know, moving up the
17  ladder, you know, there were more things
18  in the future.
19    Q.    I'm asking if any -- you had
20  talked to any supervisor or anyone in
21  management that you were interested in
22  the assistant supervisor job before Kenny
23  Taylor had gotten it?

Page 175

1    A.    No, because I did not -- I
2  wasn't aware of it.  Nobody was.
3    Q.    And prior to Kenny Taylor
4  getting the assistant supervisor job,
5  what was he?
6    A.    He was a lead man.
7    Q.    You were a lead man; correct?
8    A.    Correct.  Both of us was.
9    Q.  He was the lead man in the
10  other department?
11    A.    Yes.
12    Q.    Is there anything else that we
13  haven't gone over that would comprise
14  your allegation in Paragraph 6?
15    A.    No.  Just saying I feel like I
16  just was qualified just like anybody else
17  was, because we talking about the four
18  questions.  And all of the answers that I
19  applied to it, you know, I can say that
20  one word mean more than a thousand words
21  when I'm trying to say certain things.
22  You know, it's kind of hard for me to
23  talk to people like I'm at a -- I'm at a

Page 176

1  job interview all the time, you know, you
2  got to play that role, too.  But they
3  knew about that I wanted to -- they knew
4  about I wanted the job, or try it anyway.
5  I told them I'd try it.
6    Q.    You're talking about the job
7  Stan Henderson received?
8    A.    Yes.
9    Q.    Is there anything else that we
10  haven't gone over?
11    A.    Not as I know.
12    Q.    If you go to Paragraph 8, talks
13  about RP's promotion process constitutes
14  a pattern or practice of promotion
15  discrimination against black or
16  African-American employees.  Is there
17  anything that we haven't discussed that
18  comprises that allegation?
19    A    No.  I just feel like -- I feel
20  like I've been discriminated against just
21  like all the other black have been --
22  feel like they've been discriminated
23  against because of their color and they

44 (Pages 173 to 176)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 177

1  hadn't had the opportunity, the door to
2  open up, just saying we can do better.
3       Q.      So are there any facts that we
4  haven't gone over?
5       A.      No.
6       Q.      Have you looked at Page -- turn
7  the page to Paragraph 9. It says RP
8  further discriminates against blacks and
9  African-American employees, including
10 Lett, by pay them less than similarly
11 situated Caucasian employees. We've
12 talked about Steve Paulk. Is there any
13 other employee that you believe is --
14 excuse me, black employee that makes less
15 than a white employee that's similarly
16 situated?
17      A.      He's -- I don't know that much
18 about him, but this guy come to me,
19 talked to me about it. I mean, he --
20 he's a Puerto Rican, but I just assume --
21 he's another race, but he feel like he
22 been looked over so many times, and he
23 talked to Mr. Helms about the situation

Page 178

1  that he was going through, the same thing
2  concerning what I'm dealing with.
3       Q.      This having to do with pay?
4       A.      Pay and promotions.
5       Q.      And who is this individual?
6       A.      All I know, his name, Catum.
7       Q.      Cater?
8       A.      Catum.
9       Q.      Catum?
10      A.      Uh-huh. I don't know his last
11 name, but --
12      Q.      And he's a Puerto Rican?
13      A.      Yes.
14      Q.      And what specifically -- you
15 said promotions, that he's been denied
16 promotions. What promotions has he been
17 denied?
18      A.      He feel like he have been
19 denied promotion of moving up from
20 welding to lead man, and any other
21 position that came open, because he been
22 there eleven years and he never got no
23 further than where he got.

Page 179

1       Q.      So do you know if he's ever
2  told management or any of his
3  supervisors?
4       A.      He said he did, now.
5       Q.      Do you know whether he did?
6       A.      I'm just saying he said he did.
7       Q.      And what about pay, what
8  similarly situated white employee makes
9  more than Catum?
10      A.      According to him, he got
11 several that make more than he do in his
12 department. I couldn't tell you exactly
13 how much they make more than -- he didn't
14 tell me any detail or all of this. He
15 came to me and talked to me about it. I
16 don't know.
17      Q.      So you don't know what white
18 employees are -- who they are?
19      A.      Probably every one I've got --
20 I turned in a piece of paper, all of them
21 on that list.
22      Q.      Is there anything else that we
23 haven't covered that would comprise your

Page 180

1  allegation in Paragraph 9?
2       A.      No.
3       Q.      Is there anything that we
4  haven't gone over today?
5       A.      I answered the questions best
6  of my knowledge.
7       Q.      That would be a no?
8       A.      As I know of.
9       Q.      So you don't know of anything
10 else?
11      A.      Not as I can call right now.
12      Q.      Anything that can help you
13 recall?
14      A.      Help my --
15      Q.      Help you?
16      A.      No. I just feel like I stepped
17 out, you know, being a black American,
18 you know, standing for the peoples at
19 Reliable, for the blacks. Sometimes you
20 hate to be in a position to do some
21 things that you need to do what is right
22 and try to get a point across to the
23 company that we all equal and we out here

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 181

1  to do this same job, and we want to be
2  treated the same way regardless of what
3  color we are, race or whatever, you know.
4  We just want to feel like we're not on
5  the back side and have that same
6  opportunity.
7       When you see people come in the
8  door, only been there for a year or two
9  years, and they move up the ladder and
10 you still sitting there, it hurts, you
11 know, and you not -- and you doing
12 everything you do, a good employee, to
13 meet them obligation and you never get
14 that opportunity.  And then you see other
15 peoples come in like I say, and it's a
16 so-called friend to one of the management
17 or somebody up higher and they get these
18 positions and you sit -- you sit there
19 and see it done, it hurts, you know.  And
20 you wonder why where you can say I
21 remember he used to work over there with
22 this one over here back over here when
23 they worked over here, and now he's over

Page 182

1  here and he done got this one, and they
2  move up, all the whites move up.  The
3  blacks still in one area.  We can't --
4  can't prosper.  And all we want is the
5  opportunity, you know, just like
6  everybody else, the opportunity to do
7  what we got to do to make that job more
8  success, satisfy the customer, do what's
9  right for the employer, best of your
10 knowledge, not saying that everything
11 going to be perfect.
12      Q.    Is there anything else we
13 haven't gone over?
14      A.    No.
15      Q.    So we've covered everything?
16      A.    As of my knowledge.
17      Q.    You filed an EEOC charge,
18 didn't you?
19      A.    Yes.
20      Q.    Let me give you a copy of your
21 charge of discrimination.  Is that a true
22 and correct copy of the charge of
23 discrimination that you filed with the

Page 183

1  EEOC?
2      A.    That's correct.
3      Q.    And that's your signature at
4  the bottom?
5      A.    Yes, ma'am.
6      Q.    And you filed that on November
7  17th, 2004?
8      A.    That's correct.
9      Q.    Or at least that's when you
10 signed it; correct?
11      A.    That's when I got information
12 back, yes.
13      MS. ODOM:  Okay.  I'd like to
14 make the charge the next exhibit.
15      (WHEREUPON, DEFENDANT'S
16      EXHIBIT #8 WAS MARKED FOR
17      IDENTIFICATION AND IS ATTACHED
18      HERETO.)
19      Q.    When did you first consult the
20 EEOC?  Do you remember?
21      A.    I think I wrote them back in
22 October.  If I'm not mistaken, back in
23 October right after the --

Page 184

1      Q.    I'm handing you a copy of a
2  letter dated October 6, 2004.  Is that
3  your signature at the bottom of this
4  letter?
5      A.    That's correct.
6      Q.    Is this the letter that you
7  sent to the EEOC?
8      A.    Yes, that's correct.
9      Q.    And was this your first contact
10 with the EEOC?
11      A.    Yes, it is.
12      Q.    So you sent this to them.  Did
13 you get a response from them?
14      A.    Yes, I got a response.
15      Q.    Did they tell you to file -- go
16 ahead and file a charge?
17      A.    No, they did not.
18      Q.    What was their response?
19      A.    Their response said they have
20 to have -- I think I had to write them
21 again to give them some more information
22 of what I thought about what had really
23 happened on the job, that for them to go

46 (Pages 181 to 184)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 185

1  on and investigate more about what was
2  going on.
3  　　Q.　So this was before you filed
4  your charge?
5  　　A.　Yes.
6  　　Q.　Okay.  What other document did
7  you submit to them?  Did you submit any
8  more information?
9  　　A.　I thing I refer -- I wrote them
10  again and told them just a little bit
11  more detail.  They wanted me to be a
12  little bit more specific about what I had
13  filed, you know, at that time.  And I
14  did, I think it was on the second letter
15  that I wrote.
16  　　Q.　Was it a letter similar to this
17  one?
18  　　A.　Yes.
19  　　Q.　And it would have been dated
20  before November 17, 2004, the date of
21  your charge, you would have sent that
22  letter in?
23  　　A.　I think so.  I sent two

Page 186

1  letters, I don't know -- if I'm not
2  mistaken I sent two.
3  　　Q.　And in this letter that we're
4  looking at right now, this October 6,
5  2004 letter to the EEOC, the last
6  paragraph says that on October 5th, 2004
7  Henderson told me that he and his wife
8  talked about it the night before because
9  it concerned him the way I was treated.
10  I assume this has to do with Stan getting
11  the job; is that correct?
12  　　A.　That's correct.
13  　　Q.　Can you elaborate on what Stan
14  told you?
15  　　A.　The words that we talked about,
16  I ran across him, and I told Stan that I
17  had no beef or feelings against him
18  because he got, I know, the promotion, I
19  congratulate him.  And he said, yeah,
20  Frank, you know, it's hard.  And I said,
21  what you mean.  We got to talking and he
22  was saying him and his wife discussed
23  that that night -- I don't know if it was

Page 187

1  that night, he said him and his wife
2  discussed about that situation, that I
3  didn't get the job, but he was quite sure
4  that I was probably going to get the job.
5  And he said he thought I was -- probably
6  would have did a good job.  And he said
7  he would have liked to had the job that I
8  had and I moved up.  And he said it was
9  -- kind of hurt because him and his wife
10  was talking about it and he felt like --
11  he felt like he was in the in-between of
12  it.  And, you know, like I told him, I
13  said I don't fault you for not getting
14  the job, you know.  It wasn't your fault
15  'cause he was selected like everybody
16  else always selected, you know, to get a
17  job when it come to something like this.
18  I'm a black man and you is a white man
19  and I feel like I been let down again,
20  you know, because we always get caught in
21  this trap, in this position, we can't
22  move no further out of this rut.  And
23  that's what he was saying, he felt bad

Page 188

1  about it, him and his wife talked about
2  it, and he felt bad about it.
3  　　Q.　Do you know if he told anyone
4  in management that he thought you
5  deserved the job more?
6  　　A.　He talked to Kenny.  I don't
7  know what words that he had with Kenny
8  about the situation, and he probably told
9  Kenny the same thing, too.
10  　　Q.　Do you know that for sure?
11  　　A.　I can't -- I never asked him,
12  but I'm sure that I know Stan.  Stan
13  probably told him in so many words, and
14  he say he thought that I should have got
15  the job, I should have got a try at it
16  anyway, because he knew that -- he said,
17  you're good in whatever you do, you know.
18  I mean --
19  　　Q.　But don't know that for sure,
20  whether he told Kenny that?
21  　　A.　I'm quite sure he talked to
22  him.  I don't know for sure, no, I don't,
23  but I'm quite sure he did.

47 (Pages 185 to 188)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 189

1    MS. ODOM: I'd like to mark
2 this October 6th letter as the next
3 exhibit, 9.
4    (WHEREUPON, DEFENDANT'S
5    EXHIBIT #9 WAS MARKED FOR
6    IDENTIFICATION AND IS ATTACHED
7    HERETO.)
8    Q.    Mr. Lett, I'm going to show you
9 a copy of a Dismissal and Notice of
10 Rights.
11    A.    Yes.
12    Q.    Do you recall receiving this
13 document from EEOC?
14    A.    Yes.
15    Q.    Do you recall when you received
16 it?
17    A.    I received it back in -- I
18 couldn't tell you exactly what date it
19 was.
20    Q.    But the date down there is
21 February --
22    A.    February 23rd.
23    Q.    Was it sometime around that

Page 190

1 date?
2    A.    Somewhere up in there.
3    Q.    Okay. And it looks like the --
4 there's a checkmark on it and it -- next
5 to the checkmark it says, the EEOC issues
6 the following determination: Based on
7 its investigation, the EEOC is unable to
8 conclude that the information obtained
9 establishes a violation -- establishes
10 violation of the statutes. Is that what
11 it says?
12    A.    That's what it says.
13    Q.    So the EEOC is issuing a no
14 cause determination; is that correct?
15    MS. LOWELL: Object.
16    THE WITNESS: That's what it
17 says.
18    MS. ODOM: I'd like to make
19 this the next exhibit, Exhibit 10.
20    (WHEREUPON, DEFENDANT'S
21    EXHIBIT #10 WAS MARKED FOR
22    IDENTIFICATION AND IS ATTACHED
23    HERETO.)

Page 191

1    Q.    (BY MS. ODOM) Mr. Lett, when
2 did you first consult an attorney?
3    A.    After I got the letter that
4 they give me so many days to fill out the
5 report -- I mean, to get an attorney to
6 go on with this case and more investigate
7 -- do more investigating of what was
8 going on. So when I sought the attorney,
9 I can't tell you exactly what day it was.
10 Probably ninety days I was talking to an
11 attorney.
12    Q.    Okay. And your current
13 attorney and her law firm, is that the
14 only attorneys that you spoke with, or
15 did you speak with any other law firms?
16    A.    Well, they had talked to me
17 about several law firms, but the NAACP
18 performed me to talk to this firm.
19    Q.    So another lawyer told you to
20 talk to --
21    A.    No. I'm in -- a member of the
22 NAACP and they was just telling me --
23    Q.    NAACP -- okay. Do you have any

Page 192

1 other sources of income besides your job
2 at Reliable?
3    A.    No.
4    Q.    No property?
5    A.    No.
6    Q.    What about your spouse? Does
7 she have a job?
8    A.    No.
9    Q.    Any financial assistance?
10    A.    With me?
11    Q.    Uh-huh. Yes.
12    A.    She's -- she draw disability.
13    Q.    Cora Lett draws disability?
14    A.    Uh-huh.
15    Q.    Do you have any other type of
16 financial assistance?
17    A.    No.
18    Q.    Do you have any health
19 problems?
20    A.    Not I'm aware of.
21    Q.    Have you seen the doctor in the
22 last three years?
23    A.    Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 193

1    Q.    For what?
2    A.    Last time I had a physical
3  contact -- or just a physical checkup,
4  and I have checked to see any reason
5  about a lot of pains in the back part of
6  my back.
7    Q.    When did you have this
8  physical?
9    A.    Been over a year and a half
10  ago, I think, last time I had a physical,
11  whatever, a year.  But I have one every
12  year, but it's been a little over a year.
13    Q.    And all you have is pains in
14  your back?
15    A.    Yes.
16    Q.    Are you taking medications?
17    A.    Sometime I take some.
18    Q.    And these medications are for
19  your back?
20    A.    Yes.
21    Q.    Do you know what specific
22  medication you're on?
23    A.    I don't try to take them.  I

Page 194

1  take muscle relaxant, I take part-time
2  sometimes Lortabs, mostly spasm -- some
3  kind of medicine.
4    Q.    What doctor -- I'm sorry.  Go
5  ahead.
6    A.    And sometime I have stomach
7  ulcers, you know, I take some kind of
8  acid medicine for that from Dr. Cosby.
9    Q.    I'm sorry?
10    A.    Dr. Kraft, I'm sorry.  Dr.
11  Kraft.
12    Q.    Dr. Kraft.  Is he your only
13  doctor?
14    A.    Yes.  I see Dr. Cosby
15  sometimes.
16    Q.    Dr. Cosby?
17    A.    Uh-huh.
18    Q.    And Dr. Kraft, is he the one
19  who prescribed your stomach medication?
20    A.    Yes.  He's the only one I deal
21  with right now.
22    Q.    And Dr. Cosby, what type of
23  doctor is he?

Page 195

1    A.    He's in the same building.
2  He's -- they take turns in case one's not
3  there and I see the other one.
4    Q.    Are they internists, family
5  medicine doctors?
6    A.    Yes.
7    Q.    Which one, do you know?
8    A.    Dr. Kraft I deal with.
9    Q.    And they're just regular --
10    A.    Doctors.
11    Q.    Any other health problems?
12    A.    No.  I do a lot of -- I got a
13  lot of -- doing a lot of dentist work.
14    Q.    Are there any other people that
15  would have personal knowledge regarding
16  your claims that you've made in this
17  lawsuit?
18    A.    Beg pardon?
19    Q.    Any witnesses?
20    A.    Any witnesses?
21    Q.    Uh-huh.
22    A.    Not as my knowledge.
23    Q.    Have you spoken to any other

Page 196

1  employees about your claims?
2    A.    Yes, we have discussed it.
3    Q.    Who?
4    A.    My brother, I talked to him.
5  That's the closest one I can talk with.
6    Q.    Is he an employee?
7    A.    Yes.
8    Q.    What department?
9    A.    Six.
10    Q.    What is his job?
11    A.    I don't know -- he's assembly
12  back there in the back, all I know.
13    Q.    Any other employees you've
14  spoken with?
15    A.    I think all of them are aware
16  of what's going on, but I try not to
17  talk.  That's hearsay.  They be come ask
18  me a question, but I try to throw them
19  off on it.  I don't know like to talk to
20  peoples about it.
21    Q.    Have you ever talked to Cynthia
22  Lane about your lawsuit?
23    A.    No.  She's just like everybody

49 (Pages 193 to 196)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 197

```
1   else, she's aware of it.  They assume.
2        Q.     Are there any other employees
3   who can collaborate your claims?
4        A.     About my case?
5        Q.     Uh-huh, yes.
6        A.     Sure.  I mean, probably several
7   peoples can say some things about it, you
8   know.
9        Q.     Well, I guess my question is
10  who can support your allegations?
11       A.     Witness?
12       Q.     Yes.
13       A.     Oh, gosh, a list, half of this
14  -- say over eighty percent of the blacks.
15       Q.     Can you name them?
16       A.     I can't name all of them.  I'll
17  just have to get you a list.  I say
18  eighty percent of them.
19       Q.     Can you get me a list?
20       A.     Probably, yes, ma'am.
21       Q.     What do you think these
22  African-American employees will say?
23       A.     The truth.
```

Page 198

```
1        Q.     Tell me what they'll say.
2        A.     The truth.
3        Q.     What's the truth?
4        A.     I can't tell you how they will
5   -- till you talk to them, the truth about
6   they feel the blacks has been
7   discriminated against since they've been
8   at Reliable, hadn't gave the opportunity
9   to get a job, better job as far as
10  management, or move up in just another
11  area for the better job.
12       Q.     Is there anything else they're
13  going to say?
14       A.     They'll probably speak what's
15  in their heart, whatever -- I don't know
16  what all they'll say.
17       Q.     You don't know what they'll
18  say?
19       A.     No.
20            MS. ODOM:  We can take a break.
21  I think we're almost finished.
22            (WHEREUPON, A SHORT RECESS WAS
23       HAD.)
```

Page 199

```
1        Q.     (BY MS. ODOM)  Okay.  Mr. Lett,
2   we're just going to finish up.  You had
3   submitted some documents in response to
4   our deposition notice, and I've looked
5   over some of those documents.  I want you
6   to take a look at this one that's marked
7   number six.  Can you tell me what this
8   is?
9        A.     That's just something one of
10  the guys in another department, you know,
11  just give me four questions that a job
12  had came open that they had to answer to
13  get the job, one of the black guys.
14       Q.     What -- I'm sorry.  Go ahead.
15       A.     He brought it to me, said these
16  the four questions that we got to answer.
17  I said, well, you better answer, you
18  better answer them right, I said, because
19  I been trapped in that right there to a
20  point that if you don't make it specific
21  it will go against you.  That's what I
22  feel.  But, I said, that's not going to
23  do no good because you going to get
```

Page 200

```
1   selected who they want to, anyway.
2            And he brought me these
3   questions right here, and that was sort
4   of based on the same question that I had
5   after the four questions.  And I was
6   telling him, I said, they make up the
7   questions that they want from different
8   departments that are coming down from the
9   headquarters.  Everybody answer the same
10  judgement or same kind of question, but
11  every supervisor, I assume, or management
12  got their own way or their own questions,
13  how they'll come up with the answer when
14  it come to a lead man job or -- I mean,
15  this is the first time I've seen this,
16  too, you know.
17       Q.     What employee gave you that?
18       A.     Andrew Clay.
19       Q.     Did you apply for this job that
20  he's talking about?
21       A.     No, because I had already made
22  my charges, applied for this job right
23  here, assistant supervisor.
```

50 (Pages 197 to 200)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 201

1    Q.    Okay.  And he gave you this
2  long after the assistant supervisor
3  position was filled back there?
4    A.    Yes.
5    Q.    And he told you what's this,
6  and --
7    A.    Yeah, he was just asking me a
8  question about it.  I said, well, let me
9  see it, and I got a copy of it.  And a
10  job had came open in his department as
11  far as lead man and he had been there
12  about twenty-something years and he was
13  considering, you know, about getting this
14  -- trying to get a lead man job, but he
15  told me he didn't have a GED -- I mean, a
16  high school education.  You know, that's
17  one thing they had one time before they
18  was saying.  But I said it doesn't
19  matter, that's what I told him, I said it
20  doesn't matter, you can get your GED
21  'cause I know a guy that got up and he
22  went and got his GED and he was already
23  promoted, and I say so what's the

Page 202

1  difference.
2    Q.    Do you know if Andrew completed
3  this questionnaire?
4    A.    I do not know.  I didn't ask
5  him any more about it.
6    Q.    You just told him to make sure
7  he completed it.
8    A.    Yes.
9    Q.    If he wanted the job.
10    A.    Yes.
11    Q.    Is that correct?
12    A.    That's correct.
13    Q.    There's another document that
14  you produced, and this is document,
15  number one to five, and when I say one to
16  five, I'm referring to your Bates
17  numbers.  And it looks as though this
18  document is a performance evaluation for
19  Steve Paulk.
20    A.    Uh-huh.
21    Q.    Is that correct?
22    A.    That's correct.
23    Q.    Okay.  Where did you get that

Page 203

1  document?
2    A.    I got it from Steve Paulk.
3    Q.    He just gave it to you?
4    A.    No.  We was talking about
5  evaluation one day, and I told him, I
6  said, well, my last evaluation, I said I
7  made top pay, told me I'm at top pay, I
8  can't get no more money.  And he said
9  what is top pay.  I said I don't have no
10  idea what top pay is.  I said, well, they
11  say if you're at top pay you're going to
12  get a check for four hundred dollars.
13  And I said, I reckon if I'm at top pay,
14  I'm going to get a check for four hundred
15  dollars.  He said probably me too.  So,
16  when he got his, I had got mine, and --
17    Q.    So when he got his, what?
18    A.    He let me see what top pay was.
19  I asked him what was top pay, and he told
20  me fourteen seventy-three.  I said that
21  can't be right.  They told me top pay --
22  I was already at top pay at fourteen
23  sixty-one.

Page 204

1    Q.    When you say they told me top
2  pay was fourteen sixty-one, who are you
3  referring to?
4    A.    I'm referring to my supervisor
5  when he told me, he said you already at
6  top pay.
7    Q.    Kenny Taylor?
8    A.    That's right.
9    Q.    Okay.  When did Kenny tell you
10  top pay was fourteen sixty-one?
11    A.    When I got my evaluation on
12  that four hundred dollars back in 2004,
13  if I recall, 2005 -- that last raise.
14  2005, I think, somewhere up in there.
15    Q.    So your evaluation in 2004, the
16  top pay -- excuse me, at your evaluation
17  in 2004, you're saying that Kenny Taylor
18  told you top pay was four sixty-one?
19    A.    He said I was at top pay.
20    Q.    And your pay was four
21  sixty-one?
22    A.    Right.
23      MS. LOWELL:  I believe it's

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 205

1  fourteen sixty-one.
2        THE WITNESS: Fourteen
3  sixty-one, I'm sorry.
4     Q.    (BY MS. ODOM) I'm sorry.
5  Yeah, fourteen sixty-one.
6     A.    Uh-huh.
7     Q.    And you say that you had a
8  conversation with Steve Paulk about top
9  pay, what top pay was, and Steve was
10  telling you that his top pay was more
11  than fourteen sixty-one?
12     A.    Yeah.
13     Q.    Okay. And that's based on a
14  2005 evaluation?
15     A.    The last evaluation.
16     Q.    That evaluation occurred in
17  2005; correct?
18     A.    Right.
19     Q.    And your evaluation occurred in
20  2004; correct?
21     A    Back in November, yes.
22     Q.    Do you know how Kenny -- I
23  mean, excuse me, do you know how Steve

Page 206

1  got a copy of his performance evaluation?
2     A.    I don't know. He asked me --
3  he said he asked for it and he got it.
4  And I did ask for one of mine, but I
5  never did receive mine.
6     Q.    Is his supervisor Kenny Taylor?
7     A.    No, Eddie Ward.
8     Q.    And what department is Steve
9  in?
10     A.    Eleven.
11     Q.    And he's a lead man?
12     A.    Yes. I assume that's what he
13  is.
14     Q.    But you don't know what he is?
15     A.    Yeah, that's what he is.
16     Q.    Have you ever made any
17  audiotapes or recordings of conversations
18  with any employees at Reliable?
19     A.    No.
20     Q.    Has anyone else at your
21  direction made any audio or tapings of
22  conversations?
23     A.    Not as my knowledge.

Page 207

1     Q.    What do you want -- what is
2  your objective in this lawsuit, what do
3  you want?
4     A.    What's right.
5     Q.    Elaborate on what you think is
6  right.
7     A.    That we should be equals as to
8  all employees, and I think we should have
9  opportunity, place jobs on the board, and
10  have some kind of guideline that we go by
11  saying that we qualified or we not
12  qualified instead of just being
13  handpicked who you are.
14     Q.    Do you want them to demote Stan
15  and put you in the position?
16     A.    Promote Stan and put me in the
17  position?
18     Q.    Demote Stan. Do you want them
19  to take Stan out of the position and put
20  you in the position?
21     A.    No. I just wanted that
22  opportunity, just like Stan had a
23  opportunity.

Page 208

1     Q.    It's my understanding that you
2  applied just like Stan applied; correct?
3     A.    Correct.
4     Q.    So you were given the
5  opportunity; correct?
6     A.    I didn't apply for it. All I
7  was just talked about. I mean, I didn't
8  have -- thought I had an opportunity to
9  apply for it.
10     Q.    But you don't know of anything
11  different that Stan did to get the job
12  that you didn't do?
13     A.    Not no more than what he told
14  me.
15     Q.    What did he tell you?
16     A.    He didn't have anything to do
17  with it, he don't know, he just got job.
18     Q.    So he had filled out -- as far
19  as you know, he filled out the same four
20  questions that you filled out?
21     A.    Yes, as far as I know.
22        MS. ODOM: I think I'm
23  finished. It's all yours. Thank you, Mr.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 209

1    Lett.
2
3    EXAMINATION BY MS. LOWELL:
4        Q.    I have a few follow-up
5    questions. We talked earlier today about
6    your work on the architectural side;
7    correct?
8        A.    Correct.
9        Q.    About -- can you give me an
10    approximation on how many hours or days
11    you would say that you've worked on the
12    architectural side within the last ten
13    years?
14        A.    Ten years?
15        Q.    Yes, sir.
16        A.    I couldn't give you approximate
17    days and hours, but mostly on Saturday
18    when we're not working I'm always
19    volunteer to work in the other area, in
20    architect. Been like that for down
21    through the years, you know, I fill in
22    wherever I can fill in at, do whatever
23    needed.

Page 210

1        Q.    How many Saturdays would you
2    say you've worked in the last year?
3        A.    In architect or just --
4        Q.    Architect.
5        A.    In the last year probably --
6    mostly the last year I worked probably
7    every Saturday that were available that
8    they had to work. Not every Saturday but
9    every time the opportunity came. If I
10    wasn't working I worked.
11        Q.    Okay. Did you ever work nights
12    on the architectural side within the last
13    ten years?
14        A.    No.
15        Q.    How about overtime, if that's
16    different from Saturdays?
17        A.    That overtime on Saturday. A
18    couple of hours in architect in the
19    afternoon when we didn't work but eight
20    hours, I go work with them maybe two
21    hours during the day, or maybe an hour
22    just, you know, for the extra hour or
23    two, just helping out.

Page 211

1        Q.    So you're saying that during
2    the regular work week, Monday through
3    Friday, you would go and spend a couple
4    of hours periodically?
5        A.    Not all the time, but varying
6    Saturdays we would work, and I -- if they
7    had opened and worked, I would.
8        Q.    So sometimes?
9        A.    Sometimes.
10        Q.    Where else did you work
11    overtime, what other areas, or volunteer
12    work?
13        A.    Oh, well, in the years past, I
14    probably worked everywhere -- well, I
15    worked in the paint shop before, you
16    know, helping them out in the paint shop.
17    That was overtime sometimes, but it's
18    been a while. I also have worked in the
19    anodizing area, you know, just loading
20    racks in the past, you know.
21        Q.    Earlier today we were talking
22    about whether or not you've ever had to
23    complete any written reports in your

Page 212

1    current position as a lead man; correct?
2        A.    Written report?
3        Q.    Have you ever had to -- we've
4    talked about this earlier today. Do you
5    remember that?
6        A.    Yes.
7        Q.    And then later you testified
8    that you have had the complete
9    evaluations on employees; correct?
10        A.    That's correct.
11        Q.    Would you consider an
12    evaluation a written report?
13        A.    Yes, I would.
14        Q.    So you have had to complete
15    written reports other than completing
16    orders in your current position?
17        A.    Right.
18        Q.    Today we talked about any time
19    anybody gets pregnant in your department,
20    it is -- it's Frank's child?
21        A.    Yes, a joke, you know, but --
22        Q.    Is that a joke?
23        A.    Yes, because just had one last

53 (Pages 209 to 212)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 213

1  week, you know, now she's pregnant, they
2  said, Frank, you got another one, it's in
3  your water back here, you know.
4      **Q.    Okay.**
5      A.    It's always --
6      **Q.    So it's just a joke?  I mean,**
7  **everybody's laughing about it?**
8      A.    Yes.  I mean, I don't pay any
9  attention.
10      **Q.    So I'm clear, the issue**
11  **involving Cynthia and Cora and the --**
12  **whether or not a lawsuit was filed, are**
13  **you aware if that was a criminal suit or**
14  **if it was a civil suit?**
15      A.    It wasn't nothing to it.  I
16  don't know what came -- the outcome on
17  it.  They threw it out because both
18  parties was just -- you know, Cora,
19  that's -- which is my wife, she's got
20  health problems, schizophrenic.  A lot of
21  things came up and she wasn't focused on
22  what really was going on, nobody don't
23  know what was going on till all of that

Page 214

1  came up in the document.  You know,
2  that's why I was saying that's another
3  incident.
4      **Q.    Okay.**
5      A.    I think it was throwed out.  I
6  never did -- I never did get between it.
7      **Q.    Okay.  We had talked earlier**
8  **today about an assistant supervisor**
9  **position in the paint shop.  Do you**
10  **recall that?**
11      A.    Yes.
12      **Q.    Okay.  Were you interested in**
13  **that position?**
14      A.    Well, I was interested in
15  moving, because, you know, sometimes you
16  get burnt out where you at, you know, and
17  at the time I wouldn't mind trying it
18  out, you know, but it's just the thought.
19  The job came open and nobody knew nothing
20  about it, you know, just like any other
21  job I would say, we don't know nothing
22  about it until someone got the yob.
23      **Q.    Okay.  Have you ever seen a**

Page 215

1  **position for management posted at your**
2  **workplace?**
3      A.    No, I hadn't seen no job posted
4  far as management.
5      **Q.    Is there a common area where**
6  **these postings could be located?**
7      A.    Yes.  They're supposed to be on
8  the board in the break room, several
9  boards that they put job postings on,
10  mostly the break room, posted on the
11  board.
12      **Q.    What type of positions are**
13  **posted on the board?**
14      A.    Most of the -- saw operator,
15  that's mostly something like that, some
16  kind of special job, mostly saw operator,
17  or welder's job or something like that.
18      **Q.    Are they all non-management**
19  **positions?**
20      A.    Well, mostly, yes, they are,
21  most of those are.
22      **Q.    Okay.  Have you ever told a**
23  **supervisor that you were interested in**

Page 216

1  moving up?
2      A.    Yes.
3      **Q.    Who?**
4      A.    I talked to Kenny about it, you
5  know, I said, you know, you tired of this
6  right here, sometimes you want to try
7  something different.
8      **Q.    Have you talked to anybody**
9  **else?**
10      A.    No, no more than I talked to
11  George there one time before, we had a
12  conversation about things in the future
13  that, you know, we can -- things can get
14  better, you know.  I assume that's what
15  we was talking about, you know, moving up
16  the ladder.
17      **Q.    Okay.**
18      A.    I -- beg pardon.  I go back, I
19  talked to Roger Peak the time that Kenny
20  got the job of assistant supervisor.  I
21  mentioned it to him, what do a man got to
22  do to rise up.
23      **Q.    Okay.  Do you recall what his**

54 (Pages 213 to 216)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 217

1  suggestions or comments were to you when
2  you addressed that question to him?
3      A.    Roger?
4      Q.    Yes.
5      A.    We was coming out the learning
6  center after they pronounced Kenny had --
7  nobody asked no question while we were
8  present when they announced that he had
9  the job. No one, all the other lead men
10  and the peoples that was there, nobody
11  said anything about him getting that job,
12  nobody questioned them about it. We just
13  left it.
14      Q.    Let me rephrase. When you
15  asked specifically what does a man have
16  to do to move up in this company, was a
17  response given to you?
18      A.    Yes.
19      Q.    And what was that response?
20      A.    He said, Frank, we had several
21  that we thought about, but then yet, he
22  said, you doing -- you doing a good job.
23  He said we didn't -- don't think we

Page 218

1  didn't consider you, but at the time he
2  said Kenny had less responsibility far as
3  how many people was in his department,
4  which he was lead man over probably about
5  four, maybe five people at that time and
6  I was lead man over approximately during
7  the time about fifteen to seventeen
8  people. And I feel like he was trying to
9  say he was more looser to deal with the
10  situation by being assistant supervisor
11  and I was more tied up because he didn't
12  have that much responsibility. That's
13  what I assumed that's what he was trying
14  to tell me, you know, and that was the
15  conversation that we had.
16      Q.    Do you know think it had to do
17  with your age as far as Kenny was
18  concerned in his promotion to the
19  position versus you?
20      A.    Yes, I do, because the way
21  things had happened in the past, you
22  know, you always going -- you don't want
23  to play no race issue or race role. I

Page 219

1  don't like to play that role, that's the
2  last thing I ever wanted to say, don't
3  look at it on that behalf. I done that
4  many years, I never looked at it on a
5  race part, on black or she's white or
6  he's white. I always try to blind that
7  side out and look at the circumstances,
8  but when you see so much of it and you
9  stagnated in that same place, you have to
10  say it's got to be the race role. That's
11  why I say it.
12      Q.    About the four questions that
13  you were presented by Kenny for the
14  assistant supervisor position -- you know
15  what I'm talking about?
16      A.    Uh-huh.
17      Q.    Do you know what, if anything,
18  Stan was told about those four questions
19  and how to answer them?
20      A.    No, I do not. I was wanting to
21  know when did he write them questions,
22  and I -- before the job came open or
23  after the job came open, you know. I

Page 220

1  never got in any discussion with Stan
2  about that, when did he write that
3  statement about that.
4      Q.    Did you ever have any
5  conversations with Stan or anybody else
6  about what Stan was told prior to
7  answering those questions?
8      A.    No more than just Stan.
9      Q.    And what conversation did you
10  have with Stan about what, if anything,
11  he was told about answering those
12  questions?
13      A.    He just said he just filled out
14  the paperwork, you know, just done that,
15  you know.
16      Q.    Okay.
17      A.    That's all he was talking
18  about.
19      Q.    Okay. We had talked about the
20  sexual relationship between you and
21  another employee, Cynthia. She was not
22  employed -- I mean, she was not your
23  subordinate at the time that you had the

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 221

1   relationship with her?
2       A.    When we started out talking,
3   she was in personnel resource.
4       Q.    She was employed by Reliable,
5   but she was not under you?
6       A.    Right.  She was under Reliable,
7   but she was under personnel resource.
8       Q.    Okay.  Are you aware of any
9   other members of management or persons
10  who have been promoted who have had
11  sexual relationships with other employees
12  or relationships outside of a working
13  relationship?
14      A.    Sure.
15      Q.    Can you tell me who?
16      A.    Facts, I couldn't tell you
17  exactly.  You always going to hear
18  rumors, but you got other employees in
19  management that have relationships with
20  employees.  You got -- I don't know where
21  to start at.  I start from the bottom, I
22  work my way up to the top.  You got Steve
23  Paulk said that he had a relationship

Page 222

1   with employees.
2       Q.    Steve was a member of
3   management?
4       A.    Yes.
5       Q.    Who did he have a relationship
6   with?
7       A.    Her name, Cynthia Myhand.  And
8   there's others, I can't call their -- I
9   don't know their name but say he's
10  involved -- that have been involved with
11  him.  And you got -- I can't call their
12  name because I really don't know their
13  name right off.  And you got other
14  management, like a lady's name was Maiby
15  Baxley --
16          MR. HARBUCK:  I'm sorry.  Who?
17          THE WITNESS:  Maiby Davis.
18      Q.    (BY MS. LOWELL)  Maiby --
19      A.    Maiby Davis.  She used to be an
20  employee in management out there.  She
21  was in management, she said she had a
22  sexual relationship with one of the
23  management.  And also she --

Page 223

1       Q.    Another member of management or
2   another employee?
3       A.    Management, it was in
4   management.
5       Q.    Who did she have a relationship
6   with?
7       A.    Well, she married one of the
8   guys out there named William -- William,
9   all I know his name is William.
10      Q.    Was William a member of
11  management?
12      A.    He became management later on.
13  He ended up marrying her.
14      Q.    Did he become a manager before
15  or after he married her?
16      A.    I can't -- it was so close in
17  there, it was pretty close.  I think
18  after.  It might have been before, but it
19  was close.  And you got a relationship,
20  you got Corky Newman, he just became
21  supervisor, I can't call the lady's name,
22  but he was tied up with her or had a --
23  just the same kind of relationship with

Page 224

1   her before he became management.
2       Q.    Do you know in what department
3   she works?
4       A.    She works in 6 and he also was
5   working in 6.  And you got --
6       Q.    Let me interrupt you for one
7   second.  I apologize.  When Steve was
8   having a relationship with Cynthia, what
9   department was Cynthia in?
10      A.    She's in 11.
11      Q.    What department was Steve in?
12      A.    He's in 11.
13      Q.    Okay.  And he was her manager?
14      A.    Yes.
15      Q.    Okay.  Did their relationship
16  begin before or after Steve was promoted
17  to management?
18      A.    He was already in management.
19      Q.    Okay.  And Ms. Davis, when she
20  had a relationship with William, were
21  they working in the same department?
22      A.    No.
23      Q.    Okay.  Did they work in the

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 225

1  same department after he became a member
2  of management?
3      A.    No.
4      Q.    Okay.  I apologize, you were
5  going forward.  The last person I have is
6  Corky.
7      A.    . He was -- he was -- I don't
8  know if he was a lead man or whatever, he
9  was in -- he was in management, but the
10  lady, she wasn't.
11     Q.    Is there anybody else?
12     A.    Well, you just might as well
13  name them all.  You got Randy Davis, he's
14  in management.
15     Q.    Who did Randy have a
16  relationship with?
17     A.    I couldn't call her name, I
18  just -- you know, all of these things,
19  you have --
20     Q.    The woman allegedly that he had
21  had a relationship with, where did she
22  work?
23     A.    She worked in his department.

Page 226

1      Q.    Is there anybody that you know
2  that would know who this person is?
3      A.    Yes, probably.  Yes.
4      Q.    Who?
5      A.    Do I know?  I would ask
6  somebody in their department what the
7  name.
8      Q.    What department does Randy work
9  in?
10     A.    Seven.
11     Q.    Okay.  Randy Davis, and is
12  there anyone else?
13     A.    There's one in management that
14  -- I don't know if you want to call it a
15  sexual relationship.  When he got on up
16  in the higher class, he had like a pool
17  bash, a nude party at his home.  I mean,
18  in the --
19     Q.    Who had a nude party at his
20  house?
21     A.    I assume that's what it was.  I
22  mean, he -- he told it in front of
23  everybody, Scottie Parnell.

Page 227

1      Q.    Okay.  So would it be safe to
2  say that other people have had
3  relationships with other persons in their
4  departments and have not been denied a
5  promotion on the basis of that?
6      MR. HARBUCK:  Object to the
7  form.
8      THE WITNESS:    Yeah.
9      Q.    (BY MS. LOWELL)  Have you seen
10  other people that have had relationships
11  with employees in their department who
12  have been promoted?
13     A.    Had been promoted?
14     Q.    Have been promoted, yes.
15     A.    Yes, there's some that have
16  been promoted.  I don't know what kind of
17  relationship they call it.  You got -- I
18  mean, you going to always hear some
19  things.  Even of George himself, he's
20  sitting there, and there's rumors about
21  him, his relationship with employees, you
22  know, in his staff -- not on his staff,
23  but in his area.

Page 228

1      Q.    Who is George alleged to have
2  had relationships with that were his
3  subordinates?
4      A.    It's a personnel resource -- I
5  don't know the name exactly, but Melissa.
6      Q.    Belissa or Melissa?
7      A.    Melissa.
8      Q.    Is there anybody that you can
9  think of?
10     A.    Not right off.  I mean, so
11  much, probably all over, you know, the
12  plant.  I mean, you know, it's just not
13  in one area.  That's like I said, it's
14  probably all over.
15     Q.    We had talked earlier today
16  about people who had friends who were
17  hired off the street and they were given
18  promotions and surpassed people that had
19  been employed at Reliable for extended
20  periods of time.  Can you elaborate on
21  that a little bit?  Let me ask it
22  differently:  Who do you know of that's
23  gotten a promotion or has been hired off

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 229

1  the street and has surpassed other
2  Reliable employees?
3     A.    Just that came in and got a
4  job? I don't know where to start at on
5  this. Well, I just say, for instance,
6  for the truth, had a guy that came to
7  Reliable, worked in a couple of areas, he
8  got a promotion all the way up to
9  supervisor.
10    Q.    Who was that?
11    A.    His name, Eddie Jackson.
12    Q.    Who was he friends with?
13    A.    Well, he knew George.
14    Q.    How did he know George?
15    A.    They worked together in
16  Flemming Foods.
17       MS. ODOM:    I'm sorry?
18       THE WITNESS:    Flemming Foods,
19  in a company named Flemming Foods.
20    Q.    (BY MS. LOWELL) Anyone else?
21    A.    Got several of them been there
22  years ago, but they come in, got Roy
23  Clark, he came from Flemming Foods. You

Page 230

1  got -- in management, you got a guy in
2  Department -- I mean, so much goes on
3  that it's hard. You got Department No.
4  3, David Burch, he's got a nephew, he's
5  up assistant supervisor already and he
6  only been there a few years back.
7     Q.    What's his name?
8     A.    Brad, all I know.
9     Q.    Brad has only been employed for
10  approximately how many years?
11    A.    I don't know, probably five or
12  six years there. I'm just guessing.
13    Q.    How old is Brad?
14    A.    He probably is in his late
15  twenties, maybe.
16    Q.    And you said that he's an
17  assistant supervisor?
18    A.    Yes.
19    Q.    Over what department?
20    A.    Three.
21    Q.    Are you aware of anyone else
22  who has friends inside the company that
23  has either been hired off the street to

Page 231

1  surpass current Reliable employees or
2  have been promoted to surpass current
3  Reliable employees?
4     A.    Not right off. You got a lot
5  of young peoples in there right now, they
6  in positions far as lead man and probably
7  had been there two or three years, or a
8  year or more or two, and they in
9  positions already. I can't call their
10  name right off, but they in positions
11  already, lead man. You got people that
12  been there for a long time hadn't got
13  that opportunity.
14    Q.    How many years did it take you
15  to receive the position of lead man?
16    A.    Since '94, so probably right at
17  twenty years.
18    Q.    It took you twenty years to get
19  to the position of lead man?
20    A.    At least twenty.
21    Q.    Have you ever had any -- that
22  you are aware of, have you ever had any
23  bad performance evaluations?

Page 232

1     A.    Not before Kenny Taylor took
2  over as supervisor. I mean, they're not
3  bad, but they -- my evaluations, you can
4  go back on my record, they always was
5  good, but since he had came supervisor, I
6  told him, I said I hadn't got a good
7  evaluation since you become a supervisor.
8  I said the last supervisor before you
9  gave me great evaluations. And he was
10  saying he was doing the best he could.
11       And the first time he give me
12  one, and I acknowledged this was the
13  first time giving me a evaluation because
14  he was new at the job, you know, I let it
15  blow by, you know, I didn't get a good
16  evaluation. But the second time, which
17  it was good in his sight, it wasn't bad,
18  but it wasn't great as another one, and I
19  thought maybe the last one I got from him
20  before then, I disapproved, because I
21  didn't even sign it. I was upset about
22  it, you know, because I didn't think the
23  evaluation was good and he was saying

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 233

1  what was what, because we had new changes
2  that came around in the company for ISO
3  and manufacturing, and I had to make a
4  big difference and change on my job far
5  as changing toward the future, how they
6  want things performed and get things out
7  smarter, quicker, cheaper and everything.
8  So I had to make a big adjustment and I
9  did that big adjustment on my job. And I
10  -- if you look at the record in my
11  department, which is -- it's one of the
12  highest far as grade in getting the work
13  out on time and getting the work
14  performed done. And I mean, I get graded
15  a .99 about everything and, I mean, he
16  must have changed it, I had to get to
17  that point, you know. It's --
18      Q.    So you've gotten -- have you
19  gotten good evaluations?
20      A.    I didn't think I got a good
21  evaluation because --
22      Q.    When did that evaluation occur?
23      A.    It wasn't the last evaluation,

Page 234

1  it was the current one before then, I
2  think it was.
3      Q.    Are they done annually, though?
4      A.    Once a year.
5      Q.    That would have been 2004?
6      A.    2004, 2003, it's one of the
7  two. I know I didn't sign it.
8      Q.    Okay. Other than the 2003 or
9  2004, and we're not sure which, but the
10  one you did not sign, have you gotten
11  pretty good evaluations?
12      A.    The first evaluation I got was
13  like the last evaluation, which was the
14  first of the year or the end of last
15  year, I got a evaluation, I think it's
16  one of the best evaluations he gave, you
17  know. And probably I got a fifty-cent
18  raise, and the best raise that I had
19  gotten in the last three or four years.
20      Q.    Do you have any reason to
21  believe that you should have been
22  promoted -- or should not have been
23  promoted to the assistant supervisor

Page 235

1  position?
2      A.    Do I have any reason not?
3      Q.    That you feel that you should
4  not have been promoted?
5      A.    No, I do not have any reason I
6  should not.
7      Q.    Briefly, today you touched on
8  education of some of the members of
9  management. Do you recall that?
10      A.    Yes, I was saying something
11  about somebody's GED.
12      Q.    Was that person a manager, the
13  person that -- tell me the circumstances
14  around the GED.
15      A.    Well, that was concerning the
16  four questions that she had while ago. I
17  was saying one of the management done
18  moved up and he just applied about a year
19  ago to get his GED.
20      Q.    How long has he been employed
21  by the company?
22      A.    Probably -- I don't know, going
23  back five or ten years, or probably

Page 236

1  longer, ten years or more. And he was in
2  management, and he -- he didn't have his
3  high school education, I don't reckon.
4      Q.    What's his name?
5      A.    Scottie Parnell.
6      Q.    So Scottie just recently
7  received his GED?
8      A.    Yes.
9      Q.    And Scottie is a member of
10  management?
11      A.    Yes.
12      Q.    Okay.
13      A.    And the guy that --
14      Q.    Did you complete high school?
15      A.    Yes.
16      Q.    Did you get a diploma?
17      A.    Yes.
18      Q.    You mentioned earlier today
19  that you have taken some seminars and/or
20  classes subsequent to your high school
21  education. Do you recall that?
22      A.    Yes. It was a seminar that the
23  company has sent -- you know, in the past

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 237

1 that we go to certain seminars.
2   Q.    And what seminars did you
3 attend?
4   A.    Just the regular base seminars
5 concerning how to treat peoples on the
6 job concerning the job I was performing.
7 And the last class that I had was -- we
8 went to the -- in management division, it
9 was in Tuscaloosa. There was a course
10 there, we had to go for three months
11 three days a week -- I mean, three days
12 out of a month. I completed that recent.
13   Q.    Okay. Back to the four
14 questions that you were presented with
15 for the assistant supervisor position,
16 have you ever been presented with any
17 type of questions before?
18   A.    No.
19   Q.    Are you aware of anyone ever
20 being presented with questions similar to
21 those?
22   A.    Not as my knowledge.
23   Q.    Did the questions that were

Page 238

1 presented to you by Andrew Clay happen
2 before or after you were presented with
3 the questions from Kenny Taylor?
4   A.    After.
5   Q.    Do you know whether or not the
6 four questions procedure has always been
7 used or if this is something new?
8   A.    To me this is something new.
9   Q.    Have you ever heard anybody
10 talk about the questions in the past?
11   A.    No, I hadn't.
12   Q.    When you were approached by
13 Kenny Taylor regarding the assistant
14 supervisor position that Stan Henderson
15 received, is this the first time that you had
16 ever been approached about a management
17 position?
18   A.    After he had received the job?
19 Yes, that was the first time I was
20 approached.
21   Q.    Kenny Taylor talked to you
22 about the position that Stan Henderson
23 received prior to him being placed into

Page 239

1 that position; correct?
2   A.    Right.
3   Q.    Was this the first time that
4 you had ever been approached about a
5 management position at Reliable?
6   A.    No more than when I got the
7 lead man job, I was approached then.
8   Q.    Okay. When did you get that,
9 would you say? What year again was --
10 did you get the lead man position?
11   A.    Back in '94, I think, somewhere
12 up in there.
13   Q.    '94? Is a lead position
14 considered management?
15   A.    Yes.
16   Q.    Is it management or
17 supervisory?
18   A.    It's management.
19   MS. LOWELL:    Okay. I think
20 that's all I have right now.
21   MS. ODOM: We're going to have
22 some redirect.
23

Page 240

1 RE-EXAMINATION BY MS. ODOM:
2   Q.    You just mentioned that when
3 you refer to management you're including
4 lead persons in that definition; correct?
5   A.    That's correct.
6   Q.    So you would consider yourself
7 part of management; correct?
8   A.    That's correct.
9   Q.    Now, that's your term that
10 you're using for management?
11   A.    No. They got it on paper. All
12 management, they got my name listed just
13 with the rest of them.
14   Q.    And when you applied for the
15 position of assistant supervisor, the one
16 that Stan Henderson received, is that the
17 first time that you had ever applied for
18 assistant supervisor?
19   A.    That's the only time that --
20 well, the time before the opportunity
21 came, I did not know nothing about it.
22 This time, you know, I was approached and
23 they talked to me about it, Kenny did.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 241

1    Q.    And you said that you had been
2  -- it took you twenty years to become a
3  lead man; is that correct?
4    A.    That's correct.
5    Q.    From 1973 to 1994; correct?
6    A.    Correct.
7    Q.    Did you ever apply for the
8  position of lead man between
9  those two times?
10   A.    No, I did not apply for lead
11 man, because, like everything else, you
12 was handpicked.
13   Q.    Did you ever tell anyone that
14 you were interested in becoming a lead
15 man?
16   A.    Yes, I always tell everybody,
17 everybody -- we plan on moving up.  Who
18 wouldn't?
19   Q.    Were you ever specifically
20 denied a promotion to lead man?
21   A.    No.
22   Q.    Now, you have talked about
23 individuals being promoted off the

Page 242

1  street, and you listed a few.  The first
2  one you listed was Eddie Jackson.  You're
3  saying that he was promoted.  What
4  position was he promoted to?
5    A.    He made -- I don't know, I
6  can't put my fingers on it, but I think
7  he went up to supervisor.
8    Q.    Is it your belief that he was
9  promoted because he was friends with
10 people in management?
11   A.    Yes, and everybody else does.
12   Q.    And what is his race?
13   A.    He's white.
14   Q.    Did his race have any role in
15 his promotion?
16   A.    I don't think so.  I don't --
17 couldn't say as it had anything to do
18 with it or not.
19   Q.    What about Roy Clark?  You said
20 that he was promoted.  What position was
21 he promoted to?
22   A.    Well, he's assistant supervisor
3  right now.

Page 243

1    Q.    Okay.  Do you believe that he
2  was an assistant supervisor because he
3  was friends with people in management?
4    A.    Had a lot to do with it, who
5  you know.
6    Q.    Did his race have anything to
7  do with it?
8    A.    I couldn't say that, because
9  you got blacks up there still in the same
10 place, just like it is everywhere else.
11   Q.    So what's Roy Clark's race?
12   A.    White.
13   Q.    What about David Burch, he was
14 promoted to assistant supervisor? Was
15 that what you were saying?
16   A.    No, David's in management.
17   Q.    David's in management.
18   A.    Yeah.
19   Q.    So you're not alleging that he
20 was promoted from off the street?  I know
21 you had listed a few people --
22   A.    No.  I was saying that his
23 nephew --

Page 244

1    Q.    Brad?
2    A.    Right.
3    Q.    Okay.  And you believe his
4  nephew Brad was promoted to assistant
5  supervisor because he was friends with
6  David?
7    A.    It's all who you know.
8    Q.    Did it have anything to do with
9  Brad's race?
10   A.    I got several of them like to
11 have that job and there's some blacks up
12 in that area.
13   Q.    Do you have any facts to
14 support the belief that Brad was promoted
15 because he was white as opposed to being
16 black?
17   A.    I can't say on that part.
18   Q.    Are there any other employees
19 who you believe were promoted that you
20 believe -- who you talk about being
21 promoted off the street, is there anyone
22 else?
23   A.    No.  Like I said, you got a lot

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 245

1  of young peoples in there now. And some
2  they got peoples I do not know, younger
3  peoples, you know, and I know they got
4  higher positions than some that have been
5  there for years and years and years.
6      Q.    But you don't know anyone
7  specifically?
8      A.    No.
9      Q.    You went ahead and listed
10  several employees that you believe had
11  had sexual relations with other
12  employees. Did you say George?
13     A.    George, yes.
14     Q.    Are you referring to George
15  Helms?
16     A.    Yes.
17     Q.    You're saying that he had a
18  relationship with Melissa?
19     A.    I can't put my fingers on that,
20  but it's just like everything else,
21  rumors, like everybody say I'm pregnant,
22  well, everybody's pregnant from me.
23     Q.    What facts do you have to

Page 246

1  support that?
2      A.    Beg pardon?
3      Q.    Do you have any facts to
4  support that?
5      A.    Just like anything else, going
6  through rumors.
7      Q.    What about Randy Davis, you say
8  that he's having a relationship with
9  someone in his department?
10     A.    I don't have no facts on it
11  either.
12     Q.    Do you have any belief that
13  anyone in management knows about that?
14     A.    Probably.
15     Q.    Do you know for sure?
16     A.    I can't -- I can't say.
17     Q.    What about Scottie Parnell, you
18  said that he had a nude party. What do
19  you mean by that?
20     A.    I don't know. He was
21  explaining one day about ask him, he know
22  you'll get in trouble about it sometimes
23  if you do certain things you shouldn't

Page 247

1  do, and he brought that up.
2      Q.    He's a lead man; correct?
3      A.    He's a supervisor or assistant
4  supervisor right now.
5      Q.    Does -- do you have any facts
6  that anyone above him knows that he had a
7  nude party?
8      A.    Yes.
9      Q.    Who?
10     A.    Probably his whole department,
11  probably.
12     Q.    You're saying his whole
13  department. Do you know for sure?
14     A.    I won't say everybody in there,
15  but lots of people know what went on that
16  night or whatever -- whatever happened.
17     Q.    Corky Newman, you said that he
18  is having an affair with someone named --
19  or he had, excuse me, a personal
20  relationship with another employee in
21  Department 6; is that correct?
22     A.    That's what I said.
23     Q.    And who was it?

Page 248

1      A.    I couldn't call her name right
2  off. I don't know that much about her.
3      Q.    Do you have any facts to
4  support that upper management knows?
5      A.    I don't know if upper
6  management knows or not, but there are
7  people that knows.
8      Q.    Who knows?
9      A.    Just people in general. I
10  can't --
11     Q.    Is it just a rumor or is it --
12     A.    No, it's not a rumor, but I
13  can't call her name. I don't -- I don't
14  get into the names.
15     Q.    Maiby Davis, you said she had a
16  personal relationship with William.
17  What's William's last name?
18     A.    He's -- Baxley, named William
19  Baxley.
20     Q.    Baxley. And is Maiby a
21  supervisor?
22     A.    No. She's not employed there
23  no more.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 249

1  Q.   What was she when she was
2  there?
3  A.   She was the lead person.
4  Q.   And what was William?
5  A.   I think he was a lead.
6  Q.   He was another lead person?
7  A.   Uh-huh.
8  Q.   Do you have any facts to
9  support that upper management knew about
10  this affair -- or, excuse me, personal
11  relationship?
12  A.   No.  She married him.
13  Q.   What about Steven Paulk?  You
14  said that he had a personal relationship
15  with Cindy Myhand; is that correct?
16  A.   That's what I said.
17  Q.   Do you have any facts to
18  support that upper management knew about
19  that?
20  A.   I can't recall.
21  MS. ODOM:  Can we take a short
22  break?
23  MS. LOWELL:  Sure.

Page 250

1  (WHEREUPON, A SHORT RECESS WAS
2  HAD)
3  MS. ODOM:  Mr. Lett, I'm
4  finished with my questions.  Thank you.
5  MS. LOWELL:  I have like two
6  tiny follow-up questions.
7
8  RE-EXAMINATION BY MS. LOWELL:
9  Q.   Back to the Scottie Parnell --
10  the nude party, can you explain that a
11  little bit further to me as far as did
12  you testify earlier that there -- he
13  talked about -- Scottie talked about this
14  in front of a group of people; is that
15  correct?
16  A.   Well, we had a meeting, a group
17  meeting, I think management was in there
18  during the time, and they was going over
19  about different things about what you
20  need to do and what you can't do and who
21  you can be seen with, it's not good for
22  the company, and blah, blah this and all
23  this jazz.  And then Scottie's

Page 251

1  coincidence came up and he -- and I think
2  he made a statement, he said, yeah, you
3  can ask me about it, because there's a
4  rumor that he had this party at his
5  house, at his pool, and all this took
6  place, he mentioned it then, he said,
7  yes, I know about it, you can get in
8  trouble about things like that.
9  Q.   Did Scottie say that people
10  were naked at his house at this party in
11  that statement?
12  A.   He didn't say it in that
13  statement when he said that.  He said he
14  knows you can get in trouble about that.
15  Q.   Was Scottie promoted subsequent
16  to the alleged nude party?
17  A.   Yes, he been promoted since
18  then.  I think he was the -- I don't
19  know, he's -- I think he's been promoted
20  since then.
21  Q.   Okay.  Are you aware of any
22  lead man positions that have ever been
23  posted?

Page 252

1  A.   Not as my knowledge, I'm not
2  aware of it.
3  Q.   So you've only been placed into
4  one lead man position, but prior to that
5  you didn't know of any lead man positions
6  that were available until after they were
7  filled?
8  A.   Mostly when they filled.
9  MS. LOWELL:  That's all I have.
10  MS. ODOM:  We're finished.
11  Thank you.  Thank you very much, Mr.
12  Lett.
13
14  FURTHER DEPONENT SAITH NOT
15
16
17  (SAID DEPOSITION WAS CONCLUDED AT
18  1:27 P.M. ON MARCH 28TH, 2006.)
19
20
21
22
23

63 (Pages 249 to 252)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 253

```
 1          C E R T I F I C a T E
 2
 3
 4    STATE OF ALABAMA)
 5    JEFFERSON COUNTY)
 6
 7         I hereby certify that the above
 8    and foregoing deposition was taken down
 9    by me in stenotype, and the questions and
10    answers thereto were reduced to
11    typewriting under my supervision, and
12    that the foregoing represents a true and
13    correct transcript of the deposition
14    given by said witness upon said hearing.
15         I further certify that I am
16    neither of counsel nor of kin to the
17    parties to the action, nor am I in
18    anywise interested in the result of said
19    cause.
20
21         JANE B. ELLIOTT, CSR
22         COMMISSIONER - NOTARY PUBLIC
23
```

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO