# FREEDOM COURT REPORTING

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  FRANK LETT,
6  Plaintiff,
7  vs.          CV 1:05-CV-479-A
8  RELIABLE RUSKIN d/b/a
   RELIABLE PRODUCTS,
9
   Defendants.
10
11  _____
12
13  DEPOSITION OF: GEORGE HELMS
14  _____
15
16
17  S T I P U L A T I O N
18
19  IT IS STIPULATED AND AGREED by and between the
20  parties through their respective counsel that the
21  deposition of GEORGE HELMS may be taken on April
22  13, 2006, before Anne E. Miller, Commissioner and
23  Notary Public, at Wiggins, Childs, Quinn &

## Page 2

1  Pantazis, The Kress Building, 301 19th Street
2  North, Birmingham, Alabama.
3   IT IS FURTHER STIPULATED AND AGREED that it
4  shall not be necessary for any objections to be
5  made by counsel to any questions except as to
6  form or leading questions, and that counsel for
7  the parties may make objections and assign
8  grounds at the time of trial or at the time said
9  deposition is offered in evidence or prior
10  thereto.
11
12
13
14
15
16
17
18
19
20
21
22
23

## Page 3

1          APPEARANCES
2  Appearing For The Plaintiff:
3
4    WIGGINS, CHILDS, QUINN & PANTAZIS
     Ms. Allison W. Lowell
5    Mr. C. Michael Quinn
     The Kress Building
6    301 19th Street North
     Birmingham, Alabama 35203
7
8  Appearing For The Defendant:
9    THE KULLMAN FIRM
     Ms. Elizabeth P. Odom
10   Mr. Jonathan S. Harbuck
     600 University Park Place
11   Suite 340
     Birmingham, Alabama 35209
12
13  Court Reporter: Anne E. Miller
14
15          INDEX
16
17  Examination by Ms. Lowell ............. 4
18  Examination by Ms. Odom ............... 85
19  Examination by Ms. Lowell ............. 93
20
21  Plaintiff's Exhibit 1 ................. 20
    Plaintiff's Exhibit 2 ................. 23
22  Plaintiff's Exhibit 3 ................. 30
    Plaintiff's Exhibit 4 ................. 56
23  Plaintiff's Exhibit 5 ................. 66

## Page 4

1  I, Anne E. Miller, a Court Reporter for the
2  State of Alabama, acting as Commissioner, certify
3  that on this date there came before me at
4  Wiggins, Childs, Quinn & Pantazis, The Kress
5  Building, 301 19th Street North, at Birmingham,
6  Alabama, on April 13, 2006, beginning at or about
7  9:30 a.m., GEORGE HELMS, witness in the above
8  cause, for oral examination, whereupon the
9  following proceedings were had:
10
11       GEORGE HELMS,
12  being first duly sworn, was examined and
13  testified as follows:
14
15  EXAMINATION BY MS. LOWELL:
16  Q. Will you please state your full name for
17  the record?
18  A. George W. Helms the III.
19  Q. As you know, I'm Allison Lowell. I'm
20  representing Frank Lett in his lawsuit against
21  Reliable. Can you please state your address?
22  A. 2256 State Highway 85, Geneva,
23  Alabama.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 5 | Page 7 |
|---|---|
| 1   Q. And what is your Social Security number? | 1   went to court. Yes, I did. |
| 2   A. ████████████ | 2   Q. What was the outcome of that case? |
| 3   Q. Have you ever had your deposition taken | 3   A. If I recall correctly, it was |
| 4   before? | 4   settled. But I don't remember for sure. |
| 5   A. Yes. | 5   That's been years ago too. |
| 6   Q. When? | 6   Q. Who were you employed with during that |
| 7   A. It's probably been two or three years | 7   time? |
| 8   ago. I don't remember the exact date. | 8   A. With Reliable. |
| 9   Within the last three or four years. | 9   Q. Okay. How long have you been employed with |
| 10   Q. And what was that case about? | 10   Reliable? |
| 11   A. Worker's compensation case. | 11   A. Since January of '92. |
| 12   Q. Okay. Have you ever had to testify in a | 12   Q. Where were you employed before that? |
| 13   discrimination case? | 13   A. With Fleming Companies. |
| 14   A. Not that I recall. | 14   Q. Where is Fleming located? |
| 15   Q. Is the worker's comp deposition that you | 15   A. They were located in Geneva, Alabama, |
| 16   were involved in about three or four years ago | 16   also. |
| 17   the only deposition you have ever been involved | 17   Q. What was your job there? |
| 18   in? | 18   A. Human resources manager. |
| 19   A. As I can remember, yeah. It's | 19   Q. How long were you employed at Fleming? |
| 20   possible years ago, I mean, may have, but | 20   A. The last time, nine and a half years. |
| 21   that's the only one I can remember. | 21   Q. Was there a time before? |
| 22   Q. Okay. In the worker's comp case, what were | 22   A. I worked with them part time through |
| 23   the facts? | 23   college and during high school. So I have |

| Page 6 | Page 8 |
|---|---|
| 1   A. An individual was at work, came to me | 1   worked with them on several occasions, but |
| 2   and indicated that he had -- needed time | 2   the only full-time stint was after -- |
| 3   off to go to a doctor for his back, | 3   immediately after graduation from college. |
| 4   indicated that the injury had happened at | 4   Q. Where did you go to college? |
| 5   another place before he came to work with | 5   A. University of Alabama. |
| 6   us, that he had filed a worker's | 6   Q. And why did you leave Fleming? |
| 7   compensation claim with that company. They | 7   A. The division I worked for had sold to |
| 8   were taking care of the bills, that the | 8   an individual, and we were really unsure |
| 9   injury had nothing to do with anything he | 9   about the future of that company or the |
| 10   had done at our place of employment. | 10   stability of the company because it was |
| 11   Q. So the other company paid his comp claim? | 11   changing hands. And the -- I understood or |
| 12   A. I don't know. That's what he told | 12   had heard that the HR position at Reliable |
| 13   me. | 13   was going to be open, that the person that |
| 14   Q. What was the outcome of your deposition? | 14   was in the job was leaving. So I inquired |
| 15   This was while you were employed at Reliable? | 15   into that job and was interviewed and hired |
| 16   A. Right. | 16   for it. |
| 17   Q. Was Reliable responsible for any of the | 17   Q. Okay. How did you find out that that job |
| 18   payments on that? | 18   was going to -- how did you find out that person |
| 19   A. No. | 19   was leaving? |
| 20   Q. Have you ever testified in court? | 20   A. A guy's that I worked with wife |
| 21   A. I don't believe so. I don't | 21   worked at Reliable, and she told him. And |
| 22   remember. Well, yes. I have on another | 22   he passed it on to me at work. |
| 23   worker's compensation case that actually | 23   Q. Who was the person who used to be in that |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1 position, HR at Reliable?
2   A. Charlotte Horning.
3   Q. Horning?
4   A. Horning.
5   Q. H-o-r-n-i-n-g?
6   A. I believe that's right.
7   Q. Female?
8   A. Correct.
9   Q. Who did you interview for or with for that
10 position at Reliable, your current position?
11   A. Terry Agal.
12   Q. Last name was?
13   A. Agal, A-g-a-l.
14   Q. What was Terry's position?
15   A. Vice president of human resources for
16 Hart and Cooley.
17   Q. For?
18   A. Hart and Cooley, H-a-r-t and Cooley,
19 C-o-o-l-e-y.
20   Q. Okay. Is Terry still employed?
21   A. No.
22   Q. Who holds Terry's position now?
23   A. I'm not sure.

Page 10

1   Q. Is there still a vice president of human
2 resources?
3   A. I'm not sure. We don't have any
4 relationship with Hart and Cooley anymore
5 so I don't know who the people are there.
6   Q. Okay. What is your official title at
7 Reliable?
8   A. Director of human resources.
9   Q. You told me you went to Alabama. When?
10   A. Graduated in 1982.
11   Q. Immediately upon graduation, you went to
12 work at Fleming; is that correct?
13   A. Right. I started two weeks after I
14 graduated.
15   Q. Okay. What was your degree in at Alabama,
16 if I haven't already asked?
17   A. Commerce and business administration,
18 concentration in labor relations.
19   Q. Were you ever trained on Title 7 or
20 discrimination during your college career?
21   A. Yes.
22   Q. Did you take any specific classes regarding
23 discrimination of any type?

Page 11

1   A. Took all of the required courses for
2 that curriculum, and there were human
3 resources classes and labor law classes and
4 those kind of things. I can't recall all
5 the different classes.
6   Q. Those specifically address discrimination?
7   A. Yes.
8   Q. Do you have any other degrees?
9   A. No.
10   Q. Have you ever gone to any type of
11 vocational school?
12   A. No.
13   Q. Any type of continuing education, training
14 subsequent to college?
15   A. Yes.
16   Q. In what?
17   A. Various management type things. I
18 can't recall the specifics of them or the
19 titles of them. But from time to time
20 through the years, I have gone to different
21 things.
22   Q. What topics have those generally covered?
23   A. Various management topics.

Page 12

1   Q. Employee relations?
2   A. I don't specifically remember going
3 to any for employee relations.
4   Q. Okay. Discrimination?
5   A. I don't remember going to any for
6 that.
7   Q. Which ones do you remember going to?
8   A. Went to one that we were actually
9 invited to attend by the University of
10 Alabama concerning communication with
11 employees. That was the last one, I
12 believe, that I have gone to.
13   Q. When did that occur?
14   A. It was probably in 2004 or 2005. I
15 don't remember.
16   Q. And in the communication with employees
17 class, what type of communications did you all
18 discuss?
19   A. Basically how to deal with other
20 people, not just employees but co-workers
21 as far as how to communicate concerning
22 problems and how to reach agreement, those
23 kinds of things.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1    Q. Okay. Have you ever taken any type of
2  training classes subsequent to college on
3  promotions?
4    A. I'm not sure I understand the
5  question.
6    Q. Have there ever been any classes that you
7  have attended in a continuing education type
8  setting that dealt with promoting employees?
9    A. No.
10    Q. No? During college, did you take any
11  classes that dealt with promoting employees?
12    A. I'm not sure that there were any
13  classes that specifically were about
14  promoting employees. It's probable that in
15  the human resources curriculum that there
16  was -- there was text and discussion about
17  that.
18    Q. Okay. Have you ever had any training on
19  the purpose and reasons for doing evaluations?
20    A. Yes.
21    Q. What type of training?
22    A. We studied that in college. And I
23  don't remember specifically, but there is a

Page 14

1  possibility that some of the things that I
2  have taken after college or some of the
3  courses that I have been to after college,
4  that was discussed. But we discussed it in
5  college.
6    Q. Okay. What is your understanding of the
7  purpose of evaluations for employees?
8    A. To serve as a basis for pay
9  increases, to identify problem areas, areas
10  where people need improvement and to
11  identify strengths.
12    Q. Would you also consider evaluations useful
13  in deciding who you are going to promote?
14    A. Yes.
15    Q. Based on their strengths?
16    A. Based on their strengths and/or their
17  weaknesses.
18    Q. Okay. And you mentioned identification of
19  problems. When you do an evaluation, if somebody
20  has a problem, did you discuss the problem with
21  them? Would you?
22    A. I would, yes.
23    Q. Why?

Page 15

1    A. To indicate to them that it is a
2  problem as it relates to the performance of
3  the job they are in.
4    Q. Do you think that or would you agree that
5  it would be unfair to an employee if they had a
6  problem not to discuss it with them?
7    A. I think that if a person has a
8  problem, that it should be discussed with
9  them.
10    Q. Okay. If the problem weren't discussed, do
11  you think that it would be fair to deny somebody
12  a promotion on the basis of this problem that's
13  never been discussed with them?
14    A. It's possible, but not in all cases.
15    Q. What's possible? That it would be unfair?
16    A. Yes. I don't think that in all cases
17  it would be unfair, and the reason I say
18  that is because if a person has a problem
19  and the manager doesn't address it, then
20  they have actually made them look better
21  than they actually were in the job. So it
22  could actually give them an advantage as
23  opposed to it being a disadvantage.

Page 16

1    Q. But I think what I'm trying to ask is that
2  if a manager knows that an employee has a problem
3  and the manager doesn't discuss the problem with
4  the employee and then the manager later decides
5  not to promote the employee based on the problem,
6  is that fair?
7    A. Well, when they are doing a
8  performance appraisal, they are not
9  appraising them for something they might do
10  later on. They are appraising them for the
11  job they are in. And the problem, if it is
12  a problem with the job that they are in, it
13  should be discussed. It may not be a
14  problem with the job -- I mean, there may
15  not be a problem with the job they are in.
16    Q. You are saying to me if there is a problem,
17  the manager should discuss it with the employee
18  so that they can correct it?
19    A. If it's a problem with the job they
20  are currently holding, yes.
21    Q. If it was a problem in the job that they
22  are currently holding and they made a decision
23  not to promote this person due to this problem

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  but it was also a requirement of the position
2  that they were hoping to be promoted to, they
3  should discuss that problem with them?
4  A. I'm not sure I understand the
5  question.
6  Q. Okay. In your opinion do evaluations need
7  to be done honestly?
8  A. Sure. They should be done honestly.
9  Q. Okay. You said earlier that sometimes you
10  cannot be honest on an evaluation and get the
11  employee an advantage. Is that something that
12  the company would do normally?
13  A. I don't understand that. I don't
14  understand what you are saying that I said.
15  Q. Okay. You said that sometimes in an
16  evaluation, you could not grade an employee
17  harshly in an area and that that would give an
18  employee an advantage.
19  A. That's not what I said.
20  Q. Okay. I'm sorry. I must have
21  misunderstood.
22  A. That's not what I said.
23  Q. At your company, do you all review

Page 18

1  evaluations with the employees after they have
2  been done?
3  A. Yes.
4  Q. Who does the review?
5  A. Usually the person who the person
6  directly reports to.
7  Q. Okay. Anybody else?
8  A. There could be situations where
9  another level of supervision would be
10  involved.
11  Q. What situations?
12  A. If there was a particular problem
13  with the person's performance that they
14  felt might result in disciplinary action or
15  the person losing their job or something
16  like that would be an example. Another
17  example might be if a person is a
18  particularly difficult person to deal with,
19  it may help to have another person
20  involved.
21  Q. Okay. Do you know if Frank has ever had to
22  have a review done by anyone other than his
23  immediate supervisor?

Page 19

1  A. Not to my knowledge.
2  Q. Okay. This is the notice of deposition for
3  you, and we have requested some documents along
4  with this deposition. I believe your lawyers
5  told me that they had these documents.
6  MS. ODOM: We do have some documents.
7  These are the documents that relate to what he
8  can testify on. They are not all the documents
9  that are in response to our request for
10  production of documents. The additional
11  documents, we'll produce within that deadline of
12  when our requests are done. But for now, these
13  are the ones that we can make available. The
14  other ones are -- we need to copy them. But we
15  will make available the documents labeled 179 to
16  1594, and these documents are responsive to some
17  of those things that are listed in here.
18  MR. QUINN: Are those our copies?
19  MS. ODOM: These are your copies,
20  correct.
21  Q. (BY MS. LOWELL) If you will take a look at
22  the deposition notice and look at the categories.
23  Are you able to testify as to all the categories

Page 20

1  I have identified?
2  A. I believe so, yes.
3  MS. ODOM: If I may interrupt. I
4  believe the first two topics are responses to
5  interrogatories and the responses to the request
6  for production. We have yet to submit our
7  responses. So based on the questions, I mean, I
8  think he does have the knowledge of what our --
9  what the questions were and does have knowledge
10  surrounding those facts. But as far as what our
11  actual responses will be, since those responses
12  haven't been made available, he won't be able to
13  say what we'll exactly say.
14  Q. (BY MS. LOWELL) Have you or are you going
15  to be involved in the responses to plaintiff's
16  interrogatories and request for production?
17  A. Through counsel.
18  Q. Okay.
19  (Plaintiff's Exhibit 1 was marked.)
20  Q. (BY MS. LOWELL) What is your role as the HR
21  director in the company?
22  A. To coordinate benefits, pay systems.
23  Q. As far as you control what employees get

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | Page 21 |
|---|---|

1 paid or make recommendations?
2    A. Well, both. In different situations
3 both. Administer the payroll system
4 approved by corporate.
5    Q. What recommendations do you make about
6 employees' pay?
7    A. With regard to people who report to
8 me, I would make recommendations.
9    Q. Do you make recommendations about their pay
10 for any employee who does not report to you?
11    A. No, if I understand the question you
12 are asking.
13    Q. I want to make sure you understand. Are
14 there any employees that do not report to you who
15 you make recommendations about their pay as far
16 as what they get paid?
17    A. As far as making the recommendations,
18 no. I don't think so.
19    Q. And corporate, you said, approves all of
20 your people's pay or everybody's?
21    A. They approve the pay grades.
22    Q. Pay grades. How are pay grades
23 established?

|  | Page 23 |
|---|---|

1 clear cut, it's clear who that person
2 should be, then they can be just put into
3 the job.
4    Q. Okay. When you say that it can be -- it's
5 clear that somebody is the right man for the job,
6 how do you determine that -- first, are those
7 jobs posted when it's clear that you have got the
8 right person for the job?
9    A. In many cases, they are not posted.
10    Q. Okay.
11    A. An example of that would be when
12 Frank Lett was promoted to lead person,
13 that job wasn't posted.
14    Q. Are any of the supervisory positions
15 posted?
16    A. No.
17    Q. Do you all have a posting policy?
18    A. Yes.
19    Q. I'm going to give to you what's going to be
20 marked as Plaintiff's Exhibit 2.
21    (Plaintiff's Exhibit 2 was marked.)
22    Q. (BY MS. LOWELL) Is this your policy on
23 posting?

|  | Page 22 |
|---|---|

1    A. We gather survey information from
2 other companies in the area. Corporate
3 also gathers survey information that's done
4 by companies that do that, that produce
5 that type of information. They probably
6 take into consideration wages paid at other
7 plants in different parts of the country
8 and that kind of thing, and we recommend --
9 we make recommendations and they made
10 recommendations, and then we discuss it.
11 Ultimately they made the decision as to
12 what the grades are, but we do look at --
13 we look at survey information of the area
14 because we have to be -- we have to be
15 somewhat competitive or we couldn't hire
16 anybody.
17    Q. How do you move up in pay grade at
18 Reliable?
19    A. It can be done in more than one way.
20 It can be done through a job posting in
21 response to a posting. It can also be done
22 if there is an opening and a person is
23 needed to fill that opening and there is a

|  | Page 24 |
|---|---|

1    A. This is the handbook, our employee
2 handbook, and the section within the
3 handbook that describes the posting policy.
4    Q. Okay. Is this your current job posting
5 policy?
6    A. We have a policy.
7    Q. Is this it?
8    A. This is what appears in the handbook.
9 This is not the policy.
10    Q. Okay. So is the handbook description of
11 job postings different than the posting policy?
12    A. No. It's not different. It's just
13 more general, but it describes this period
14 of the policy.
15    Q. The second sentence says that job opening
16 notices are posted on company bulletin boards as
17 job openings occur. Is that correct?
18    A. If the job is posted, yes.
19    Q. Why do you not post some jobs?
20    A. Well, as I stated earlier, there are
21 situations where -- and Frank Lett's
22 situation being promoted to lead person is
23 a good example of it -- where in a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1 particular work area, a person has
2 demonstrated that they can perform the job
3 in the area. And from working with that
4 person on a day-to-day basis, the
5 supervisor may feel that that is really the
6 only person in the area who can be
7 considered for the job, legitimately be
8 considered for the job. And in those
9 cases, we don't create paperwork and go
10 through a bureaucratic process to post it.
11    Q. So you sort of go against your posting
12 policy as far as it's stated in the --
13    A. No. It says whenever practical.
14 That's what we mean by whenever practical,
15 which means that we don't post all the
16 jobs. Our policy says that we don't
17 necessarily post all the jobs. That was
18 never our intent.
19    Q. Can you tell me who makes the decision on
20 when to post and not post?
21    A. The production manager and the
22 supervisor know if there is somebody in an
23 area that can perform a particular job.

Page 26

1 And in some cases, they come to me and say
2 this person is the person we need to go
3 ahead and put in this job.
4    Q. Okay. When they come to you and say this
5 is the man we need to put in this job --
6    A. Or woman.
7    Q. Or woman, do you take any time to go and
8 interview the person that they are talking about
9 or make contact with them to figure out why they
10 are a superior candidate as opposed to all
11 others?
12    A. No. The supervisor and -- or the
13 supervisor and production managers work
14 with these people every day. They know
15 more about what their capabilities are and
16 what they can do already than I can
17 possibly find out in an interview.
18    Q. Okay. What exactly are the job functions
19 of the production manager?
20    A. The production manager oversees or
21 supervises the production supervisors.
22    Q. Would Kenny Taylor be considered a
23 production supervisor?

Page 27

1    A. Yes.
2    Q. Could you give me a list of the production
3 manager duties other than they just oversee? I
4 mean, does it take a more active role? Describe
5 it for me.
6    A. I don't know what you mean by active
7 role. Can you --
8    Q. Sure. I mean, I'm just asking whether the
9 production manager kind of stays in his office
10 and just says "come report to me if you have a
11 big problem" or if he is out on the -- you know,
12 interacting constantly?
13    A. No. They are out on the floor. They
14 have an office, and I'm sure they spend
15 time in their office because they do have
16 to produce reports and generate numbers as
17 far as production and that kind of thing.
18 But they spend a lot of time out on the
19 floor.
20    Q. Does the supervisor spend more time with
21 the floor employees than the production manager
22 in your opinion?
23    A. Yeah, yeah. I would say that's true.

Page 28

1    Q. When you got your job with Reliable, do you
2 know if there was anybody else already in the
3 company that was qualified to do HR -- your
4 position, which is the HR director?
5    A. I would say that -- and I can't say
6 for sure, but I don't think anybody else
7 was.
8    Q. Okay. Back to Plaintiff's Exhibit 2,
9 "whenever practical, Reliable promotes from
10 within." Is that an accurate statement?
11    A. Yeah.
12    Q. Okay. Are there ever times when it would
13 be practical to hire from within but you chose
14 somebody from outside?
15    A. From outside the company, you mean?
16 Hire in from outside the company?
17    Q. Yes.
18    A. I can't ever remember hiring somebody
19 from outside if we had a person internally
20 that we felt could do a good job in that
21 position.
22    Q. And who would be making that decision?
23    A. I think it would be a team. It would

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  depend on the situation. We would discuss
2  it, I think, as a management team if it was
3  -- if it was a supervisory job in the plant
4  or a lead person job in the plant, the
5  supervisor or production manager -- I don't
6  remember it happening this way, but I can
7  imagine it happening this way. If they
8  came to me and said "we need a supervisor
9  but there is nobody out here that can do
10 it. We have looked and we have talked
11 about all the people in our area, and we
12 don't have anybody that could do this job,"
13 then we would have no choice but to look
14 outside if there is not an internal
15 candidate.
16 Q. When you are making selections and
17 decisions on whether or not there is an internal
18 candidate, what do you base that selection
19 process on?
20 A. When I do it?
21 Q. Somebody within the company. What are the
22 decision factors?
23 A. I think we base it on relative

Page 30

1  experience for the position that they are
2  looking to fill, and at times they ask
3  people to respond to questions or whatever.
4  I think they consider those too. That
5  would be the reason for doing that.
6  Q. Okay. You brought up responding to
7  questions. Frank Lett was presented with the
8  four questions.
9  A. Right.
10 Q. Hold on. I'm going to hand you what's
11 going to be marked as Plaintiff's Exhibit 3.
12    (Plaintiff's Exhibit 3 was marked.)
13 Q. (BY MS. LOWELL) At the top of that copy,
14 it says, "We may have an opportunity to have an
15 assistant supervisor in department five in the
16 near future"; is that correct
17 A. Correct.
18 Q. Do you know who drafted these questions?
19 A. David Burch.
20 Q. Do you know why he drafted those questions?
21 A. David came to me and said that they
22 had not had an assistant supervisor for a
23 while and were thinking that they were

Page 31

1  going to need one and that his idea was to
2  consider the lead people in the areas that
3  reported to Kenneth Taylor.
4  Q. Who were those people?
5  A. Frank Lett would have been one,
6  Wendall Ard, Harman Sellers. I'm thinking.
7  I think there may be one more, but I can't
8  remember off the top of my head. I can't
9  remember. There could be one more, but I
10 can't remember off the top of my head.
11 Q. Stan?
12 A. Yeah, Stan.
13    MR. HARBUCK: I think that's
14 stipulated pretty much in this case.
15 Q. (BY MS. LOWELL) So David came to you and
16 said there has not been an assistant supervisor
17 in a while, we are going to consider the leads,
18 correct?
19 A. Right.
20 Q. How did the questions come out of that
21 statement?
22 A. He said that he would like to put
23 together some questions that would give the

Page 32

1  guys an opportunity to think through --
2  think through the responses and respond to
3  them about ways that they think they could
4  improve the department or why they felt
5  like they were qualified and those kind of
6  things. And I told him I thought that was
7  fair and would be a good idea.
8  Q. Okay. Did you have any other involvement
9  in drafting the questions other than --
10 A. No. He drafted the questions. He
11 brought them to me. I looked at them and
12 thought they were relevant and told him I
13 thought they were fine.
14 Q. Okay. Now this assistant supervisor
15 position that Stan got, what areas does he
16 assistant supervise?
17 A. All of the areas that report to
18 Kenneth Taylor.
19 Q. Is there any reason why when you reviewed
20 this you didn't think that -- let me back up.
21 What areas does Kenneth Taylor supervise?
22 A. Well, there is several lines, and
23 Kenneth quoted all the names of them the

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1  other day.
2    Q. How about just department numbers?
3    A. Yeah. Those have changed over the
4  years too so it's kind of confusing.
5    Q. Sure.
6    A. But department four, department five,
7  department two, but I can't tell you
8  exactly when some of those lines were in
9  one or the other or, you know, the area
10  that we call the 8500 line that Frank is
11  the lead person over wasn't always
12  department two. I think that was an
13  accounting thing where they wanted to
14  separate that product line so that they
15  could charge costs to somebody, whatever.
16  But all I'm saying is all of those areas
17  report to Kenneth. They have been called
18  different things over time.
19    Q. Okay.
20    A. But when there was an assistant
21  supervisor before, the assistant supervisor
22  was over all those areas, and I think that
23  was the intent the whole time.

Page 34

1    Q. If we go back to the first sentence on this
2  questionnaire, why is it limited just to
3  department five when you reviewed this?
4    A. When I reviewed it, it never crossed
5  my mind that it just said department five
6  when he was discussing it with me. The
7  intent was it would be all areas that
8  reported to Kenneth.
9    Q. But that's not stated in the questionnaire,
10  right?
11    A. Right. And I don't know if the line
12  that Frank is lead person over, the 8500
13  line, was even called department two at
14  that time. I don't know if it was.
15    Q. Do you know when all those departments
16  merged?
17    A. Huh-uh (no).
18    Q. The dates? No? Years?
19    A. No. Again, those were accounting
20  things. They have to pass through costs to
21  -- we sell, for example, the 8500 product
22  is sold through other companies that are a
23  part of our company, and we don't get full

Page 35

1  profit for them. They pass the cost
2  through. And so they change those things
3  around from time to time to try to isolate
4  what different products cost and that kind
5  of thing. So it really had nothing to do
6  with human resources or anything to do with
7  the employees themselves as to what the
8  departments were called. It was strictly
9  for accounting purposes.
10    Q. Okay. You don't recall whether or not it's
11  been within the last four years?
12    A. No. I can't -- I can't tell you when
13  -- what area was called what. I can't
14  recall it.
15    Q. Is your job as an HR director, I mean, is
16  it your opinion that you need to get fairness
17  standards or non-discriminatory tactics across,
18  convey that to the people that are supervising
19  the general employees?
20    A. Yes.
21    Q. Do you all have any type of sensitivity
22  training? And by that I'm talking about sex,
23  age, race, disability.

Page 36

1    A. We have, yes.
2    Q. What type of training?
3    A. We have had training class where we
4  talked about sexual harassment, all the
5  protected areas.
6    Q. How frequently do you do the training?
7    A. It's not done on any scheduled basis.
8  The different structures that we reported
9  to, I think, had some different ideas about
10  how often those things should be done, that
11  kind of thing. We have tried to do it as
12  instructed by corporate, but we have done
13  it from time to time.
14    Q. When was the last time?
15    A. I did a session sometime in 2005. I
16  can't remember the month, but sometime in
17  2005.
18    Q. Who was in that meeting?
19    A. Assistant supervisors, lead people,
20  supervisors, managers.
21    Q. Assistant supervisors, managers, I'm sorry?
22    A. Lead people, assistant supervisors,
23  supervisors and managers.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  Q. And managers, okay. Was Kenny Taylor
2  there?
3  A. I'm not sure. And let me go ahead
4  and say too that in that particular
5  meeting, there was -- I think it was late
6  in 2005, and it was not all inclusive. My
7  intentions were to do that meeting and then
8  do some other meetings and get everybody
9  in. And I haven't been able to finish
10  that. So I can't tell you who was in that
11  meeting and who was not in that meeting.
12  Q. Okay. So when you say it was not all
13  inclusive, you mean as to not all of the
14  assistant supervisors, managers, supervisors and
15  leads?
16  A. Right.
17  Q. Okay.
18  A. They will be all given the same
19  training. I did one session and have not
20  been able to get finished with the project.
21  It's still sitting on my credenza with the
22  names of the ones who attended and a list
23  of the ones who didn't attend so I can

Page 38

1  finish it. But I have not finished that
2  project or that training.
3  Q. And you don't recall whether or not Kenny
4  Taylor was there?
5  A. I can't remember off the top of my
6  head.
7  Q. How many people would you approximate were
8  in your '05 training class?
9  A. Probably 30. I don't remember for
10  sure.
11  Q. Do you remember whether or not Stan
12  Henderson was there?
13  A. I don't remember.
14  Q. Do you remember whether or not Frank Lett
15  was there?
16  A. I don't remember.
17  Q. Do you remember the topics that you
18  discussed?
19  A. Yeah. We talked about the company's
20  harassment policy.
21  Q. What is the company's harassment policy?
22  A. People have -- and this is just a
23  general synopsis. People have the

Page 39

1  opportunity to come to work and work
2  without being harassed because of their
3  race, sex, national origin, all the
4  protected classes, age. We went through
5  those things. There was a slide
6  presentation that was put together by
7  corporate.
8  Q. Would you agree with me that all people
9  should be treated fairly without regard to age,
10  race, sex, disability?
11  A. Absolutely.
12  Q. Prior to the '05 training class that some
13  people attended, when was the last training class
14  before that?
15  A. I can't remember.
16  Q. Years, months?
17  A. Probably more than a year, but I
18  can't say right off the top of my head.
19  Q. Can you give me an estimate on the
20  frequency that these occur?
21  A. Not specifically. I wouldn't say we
22  have done it every year. We have done some
23  in the past.

Page 40

1  Q. Since you have been employed, how many
2  classes have you held?
3  A. How many classes have I?
4  Q. Personally done.
5  A. I don't know.
6  Q. More than ten?
7  A. I don't know. I can't say if it's
8  more than ten.
9  Q. Less than ten?
10  A. I don't know.
11  Q. Less than 20?
12  A. Less tan 20.
13  Q. Okay. How many supervisors do you have at
14  Reliable?
15  A. I can't tell you the number off the
16  top of my head.
17  Q. Do you have an approximation?
18  A. Let's see.
19  MS. ODOM: Can you clarify what you
20  mean by supervisors because we have used it
21  different ways in this lawsuit?
22  MS. LOWELL: I'm not talking about
23  assistant supervisors.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1    A. Are you talking about production
2    supervisors?
3    Q. (BY MS. LOWELL) What kind of supervisors
4    do you have?
5        MR. HARBUCK: I think the question is
6    are you referring to them by that title or by the
7    more generic definition of people who supervise
8    other people?
9        MS. LOWELL: I'm referring to the
10   title.
11       THE WITNESS: To the title?
12       MR. HARBUCK: Mr. Lett used it more
13   generally, and we just want to be sure that we
14   are responsive to your question.
15       MS. LOWELL: I'm talking about
16   supervisor title, yes.
17   A. Probably eight. I can't -- I mean, I
18   may be missing something, but I think there
19   is about eight.
20   Q. Okay. Can you tell me who those people
21   are?
22   A. Terry Rogers, Eddie Ward.
23   Q. Eddie?

Page 42

1    A. Eddie, E-d-d-i-e. Kenneth Taylor,
2    Randy Davis, Bill Jordan, Walter Newman,
3    Arnold Boyd, and I believe that's all the
4    production supervisors.
5    Q. Okay. Are any of those people African-
6    American?
7    A. No.
8    Q. How long has Terry Rogers been employed?
9    A. I can't say for sure. I would say
10   more than -- probably more than 15 years,
11   maybe 20 years. I'm not sure.
12   Q. Approximately how long has Eddie Ward been
13   with Reliable?
14   A. Probably 25 or 30 years.
15   Q. How long has Kenny Taylor been with
16   Reliable?
17   A. And all these are estimates because I
18   don't know the dates of hire.
19   Q. That's fine.
20   A. Kenneth has probably been there
21   between 15 and 20 years.
22   Q. Randy Davis?
23   A. Probably 25 or 30 years.

Page 43

1    Q. Bill Jordan?
2    A. Twenty-five, 20, 25 years.
3    Q. Do you know? I mean, you are making an
4    approximation?
5    A. I'm absolutely making approximations,
6    but I have been there 14 years. And some
7    of these guys have been there, you know, 15
8    years before I got there. So I'm not -- I
9    mean, I can't quote you their dates of hire
10   by any stretch but --
11   Q. Was Kenny Taylor there before you were
12   hired?
13   A. I'm almost positive he was, almost
14   sure he was.
15   Q. How about was Walter Newman employed before
16   you were?
17   A. No. He was employed after I was.
18   Q. How long has Walter been there?
19   A. He has probably been there for seven
20   or eight years.
21   Q. Okay. How about -- was it Arnold Boyd?
22   A. Boyd, B-o-y-d, he has been there much
23   longer than me.

Page 44

1    Q. Okay. How many assistant supervisors do
2    you have?
3    A. In the production areas, four that I
4    can think of.
5    Q. And who are those?
6    A. Johnny Hendrix, Frankie Weeks, Brad
7    Campbell and Stan Henderson.
8    Q. How long has Mr. Hendrix been in the
9    assistant supervisor position?
10   A. I'm not sure.
11   Q. Do you have a guess or an approximation?
12   A. It's been a while. I mean, I would
13   say more than five years, but I don't know
14   exactly how long.
15   Q. Stan was promoted in '04?
16   A. He was '04, I think.
17   Q. October?
18   A. I think it was October of '04.
19   Q. Do you know how long Mr. Campbell has been
20   in his position?
21   A. Brad has been in that position for
22   probably a couple of years.
23   Q. What position was he in before he became

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1  assistant supervisor?
2      A. I think he was a lead person, but I'm
3  not sure.
4      Q. Are you sure what department or do you know
5  what department?
6      A. He is assistant supervisor over
7  departments three and eleven.
8      Q. Okay. Do you know what department he was
9  the lead person in?
10     A. I think he was a lead person in
11 three, but I'm not sure.
12     Q. Do you know whether or not he was ever a
13 lead person in eleven?
14     A. I don't recall.
15     Q. Mr. Weeks, how long approximately has he
16 been in the assistant supervisor position?
17     A. I would say five to ten years, but
18 again I'm not sure.
19     Q. What departments does he --
20     A. It's department seven.
21     Q. Department seven? Do you know what his
22 position was prior to being promoted to assistant
23 supervisor?

Page 46

1      A. Lead person.
2      Q. Over which department?
3      A. Seven.
4      Q. And Mr. Hendrix, he has been in the
5  position for approximately five years pursuant to
6  what you said?
7      A. I'm saying it's probably been at
8  least that long, but I'm not sure.
9      Q. Do you know which position he was promoted
10 from?
11     A. Lead person, I'm sure.
12     Q. And what department is he assistant
13 supervisor over now?
14     A. I'm sorry?
15     Q. What department is he the assistant
16 supervisor over?
17     A. Department six.
18     Q. Do you know what department he was lead
19 person in?
20     A. Six.
21     Q. And Stan is assistant supervisor over which
22 department?
23     A. Two and four, I think is what they

Page 47

1  are calling them now. Again, they have
2  changed them, and I don't -- it may be, I
3  guess, two, four and five maybe. They
4  consolidated some and changed them, and I
5  can't even keep up with what they call all
6  of them.
7      Q. Okay. Of the assistant supervisors that
8  you just named, are any of those African-
9  American?
10     A. No.
11     Q. Have you ever known an African-American
12 during your 14 years of employment at Reliable
13 that has been a supervisor?
14     A. No.
15     Q. Has there ever been an African-American
16 assistant supervisor during your 14 years?
17     A. No.
18     Q. Do you know how long Frank Lett has been
19 employed with Reliable?
20     A. I think 25 or 30 years probably. I
21 don't know the exact date on that one
22 either.
23     Q. Do you know how Mr. Hendrix was selected

Page 48

1  for his assistant supervisor position?
2      A. I can't recall off the top of my head
3  whether it was posted or not. I don't
4  know.
5      Q. Are any of the supervisor or assistant
6  supervisor positions posted?
7      A. Supervisor are not. I can't remember
8  if we have ever posted an assistant
9  supervisor job or not. I would say that
10 it's probably not likely.
11     Q. Okay. And again it's the manager or the
12 supervisor that basically makes a decision on who
13 to pick for assistant supervisor; is that
14 correct?
15     A. Yes, usually.
16     Q. Do you know whether or not there has ever
17 been an assistant supervisor over 50 that was
18 promoted?
19     A. I'm not sure how old Arnold Boyd is,
20 but Arnold was probably -- I don't know if
21 he was over 50 when he was promoted, but I
22 would say he was -- I would say he was over
23 40 when he was promoted to supervisor. I

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  would say that. Again, I don't remember.
2  I don't even know exactly how old he is
3  now, but he was promoted to supervisor in
4  the last few years. And my guess would be
5  he was probably over 40.
6    Q. Okay. Do you know whether or not any
7  people have been promoted into the assistant
8  supervisor position that have been over 50?
9    A. I can't recall.
10   Q. Do you think there have been?
11   A. Again, Arnold might have been
12  promoted to assistant supervisor, and I
13  don't know his exact age so it's possible
14  as far as when he was promoted. I don't
15  know, and I don't know his exact age. And
16  I'm sorry. Did you say assistant
17  supervisor?
18   Q. I did.
19   A. I can't remember any more.
20   Q. Plaintiff's Exhibit 3 are the four
21  questions that were submitted. Have there been
22  any other jobs where you have required some type
23  of written communication?

Page 50

1    A. There have been.
2    Q. What jobs were those?
3    A. I don't recall, but I know that there
4  have been times when the production manager
5  or the supervisor would do something like
6  this, something of a similar nature.
7    Q. How many times would you estimate that this
8  has happened or this procedure has been followed?
9    A. I would say I have seen it maybe five
10  times. I don't know. I don't know exact
11  number.
12   Q. What types of jobs are they typically
13  required for?
14   A. I don't -- I don't remember. I mean,
15  I remember seeing these kinds of things,
16  but I don't remember. We haven't required
17  them to do it on any particular jobs so --
18   Q. Would it be required for an assembler?
19   A. Well, people are not typically
20  promoted to assembler.
21   Q. From a hiring standpoint? I mean, you hire
22  into the assembler position from the outside?
23   A. Right, right.

Page 51

1    Q. Would that be required in an assembly job
2  before going in?
3    A. No, no.
4    Q. What's the next line in the progression?
5    A. The job category that would include
6  saw operators.
7    Q. Would a saw operator have to fill out
8  questions to get promoted?
9    A. Not generally, no. I wouldn't think
10  so.
11   Q. What's next in the progression?
12   A. The job -- and there are groups of
13  jobs in each classification, and I can't
14  quote them. I mean, I can't recite all the
15  different ones in the different
16  classifications. But the next level up, I
17  think, would be the classification that
18  would include large press operator.
19   Q. Would a large press operator ever have
20  questions to answer prior to being promoted?
21   A. I wouldn't think so.
22   Q. And what's next after large press operator?
23   A. Let's see. That would be the

Page 52

1  classification that would include
2  mechanical press operator, and again there
3  are several other jobs in there. I don't
4  remember what all those are.
5    Q. Would a mechanical press operator or
6  somebody promoting from a large press to
7  mechanical press be given questions?
8    A. I wouldn't think so.
9    Q. What's next?
10   A. I think the next classification would
11  be the one that includes the lead person.
12   Q. Okay. Would a lead person or a mechanical
13  press operator, when they are promoted to lead,
14  be given questions to answer?
15   A. It's possible.
16   Q. Have you ever seen it?
17   A. From mechanical press to lead person?
18  Specifically I can't say whether I have or
19  not.
20   Q. Do you know whether or not any person
21  that's been promoted to lead has been given four
22  questions or any type of questions to answer?
23   A. Yes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  Q. Who?
2  A. It was done in this situation, and I
3  think that there probably -- I think I have
4  seen situations before where they have done
5  that. But I can't specifically tell you
6  what they are.
7  Q. Okay. But it's only happened about five
8  times?
9  A. Probably something like that.
10  Q. All right. And you don't remember which
11  lead person or really if it happened at all where
12  a lead person was given four questions or any
13  type of written format?
14  A. I can't specifically tell you what's
15  been done or for what particular job.
16  Q. What's next in the progression line?
17  A. I think the next classification would
18  be the assistant supervisor.
19  Q. We know that there were questions presented
20  for the assistant supervisor?
21  A. Right.
22  Q. Does it happen on more than one occasion?
23  A. It's possible, but again I can't

Page 54

1  specifically tell you when.
2  Q. You don't recall it happening any other
3  time than the questions that were presented to
4  Frank Lett; is that correct?
5  A. I don't know exactly when it's been
6  done or -- I can't tell you exactly when
7  it's been done or for what particular job
8  it's been done.
9  Q. You don't recall this ever happening except
10  when they were presented -- specifically, you do
11  not recall it happening in another assistant
12  supervisor position other than Frank Lett?
13  A. Specifically, I can't say that it
14  hasn't, but it could have. I can't tell
15  you.
16  Q. Because you don't recall?
17  A. I just don't recall.
18  Q. Okay. After assistant supervisor, then you
19  go in to supervisor?
20  A. Well, there are other pay
21  classifications above supervisor -- I mean,
22  I'm sorry, above lead person. No, we were
23  at assistant supervisor, weren't we?

Page 55

1  Q. Yes.
2  A. There are pay grades above assistant
3  supervisor that have to do with some of the
4  technical type jobs like tool die maker and
5  maintenance technician type jobs and that
6  kind of thing.
7  Q. Are maintenance technicians and tool die
8  operators, have you ever known them to be
9  presented with questions prior to being promoted?
10  A. No.
11  Q. After tool die operator and mechanic
12  technician, what's the next in the line of
13  progression?
14  A. I can't remember the exact
15  progressions in those jobs, but -- I can't
16  quote the jobs to you and the pay
17  classifications above there. There are
18  about ten of them so --
19  Q. Are we getting close to supervisor?
20  A. Well, supervisor is not on the hourly
21  pay classification sheet. It's a different
22  -- it's not on there.
23     MR. HARBUCK: I'm going to need a

Page 56

1  break when you get to a stopping point.
2  Q. (BY MS. LOWELL) Has there ever been a
3  supervisor position where questions have been
4  presented prior to the promotion of the applicant
5  or candidate?
6  A. Not that I recall.
7     MS. LOWELL: Do you want to take a
8  break?
9     (Recess taken.)
10  Q. (BY MS. LOWELL) We are back on the record
11  after a break. I'm going to hand you what is
12  going to be marked as Plaintiff's Exhibit 4.
13     (Plaintiff's Exhibit 4 was marked.)
14  Q. It's a three page document. Can you tell
15  me --
16     MR. HARBUCK: Do you have Bates
17  numbers on those for us?
18     MS. LOWELL: It's document number 180
19  through 182.
20  Q. Can you tell me if this is a position that
21  Stan Henderson was awarded?
22  A. Yes, I believe it is.
23  Q. Yes?

14 (Pages 53 to 56)

## FREEDOM COURT REPORTING

Page 57

1  A. Yes.
2  Q. Do you know what the racial makeup is at
3  Reliable on a percentage basis, African-American
4  versus Caucasian?
5  A. Yes.
6  Q. Can you tell me what that is, please?
7  A. As of yesterday, we had 668
8  employees. Eighty-one of those are black.
9  That does not include one black employee
10 that I have hired who has not started to
11 work yet so -- he had a family situation.
12 And as soon as he can start -- if he had
13 started with the group when I was hiring,
14 we would have had 82. But anyway, I think
15 that works out at 12.3 percent.
16 Q. Are there any other nationalities aside
17 from Caucasian that make up the remaining
18 percentage?
19 A. Yes.
20 Q. Tell me what percentage is Caucasian.
21 A. I can't -- I can't -- I don't know.
22 I didn't -- I can't say that one, but I
23 know the black percentage as of yesterday

Page 58

1  was 12.3. We also have Hispanic employees.
2  We have Asian employees.
3  Q. Approximately can you give me a percentage
4  of Hispanic employees?
5  A. Not off the top of my head. There
6  are -- it's fewer than black, but I don't
7  know how many off the top of my head.
8  Q. So less than 12?
9  A. Yeah.
10 Q. How many Asian employees?
11 A. I don't know.
12 Q. Percentage wise?
13 A. But it's a lower percentage too.
14 Q. Less than 12?
15 A. Yes.
16 Q. And the remaining are Caucasian?
17 A. We have American Indian.
18 Q. Approximately how many American Indian
19 employees?
20 A. Again, I don't know, but it's less
21 than 12.
22 Q. Less than 12 percent?
23 A. Yes.

Page 59

1  Q. And are there any other nationalities or
2  national origin?
3  A. That's all the ones I can recall.
4  Q. So we have got American Indian, Asian,
5  Hispanic. And as far as national origin, that's
6  all you can recall?
7  A. That's all I can remember off the top
8  of my head.
9  Q. Collectively --
10 A. Caucasian and black.
11 Q. Aside from. Collectively with the American
12 Indian, Asian and Hispanic, would you say that
13 collectively they would make up about 12 percent
14 or less of the company?
15 A. Say that again for me.
16 Q. American Indian, Asian and Hispanic
17 employees collectively, would they make up less
18 than 12 percent of the company makeup?
19 A. I think that would be accurate, yes.
20 Q. And then you said that there is 12.3
21 percent which are African-American, and the
22 outstanding or the remainder are Caucasian?
23 A. I believe that's correct, yes.

Page 60

1  Q. Were you ever involved in any type of
2  racial discrimination case while you were
3  employed at Fleming?
4  A. Yes. There were cases.
5  Q. There were cases?
6  A. Yes.
7  Q. Can you recall any of the details of any of
8  the cases?
9  A. There was one that was a -- that
10 involved the termination of a black female.
11 Q. And do you feel that that was done in
12 discrimination based on her race?
13 A. Say what?
14 Q. Was that done based on -- was her
15 termination based on her race?
16 A. I didn't feel that it was, but I was
17 not involved in the termination, didn't
18 have anything to do with it. But from what
19 I heard about the case, I didn't think it
20 was.
21 Q. Did you have to review anything subsequent
22 to her termination?
23 A. No.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1    Q. Did you ever talk to her about her
2  termination?
3    A. No.
4        MR. HARBUCK: Off the record a second.
5      (Discussion off the record.)
6    A. Can I clarify something?
7    Q. Sure.
8    A. When I worked at Fleming, you asked
9  me what my position was.
10    Q. Yes.
11    A. And I said it was human resources
12  manager, and that was what it was when I
13  left at the end. But prior to being human
14  resources manager, I was loss control
15  manager.
16    Q. Okay.
17    A. And I believe that all of that
18  situation with the lady who was terminated
19  happened when I was loss control manager.
20  I wasn't in human resources at that time.
21    Q. Did you serve any other function for
22  Fleming aside from HR and loss control?
23    A. No. That was the only two jobs.

Page 62

1    Q. And loss control was a promotion -- you
2  were promoted into the HR department?
3    A. Right.
4    Q. What was your official title when you were
5  at Fleming in the HR?
6    A. I believe it was human resources
7  manager.
8    Q. Manager, okay. As the human resources
9  manager, did you ever have any encounters with
10  employees alleging race discrimination?
11    A. I don't remember -- I don't remember
12  any claims being brought after I was in
13  human resources.
14    Q. Okay.
15    A. But I can't remember. It's been a
16  long time ago. I can't remember for sure,
17  but none stand out. I don't remember any
18  off the top of my head.
19    Q. Okay. Do you remember approximately how
20  many race discrimination issues there were while
21  you were at Fleming, whether you were in loss
22  control or in HR?
23    A. No, I don't. I don't. I remember

Page 63

1  that one case, but I don't remember any
2  more off the top of my head.
3    Q. Do you remember the outcome of that case?
4    A. It was settled, I believe.
5    Q. Did you have to fill out an application for
6  your employment there?
7    A. At Fleming?
8    Q. At Fleming.
9    A. Yes.
10    Q. Were you honest on your application?
11    A. Yes.
12    Q. Did you have to fill out an application for
13  Reliable?
14    A. Yes.
15    Q. Were you honest on that application?
16    A. Yes.
17    Q. Were you involved with the EEOC
18  investigation of Mr. Lett's case?
19    A. Yes.
20    Q. What was your involvement?
21    A. We received notice of the EEO charge,
22  and I forwarded it to our corporate legal
23  department.

Page 64

1    Q. Are they located in Denver?
2    A. Now they are. That has changed
3  within the last couple of years. They were
4  in Dayton, Ohio. They eliminated some
5  positions there and moved some of the
6  remaining people to Denver. They are in
7  Denver now.
8    Q. Okay. Other than forwarding on the EEO
9  charge, EEOC charge to the corporate department,
10  legal department, did you have any other
11  involvement in the investigation?
12    A. We worked with them to prepare the
13  response to the charge.
14    Q. Tell me what -- did you interview anybody?
15    A. We talked with David Burch and
16  Kenneth Taylor.
17    Q. What conversations did you have with David
18  Burch regarding this investigation?
19    A. We discussed the process that they
20  went through to choose the person that they
21  wanted for the job.
22    Q. And what did you discuss with Kenny?
23    A. Well, they were both involved in the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 65

1 conversation. They were the people who
2 were the decision-makers in the promotion,
3 and we discussed the process that they went
4 through to determine who to recommend for
5 promotion.
6    Q. Okay. Did you talk to anybody else?
7    A. I don't recall.
8    Q. Not that you recall?
9    A. Not that I recall. Let me clarify
10 that. I could have discussed it with the
11 operations manager but --
12    Q. Who was the operations manager?
13    A. Clyde Cook, but I don't specifically
14 remember. It's possible I could have. I
15 usually keep informed of those kinds of
16 things.
17    Q. You don't recall whether or not you talked
18 to Clyde Cook?
19    A. I can't recall. And I could have
20 talked to somebody else. I don't remember
21 exactly who I talked to.
22    Q. What is Clyde's position?
23    A. Director of operations.

## Page 66

1    Q. Does he work directly with Stan Henderson?
2    A. Directly?
3    Q. Does he have daily interaction with Stan?
4    A. No. And let me clarify that. He
5 walks through the plant too so he speaks to
6 people and walks through the plant. But as
7 far as a daily meeting with anybody at that
8 level of the organization, no.
9    Q. Do you know what Clyde's job duties are?
10    A. He is over the entire operation, all
11 departments with exception of the sales
12 departments and engineering. Pretty much
13 everybody at our location reports to him,
14 either directly or indirectly.
15    Q. Okay. So he is in more of a supervisory
16 role than a hands on?
17    A. Yes.
18    Q. I'm going to hand you what's going to be
19 marked as Plaintiff's Exhibit 5.
20       (Plaintiff's Exhibit 5 was marked.)
21    Q. Can you tell me what that is?
22    A. It's a page out of our employee
23 handbook.

## Page 67

1    Q. Regarding promotions and transfers?
2    A. Correct.
3    Q. Is this the policy, the company policy, on
4 promotions and transfers?
5    A. I think it's representative of our
6 practice.
7    Q. Okay. Is that the policy?
8    A. There is no written policy.
9    Q. There is no written policy? Okay. I may
10 have already asked you this. I apologize if I
11 have. When we talked about the job posting, is
12 there a policy like a written policy on job
13 postings?
14    A. Huh-uh (no).
15    Q. Okay. There is no written policy on
16 promotions?
17    A. No.
18    Q. Okay. But you said that you would agree
19 that this is representative of what the
20 company --
21    A. Yes.
22    Q. This is from the employee handbook, right?
23    A. Correct.

## Page 68

1    Q. Do you know whether or not Frank Lett ever
2 advised any of his supervisors that he was
3 interested in moving up in the company?
4    A. He -- I don't know who he might have
5 mentioned it to. He mentioned it to me at
6 one time.
7    Q. He mentioned it to you?
8    A. Yeah.
9    Q. What did Frank tell you?
10    A. I don't recall the conversation
11 exactly. It's been years ago. He made
12 some comment about wanting to move up, and
13 that might have been before he was a lead
14 person. I don't know. I can't remember.
15    Q. And do you remember the basics of it other
16 than he wanted to move up?
17    A. I really don't remember that much
18 about the conversation other than he was
19 interested in moving to a higher pay grade
20 job or whatever. And again I don't
21 remember what his -- I don't remember what
22 his status was at that point.
23    Q. You said this was some years ago?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1  A. Yeah. Could have been prior to him
2  being a lead person. I don't remember.
3  Q. What documents did you review today to
4  prepare for your deposition or in preparation,
5  not necessarily today?
6  A. Several documents that I looked over
7  with the attorneys.
8  Q. Can you tell me what those were? All
9  those? Do you know if there is anything outside
10 of what's in there without having to --
11 A. I really don't know. We have
12 obviously given them lots of documentation,
13 and I don't know exactly everything that's
14 in there. They are aware of everything
15 that I looked over, if that's -- I don't
16 know if that's a good answer to the
17 question.
18     MR. QUINN: That's mostly personnel
19 files, three personnel files is what makes up
20 most of that.
21 Q. (BY MS. LOWELL) Did you review anything
22 other than personnel files in preparation for
23 this deposition?

Page 70

1  A. Looked at a log that I use to kind of
2  track postings, who applies for postings.
3  Q. What jobs were posted that you reviewed?
4  A. There were several saw operator jobs.
5  There were several mechanical press
6  operator jobs. There were several large
7  press operator jobs. There were several --
8  well, stop that sentence. I don't
9  remember. I remember those, and there
10 might have been a couple of lead people on
11 there. I can't remember all of them.
12 Q. You are not sure whether or not there were
13 any lead people?
14 A. I'm sure there are some on the log,
15 yeah.
16 Q. You are sure that there have been lead
17 positions posted?
18 A. Yeah, but I don't know how many. We
19 have posted some in the past when there is
20 not a -- again, if there is not a candidate
21 that it's clear to us that is the person
22 for the job, again as Frank was in his
23 promotion to lead person.

Page 71

1  Q. And the supervisor usually decides whether
2  or not there is a person like the perfect guy for
3  the job because they work with them closely every
4  day?
5  A. They are with them every day. They
6  know their limitations and, you know, their
7  strengths, their weaknesses.
8  Q. All right. Do you guys have a tuition
9  reimbursement plan?
10 A. Yes, we do.
11 Q. What kind of classes are covered in that?
12 A. We would approve anything that a
13 person could use at our business. I mean,
14 we wouldn't approve nursing, for example,
15 because we don't have nurses. But we would
16 approve business courses, some types of
17 engineering courses if it related back to
18 what we do.
19 Q. Would you approve a class like English, for
20 instance?
21 A. Yes, yeah. And the reason being that
22 that would be a basic requirement for any
23 of the other types of curriculum that you

Page 72

1  would go into. So we would cover basic
2  types of classes, as long as the person was
3  indicating that they were going into
4  business or something that related back to
5  us. If it was an English class and they
6  indicated that they were going to nursing
7  school, we wouldn't approve it.
8  Q. Okay. Do you ever make recommendations to
9  any employees that they should take a class to
10 improve their skills?
11 A. I have in the past but --
12 Q. Who?
13 A. I have in the past, but not very
14 often. I mean, you know, if people come to
15 me and ask questions or whatever, I try to
16 recommend things.
17 Q. Who have you recommended?
18 A. I recommended to Ricky Jordan at one
19 point.
20 Q. Is Ricky Jordan a supervisor?
21 A. No.
22 Q. What is his position?
23 A. I think his current title is sheet

18 (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 73

1  metal fabricator.
2    Q. What did you recommend that Ricky take?
3    A. He came to me, and he indicated that
4  he had a degree in drafting and wanted to
5  know if there were ever any opportunities
6  in drafting. And I told him there were.
7  It's not unusual at all for us to need a
8  drafter. And asked him, you know, when he
9  went to school and what his background was.
10  And he told me he had gone to drafting
11  school, but then he said that he went when
12  they drew with a pencil and a straight
13  edge. And I indicated to him that we
14  didn't draw with pencils and straight edges
15  any more, hadn't for years. Even when I
16  started there in '92, it had been years --
17  they had for years gone to computer-aided
18  drawing, where you draft with a computer,
19  with a personal computer.
20    Q. Right, like auto cad?
21    A. Auto cad.
22    Q. Is there anybody else other than Ricky
23  Jordan you recommend go and seek classes?

## Page 74

1    A. I assisted a lot of people with it.
2  But as far as going out to people and say
3  you need to go take this and you need to go
4  take this and you need to go take this, I
5  don't regularly do that. I mean, if people
6  indicate that they are interested in doing
7  that, we help them.
8    Q. Okay.
9    A. But I told Ricky that, you know, if
10  he had -- he already had the basics of
11  drafting. It would be a good idea, he
12  might only have to take a class or two in
13  auto cad or something, and he might be able
14  to move into drafting and told him about
15  educational assistance, told him how it
16  worked. And he indicated he would think
17  about it, but he never came back to me and
18  said that he wanted to do it or anything.
19    Q. Okay. Did you participate in the response
20  to the EEOC that was done by your in-house
21  counsel and signed by Kimberly Kimmett?
22    A. Kimmett. I participated from the
23  standpoint of helping her gather

## Page 75

1  information. She prepared it.
2    Q. Okay. Did you assist in the second
3  response, prepared by Ms. Kimmett?
4    A. I don't remember, but I'm sure I did
5  as far as telling me she needed additional
6  information or whatever. But I didn't
7  prepare it. She prepared it.
8    Q. When you all are considering people for
9  promotions, is education a big factor?
10    A. It depends on the position.
11    Q. How about the promotion to assistant
12  supervisor?
13    A. I would think it would be important.
14    Q. Okay. Corky Newman and Walter Newman are
15  the same person?
16    A. Same person.
17    Q. Corky is a -- is he a supervisor or an
18  assistant supervisor?
19    A. Supervisor.
20    Q. Supervisor, okay. Do you know what his
21  education level is?
22    A. Not off the top of my head, but I
23  would say he is a high school graduate. I

## Page 76

1  don't know if he has had anything past
2  that.
3    Q. Do you know whether or not he has recently
4  received his GED within the last few years?
5    A. I don't know.
6    Q. And he is a supervisor?
7    A. Uh-huh (yes).
8    Q. Okay.
9    A. I would not think that's true, but, I
10  mean --
11    Q. Okay.
12    A. I don't know for sure.
13    Q. Do you know whether or not Frank Lett had
14  ever supervised Kenny Taylor?
15    A. It's possible, but I don't know for
16  sure. Again, there were people moving
17  around a lot, and I don't know who was
18  where or when and that type thing. But
19  it's possible he could have.
20    Q. Do you know whether Frank ever supervised
21  Stan?
22    A. It's possible he could have.
23    Q. Okay. Is Wendall Ard African-American or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 77 | Page 79 |
|---|---|
| 1 Caucasian? | 1  Q. Okay. The four people that you listed were |
| 2  A. Who? | 2 Stan Henderson, Frank Lett, Harmon Sellers, |
| 3  Q. Wendall? | 3 right? |
| 4  A. Wendall? | 4  A. Yeah, Harmon, H-a-r-m-o-n, right. |
| 5  Q. Ard? | 5  Q. Not Herman. I realize those are two |
| 6  A. Ard, A-r-d? | 6 different people. And who was the fourth? Was |
| 7  Q. A-r-d. | 7 it Wendall? |
| 8  A. He is white. | 8  A. Wendall Ard. |
| 9  Q. Do you know how Kenny Taylor was promoted | 9  Q. Okay. Were all four of those people given |
| 10 to supervisor? | 10 questionnaires? Do you know? |
| 11     MS. ODOM: Object. It's irrelevant | 11  A. It was my understanding that Harmon |
| 12 here. | 12 was not interested. He just told them he |
| 13  A. I don't remember. | 13 was not interested. So I don't know if |
| 14  Q. (BY MS. LOWELL) You can answer. | 14 Kenneth actually handed it to him or not |
| 15  A. I don't remember. I mean, off the | 15 because he told him he wasn't interested in |
| 16 top of my head, I can't say. | 16 it. |
| 17  Q. Do you know who he was working under at the | 17  Q. Do you know if Wendall filled out a |
| 18 time? | 18 questionnaire? When I say a questionnaire, I'm |
| 19     MS. ODOM: Object again. | 19 referring back to Plaintiff's Exhibit 3. |
| 20     MR. HARBUCK: Can we inquire the | 20  A. I can't remember for sure, but I want |
| 21 relevance of this line of questions? | 21 to say Wendall didn't. But I'm not |
| 22     MS. LOWELL: I just want to know how | 22 positive. |
| 23 promotions are done. | 23  Q. Okay. |

| Page 78 | Page 80 |
|---|---|
| 1     MR. HARBUCK: The issue of Mr. | 1  A. I think he indicated that -- I think |
| 2 Taylor's promotion has been dismissed by the | 2 he took the questions. But whether he |
| 3 Court. | 3 actually responded to them, I can't |
| 4     MS. LOWELL: Okay. I'm inquiring as | 4 remember for sure whether he did or not. |
| 5 to how promotions are done. | 5  Q. Can you tell me which departments are in |
| 6     MR. QUINN: What was dismissed? | 6 architectural and which departments are in the |
| 7     MS. ODOM: There were two claims. | 7 HVAC? |
| 8     (Discussion off the record.) | 8  A. I will try. |
| 9  Q. (BY MS. LOWELL) So you do not know how | 9  Q. Okay. Let's start with architectural. |
| 10 Kenny Taylor was promoted? | 10  A. Departments six, seven, ten. |
| 11  A. Off the top of my head, I can't | 11     MR. QUINN: I think we have it. |
| 12 remember. | 12  A. Yeah. It would be on there. |
| 13  Q. You don't know who he was working under at | 13  Q. Okay. |
| 14 the time of his promotion? | 14     MR. QUINN: We didn't have it before |
| 15  A. I can't remember. | 15 today, but we have it now. |
| 16  Q. Do you know whether or not Kenny Taylor has | 16  Q. (BY MS. LOWELL) Do you know whether Frank |
| 17 worked in all the areas that he supervises? | 17 was ever considered for the position that Scottie |
| 18  A. I'm not sure. | 18 Parnell was given for the paint job supervisor? |
| 19  Q. Do you know who all -- I think we have been | 19  A. No. I wouldn't think he was. |
| 20 over this. I believe there were four people who | 20  Q. Okay. Why not? |
| 21 were considered; is that right, for the assistant | 21  A. It's kind of a different animal. |
| 22 supervisor position? | 22 It's paint finishing. Frank had never |
| 23  A. I think that's right. | 23 worked in paint finishing. |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 81 |
| --- |

1   Q. Ever?
2   A. Well, you know, I think Frank said
3   that he worked in some other areas on the
4   weekends or whatever to get some overtime
5   and that kind of thing. So he might have
6   -- he might have worked in the paint shop
7   on occasion, but I would think that he
8   would have had very, very limited knowledge
9   of how that -- you know, what was involved
10  in running that department.
11  Q. Okay. Do you know if Scottie Parnell was
12  just kind of hand picked like the other assistant
13  supervisors or supervisors?
14  A. I don't remember if that one was
15  posted or not, but Scottie had -- Scottie
16  worked in several different areas by virtue
17  of the fact that he would work whenever --
18  he made it clear that he would like to move
19  up. And if he needed to work second shift
20  or third shift or if you needed him to --
21  whatever you needed him to do, he would do
22  it.
23  Q. Do you know if Frank had those same

| Page 82 |
| --- |

1   intentions and conveyed it to people,
2   supervisors?
3   A. The only -- the only time that I know
4   of was when he spoke to me years ago, and
5   again I don't remember if that was before
6   he was promoted or after he was promoted.
7   Q. Okay. Do you have any reason to think that
8   Frank wouldn't want to -- I mean, he said that he
9   has worked overtime and weekends. Is there any
10  reason to believe that he wasn't interested in
11  moving up or wasn't willing to work in a number
12  of different areas to get experience and learn?
13  A. Well, I think the reason he worked in
14  the other areas was to make the overtime as
15  opposed to really getting experience, but
16  he operated some equipment and those kind
17  of things. When he worked in the other
18  areas, to my knowledge, he didn't do
19  anything having to do with any lead person
20  type responsibilities or assistant
21  supervisor type responsibilities.
22  Q. And Scottie did?
23  A. I don't know. I'm just saying,

| Page 83 |
| --- |

1   again, as I said earlier, Scottie was used
2   in a lot of different areas because he
3   would go wherever and do whatever needed to
4   be done. And there are lots of people that
5   won't do that. They are not willing to do
6   a second shift.
7   Q. Was Frank ever not willing to do a second
8   shift?
9   A. I don't know. I mean, I don't
10  remember him ever saying that he wouldn't.
11  Q. My understanding is the company is divided
12  -- or in the EEOC response, it's sort of
13  explained that the company is split into an
14  architectural and HVAC; is that correct?
15  A. Correct.
16  Q. Have there ever been any crossover
17  employees? And by that I mean have employees
18  gone from architectural to HVAC and vice versa?
19  A. Yes.
20  Q. Is that a common thing?
21  A. I wouldn't say it's a common thing,
22  but it's happened. There have been times
23  when we would have a department whose work

| Page 84 |
| --- |

1   slowed down. Instead of laying somebody
2   off or terminating them, we moved them
3   over. Another example of that was Willie
4   Lett, Frank's brother. Willie came to me,
5   I would say, maybe '04, sometime in '04,
6   and indicated that he had been operating
7   the saw some in his department. He worked
8   in department one and asked me was there a
9   possibility that he could -- as he said --
10  get saw pay. And I said, "Let me talk to
11  David and Kenneth about it." And I spoke
12  with David. David said, "I'm not really
13  sure what they have had him doing. Let me
14  talk to" -- not Kenneth, I'm sorry. Terry
15  Rogers, said, "Let me talk to Terry, and I
16  will get back with you." He did, he got
17  back with me, and he indicated that Willie
18  was filling in for him some when people
19  were out.
20  Q. So people do switch sides? I'm sorry to
21  interrupt you.
22  A. Yeah, they do switch sides.
23  Q. Walter Newman, Corky, he is a supervisor.

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  Do you know how he was selected?
2      A.  He was a lead person, and I can't
3  remember if he was assistant supervisor.
4  He could have been.  I can't remember.  But
5  he had worked in just, I think, all the
6  areas on the architectural side.
7      Q.  Do you know who selected him to become
8  supervisor?
9      A.  I can't say for sure.  Probably Roger
10  Terry.  I can't say for sure.
11      Q.  Do you have to become an assistant
12  supervisor before you become a supervisor?
13      A.  It's not absolutely necessary.  It
14  would be kind of an order of progression,
15  but it wouldn't be absolutely necessary.
16          MS. LOWELL:  I think I'm about
17  finished.
18          MS. ODOM:  I'm going to have some
19  follow-up, but I want to take a five minute break
20  if that's okay.
21          (Recess taken.)
22
23  EXAMINATION BY MS. ODOM:

Page 86

1      Q.  I just have a few follow-up questions on
2  what we had discussed today.  We had talked about
3  performance evaluations of employees at Reliable,
4  and one of the questions I would like to know is
5  when you evaluate an employee, what's the purpose
6  of that evaluation?  Is it for their current job?
7  Is it for another job?  Why are you doing the
8  evaluation?
9      A.  You are grading their performance in
10  their current position.
11      Q.  Is it used for any other purpose?
12      A.  It could be used later, but you can't
13  -- you can't use it then for something else
14  because you don't know what's coming up
15  later.
16      Q.  Why do you not post supervisor positions or
17  you don't customarily post supervisor positions?
18      A.  My guess would be most people would
19  like to be a supervisor one day.  And so we
20  consider everybody that we feel, if we have
21  that type of position, we feel we would
22  consider everybody that we felt had the
23  tools to do the job.

Page 87

1      Q.  We had talked today about certain
2  supervisors at the facility as well as assistant
3  supervisors and how long they had been with the
4  company or in their current job.  What role does
5  seniority play in promoting an employee?
6      A.  If two people had identical or nearly
7  identical tools to bring to the job, then
8  we would go with the more senior person.
9  But that doesn't necessarily mean that --
10  you know, if a person has done basically
11  the same job for ten years and then it
12  takes a year to learn how to do that job
13  and they have done that same thing for ten
14  years, that doesn't necessarily make them
15  more -- a better candidate for another job.
16  Did I answer the question?  Maybe I
17  answered the question.
18      Q.  Do qualifications trump seniority?
19      A.  In my opinion, they do.
20      Q.  With respect to deciding who will be
21  promoted, would the fact that someone is more
22  qualified trump someone who has been there
23  longer?

Page 88

1      A.  I think it's our responsibility to
2  put the person in the job who can do the
3  best job because we are competing locally.
4  And we are an employer in a small town
5  that's lost 1200 textile jobs in the last
6  few years.  There are a lot of people in
7  our area that need jobs.  If we don't put
8  people in the jobs that can get the most
9  out of them, we are jeopardizing -- we are
10  jeopardizing my job and everybody else's
11  job that works at that plant because these
12  corporate folks will move it to -- they
13  will move it some place else.  They will
14  take it to Japan or Mexico or some place
15  where they have other plants, and we don't
16  want that to happen.
17      Q.  You had talked about Ricky Jordan earlier
18  with respect to training classes.  What's Mr.
19  Jordan's race?
20      A.  Ricky is black.
21      Q.  You had also mentioned that Frank Lett had
22  come to you several years ago or you don't really
23  remember when to talk about moving up.  What

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1  other opportunities have been provided to Mr.
2  Lett that you know about?
3      A.  When we were still a part of Hart and
4  Cooley, Hart and Cooley purchased a window
5  manufacturing plant in Memphis, Tennessee.
6  And the intentions were to move that plant
7  to Geneva.
8      Q.  When was that?
9      A.  I want to say that was like '96, '97,
10  somewhere in that -- somewhere along in
11  there.
12      Q.  I'm sorry to interrupt.
13      A.  The Hart and Cooley sale took place
14  in 2000.  So it was end of January or end
15  of '99.  So it was prior to that.  I would
16  say it was '96, '97, '98, somewhere along
17  in there.  I don't remember the exact year.
18  But there were some groups of people who
19  went up to that plant to see how the plant
20  operated.  It was a different type of
21  business than what we do.  It was -- from a
22  marketing standpoint, it was a good tie in
23  with what we did or what we do because the

Page 90

1  products they built went in the same wall
2  systems as some of the products that we
3  build.  But as far as knowing how those
4  things were built, we didn't have any idea
5  how they were built.  We had no experience
6  with glass.
7          So it was going to be a complete
8  startup for us as far as moving that plant to
9  Geneva.  So some groups were put together to go
10  up to look at the equipment, figure out how the
11  lines operated, take notes, talk to the people
12  that were doing the jobs there, just do
13  everything that we could possibly do so when we
14  move that plant to Geneva, that we were able to
15  operate it.  And Clyde Cook was the director of
16  operations at the time -- I don't remember his
17  title, but it was maybe plant manager.  And he
18  was the one in charge of that entire operation as
19  far as moving to Geneva.  And he picked Frank as
20  I recall as one of the people to go up and learn
21  how that operation worked so it could be moved
22  back to Geneva.  I thought that was an
23  opportunity for Frank.  And he made one trip, and

Page 91

1  as far as I -- my understanding was he said he
2  wasn't going back.
3      Q.  What about employees that stayed on with
4  the Memphis trip, employees that continually went
5  up?
6      A.  Chris Hutcherson was another black
7  employee who was picked to go on those
8  trips, and Chris was eventually a lead
9  person in that operation.  And that job
10  wasn't posted.  He went up.  He paid the
11  dues to go spend the nights in the motel
12  and learn how that operation worked.  And
13  he was made -- he was made lead person, and
14  that job wasn't posted.
15          We also had one individual in the
16  plant who was interested in moving to Geneva.  We
17  offered the possibility to have some folks come
18  down if they wanted to, and there weren't many.
19  But one particular individual was Rodney Hodges.
20  And we relocated him to Geneva.  In a short
21  period of time after we got that operation up and
22  going, he was promoted to lead person.  He was
23  also black.  That job was not posted.  He was

Page 92

1  placed in that position.
2      Q.  We had talked about the paint finish
3  position earlier.
4      A.  Right.
5      Q.  Do you know if Frank Lett ever indicated
6  that he was interested in the paint finish
7  position?
8      A.  Not to my knowledge.  He can work
9  over there to get overtime.  But as far as
10  being over there to learn the position or
11  position himself for the position or having
12  ever said anything to anybody about wanting
13  a position in paint, not to my knowledge.
14  Nobody ever said that to me.
15      Q.  I know that Frank Lett is an African-
16  American lead person.  What other African-
17  Americans are also lead people?
18      A.  Calvin Grooms, Calvin was placed in
19  that position.  It was not posted.
20      Q.  What about people that used to be lead
21  people, lead persons that are African-American?
22      A.  Rodney Hodges that I have already
23  mentioned.  Chris Hutcherson that I already

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  mentioned. And there may be others.
2  That's the only ones I can think of off the
3  top of my head.
4     Q. And these are African-American lead people?
5     A. Yes.
6        MS. ODOM: I have no further
7  questions.
8
9  EXAMINATION BY MS. LOWELL:
10    Q. I just have a couple more questions. Is
11 Chris Hutcherson still employed?
12    A. Chris is -- he is still employed. He
13 is on military leave. He has been on
14 military leave for a couple of years.
15    Q. Is Rodney Hodges still employed?
16    A. Rodney is not employed. He did a
17 great job for us. We liked him. I think
18 he liked working for us. He got involved
19 with a lady there in town, and they started
20 really having problems to the point she was
21 coming to his house and damaging his car at
22 night and things like that. And he fought
23 it for a while and finally came in and told

Page 95

1        MS. LOWELL: I don't think that we
2  have anything else. That's it.
3
4
5     (Deposition concluded at 12:09 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 94

1  me he just couldn't -- he was going to have
2  to get out of there because he couldn't get
3  away from her. He couldn't get her to
4  leave him alone. So he resigned and as far
5  as I know moved back to Memphis.
6     Q. Do you know whether Frank was ever offered
7  an opportunity to get more experience in the
8  paint department, the position that Corky got?
9     A. Other than -- the paint department?
10 That was Scottie.
11    Q. I'm sorry, Scottie.
12    A. Yeah. The only thing that I know of
13 -- and I don't know for sure. I can't say
14 for sure that he ever even worked in the
15 paint department, but I would guess if they
16 would let him go over there and work some
17 overtime, he probably did.
18    Q. Do you know how many people Frank Lett
19 supervises currently in his lead position?
20    A. There is probably 25. I don't know
21 exactly. I don't know exact. It
22 fluctuates, but there is probably 25 of
23 them.

Page 96

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  JEFFERSON COUNTY )
5
6     I hereby certify that the above and foregoing
7  proceeding was taken down by me by stenographic
8  means, and that the questions and answers therein
9  were produced in transcript form by computer aid
10 under my supervision, and that the foregoing
11 represents, to the best of my ability, a true and
12 correct transcript of the proceedings occurring
13 on said date at said time.
14    I further certify that I am neither of counsel
15 nor of kin to the parties to the action; nor am I
16 in anywise interested in the result of said case.
17
18
19
20
21        _____
22        Anne E. Miller
23        Court Reporter and Commissioner

24  (Pages 93 to 96)