IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FRANK LETT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  1:05cv479-WHA |
| | ) | |
| RELIABLE RUSKIN, D/B/A, | ) | (WO) |
| RELIABLE PRODUCTS | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**
**I.  INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #20) filed by the Defendant, Reliable Ruskin Company ("Ruskin") on April 27, 2006.  The Plaintiff, Frank Lett ("Lett") originally filed a Complaint on May 23, 2005, bringing claims for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and 42 U.S.C. § 1981 (Count I) and age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA") (Count II).

On June 13, 2005, Ruskin filed a Motion for Partial Dismissal or, in the alternative, Motion for Partial Summary Judgment (Doc #5).  On August 29, 2005, this court granted Ruskin's Motion for Partial Dismissal, dismissing several of the claims brought by Lett.  In the instant motion, Ruskin asks the court to grant summary judgment on the remaining claims. Those remaining claims are: (1) that Lett, a black male over 40 years old, was denied promotion because of his race and age and (2) that Ruskin violated § 1981 because it paid Lett less money than a similarly situated white employee.

1

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED on all counts.

## II. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

Ruskin is a company that produces air handling equipment at its plant in Geneva, Alabama. The company is divided into two components: the HVAC side and the architectural side. Each component is divided into different departments which are designated by a number. For instance, the HVAC side is comprised of departments 2 and 5. The HVAC side used to consist of departments 2, 4, and 5, but a recent reorganization of the plant merged departments 4 and 5 into one department that is now referred to as department 5. Since the parties often interchange the two departments, the court will refer to the current department 5 as department 4/5. The HVAC component, which is the relevant component for this case, is managed by David Burch, who holds the title of HVAC production manager.

Lett was hired by Ruskin in 1973 and began work as an assembler in what was then department 4. In 1989 Lett was promoted to the position of saw operator in department 4, and in 1993 he became a tack welder. In 1994, Lett was promoted to his current position of "lead man" in department 2. As a lead man, Lett is responsible for approximately thirty employees who work on the various production lines within department 2. In this supervisory capacity Lett makes sure that his employees have the materials needed to complete their tasks, that work is completed in a timely fashion, and that orders are shipped correctly.

### A. Denied Promotion to Assistant Supervisor

2

Kenneth Taylor ("Taylor"), who is a 39 year old white male, is the supervisor in charge of departments 2 and 4/5. He was promoted to supervisor in 2001, and reports directly to the production manager, David Burch. Previously Taylor was the assistant supervisor of departments 2 and 4/5. Before that he spent two years working as the lead man in department 4. Taylor has worked for Ruskin for a total of 17 years.

When Taylor was promoted to supervisor, the position of assistant supervisor was left vacant, but in 2004, Taylor and Burch decided the position needed to be filled. They did not publicly advertise the position. Instead they solicited personnel at Ruskin who were assigned as lead men and allowed them to apply for the job if interested. In lieu of a formal interview and application process, the following questionnaire was distributed:

> WE MAY HAVE AN OPPORTUNITY TO HAVE AN ASSISTANT
> SUPERVISOR IN DEPT 5 IN THE NEAR FUTURE. IF YOU ARE
> INTERESTED IN THIS POSITION WE WOULD LIKE FOR YOU TO
> ANSWER THE QUESTIONS BELOW.
>
> WHAT DO YOU THINK ARE THE RESPONSIBILITIES OF AN ASSISTANT
> SUPERVISOR?
>
> DO YOU THINK THAT YOU ARE QUALIFIED TO FILL THIS POSITION?
>
> WHAT ATTRIBUTES OR EXPERIENCES TO YOU HAVE THAT YOU
> THINK QUALIFIES YOU FOR THIS POSITION?
>
> WHAT ARE SOME THINGS THAT YOU WOULD LIKE TO CHANGE
> WITHIN YOUR DEPT TO MAKE IT A MORE EFFICIENT OPERATION?

Def's Ex. 4 (all caps in the original). Taylor informed the men given the questionnaire that they would have three weeks to answer the questions and return it to him. Four applicants completed the questionnaire and were considered: Plaintiff Frank Lett (black, age 51), Stan Henderson (white, age 34), Walter Newman (white, age 43), and Ted Hampton (white, age 40). Each of the

applicants had experience as a lead man.  On October 4, 2004, Stan Henderson was selected as the new Assistant Supervisor.

### B.  Pay Disparity

At Ruskin, the lead men in the various departments are paid at an hourly rate.  The rate is determined by the employee's pay grade, and his or her time in that grade.  Each year, employees are eligible for merit increases in pay, which become effective on the employees' anniversary in grade.  Annual increases are not unlimited, as each pay grade is subject to a "cap" or "top pay."

For a twenty-one month period, from February 2004 to November 2005, Lett was paid $14.61 per hour.  During that same time period, a white employee named Steve Paulk was paid at a rate of $14.73 per hour, or 12 cents more per hour than Lett.  While Lett has been with Ruskin for six more years total, both Lett and Paulk were named lead men in their respective departments in 1994 (Paulk in department 3).

### C.  EEOC charge and Plaintiff's bankruptcy

On November 17, 2004, Lett filed an EEOC charge of discrimination.  Not long after, on January 7, 2005, Lett filed for bankruptcy in this district, seeking Chapter 13 protection.  When he filed for bankruptcy he did not list his pending EEOC charge under his Schedule of Assets or Statement of Financial Affairs.  On February 25, 2005, the EEOC issued a "no cause" determination and "right to sue" letter and on May 26, 2005, Lett filed the instant suit.  On March 28, 2006, during his deposition, Lett admitted that he had a bankruptcy case pending at the same time as this discrimination lawsuit.  The next day, Lett amended his Schedule B to include this lawsuit as a potential asset.

4

# III. <u>DISCUSSION</u>

Ruskin argues that Lett has failed to meet his obligations as a debtor pursuant to the Bankruptcy Code by not listing his pre-petition claims against Ruskin in his original bankruptcy filings, and only amended his bankruptcy documents to include his claims against Ruskin when forced to do so.   Therefore, Ruskin contends Lett's discrimination claims ought to be barred under the doctrine of judicial estoppel.

## A.  Judicial Estoppel

Judicial estoppel is an equitable doctrine invoked at a court's discretion that precludes a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.  <u>Burnes v. Pemco Aeroplex, Inc.</u>, 291 F.3d 1282, 1285 (11th Cir. 2002) (citations omitted); <u>see</u> <u>also</u> <u>Parker v. Wendy's International, Inc.</u>, 365 F.3d 1268, 1271 (11th Cir.2004); <u>Barger v. City of Cartersville</u>, 348 F.3d 1289, 1293 (11th Cir.2003).  The doctrine exists "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." <u>Burnes</u>, 291 F.3d at 1285 (quoting <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001)).  "The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings." <u>Burnes</u>, 291 F.3d at 1285 (quoting <u>American Nat'l Bank of Jacksonville v. Federal Dep. Ins. Corp.</u>, 710 F.2d 1528, 1536 (11th Cir.1983). "Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against playing fast and loose with the courts, blowing hot and cold as the occasion demands, or having one's cake and eating it too. Emerson's dictum that a foolish consistency is the hobgoblin of little minds cuts no ice in this context." <u>In re Coastal Plains, Inc.</u>,

5

179 F.3d 197, 205 n.1 (5th Cir. 1999)(quoting <u>Reynolds v. Commissioner of Internal Revenue</u>, 861 F.2d 469, 472-73 (6th Cir. 1988)); <u>see</u> <u>also</u> <u>United States v. McCaskey</u>, 9 F.3d 368, 379 (5th Cir. 1993) (purpose of doctrine is "to protect the integrity of the judicial process and to prevent unfair and manipulative use of the court system by litigants"); <u>McNemar v. Disney Store, Inc.</u>, 91 F.3d 610, 616 (3d Cir.1996) ("The doctrine of judicial estoppel serves a consistently clear and undisputed jurisprudential purpose: to protect the integrity of the courts."); <u>Matter of Cassidy</u>, 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process.").

The Eleventh Circuit has enumerated two factors that courts should consider when trying to decide whether to apply the doctrine of judicial estoppel to a particular case. "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." <u>Solomon Smith Barney, Inc. v. Harvey, M.D.</u>, 260 F.3d 1302, 1308 (11th Cir. 2001); <u>Burnes</u>, 291 F.3d at 1285.

The Supreme Court has noted that although the circumstances under which judicial estoppel should be invoked are not reducible to a general formulation of principle, courts have traditionally looked at three basic factors: 1) whether a party's later position was clearly inconsistent with its earlier position; 2) whether the party succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and 3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. <u>New Hampshire</u>, 532 U.S.

6

at 750-51.  The Court observed that these factors do not establish "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel"; rather, additional considerations may be appropriate. Id. at 751.  In Burnes v. Pemco Aeroplex, Inc., the Eleventh Circuit determined that the two factors applied in the Eleventh Circuit are consistent with the Supreme Court's holding in New Hampshire v. Maine, "and provide courts with sufficient flexibility in determining the applicability of the doctrine of judicial estoppel based on the facts of a particular case." Burnes, 291 F.3d at 1285-86.

The doctrine of judicial estoppel is particularly applicable in the bankruptcy context.  A debtor seeking the protection of the bankruptcy laws has a duty to disclose all assets, or potential assets, to the bankruptcy court.  11 U.S.C. §§ 521(a) and 541(a)(7).  If circumstances change, a debtor has a continuing duty to amend his financial statements.  Burnes, 291 F.3d at 1286 (citing Coastal Plains, 179 F.3d at 208)).  "Full and honest disclosure in a bankruptcy case is 'crucial to the effective functioning of the federal bankruptcy system.'" Id. (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co. Et al., 81 F.3d 355, 362 (3rd Cir. 1996)).

### 1.  Waiver of Judicial Estoppel

Lett argues that Ruskin waived its right to assert the affirmative defense[1] of judicial estoppel because Ruskin did not include judicial estoppel as part of its answer to Lett's complaint.  Lett cites Federal Rule of Civil Procedure 8(c) which states in pertinent part: "In

---

[1] An affirmative defense has been described as "[a]ny matter that does not tend to controvert the opposing party's prima facie case as determined by the applicable substantive law." Hassan, 842 F.2d at 263 (quoting  2A J. Moore et al., Moore's Federal Practice ¶ 8.27[3] (2d ed. 1985)).

pleading to a preceding pleading, a party shall set forth affirmatively...estoppel...and any other matter constituting an avoidance or affirmative defense...."  The court finds that this argument is without merit.

"The Supreme Court has held that the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it." Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989) (citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 350 (1971)).  "Thus, if a plaintiff receives notice of an affirmative defense by some means other than pleadings, 'the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.'" Id. (quoting Hassan v. U.S. Postal Service, 842 F.2d 260, 263 (11th Cir.1988)).  Because the Federal Rules of Civil Procedure have established liberal pleading rules with regard to affirmative defenses, the Eleventh Circuit has held that it is important to "avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule."  Hassan v. U.S. Postal Service,  842 F.2d 260, 263 (11th Cir. 1988).

Lett has not argued that he suffered any prejudice, and in any event, the record before the court shows that Lett has not been prejudiced by Ruskin's judicial estoppel argument.  Lett points out that the first time Ruskin raised the issue of judicial estoppel was in Ruskin's Motion for Summary Judgment, filed on April 27, 2006.  That same day this court issued an Order giving Lett until May 18, 2006, to file a response in opposition to Ruskin's Motion.  The court finds that twenty days is more than enough notice for Lett to have prepared arguments to counter Ruskin's judicial estoppel claims.  Indeed, a review of Lett's Response in Opposition to Defendant's Motion for Summary Judgment (Doc #25) shows an organized, well written, and

vigorous argument as to why the court should not grant summary judgment, and more specifically why Lett contends that judicial estoppel is not applicable to these facts. Because Lett was not disadvantaged in any way by Ruskin's failure to include judicial estoppel as part of its answer, the court finds that the defense of judicial estoppel was not waived by Ruskin.[2]

**2. Inconsistent Positions**

When Lett filed for bankruptcy protection he did not disclose to the bankruptcy court that he had previously filed an EEOC charge against Ruskin. Lett does not dispute that he failed to note the EEOC charge on any of the paperwork he needed to fill out in order to proceed into bankruptcy. Lett's Schedule of Assets and Statement of Financial Affairs each required him to list any administrative or legal claims to which he was a party. It is also undisputed that Lett, while under oath and penalty of perjury, verified the accuracy and truthfulness of his disclosures to the bankruptcy court. See Def's Ex. 12. When Lett told the bankruptcy court that no claims existed, he had already told the EEOC that such claims did exist, therefore his inconsistent statements to the bankruptcy court were false. See Barger, 348 F.3d at 1295. Thus, Lett made

---

[2] Ruskin first found out that Lett had not listed his EEOC charge or this lawsuit in his pending bankruptcy case during Lett's deposition on March 28, 2006, which was after the deadline for the Defendant to move to amend the pleadings. Uniform Scheduling Order, Section 4 (Doc #17). The next day Ruskin served Lett with a Request for Admissions relating to Lett's failure to disclose the EEOC charge or the lawsuit on his bankruptcy documents. As discussed supra, Lett suffered no prejudice when Ruskin raised the affirmative defense of judicial estoppel on summary judgment, thus in this case omitting judicial estoppel from its answer did not prevent Ruskin from using judicial estoppel as a defense. While it would have been more appropriate form for Ruskin to first ask this court for leave to amend its Answer out of time to include judicial estoppel when Ruskin first determined that the defense was applicable to these facts, see Fed. R. Civ. P. 15(a) (leave to amend shall be freely given "when justice so requires."), the motion for summary judgment raising the issue was filed within a month after Ruskin discovered the fact which had been within Lett's knowledge all along.

inconsistent statements under oath in a prior proceeding and the first element of judicial estoppel has been met.

### 3. Inconsistencies calculated to make a mockery of the judicial system

The second factor in judicial estoppel analysis requires the court to determine if Lett, while taking the inconsistent positions discussed above, did so intending to undermine the integrity of the judicial system.  <u>Burnes</u>, 291 F.3d at 1286 (judicial estoppel only "applies in situations involving intentional contradictions, not simple error or inadvertence."); <u>see also American Nat'l</u>, 710 F.2d at 1536 (judicial estoppel applies to the "calculated assertion" of divergent sworn positions."); <u>Coastal Plains</u>, 179 F.3d at 206 ( judicial estoppel is generally applied when, "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice."); <u>Ryan</u>, 81 F.3d at 362-63 ("[T]he doctrine of judicial estoppel does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court.").

The Eleventh Circuit has held that "deliberate or intentional manipulation can be inferred from the record," and that "the debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment." <u>Burnes</u>, 291 F.3d at 1287 (quoting <u>Coastal Plains</u>, 179 F.3d at 210)).

### a. Plaintiff's knowledge of undisclosed claim

It is clear from the record that Lett had knowledge of his discrimination claims both before he filed for bankruptcy protection, and while both cases were pending.  On November 17, 2004 Lett filed the EEOC charge in this case.  It was less than two months later, on January 7,

2005, that Lett filed for bankruptcy.  This court cannot believe that when he filed for bankruptcy,

Lett had forgotten that he had recently lodged several charges of racial discrimination against his

longtime employer.  Further, while the bankruptcy case was progressing, Lett had additional

"reminders" about the instant case.  On February 25, 2005, he received a "right to sue" letter

from the EEOC and on May 26, 2005 he actually filed suit.  All the while, he neglected to update

his bankruptcy records to note his action against Ruskin.  It strains the imagination to think that

Lett did not have knowledge of his undisclosed employment claims when filing for bankruptcy,

or over the close to 14 month period it took him to eventually add his employment claim to his

bankruptcy documents.

### b.  Plaintiff's motive for not disclosing his claim

In this case, Lett had a clear financial motive to conceal his employment discrimination

claims from the bankruptcy court.  "The bankruptcy court must be confident that it has the full

and honest disclosure of the debtor concerning any potential assets that could increase the value

of the estate for the creditors."  Burnes, 291 F.3d at 1289.  As a Chapter 13 debtor, Lett's

projected income, including any potential settlement or judgment in the instant case, is applied to

his payment schedule and along with his future earnings becomes "property of the estate." 11

U.S.C. §§ 541(a)(1) and 1325(b)(1)(B).  By not disclosing his employment claims, Lett

essentially sheltered potential income that his Trustee and creditors had a right to know about.

The Eleventh Circuit has held that in Chapter 13 bankruptcy cases a financial motive to secret

assets exists, "because the hiding of assets affects the amount to be discounted and repaid."  De

Leon v. Comcar Ind. Inc., 321 F.3d 1289,1291 (11th Cir. 2003).  In this case if Lett had managed

to keep his lawsuit a secret until after his bankruptcy was discharged, he would have been the

sole beneficiary of any monetary recovery from Ruskin. It is clear to the court that Lett's failure
to disclose his employment claims would have had a definite impact on the amount discounted
and repaid to creditors. Lett's initial plan provided for a payment over time ("POT") of $1,500
to his unsecured creditors. It is unlikely that a POT plan capped at $1,500 would have been
confirmed had the Trustee been made aware of Lett's employment lawsuit. Indeed, after Lett
disclosed his claims, the Trustee filed a motion to modify Lett's Chapter 13 plan by increasing
"the dividend percentage to unsecured creditors by the amount of the net lawsuit/claim
proceeds." See Pl.'s Ex. 4, Trustee's Mot. to Modify Debtor's Confirmed Ch. 13 Plan for
Lawsuit Proceeds. The effect of this modification is that Lett would still have to pay at least
$1,500 to his unsecured creditors, but would also be forced to use the net proceeds of any
recovery to satisfy any unsecured claims above the original $1,500 limit.

　　　　Lett's arguments that he had no motive to conceal his claims are unpersuasive. Lett
argues that his failure to list his claims was simply an inadvertent mistake, but the record does
not support this argument. First, while Lett did not list the instant case in his bankruptcy
petition, he did list another case in which he was involved in his Statement of Financial Affairs.[3]
From this the court can infer that Lett understood that lawsuits were to be listed in that section of
the petition. Secondly, Lett knew that he could amend his bankruptcy petition, because on
March 1, 2006, he did just that by including additional debts. He did not however, amend his
petition to include the instant case until he was forced to disclose the case during his deposition
and on the Requests for Admission that followed. It was only then that Lett amended his

---

[3] Lett listed Alabama Telco. Credit Union v. Frank Lett, which appears to be a
garnishment action filed against him in the Geneva County District Court.

12

bankruptcy petition to add his employment claims . When faced with the proverbial eleventh

hour amendment the Eleventh Circuit has said:

> The success of our bankruptcy laws requires a debtor's full and honest disclosure.
> Allowing [Plaintiff] to back-up...and amend his bankruptcy filings, only after his
> omission has been challenged by an adversary, suggests that a debtor should
> consider disclosing potential assets only if he is caught concealing them. This so-
> called remedy would only diminish the necessary incentive to provide the
> bankruptcy court with a truthful disclosure of the debtors' assets.

Burnes, 291 F.3d 1288.

Finally, Lett argues that if he really wanted to conceal the lawsuit and deprive his

creditors, he would have chosen to apply for Chapter 7 protection, rather than Chapter 13

protection. The nuances of Chapter 7 and Chapter 13 aside, this argument is also without merit.

The Eleventh Circuit has rejected the argument and has held that judicial estoppel by failing to

disclose an existing discrimination claim applies equally to Chapter 13 proceedings as to Chapter

7, saying, "that any distinction between the types of bankruptcies available is not sufficient

enough to affect the applicability of judicial estoppel because the need for complete and honest

disclosure exists in all types of bankruptcies." De Leon, 321 F.3d at 1291.

Based on the record, the court finds that Lett had a financial motive to hide his

employment claim from the bankruptcy court. The existence of a motive, combined with the fact

that Lett had knowledge of his employment claims when he filed for bankruptcy, allows the

court to infer that Lett deliberately set out to undermine and manipulate the court system and the

court does so. Therefore, the second element of judicial estoppel has been satisfied.

**B. Judicial Estoppel only applies to claims for monetary relief**

Now that the court has determined that judicial estoppel is appropriate the court must

examine exactly what judicial estoppel bars Lett from doing. In Burnes, the Eleventh Circuit

held that judicial estoppel barred a Plaintiff from pursuing monetary damages, but did not prohibit a Plaintiff from pursuing claims that add no monetary value to the bankruptcy estate and would have no effect on the bankruptcy court's determination of how to proceed with a debtor's bankruptcy, specifically, injunctive relief prohibiting the employer from engaging in illegal employment practices. Burnes, 291 F.3d at 1289. Under the facts of the Barger case, it was held that the Plaintiff's request for reinstatement would have added nothing of value to the Chapter 7 bankruptcy estate and would not be barred by judicial estoppel. Barger, 348 F.3d at 1297. Thus, the key is to examine the demands made by the Plaintiff and then determine if success on the merits would result in any value being added to the debtor Plaintiff's estate.

In his complaint, Lett asks the court to provide both compensatory and equitable relief. The court finds Lett's demands for front pay, back pay, benefits, and any compensatory or punitive damages fall squarely into the type of relief that would add value to his bankruptcy estate, and therefore are barred by judicial estoppel. See Burnes, 291 F.3d at 1289; Barger, 348 F.3d at 1297.

Lett asks the court to order Ruskin to promote him to assistant supervisor as soon as a position comes open. A promotion to assistant supervisor would increase Lett's income and add monetary value to his estate. Because he is in Chapter 13, all of Lett's projected disposable income is allotted to make payments under his payment plan. 11 U.S.C. § 1325. Any court-ordered promotion would increase his future earnings, which become "property of the estate." 11 U.S.C. § 1322(a)(1). Because a promotion to assistant supervisor would add value to Lett's estate, he is judicially estopped from seeking an order requiring Ruskin to promote him. See Killebrew v. CSX Transportation, Inc., Nos. Civ.A. 03-CV-0943-D, 03-CV-1284-D, 04-CV-

14

960-D, 2005 WL 1705636, at *3 (M.D. Ala. July 19, 2005) (DeMent, J.) (judicial estoppel barred Chapter 13 debtor from seeking an order requiring that he be promoted).

Next, Lett asks the court to issue a declaratory judgment that Ruskin's employment practices violated Title VII, § 1981, and the ADEA. He also asks the court to issue an injunction preventing Ruskin from future unlawful employment practices. If the court were to fulfill these requests, no value would be added to Lett's bankruptcy estate and his creditors and Trustee would not be affected. For that reason, judicial estoppel does not bar Lett's efforts to obtain a declaratory judgment or an injunction that would prevent Ruskin from future unlawful employment practices. See Burnes, 291 F.3d at 1289; Barger, 348 F.3d at 1297.

Finally, Lett asks to recover costs and reasonable attorney's fees and expenses if he prevails on his requests for declaratory and injunctive relief. If Lett were to prevail on his Title VII or § 1981 claims, attorney's fees would be authorized under 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k). Section 1988 provides in part that, in civil rights actions, including those under § 1981, "the court, in its discretion, may allow the prevailing party...a reasonable attorney's fee as part of the costs." Title VII contains a similarly worded attorneys' fee provision. See 42 U.S.C.A. § 2000e-5(k). To qualify as "prevailing," a plaintiff must obtain an enforceable judgment against the defendant. Nance v. Maxwell Federal Credit Union, 186 F.3d 1338, 1343 (11th Cir. 1999) (citing Farrar v. Hobby, 506 U.S. 103, 111 (1992)). If Lett were to prevail on his ADEA claim, he would also be able to collect attorneys fees. Section 626(b) provides that "the provisions of this [Act] shall be enforced in accordance with the powers, remedies, and procedures provided in [certain sections of the Fair Labor Standards Act.]" 29 U.S.C. § 626(b). Section 216(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., is one of these

15

incorporated sections and provides that the court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). The FLSA language differs from the attorney's fees language in other statutes[4] such as Title VII, which provides that the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

Under any of the statutes mentioned above, any attorney's fees awarded to Lett would have no impact on Lett's bankruptcy estate or creditors. The right to recover monetary damages is separate from the right to an award of attorney's fees. Killebrew, 2005 WL 1705636, at *3 (citing Fernandes v. Limmer, 663 F.2d 619, 637 (5th Cir. Unit A 1981) (§ 1988 attorneys fees are not a component of monetary damages)). Indeed, the purpose of attorney's fees is to reasonably compensate the prevailing party's attorney for work performed. In this case, any fees awarded would go to Lett's attorneys, and not Lett. Because no monetary value would be added to Lett's bankruptcy estate by the award of costs or attorney's fees, the court will allow Lett to seek costs and attorney's fees if he prevails on either his claim of declaratory or injunctive relief. See Killebrew, 2005 WL 1705636, at *4 (finding that judicial estoppel does not bar Chapter 13 Plaintiff debtor from seeking costs and attorney's fees pursuant to 42 U.S.C. § 1988).

---

[4] There are subtle differences between the various statutes authorizing attorneys fees for violations of Title VII, § 1981, and the ADEA but for the purposes of determining whether judicial estoppel would bar Plaintiff Lett from collecting attorney's fees in the context of these facts, those differences are moot. Regarding this narrow issue, the court considers the statutes interchangeable. See Nance v. Maxwell Federal Credit Union, 186 F.3d 1338, 1343 n.10 (11th Cir. 1999) (mentioning that 29 U.S.C. § 626(b) and 42 U.S.C. § 1988 are generally considered interchangeable).

To summarize: (1) Judicial estoppel bars Lett's claims for monetary relief, to include front pay, back pay, benefits, and any compensatory or punitive damages; (2) judicial estoppel bars Lett from asking the court to order Ruskin to promote him to assistant supervisor; (3) judicial estoppel does not bar Lett from seeking an injunction preventing future discriminatory practices by Ruskin, or declaratory judgment that Ruskin discriminated against Lett; and (4) judicial estoppel does not bar Lett from seeking costs and attorney's fees in the event he prevailed on his attempt to gain injunctive or declaratory relief.[5]

## C.  Summary Judgment on the Merits

To obtain the declaratory and/or injunctive relief sought, Lett must first overcome Ruskin's Motion for Summary Judgment.  To decide this motion, the court must analyze Lett's remaining claims of discrimination (failure to promote and pay discrimination) on the merits.

### 1.  Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[5] The court notes that even if Lett were not judicially estopped as to most of his claims, Ruskin would be entitled to summary judgment on the merits of those claims for the reasons discussed hereafter.

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."
Id. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute
of material fact, or by showing, or pointing out to, the district court that the nonmoving party has
failed to present evidence in support of some element of its case on which it bears the ultimate
burden of proof.  Id. at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to
go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to
interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine
issue for trial.'"  Id. at 324.  To avoid summary judgment, the nonmoving party "must do more
than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  On the other hand, the evidence of
the nonmovant must be believed and all justifiable inferences must be drawn in its favor.  See
Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  After the nonmoving party has
responded to the motion for summary judgment, the court must grant summary judgment if there
is no genuine issue of material fact and the moving party is entitled to judgment as a matter of
law. FED. R. CIV. P. 56(c).

The summary judgment rule is to be applied in employment discrimination cases as in
any other case.  Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).

### 2.  Ruskin's failure to promote Lett to Assistant Supervisor

Lett claims that he was denied a promotion to Assistant Supervisor because of his race
and his age.  He is suing Ruskin for age discrimination under the Age Discrimination in
Employment Act (ADEA) and race discrimination under Title VII and § 1981.  The ADEA

makes it unlawful for an employer "[t]o discharge... any individual or otherwise discriminate against any individual...because of such individual's age [.]" 29 U.S.C. § 623(a). Title VII and § 1981 provide the same protection on the basis of race. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. Because Lett relies entirely upon circumstantial evidence to support his racial and age discrimination claims, the court's analysis will be guided by the familiar three-step framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Although the McDonnell Douglas framework originally applied to Title VII cases, it is now clear that the framework applies to claims of discrimination under the ADEA, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141-42 (2000) (recognizing widespread application of McDonnell Douglas framework to ADEA claims); Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 n.6 (11th Cir. 2001); Chapman, 229 F.3d at 1024 (applying McDonnell Douglas framework to ADEA claim), and to § 1981 claims, Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1325 (11th Cir. 1998), as well. Because the legal analysis is the same with respect to all of Lett's claims, there is no need to analyze each claim separately.

Under the McDonnell Douglas framework, the plaintiff must establish a prima facie case of discrimination. McDonnell Douglas Corp., 411 U.S. at 802. After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

19

Burdine, 450 U.S. at 256; Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir.1997).  A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).

### a. Lett's Prima Facie Case

In order to establish a prima facie case in a failure to promote claim, Lett must prove the following four elements: 1) that he belongs to a protected class; (2) that he was qualified for a job for which Ruskin was seeking applicants; 3) that, despite his qualifications, he was rejected; and 4) that, after his rejection, the employer continued to seek applicants or filled the position with a person outside of the plaintiff's protected group.  See Walker v. Mortham, 158 F.3d 1177, 1186 (11th Cir.1998); Williams v. Ala. Indus. Dev. Training, 146 F.Supp.2d 1214, 1219 (M.D.Ala.2001).  Ruskin states that it does not concede that Lett can establish a prima facie case, but offers no evidence to rebut Lett's argument that he has fulfilled all of the elements required. Resolution Trust Corp. v. Dunmar Corp.,  43 F.3d 587, 599 (11th Cir. 1995) (not a function of the district court to distill every potential argument that could be made based upon the materials before it on summary judgment, rather the onus is upon the parties to formulate arguments to support their positions).  Therefore, the court finds that Lett has met his burden and established a prima facie case of discrimination based on race and age.

### b. Ruskin's Legitimate, Non-Discriminatory Reasons

Because Lett has established a prima facie case of discrimination, the burden of production now shifts to Ruskin to articulate a legitimate, non-discriminatory reason for not

20

awarding the promotion to Lett. Ruskin's burden is "exceedingly light" and requires only that

the defendant produce evidence that could allow a rational fact-finder to conclude that the

challenged employment action was not made for a discriminatory reason. Turnes v. AmSouth

Bank, N.A., 36 F.3d 1057, 1061 (11th Cir.1994). Because the employee always bears the

ultimate responsibility for persuading the trier of fact, this burden is one of production, not

persuasion. See Reeves, 530 U.S. at 143.

Ruskin offers the following as legitimate, non-discriminatory reasons for why Henderson

was promoted and Lett was not: (1) Henderson was more qualified; (2) Henderson had better

written communication skills; (3) Lett had received written counseling for disciplinary problems,

while Henderson had a clean record; (4) Applicants were asked to fill out a questionnaire and

Henderson's answers were better than those provided by Lett; (5) Henderson had a reputation of

seeking out additional responsibilities.

Lett first argues that Ruskin has failed to meet its burden of production by failing to

articulate a legitimate, non-discriminatory reason. Keeping in mind the "exceedingly light"

burden that Ruskin was required to meet, the court disagrees. See Turnes, 36 F.3d at 1061.

Lett attacks Ruskin's claims that Henderson was more qualified and had better

communication skills on the grounds that they rely too heavily on vague and subjective criteria.

The mere fact that an employer used subjective criteria to arrive at its decision is not necessarily

fatal. "A subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory

reason under the McDonnell Douglas/ Burdine analysis." Denney v. City of Albany, 247 F.3d

1172, 1185 (11th Cir. 2001). "Subjective reasons can be just as valid as objective reasons...A

subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant

articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." Id.

In this case, Ruskin has cited specific facts to back up its reasons. Regarding its contention that Henderson was more qualified, Ruskin's main argument is that Henderson had experience as a lead man in departments 2, and 4/ 5 while Lett had experience only as the lead man in department 2. Because the Assistant Supervisor is responsible for departments 2, and 4/5 it is reasonable that Ruskin would want someone who had experience in all relevant departments and not just one. Ruskin also points out that department 2 produces only one specific product, where department 4/5 turns out multiple products that differ in size and require specialized, more complex construction. Ruskin wanted someone as Assistant Supervisor who had experience managing the more complex production issues within department 4/5.

Ruskin also stated that Henderson's written communication skills were superior. As lead men in their departments, Henderson and Lett both were required to fill out written appraisals on employees who worked under them. It is Ruskin's contention that Lett's work was often filled with grammatical errors and required changes, while Henderson's required no changes. See Ken Taylor Dep. at 96-7.

Lett's contention that Ruskin's arguments are too vague and subjective is off the mark. The court finds that Ruskin has been anything but vague in presenting the rationale behind its legitimate reasons. Additionally, while each reason may have subjective elements, whether it is Henderson's work experience or communication skills, in each instance Ruskin has provided a specific factual basis for its opinion. Denney, 247 F.3d at 1185. For both reasons, Ruskin has produced sufficient evidence so that a rational fact-finder could "conclude that the challenged

employment action was not made for a discriminatory reason." Turnes, 36 F.3d at 1061.

Therefore, the court finds that Ruskin has carried the burden of production by sufficiently stating

legitimate, non-discriminatory reasons for its action.  The burden now shifts back to Lett to show

that Ruskin's reasons are mere pretext for discrimination.

### c.  Pretext

Lett argues that the reasons set forth by Ruskin for not promoting Lett are "false and

unworthy of belief" and really pretextual.  See Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J.

at 19.   Ruskin has provided several legitimate, non-discriminatory reasons for why it did not

promote Lett.  As a general rule, when a defendant has articulated several different reasons for

an employment action, a plaintiff must demonstrate that each of the proffered reasons is

unworthy of credence in order to establish pretext. Combs, 106 F.3d at 1538.  Lett contends that

this case is an exception to the rule because he claims that Ruskin has articulated inconsistent

reasons for not promoting him.

Lett's claims of inconsistency center on the employment questionnaire that was

distributed to the lead men interested in applying for the Assistant Supervisor position, and

Lett's disciplinary record at Ruskin.  In a response letter to the EEOC, dated February 8, 2005,

Ruskin stated that one of the reasons Henderson was selected for promotion was that the answers

he provided on the questionnaire were better than the ones submitted by Lett.[6]  In the same letter,

Ruskin mentioned that Lett had a "record of counseling and disruption to the work force," while

Henderson had no disciplinary action in his file. Pl.'s Ex. 6.   As evidence of inconsistency, Lett

---

[6] An examination of the answers submitted reveals that Henderson gave a detailed,
thorough response to each of the questions, while Lett submitted simplistic one line answers.
Compare Def's Ex. 6 (Henderson's questionnaire), with Ex.5 (Lett's questionnaire).

points to the deposition testimony of Ken Taylor, who made the decision to promote Henderson and not Lett.  Lett argues that, in his testimony, Taylor denied using any of the questionnaires submitted by the candidates when making the decision to promote.  Additionally, Taylor never mentions Lett's disciplinary record as a reason for his failure to promote.

The Eleventh Circuit has held that inconsistent reasons articulated by an employer can be evidence of pretext.  See Bechtel Construction Co. v. Secretary of Labor, 50 F.3d 926, 935 (11th Cir. 1995); Tidwell v. Carter Products, 135 F.3d 1422, 1427 (11th Cir. 1998).

In Bechtel, in a proceeding before an administrative law judge, the decisionmaker stated that an employee's job performance and medical condition were not at issue, and that the employee was dismissed because of his attitude.  Id.  On appeal, however, the employer stated that the dismissal was due to poor job performance which was exacerbated by an arthritic condition. Id.  The court stated that the pretextual nature of the termination was "further demonstrated by [the employer's] shifting explanations for its actions." Id.

In Tidwell, the employee was initially told that he had done a great job, but that his position was being terminated because there was going to be a realignment of territory. Id. at 1427.  In a memo later written about the positions which would be affected by the territory realignments, the employer noted that there was a "performance issue" with the plaintiff.  Id. The court held that at most a jury could conclude that performance was an additional, but undisclosed reason for the decision and that the existence of this additional reason did not establish pretext.  Id.

Another judge in this district has applied the holding of Bechtel, and determined that a defendant employer's conflicting reasons for an employment action, when combined with the

24

plaintiff employee's prima facie case, was enough to create pretext.  Stallworth v. E-Z Serve

Convenience Stores, No. 99-D-1503-N, 2001 WL 125304 (M.D.Ala. Feb. 12, 2001) (De Ment,

J.).  In Stallworth, the court reasoned that because on two occasions the defendant said that a

particular reason was the sole reason for termination, but then on a subsequent occasion gave an

additional reason, even if the second reason could be viewed as complementing the first, because

the defendant had previously insisted that there was only one reason, a jury could conclude that

the reasons are inconsistent and, therefore, incredible. Stallworth, 2001 WL 125304 at *4.  This

is consistent with Bechtel, in which the decision maker first denied the reason later given for the

action.

It is clear that just because an employer offers differing statements, they are "not

necessarily and automatically inconsistent."  Id. ("Employment law is not a game of 'Gotcha!'").

An examination of the reasons that Lett classifies as "inconsistent" reveals that both are

dissimilar from the facts in Bechtel and Stallworth, and both do not rise to a level that would

establish pretext.

Lett argues that Ken Taylor's deposition testimony shows that Ruskin actually did not

consider the questionnaire answers the applicants submitted and this is inconsistent with

Ruskin's reply to the EEOC.  Lett cites Taylor's testimony:

> Q. You looked at–what–why did you select Stan Henderson over Frank Lett for
> the assistant supervisor position?
> A: Because of the job knowledge and experience that Stan had on all the other
> lines.
> Q: That's your reason?
> A: That's the main reason, yes.
> Q: Is that the only reason?
> A: And he also has good communication skills.
> Q: You had seen that over the years.
> A: Yes.

> Q: Any other reasons?
> A: That's pretty much it - that's it.

Taylor Dep. at 95-96.

From that statement alone, it would appear that Ruskin ignored the questionnaires each applicant filled out. A full reading of Taylor's deposition reveals that is not necessarily the case. An earlier portion of Taylor's testimony reads as follows:

> Q: When you got the sheets back, the answer sheets, did you read them over from the people?
> A: Yes, sir.
> Q: Did you make your decision as who to hire based on the answers to the questions?
> A: No, sir.
> Q: What did you make your decision on? What did you base your decision on?
> A: I wanted to see just what was - what they had to offer on paper and their mental aspect there, as well as I wanted to know - looking at their experience, knowledge. That's what I based my decision off of.

Id. at 37-38.

This second snippet of testimony reveals that the questionnaires were reviewed and Taylor's statement that he wanted to see "what they had to offer on paper" indicates to the court that they were indeed considered. It is clear that the questionnaires themselves were not the primary factor leading to Henderson's promotion, but it is equally clear to the court that they played a part in the selection. Lett also ignores the content of the questionnaire. Each applicant was asked to explain why he was qualified for the position and to list experiences and attributes that he had that would help him as an Assistant Supervisor. Henderson answered:

> Over the past year and a half to two years I have on occasion filled in for Kenneth Taylor while he has been out. I understand the responsibilities of the job and what he expects. I have successfully served as a lead person in department 2 (night shift) and department 4. With my present job as lead person in department 5, I feel I have a wide range of knowledge to succeed as an Assistant Supervisor.

26

Lett answered:

  Time and ability.

Def.'s Ex. 5 and 6.

As discussed supra, Ruskin relied heavily on Henderson's qualifications, which were referred to

in the applications. Taken as a whole, Taylor's testimony is not inconsistent with Ruskin's in-

house counsel's letter to the EEOC which referred to Henderson's answers as to qualifications

and experience being better.

  Lett points out that Taylor also did not mention Lett's disciplinary record[7] as a reason for

the promotion decision. Ruskin did mention Lett's disciplinary record in its letter to the EEOC

and also listed it as a factor in its Motion for Summary Judgment. The mere fact that Taylor did

not list Lett's disciplinary record in his testimony is not enough to create pretext.

  Although the author of Ruskin's letter to the EEOC felt that the disciplinary record was a

good reason for Lett not to have been selected, Taylor's failure to mention Lett's disciplinary

record is not inconsistent in the sense that pretext could be established. The facts in the instant

case are very different from those in Bechtel, the decision of the Eleventh Circuit that has

actually found an inconsistency capable of creating an inference of pretext. Unlike the employer

in Bechtel, Taylor did not disclaim Lett's disciplinary record as a reason for not promoting him

after being asked about it. He was not asked. At most, it might be that the court should not

consider the disciplinary record as one of the nondiscriminatory reasons that Lett was not

---

  [7] Lett received counseling for the following: (1) fathering a child out of wed lock with a subordinate; (2) a subordinate complained that Lett made repeated attempts to ask her questions about her personal life; and (3) telling another person that he could get them a job at Ruskin, even though he did not have the authority to fulfill such a promise. Def.'s Ex. 17.

promoted, since the decisionmaker, Taylor, did not testify that it was. That is what the court will do.

The court concludes that this case does not present a case of "shifting" or inconsistent reasons by the employer. Therefore, to establish pretext under the general rule expressed in Combs, Lett must create a question of fact as to whether each articulated reason is unworthy of credence. 106 F.3d at 1538.

The court will, therefore, turn to the question of whether Lett has created a question of fact as to the credibility of Ruskin's articulated reason that Henderson was more qualified for the position. Lett argues that he was more qualified than Henderson, thus any assertion that Henderson's superior qualifications got him the promotion is pretext for discrimination. With respect to the relative qualifications of candidates, "evidence showing that an employer hired a less qualified applicant over a plaintiff may be probative of whether the employer's proffered reason for not promoting that plaintiff was pretextual." Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000). The burden is on the plaintiff to establish that he or she was "substantially more qualified than the person promoted." Id. at 1255. To meet this burden, a plaintiff must show that the disparities between the successful applicant's and his own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Brooks v. County Commission of Jefferson County, 446 F.3d 1160, 1163 (11th Cir.2006); see also Ash v. Tyson Foods, Inc., --- U.S. ----, 126 S. Ct. 1195, 1197 (2006) ( per curiam ).

Lett is unable to meet this standard. Lett argues that he has worked at Ruskin longer than Henderson - Lett has 30 years of service and Henderson has 17. Ruskin countered that as a

28

policy it will not promote a more senior employee over one who is better qualified. See Cofield, 267 F.3d at 1269 ("We will not second guess [the employer's] decision to emphasize qualifications over length of service."). Ruskin felt that Henderson was more qualified based on his broader work experience with the company and since both men had significant time with the company, Lett's additional service did not give him an edge.

Lett also contends that he was more qualified for the position since, as the department 2 lead man, he directly supervised more employees than Henderson. As discussed supra, Ruskin's emphasis in choosing Henderson was based on the fact that Henderson had overseen all of the relevant production lines, and not on how many personnel reported to him. Lett's argument seems to be not that he was better qualified than Henderson, but that Ruskin emphasized the wrong criteria in choosing Henderson. It is not this court's job to determine if Ruskin should have placed greater emphasis on the number of people that Lett supervised. Chapman, 229 F.3d at 1030 ("[F]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.' ") (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991)); Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th Cir.2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); Damon v. Fleming Supermarkets of Fla, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (stating that federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

Lett has not come close to submitting evidence that would justify a conclusion that no reasonable person, in the exercise of impartial judgment, could have chosen Henderson over

29

him. Therefore, the court concludes that Lett is unable to show that Ruskin's articulated reason that Henderson was more qualified is not believable. Thus, it is impossible for Lett to satisfy the requirement of <u>Combs</u> and show that each of the articulated reasons is unworthy of credence. 106 F.3d at 1538. Therefore, Lett is unable to show that Ruskin's proffered legitimate, non-discriminatory reasons are mere pretext for discrimination.

Lett's final argument regarding his failure to promote centers on the fact that the job of Assistant Supervisor was not posted. Let claims that not posting the position creates an inference of discrimination and demonstrates pretext. The court disagrees.

Lett is correct in asserting that a failure to post job openings can create an inference of discrimination. <u>Carmichael v. Birmingham Saw Works</u>, 738 F.2d 1126, 1133 (11th Cir.1984). That inference may be rebutted if the employer who does not post openings considers "all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." <u>Id.</u> Ruskin did exactly what it was required to do. Once the decision was made to hire an Assistant Supervisor, Ruskin solicited applications from the only group who would be qualified for the position, namely the current lead men in the various departments. In other words, Ruskin solicited those "who might reasonably be interested." <u>Id.</u> Lett was one of those individuals, and was given the same opportunity to apply for the job, as those applicants outside of his protected group. The fact that the position was not posted had no discriminatory repercussions and does not create pretext.

For the reasons discussed, Ruskin is entitled to summary judgment on the Plaintiff's claims of discrimination in failing to promote him to Assistant Supervisor.

### 3. Pay Differential under 42 U.S.C. § 1981

Lett's second claim is that Ruskin violated 42 U.S.C. § 1981 by paying Lett less money than a similarly situated white employee, Steve Paulk.

The framework of <u>McDonnell Douglas</u> analysis, which applies to § 1981 claims, was discussed thoroughly <u>supra</u>, so the court will dispense with such discussion here and move straight to an analysis of Lett's claim.

Ruskin does not dispute that Lett has a prima facie case. Paulk, a similarly situated white employee was paid 12 cents an hour more than Lett over a twenty-one month period. Ruskin articulated the legitimate, non-discriminatory reason that the pay discrepancy was nothing more than an inadvertent clerical error that was corrected by the time the disparity was brought to Ruskin's attention. This was supported by the declaration of Ruskin's Director of Human Resources (Def.'s Ex. 19) who explained exactly how he made the error and how the disparity had corrected itself.

In reply, Lett offers no evidence from which a reasonable jury could conclude that Ruskin's excuse is pretextual, and offers no evidence at all that the pay discrepancy was anything more than an error. <u>Alexander</u>, 207 F.3d at 1339 ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."). When dealing with summary judgement, "conclusory allegations without specific supporting facts have no probative value." <u>U.S. v. Trainor</u>, 376 F.3d 1325, 1334 n.5 (11th Cir. 2004) (quoting <u>Evers v. General Motors Corp.</u>, 770 F.2d 984, 986 (11th Cir. 1985)). Because Lett can offer no evidence of racial discrimination regarding his pay disparity with Paulk, Summary Judgment on Lett's claim that Ruskin violated 42 U.S.C. § 1981 in regard to his pay is due to be granted to Ruskin.

**IV. CONCLUSION**

For the reasons discussed, the court finds that Plaintiff Frank Lett is judicially estopped from pursuing claims for monetary relief, and any claims which the court determined would add monetary value to his bankruptcy estate if Lett were to receive a judgment.  His claims for injunctive and declaratory relief would not be subject to judicial estoppel, but after a thorough analysis, the court has determined that Lett's contentions that Defendant Ruskin violated Title VII, the ADEA, and § 1981 are without merit.   Therefore, Ruskin's Motion for Summary Judgment (Doc. #20) is hereby ORDERED GRANTED as to all claims.  A separate judgment will be entered accordingly.

Done this 24th day of July, 2006.

/s/ W. Harold Albritton
W.  HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE